## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** : | |
| : | |
| **Plaintiff,** : | **Case No. 17-62255-Civ-COOKE/HUNT** |
| : | |
| **v.** : | |
| : | |
| **IBRAHIM ALMAGARBY and** : | |
| **MICROCAP EQUITY GROUP, LLC,** : | |
| : | |
| **Defendants.** : | |

## SEC'S MOTION FOR SUMMARY JUDGMENT
## AGAINST DEFENDANTS IBRAHIM ALMAGARBY AND MICROCAP
## EQUITY GROUP, LLC, AND SUPPORTING MEMORANDUM OF LAW

October 18, 2019

Robert K. Gordon
William P. Hicks
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, Georgia 30326
Tel.: 404-842-7600
Fax: 404-842-7666
*Counsel for Plaintiff*

# TABLE OF CONTENTS

**SUMMARY** ................................................................................................................................ 1

**UNDISPUTED FACTS** ........................................................................................................... 3

I.     Almagarby Forms MEG and is its Sole Owner Officer, Employee and Controlling Person ........ 3

II.    MEG's Business was Acquiring and Selling Securities; Almagarby Purchased Aged Debt, Converted the Debt into Stock, and Sold the Stock into the Market ............................................... 4

III.    MEG Paid Off the Issuers' Debts; the Issuers Gave MEG Right to be Repaid in Discounted Shares ..................................................................................................................................................... 5

IV.    MEG and Almagarby Acquired and Sold Over 7.6 Billion Shares and Completed Over One Thousand Securities Transactions ...................................................................................................... 6

V.     MEG's Business Relied Upon Obtaining Highly Discounted Shares ........................................... 6

VI.    Proceeds from Securities Sales were Used to Fund More Aged Debt Purchases in Order to Acquire and Sell Additional Shares ..................................................................................................... 7

VII.   MEG Generated Deals Through Referrals from Finders .............................................................. 7

VIII.   Almagarby Liquidated Shares Quickly ........................................................................................ 8

IX.    MEG's Sales Often Represented a Significant Percentage of the Volume of Sales in the Market of the Issuers' Stock .......................................................................................................................... 9

X.     Almagarby Conducted Himself as a Businessman, not as a Trader ............................................. 9

XI.    Neither Almagarby nor MEG were Registered as Dealers; Nor were they Associated with Registered Dealers .......................................................................................................................... 10

XII.   The Defendants Used the Means and Instruments of Transportation and Communication in Interstate Commerce and of the Mails ............................................................................................ 10

**ARGUMENT** ............................................................................................................................ 10

I.     Standard for Granting Summary Judgment .............................................................................. 10

II.    Dealer Registration Under the Exchange Act .......................................................................... 11

III.    What is a Dealer? ..................................................................................................................... 13

A.    The Eleventh Circuit's Holding in *Big Apple*: The "Business" of Buying and Selling Securities ...................................................................................................................................... 14

B.    Level of Participation in Securities Transactions ..................................................................... 15

C.    Dealers Profit from Selling Shares Obtained at Deep Discounts and do not Rely on Appreciation in the Value of the Securities .................................................................................. 16

IV.    MEG and Almagarby Violated Section 15(a) of the Exchange Act By Acting as "Dealers"

without Registering with the Commission ................................................................................16

A.      MEG and Almagarby Bought and Sold Securities for Their Own Account...........................17

B.      MEG and Almagarby are "Dealers" According to the Eleventh Circuit's Holding in SEC v.
        Big Apple Consulting USA .....................................................................................................18

C.      MEG and Almagarby were in the "Business" of Buying and Selling Securities ...................19

D.      The Defendants had the Requisite Volume of Securities Transactions to be "Dealers" Under
        15 U.S.C. § 78c(a)(5)...............................................................................................................21

E.      MEG Obtained Shares at Deep Discounts and Did Not Rely on Appreciation in the Value of
        the Securities............................................................................................................................23

F.      MEG Lacked Investment Intent, as Demonstrated by Almagarby's Admissions and MEG's
        Rapid Stock Sales....................................................................................................................23

G.      Almagarby has Primary Liability for Violating Section 15(a)(1) as MEG's Alter Ego;
        Alternatively, Almagarby is Liable for MEG's Violation as a Control Person ...........................23

**CONCLUSION**...............................................................................................................................25

## TABLE OF AUTHORITIES

### CASES

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................................................................ 10

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) ...................................................... 17, 22

*Briggs v. Sterner*, 529 F. Supp. 1155 (S.D. Iowa 1981) .................................................................. 17, 22

*Brown v. Enstar Group, Inc.*, 84 F.3d 393 (11th Cir. 1996) .................................................................. 25

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 10, 11

*Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968) ............................ 12, 15

*Flava Works, Inc. v. City of Miami*, 609 F.3d 1233 (11th Cir. 2010) ................................................ 11

*Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995 (11th Cir. 1997) ............................................................. 11

*Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411 (D. Mass. 1976) .......... 15, 22

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................... 11

*Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982).............. 13

*Roth v. SEC*, 22 F.3d 1108 (D.C. Cir. 1994) .................................................................................. 12, 13

*SEC v. American Institute Counselors, Inc.*, 1975 WL 440 (D.D.C. Dec. 30, 1975) ..................... 15, 22

*SEC v. Benger*, 697 F. Supp.2d 932 (N.D. Ill. 2010) ....................................................................... 15, 22

*SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015) ................... 14-16, 18-19, 23

*SEC v. Century Inv. Transfer Corp.*, 1971 WL 297 (S.D.N.Y. Oct. 5, 1971) ...................................... 16

*SEC v. China Energy Sav. Tech., Inc.*, 2009 WL 875997 (E.D.N.Y. Mar. 27, 2009) ........................... 12

*SEC v. Hansen*, 1984 WL 2413 (S.D.N.Y. Apr. 6, 1984) ................................................................. 15, 22

*SEC v. Martino*, 255 F.Supp.2d 268 (S.D.N.Y. 2003) ....................................................................... 12

*SEC v. Merchant Capital*, 311 Fed.Appx. 250 (11tth Cir. 2009) ......................................................... 12

*SEC v. Novus Tech., LLC*, 2010 WL 4180550 (D. Utah Oct. 20, 2010) ........................................... 12

*SEC v. Offill*, 2012 WL 246061 (N.D. Tex. 2012) .................................................................................. 16

*SEC v. Ridenour*, 913 F.2d 515 (8th Cir. 1990) .............................................................................. 15, 22

*SEC v. United Monetary Servs., Inc.*, 1990 WL 91812 (S.D. Fla. May 18, 1990) ......................... 12

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) ................................................................................. 12

*Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588 (2001) ......................................... 17

*SEC v. Corporate Relations Group*, 2003 WL 25570113 (M.D. Fla Mar. 28, 2003) ................. 12

## RELEASES

*Distribution by Broker-Dealers of Unregistered Securities*, 1962 WL 69442, Exchange Act Release
No. 4445, (Feb. 2, 1962) ...................................................................................................................... 11

*In the Matter of Bravo Enter. Ltd*., Administrative Proceeding File No. 3-16292, Exchange Act
Release No. 75775, 2015 WL 5047983 (Aug. 27, 2015) .................................................................... 11

*In the Matter of Burley & Co*., Exchange Act Rel. No. 4109 (June 22, 1948; Commission opinion),
1948 WL 69443 ................................................................................................................................... 16

*In the Matter of IBC Funds, LLC*, Administrative Proceeding File No. 3-17125, Exchange Act
Release No. 77195, February 19, 2016 ............................................................................................... 21

*In the Matter of Ironridge Global Partners, LLC, et al.,* Administrative Proceeding File No. 3-
16649, Exchange Act Release No. 81443, August 21, 2017 .............................................................. 21

*In the Matter of the Application of Gordon Wesley Sodorff, Jr.*, Exchange Act Release No. 3114,
1992 WL 224082 (Sept. 2, 1992) .............................................................................................15, 16, 22-23

*Registration Requirements for Foreign Broker-Dealers*, Release No. 34-27017, 54 Fed. Reg.
30013, 30015 (July 18, 1989) .............................................................................................................. 13

## STATUTES & REGULATIONS

15 U.S.C. § 77b(a)(12) .............................................................................................................................. 14

15 U.S.C. § 78c(a)(5)(A) ........................................................................................................................2, 14

15 U.S.C. § 78c(a)(5)(B) ............................................................................................................................ 13

15 U.S.C. § 78t(a) ....................................................................................................................................... 25

15 U.S.C. § 78o(a)(1) .............................................................................................................................. 1, 12

17 C.F.R. § 230.144 ...........................................................................................................................4, 19, 20, 24

17 C.F.R. §§ 240.15c3-2, c3-3 ................................................................................................................... 12

17 C.F.R. § 240.8c-1 ................................................................................................................................... 12

17 C.F.R. §§ 250.l7a-3, a-4, a-11 ........................................................................................................... 12

## **RULES**

F.R.C.P. 56(a) ....................................................................................................................................... 1

Local Rule 56.1 ..................................................................................................................................... 1

## **OTHER AUTHORITIES**

Microcap Stock: A Guide for Investors", SEC Investor Publication, Sept. 18, 2013,
  https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html ......... 11

Spotlight on Microcap Fraud," SEC Investor Publication, Feb. 22, 2019,
  https://www.sec.gov/spotlight/microcap-fraud.shtml ........................................................................ 11

Louis Loss & Joel Seligman, *Securities Regulation* 3009 (3d ed. 2002) ......................................... 15, 22

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure and Local Rule 56.1, plaintiff, United States Securities and Exchange Commission (the "Commission"), respectfully requests that the Court enter summary judgment as to liability against defendants Ibrahim Almagarby and Microcap Equity Group LLC ("MEG") with respect to the claim that the defendants were unregistered dealers in violation of Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78o(a)(1)].

## SUMMARY

Those who buy and sell securities as part of a "regular business" must register with the Commission as securities dealers. There is strict liability for those who fail to do so. The undisputed facts establish that Almagarby: (1) formed MEG for the express purpose of engaging in the business of buying and selling securities; (2) hired "finders" to solicit holders of convertible debt of microcap companies to sell the debt to MEG; (3) negotiated with the microcap companies to exchange the debt for newly issued shares of those companies at considerable discounts to the market price of the shares; (4) in 57 instances over three years, purchased debt that was convertible into newly issued shares of the microcap companies; (5) promptly converted the debt and sold the newly issued shares into the marketplace on behalf of MEG; and (6) used the proceeds of the sales to repeat the process. In conducting this business over a three-year period, MEG completed over 1000 securities transactions and sold over 7.6 *billion* shares of microcap stock.

The complaint charges MEG and Almagarby with acting as dealers without registering with the Commission in violation of Section 15(a) of the Exchange Act. This is a textbook case for summary judgment. The business activities and securities transactions of the Defendants upon which the charges turn are well-established and not in dispute. The issue of the Defendants'

liability is ripe for resolution through a ruling on whether the Defendants' securities activities bring them within the definition of a "dealer" under Section 3(a)(5)(A) of the Exchange Act [15 U.S.C. § 78c(a)(5)(A)]. If so, they are liable for operating as unregistered dealers in violation of Section 15(a) of the Exchange Act.

Almagarby formed MEG in 2013 to provide what was, in substance, a form of financing to publicly traded companies with low market capitalization, commonly known as "microcap" or "penny" stock companies (hereinafter, "issuers"). However, instead of providing funding directly to issuers, MEG pursued a business centered on obtaining shares from the issuers at a substantial discount to then-prevailing market prices and quickly selling these shares for a significant profit. The defendants pursued this business by (1) seeking out and purchasing outstanding debts owed by the issuers to third parties, (2) exchanging (via a conversion feature) the debt with the issuers for *substantially* discounted shares of the issuers' common stock, and (3) selling, into the markets, the discounted shares in order to reap what were frequently large and quick profits and then using some of those profits to expand the business by purchasing yet more issuer debts. Over three years, MEG engaged in at least 57 such debt purchases, spending around $1,115,000, and obtained from the issuers over 8.5 *billion* discounted shares, over 7.6 *billion* of which it sold into the markets for over $2.7 million in proceeds. For additional perspective, during this period, MEG completed more than 1,000 securities transactions.

Incredibly, Almagarby and MEG claim that they were not required to register because they bought and sold securities not as part of a "regular business," but, instead, as ordinary, run-

2

of-the-mill "investors" or "traders," and therefore they do not fall within the definition of "dealer."[1]

By operating a business that engaged in over 1,000 securities transactions in a three-year period and resulted in over 7.6 *billion* shares of stock from a multitude of issuers being dumped into the public markets, Almagarby and MEG demonstrated definitively that they are in no way any mere investor or trader and instead placed themselves squarely within the definition of a securities "dealer" set forth in Section 3(a)(5)(A). Despite this, neither Almagarby nor MEG ever registered with the Commission as a dealer as required by Section 15(a).

Dealer (and broker) registration advances a number of important regulatory interests, including ensuring compliance with rules established by the Financial Industry Regulatory Authority (FINRA), the self-regulatory organization for broker/dealers, and with Commission rules concerning inspection, reporting, and consumer protection, especially as they relate to microcap securities (which Almagarby and MEG all but exclusively transacted in) which are, as discussed below, of special regulatory concern due to their frequent use in connection with frauds perpetrated upon investors.

## UNDISPUTED FACTS

### I.    Almagarby Forms MEG and is its Sole Owner Officer, Employee and Controlling Person

Almagarby formed MEG as a limited liability company under the laws of the State of Florida in January 2013. (Facts ¶ 1).[2] From January 2013 through July 2016 ("the relevant period"), Almagarby

---

[1] *See* Defendant's Corrected Motion to Dismiss ("MTD") (Doc. 13) at 6-8, denied by Order of 12/4/18. (Doc. 43).

[2] The SEC's Statement of Material Facts Not Subject to Genuine Dispute is referred to herein as "Facts."

was the sole owner, officer, employee, and controlling person of MEG.  (Facts ¶ 2).  Almagarby had

previously formed at least two other companies for the purpose of engaging in securities transactions,

Almagarby International, LLC and Archstone Capital, LLC.  (Facts ¶ 3).

## II.     MEG's Business was Acquiring and Selling Securities; Almagarby Purchased Aged Debt, Converted the Debt into Stock, and Sold the Stock into the Market

As described above, MEG's business was acquiring—at a substantial discount—and then selling

shares of publicly traded microcap companies.  (Facts ¶¶ 5, 16).  MEG obtained shares by purchasing

aged debt from the issuers' debtholders and simultaneously entering into agreements with the issuers

giving MEG the right to convert the debt into common stock of the issuers at a significant discount to

then-prevailing market prices.  (Facts ¶ 6).  MEG purchased aged debt (*i.e.*, as opposed to new debt) in

order to obtain shares upon conversion of the debt that were able to be immediately sold into the market

(*i.e.*, shares that were exempt from the registration requirements of the Securities Act pursuant to SEC

Rule 144 and sometimes referred to as unrestricted or free-trading shares).  (Facts ¶ 6).  The purchase of

aged debt and concomitant selling of stock received by converting the debt was the sole source of revenue

for MEG.  (Facts ¶ 10).

In pursuing this business, Almagarby engaged at least ten different attorneys on behalf of MEG to

draft letters opining that the shares obtained in the conversions were exempt from registration under Rule

144, and he would provide the letters to stock transfer agents and brokers as needed.  (Facts ¶ 8).  MEG

engaged other attorneys to draft key documents needed to conduct business, including debt purchase

agreements, exchange agreements, convertible debentures, conversion notices, and reset notices.  (Facts ¶

9).

In connection with this business, MEG purchased approximately $1,115,000 of outstanding debt from the debtholders of issuers between January 2013 and July 2016.  (Facts ¶ 22).  During this period, it made approximately $2.7 million in proceeds from selling the shares obtained through conversion of the issuers' debt.  (Facts ¶ 22).

### III.   MEG Paid Off the Issuers' Debts; the Issuers Gave MEG Right to be Repaid in Discounted Shares

During the relevant period, MEG and Almagarby engaged in at least 57 purchases of aged debt from the debtholders of 38 different issuers.  (Facts ¶ 11).  Simultaneously with, and requisite to, MEG's purchase of the aged debt from the debtholders, it obtained convertible debentures from the issuers to satisfy that debt.  The debentures gave MEG the right to convert the debentures into shares of the issuer at a substantial discount to prevailing market prices.  (Facts ¶¶ 12, 23-27).  Almagarby, on behalf of MEG, would routinely convert at least a portion of the debentures soon after obtaining them.  (Facts ¶¶ 13, 44).  Upon receipt of a conversion notice request from MEG, issuers would arrange for their transfer agents to deposit the requested shares into one or another of MEG's multiple brokerage accounts.  (Facts ¶ 14).  Following such deposit, MEG would oftentimes immediately sell the shares into the market pursuant to Almagarby's instructions to MEG's brokers.[3]  (Facts ¶ 15).  MEG maintained in its own name at least six

---

[3] Following are two examples of MEG purchasing debt, converting the debt into shares of the issuer, and then selling the resulting shares:

**Example 1:**  On July 1, 2016, in connection with MEG's purchase of $20,184 of a debt owned by a subsidiary of Halitron, Inc., Almagarby, on behalf of MEG, executed a debt purchase agreement and related documents, and Halitron issued a convertible debenture to MEG.  (Facts ¶ 47).  MEG exercised its conversion rights under the convertible debenture issued to it by Halitron and subsequently received 25,230,125 shares of Halitron pursuant to the conversion.  (Facts ¶ 48).  Between July 22 and August 8, 2016, MEG sold all 25,230,125 shares of the Halitron stock through an MEG brokerage account, and, in so doing, generated gross proceeds of more than $56,000.  (Facts ¶ 49).

**Example 2:**  On July 9, 2016, in connection with the purchase of $25,000 of a debt owed by Bulova Technologies Group, Inc., Almagarby, on behalf of MEG, executed a debt purchase agreement and related documents, and Bulova issued a convertible debenture to MEG.  (Facts ¶ 50).  Between July 20

brokerage accounts into which shares were deposited and from which they were sold.  (Facts ¶ 17).

Almagarby's explanation for MEG's multiple brokerage accounts was his desire for "the fastest executing

platform."  (Facts ¶ 18).

## IV.    MEG and Almagarby Acquired and Sold Over 7.6 Billion Shares and Completed Over One Thousand Securities Transactions

Between January 2013 and July 2016, MEG received at least 167 deposits of shares in MEG's

several brokerage accounts from issuers as a result of issuing notices of conversion and reset notices.

(Facts ¶ 19).  MEG completed at least 962 sales of shares it acquired from the issuers in this period.

(Facts ¶ 21).  The combined number of share deposits (167) and sales orders (962) was 1,129.  (Facts ¶¶

19; 21).  Adding to this total the 57 convertible debentures that MEG acquired during the relevant period

(Facts ¶ 11), the total number of securities transactions that it completed was at least 1,186.  Of the

approximately 8.5 billion shares that MEG received from the issuers in the conversions, MEG sold over

7.6 billion shares during the relevant period.  (Facts ¶ 20).

## V.    MEG's Business Relied Upon Obtaining Highly Discounted Shares

To obtain regular profits under MEG's business model, MEG relied upon obtaining stock from

issuers at a discount to then-prevailing market prices, selling the stock into the market, and profiting from

the difference, less expenses.  (Facts ¶ 23).  Although it varied, the discount MEG most often obtained

---

and August 5, 2016, Almagarby, on behalf of MEG, exercised its conversion rights pursuant to the
convertible debenture issued to it by Bulova, and MEG received 20,995,454 shares as a result of the
conversions.  (Facts ¶ 51).  In addition to the 20,995,454 shares of Bulova stock that MEG received as
a result of the conversion, MEG obtained an additional 1,453,358 shares of Bulova stock as a result of
reset provisions which entitled MEG to additional shares.  (Facts ¶ 52).  Between August 2 and August
16, 2016, MEG sold all 22,448,812 shares of Bulova stock that it obtained as a result of MEG's
exercise of its conversion rights under the July 9, 2016 convertible debenture issued to MEG by
Bulova through a MEG brokerage account, and these sales generated gross proceeds for MEG of
$90,858.  (Facts ¶ 53).

was 50 percent of the lowest trading price of the shares over an established "look back" period expressed as a number of trading days (most often 30).  (Facts ¶¶ 24-26).

At least 13 of the convertible debentures issued to MEG during the relevant period had "reset" provisions for the rate of conversion which gave MEG the right to demand additional shares (which it could then sell) if the share price dropped to a level below the lowest "look back" period level between the time that MEG issued the conversion notice and the time that the shares were deposited and cleared for sale.  (Facts ¶ 27).

## VI.    Proceeds from Securities Sales were Used to Fund More Aged
## Debt Purchases in Order to Acquire and Sell Additional Shares

Proceeds from the sales of its shares funded additional aged debt purchases by MEG, which enabled MEG to acquire and sell more shares, thereby increasing its profits and its level of securities transactions.  (Facts ¶ 28).  During the relevant period, MEG's sales of its shares was the predominant source of money necessary to fund its ongoing business of purchasing aged debt and converting the debt into shares.  (Facts ¶ 29).

## VII.    MEG Generated Deals Through Referrals from Finders

Unlike ordinary investors or traders, MEG had contracts and informal arrangements with multiple persons who would act as "finders" for MEG by identifying, contacting, and referring to Almagarby issuers that had "aged debt" outstanding and who were willing to "repay" such debt, upon the purchase of some portion of it by MEG, by issuing discounted shares to MEG.  (Facts ¶ 31).  The finders' compensation was based on a percentage of the consideration that MEG paid for the debt that it purchased as a result of the referral.  (Facts ¶ 32).

The most important finder for MEG, described by Almagarby as "a large part of the business" (Facts ¶ 36), was Anthony Fusco of Bridgewater Capital LLC.  (Facts ¶ 33).  Fusco and MEG had a written contract.  (Facts ¶ 34).  Fusco and his sub-contractors would each solicit 40 to 60 issuers per day

to find referrals for MEG.  (Facts ¶ 35).  Fusco was paid by commission, and when he needed "advances"

to pay his sub-contractors, Almagarby would wire him $2,000, $4,000 and other sums, and would deduct

these payments from Fusco's future commissions.  (Facts ¶ 37).

When the finders referred deals to MEG, Almagarby would contact the debtholders and the

issuers.  He would negotiate with the issuers the terms of a convertible debenture, including the interest

rate of the note and the discount at which MEG would be entitled to convert the debt into shares of the

issuer.  (Facts ¶¶ 39, 40).

In an email dated November 11, 2013, to an individual from a firm that wanted to explore the

possibility of "joining forces" with Almagarby's dealer business, Almagarby wrote:

> My value is the fact that I can bring a sales force on the table that is already in place that
> has been cold calling companies and bringing deals in consistently. I manage the floor as
> well as structure deals and close them. I also am capable of trading. I also have many
> relationships with companies/shareholders that I have cultivated over the years and also
> have a network of deal finders. I have had a solid growth and thanks to a loyal team
> (including counsel, my father and his people) I am able to sail the ship smoothly.

(Facts ¶ 38).

## VIII.   <u>Almagarby Liquidated Shares Quickly</u>

Almagarby's goal was to convert the debt into shares and to sell the shares into the market quickly

(*i.e.*, shortly after receiving them).  (Facts ¶ 43).  Almagarby has stated, "I typically went to a transaction

to try [to] be in and out of it as soon as possible.  My idea wasn't to hold on to it."  (Facts ¶ 41).

Almagarby has further stated, in describing MEG's business model, "I really wanted to turn my money

around as fast as possible."  (Facts ¶ 43).

MEG typically exercised its right to convert the issuers' debt into shares promptly upon obtaining

that right.  Of the 57 debt purchases completed by MEG during the relevant period, Almagarby began

converting most of the corresponding convertible debentures into shares within two weeks of receiving

the debentures from the issuers.  (Facts ¶ 44).

During the relevant period, MEG received at least 167 deposits of shares in one or another of its brokerage accounts as a result of issuing conversion or reset notices. Almagarby and MEG sold the shares very quickly. In fact, about half the time (84 instances, or 50.3%), MEG sold all the shares in a given deposit within 7 days. Within 14 days from receipt, MEG sold all the shares from the relevant deposits in 108 instances, or 65% of the time. At the 21-day mark, the number jumped to 72.5% (121 instances). And within 30 days of receipt, MEG had sold all the shares it received in 130 of the 167 deposits, or approximately 78% of the deposits. (Facts ¶ 45).

## IX. MEG's Sales Often Represented a Significant Percentage of the Volume of Sales in the Market of the Issuers' Stock

MEG's sales of the issuers' shares frequently represented a significant percentage of the total volume of shares sold on a given day for the issuer in question. During the relevant period, on the days when MEG sold shares acquired from the issuers, the volume of the pertinent issuer's shares sold by MEG comprised over 90% of the sales activity on the day in question 13 times; over 75% of the sales activity on the day in question 21 times; over 50% of the sales activity on the day in question 63 times; more than 25% of the sales activity on the day in question 324 times; and more than 10% of the sales activity on the day in question 509 times. (Facts ¶ 46).

## X. Almagarby Conducted Himself as a Businessman, not as a Trader

In November 2013, Almagarby was approached by two individuals from Gibraltar Advisors, LLC about the possibility of combining efforts. (Facts ¶ 54). On November 11, 2013, Almagarby wrote an email to one of the two individuals stating, in part: "I relish the idea of creating a professional top notch firm that has a solid structure in place (accounting, leads management, callers, etc). Taking over this micro-cap space, where we would be the GO TO institutional firm that everyone turns to for their funding needs, whether it's cleaning the balance sheet up, 3A10's, debt financing, etc." (Facts ¶ 54). Nothing came of this. (Facts ¶ 54).

9

In a November 2014 email to an associate, Almagarby wrote: "I'd love to be able to broaden the markets I am involved in and not just be involved in this tedious, highly scrutinized space filled with piker con artists working from their basements … and, later, "Trying to get into the big boys league [be]cause this space is a joke." (Facts  ¶ 55).

## XI.     Neither Almagarby nor MEG were Registered as Dealers; Nor were they Associated with Registered Dealers

During the relevant period, neither Almagarby nor MEG was registered with the Commission as dealers; nor were they associated with individuals or entities that were registered with the Commission as dealers.  (Facts ¶ 56).

## XII.    The Defendants Used the Means and Instruments of Transportation and Communication in Interstate Commerce and of the Mails

In connection with the business of buying aged debt, entering into agreements with debtholders and issuers, converting debt to shares, and selling shares into the market, Almagarby and MEG regularly made use of the means and instruments of transportation and communication in interstate commerce and of the mails.  This included interstate telephone calls to communicate with issuers and debtholders; and interstate electronic communications with issuers, debtholders, brokers and others.  (Facts ¶ 57).

## ARGUMENT

## I.     Standard for Granting Summary Judgment

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, the Court should enter summary judgment when the movant demonstrates that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must be material and genuine.  *Anderson*, 477 U.S. at 248.  On a motion for summary

judgment, the evidence and the factual inferences arising from the evidence are construed in the light most favorable to the non-moving party. *Flava Works, Inc. v. City of Miami*, 609 F.3d 1233, 1236 (11th Cir. 2010).

The party opposing the motion for summary judgment may not simply rest upon mere allegations or denials of the pleadings. *Celotex*, 477 U.S. at 322-323; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997).

## II.   <u>Dealer Registration Under the Exchange Act</u>

Dealers and brokers act as essential intermediaries between the investing public and the securities markets, and their gatekeeping role is especially important "in situations where the securities are those of relatively obscure and unseasoned companies"—*i.e.* microcap securities. *Distribution by Broker-Dealers of Unregistered Securities*, 1962 WL 69442, at *1 (Feb. 2, 1962).

Issues relating to microcap or "penny" stocks have long been a concern of the Commission.[4] Some microcap companies are small businesses, and some are shell companies engaged in no business at all. *See In the Matter of Bravo Enter. Ltd.*, 2015 WL 5047983, at *5 (Aug. 27, 2015). Microcap stocks typically trade in low volumes, are closely held, are highly volatile, and are not typically followed by mainstream analysts and press, making "[a]ccurate information…difficult to locate for anyone who is not an insider." *Id.* This lack of information makes penny stocks unusually susceptible

---

[4] *See, e.g.*, "Microcap Stock: A Guide for Investors", SEC Investor Publication, Sept. 18, 2013, https://www.sec.gov/reportspubs/investor-publications/investorpubsmicrocapstockhtm.html; "Spotlight on Microcap Fraud," SEC Investor Publication, Feb. 22, 2019, https://www.sec.gov/spotlight/microcap-fraud.shtml.

to fraud, manipulation, and abuse. *Id.; SEC v. China Energy Sav. Tech., Inc*., 2009 WL 875997, at \*4 (E.D.N.Y. Mar. 27, 2009).  For these reasons, the role entrusted to brokers and dealers is particularly essential in the microcap space.[5]

In light of their importance, persons who act as "dealers" (or "brokers") must register with the Commission unless they are specifically exempt from registration. *Warfield v. Alaniz*, 569 F.3d 1015, 1024-25 (9th Cir. 2009).  *See* Exchange Act Section 15(a)(1), 15 U.S.C. § 78o(a)(1) (prohibiting a broker or dealer from using the mail or any other instrumentality of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" unless "registered in accordance with [Section 15(b) of the Exchange Act]").  The registration requirement "serves as the keystone of the entire system of broker-dealer regulation."  *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994) (cites and quotes omitted); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968).

Registration serves a number of important regulatory objectives including compliance with rules established by self-regulatory organizations for broker/dealers, *see* 15 U.S.C. § 78o(b)(8), and with Commission rules concerning consumer protection, recordkeeping and financial reporting. *See generally*, 17 C.F.R. §§ 240.15c3-3, 240.15c3-2, 240.8c-1, 250.l 7a-3, 17a-4 and 17a-l l.  Consistent with its broad regulatory objectives, Section 15(a) does not require a showing of scienter to establish a violation,[6] and is a strict-liability offense.  *SEC v. Merchant Capital*, 311 Fed.Appx. 250, 252 (11tth

---

[5] As described above, Almagarby, himself, referred to the microcap sector as a "space filled with piker con artists working from their basements" and "a joke."  (Facts  ¶ 55).

[6] *See, Corporate Relations Group*, 2003 WL 25570113, at \*17; *SEC v. United Monetary Servs., Inc.*, No. 83-3540-CIV-Paine, 1990 WL 91812, at \*8 (S.D. Fla. May 18, 1990); *accord SEC v. Novus Tech., LLC*, No. 3:07-CV-235-TC, 2010 WL 4180550, at \*12 (D. Utah Oct. 20, 2010); *SEC v. Martino*, 255 F.Supp.2d 268, 283 (S.D.N.Y. 2003).

Cir. 2009).  A violation of Section 15(a) is established by showing the Defendants *functioned* as "dealers" as the term is defined in the Exchange Act regardless of the Defendants' intent.

### III.  <u>What is a Dealer?</u>

The Exchange Act defines a dealer as "any person engaged in the business of buying and selling securities … for such person's own account."  Section 3(a)(4)(A) [15 U.S.C. § 78c(5)(A)]. The definition was "drawn broadly by Congress to encompass a wide range of activities involving investors and securities markets."  Registration Requirements for Foreign Broker-Dealers, Release No. 34-27017, 54 Fed. Reg. 30013, 30015 (July 18, 1989).  Broad definitions of "broker" and "dealer" advance the Exchange Act's purpose of investor protection because it "is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records."  *Reg'l Props., Inc. v. Fin. and Real Estate Consulting Co.*, 678 F.2d 552, 561 (5th Cir. 1982) (citation and quotation marks omitted); *see also Roth*, 22 F.3d at 1109 (D.C. Cir. 1994).

The term dealer does not encompass a person who buys or sells securities "not as a part of a regular business," 15 U.S.C. § 78c(a)(5)(B).  This is sometimes referred to as the ordinary "trader" or "investor" exception.  A body of case law, guidance, and commentary surrounding who qualifies for the trader exception addresses the dividing line between dealer and "trader." As to Almagarby and MEG, however, the application of the plain statutory language to the undisputed material facts leaves no doubt that the defendants bought and sold securities as part of a regular business and, therefore, are "dealers."  As demonstrated below, the case law also makes this clear.

A.     **The Eleventh Circuit's Holding in *Big Apple*:**
       **The "Business" of Buying and Selling Securities**

The Eleventh Circuit addressed the meaning of the term "dealer" in *SEC v. Big Apple*

*Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015).[7]  In finding that Big Apple was a dealer,[8]

the Court stated:

> To qualify as a "dealer," a person must be in the "business of" buying
> and selling securities.  We think the centerpiece to this definition is the
> word "business," which is defined as "[a] commercial enterprise carried
> on *for profit*, a particular occupation or employment habitually engaged
> in for *livelihood or gain*." Black's Law Dictionary 239 (10th ed. 2009)
> (emphasis added). Central to this definition is *profit* or gain. While
> evidence of merely *some* profits from buying and selling securities may
> alone be inconclusive proof, the defendants' entire business model was
> predicated on the purchase and sale of securities*.

*Id.* at 809.  The Court further stated:

> Big Apple and its subsidiaries depended on acquiring client stock and
> selling that stock to support operations and earn a profit.  In their brief, the

---

[7] Big Apple Consulting USA, Inc. provided stock promotion and related services to a publicly
traded microcap company, and was paid in discounted shares of the company, which it sold into
the market.  The SEC charged Big Apple with being an unregistered dealer in violation of Section
15(a) of the Exchange Act and with offering and selling restricted stock without meeting the
registration requirements of Section 5.  The district court granted summary judgment in favor of
the SEC on both claims.  *SEC v. Big Apple Consulting USA, Inc.*, 2011 WL 3753581 *7 (M.D.
Fla. Aug. 25, 2011).  The judgment was affirmed on appeal.  *SEC v. Big Apple Consulting USA,
Inc.*, 783 F.3d 786 (11th Cir. 2015). The defendants did not contest the Section 15(a) judgment on
appeal, but the Eleventh Circuit  stated that "any argument that can be discerned from the
defendants' brief as to § 15(a) fails as a matter of law for the same reasons as it fails under § 5."
*Id.* at 806.  In response to the Section 5 claim, Big Apple claimed that the stock sales were
exempt by virtue of Section 4(1), which exempts "transactions by any person other than an issuer,
underwriter, or dealer."  The SEC contended that the exemption was inapplicable because Big
Apple was a dealer.

[8] The Court applied the definition of "dealer" from the Securities Act, 15 U.S.C. § 77b(a)(12), which
defines the term as "any person who engages either for all or part of his time, directly or indirectly, as
agent, broker, or principal, in the business of offering, buying, selling, or otherwise dealing or trading
in securities issued by another person."  Although the district court and the parties referred to the
definition of dealer under 15 U.S.C. § 78c(a)(5)(A), the Eleventh Circuit found that the district court's
analysis was sound because the definition of dealers in 15 U.S.C. § 77b(a)(12) and 15 U.S.C. §
78c(a)(5)(A) are very similar.  *See* 783 F.3d at 809 n.11.

> defendants do not contest that they received most of their compensation by obtaining and selling their clients' stocks.  Nor could they, as testimony… reveals that the defendants placed a high priority on generating a profit from trades.

*Id.* at 809-810.[9]

## B. <u>Level of Participation in Securities Transactions</u>

Courts have held that the frequency of securities transactions is an important factor in determining whether one falls within the definition of "dealer" in 15 U.S.C. § 78c(a)(5).  The definition "connote[s] a certain regularity of participation in securities transactions at key points in the chain of distribution.  *Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp*., 411 F. Supp. 411, 415 (D. Mass. 1976).[10]

"The primary indicia in determining that a person has 'engaged in the business' within the meaning of the term 'dealer' is that the level of participation in purchasing and selling securities involves more than a few isolated transactions.  There is no requirement, however, that such activity be a person's principal business or the principal source of income."  *In re Gordon Wesley Sodorff, Jr*. 50 S.E.C. 1249, at *4 (1992) (finding that a registered representative engaged in the securities business as a dealer by selling 556,227 shares of an issuer's stock to seventeen investors over a two-month period).[11]

---

[9] The stock promotion and related services that Big Apple provided to the microcap company played no part whatsoever in the Court's analysis of who is a "dealer."  *Id.* at 809-810.

[10] *See also SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990) (finding that the defendant was a dealer because his "high level of [trading] activity … made him more than an active investor"); *accord SEC v. Benger*, 697 F. Supp.2d 932, 944 (N.D. Ill. 2010); *SEC v. Hansen*, No. 83 CIV. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984); *see also*, *SEC v. American Institute Counselors, Inc*., No. 75-1965, 1975 WL 440, at *17 (D.D.C. Dec. 30, 1975); Louis Loss & Joel Seligman, *Securities Regulation* 3009 (3d ed. 2002).

[11] S*ee also SEC v. Kenton Capital, Ltd*., 69 F. Supp. 2d 1, 13 (D.D.C. 1998) ("regularity of participation is the primary indicia of being 'engaged in the business'"); *Eastside Church of Christ*,

C.      **Dealers Profit from Selling Shares Obtained at Deep Discounts
        and do not Rely on Appreciation in the Value of the Securities**

In *Big Apple*, the Eleventh Circuit also found that the defendants' purchase of stock at

deep discounts pursuant to a contractual agreement, and their sale of those stocks for profit,

constituted further evidence of their dealer status.  783 F.3d at 810.  The Commission made a

similar finding in *In the Matter of the Application of Gordon Wesley Sodorff, Jr.*, Exchange Act

Release No. 3114, 1992 WL 224082, at *5 (Sept. 2, 1992) (Commission opinion affirming NASD

disciplinary action) ("[u]nlike an investor or trader, Sodorff's profits did not result from

appreciation in the value of the securities, but rather from his markup over the price he paid.")

IV.     **MEG and Almagarby Violated Section 15(a) of the Exchange Act
        By Acting as "Dealers" without Registering with the Commission**

The undisputed facts establish that during the relevant period, MEG and Almagarby,

without being registered with the Commission as such (Facts ¶ 54), acted as "dealers" within the

meaning of Section 3(a)(5)(A) of the Exchange Act, in that they were persons "engaged in the

business of buying and selling securities…for such person's own account."  The undisputed facts

---

391 F.2d at 361 (Defendant was a dealer because it purchased many church bonds prior to the ones in question for its own account as a part of its regular business and sold some of them).  The court in *SEC v. Offill*, 2012 WL 246061, *8-9 and n. 21 (N.D. Tex. 2012), held that the "best indication of someone's being 'engaged in the business' of a dealer is the 'regularity of [his] participation' in buying and selling of securities for his own account." *Id.* at *9 and *8 n. 21*; see also SEC v. Century Inv. Transfer Corp*., 1971 WL 297, at *6 (S.D.N.Y. Oct. 5, 1971) (limited partnership that bought and sold securities for its own account on numerous occasions was deemed a dealer); *SEC v. Corp. Relations Group, Inc.*, 2003 WL 25570113, at *6 (M.D. Fla. Mar. 28, 2003) (an unregistered stock promotion company that was operating as a broker was also operating as a dealer because it bought securities on more than a dozen occasions and sold those securities in hundreds of transactions through accounts it maintained or in which it had an interest); *In the Matter of Burley & Co*., Exchange Act Rel. No. 4109 (June 22, 1948; Commission opinion), 1948 WL 69443 (finding that a municipal bond dealer was acting as an unregistered dealer because, for 14 months, the firm made 15 separate purchases of six different securities for the firm's investment account and sold some of these securities in nine separate transactions).

further establish that MEG and Almagarby do not qualify for the "ordinary trader" exception for persons whose securities transactions are "not part of a regular business." Exchange Act, Section 3(a)(5)(B).

As demonstrated below, the undisputed facts show that Defendants were "dealers" in that they: (1) bought and sold securities for their own account; (2) were in the "business" of doing so within the meaning of the Eleventh Circuit's decision in *Big Apple* and other case law; (3) had the requisite high levels of buying and selling; (4) frequently accounted for a substantial amount of the selling volume when they sold shares; (5) profited by acquiring stock at deep discounts instead of from the appreciation of the securities; and (6) lacked investment intent, as shown by both their admissions and their conduct.

## A.      **MEG and Almagarby Bought and Sold Securities for Their Own Account**

The undisputed facts establish that MEG and Almagarby bought and sold securities for their own accounts.[12]  MEG maintained in its own name at least six brokerage accounts into which it received deposits of shares from the issuers, and from which it sold the shares.  (Facts ¶¶ 15, 17).  The accounts were in the name of MEG, but Almagarby was the sole owner, officer, and controlling person of

---

[12] While Defendants obtained securities by converting debt, this counts as "buying" under Section 3(a)(5)(A).  *See Briggs v. Sterner*, 529 F. Supp. 1155, 1166 (S.D. Iowa 1981) (debentures convertible to common stock are securities because they are akin to an option or entitlement to purchase shares). In addition, Section 3(a)(13) of the Exchange Act defines both "buy" and "purchase" to "include any contract to buy, purchase, or otherwise acquire."  *See also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750-51 (1975) ("contract to purchase … securities is expressly defined by § 3(a) of the 1934 Act … as a purchase … of securities for the purposes of that Act."); *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 594-95 (2001) (contractual right to acquire stock was "security" for purposes of Rule 10b–5).

MEG and exercised authority over MEG's accounts.  (Facts ¶ 2).  MEG's accounts were therefore also those of Almagarby.[13]

### B.      MEG and Almagarby are "Dealers" According to the Eleventh Circuit's Holding in SEC v. Big Apple Consulting USA

As previously discussed, the centerpiece to the definition of "dealer" is the word "business," meaning "'[a] commercial enterprise carried on *for profit*, a particular occupation or employment habitually engaged in for *livelihood or gain*.'"  *Big Apple Consulting*, 783 F.3d at 809.  Thus, if "the defendants' entire business model [is] predicated on the purchase and sale of securities" defendants are "dealers."  *Id.*  Another crucial factor is whether defendants depended on acquiring and selling stock "to support operations and earn a profit."  *Id.* at 809-810.

Here, the Defendants concede that "MEG was a commercial enterprise carried on for profit or gain, and its business model for obtaining profit or gain was predicated on the acquisition and sale of securities."  (Facts ¶ 4).  They further concede that "MEG's business was acquiring and selling shares of publicly traded microcap companies."  (Facts ¶ 4).

As in *Big Apple*, the Defendants' "entire business model was predicated on the purchase and sale of securities."  783 F.3d at 809.  The following excerpt from Almagarby's deposition brings this point home:

> Q.      Did Microcap Equity Group, at least between 2013 and 2016, engage in any other revenue generating activities other than buying aged debt, exchanging it for stock, selling the stock?
>
> A.      No.  Not to my recollection, no.
>
> Q.      All the company's revenue came from that line of business?

---

[13] The "trading for such person's own account" is a factor that distinguishes a "dealer" from a "broker," who trades for the accounts of others.

A.      Right.

(June 27, 2019 Deposition of Defendant Ibrahim Almagarby, 22:21-23:3, an excerpt of which is attached to this Motion as Exhibit A.)

As in *Big Apple*, MEG and Almagarby depended on acquiring and selling stock "to support operations and earn a profit."  783 F.3d at 809-810.  MEG relied on the proceeds from its sale of stock as the source of funds to make further debt purchases, which, in turn, were the vehicle for obtaining additional shares of stock from issuers.  (Facts ¶ 29).  MEG's profitability and ability to continue and grow its business depended on the acquisition and sale of stock.  In addition, MEG used proceeds from the sale of shares to pay advances and commissions to finders to generate a pipeline of deals and to pay its numerous attorneys for Rule 144 opinions and other legal services.  (Facts ¶¶ 8-9, 31-37).

MEG was undeniably and highly profitable: During the relevant period, it spent a total of approximately $1,115,000 to purchase aged debt, and it realized a total of approximately $2.7 million in proceeds from the sale of shares that it obtained through the conversion of the debt.  (Facts ¶ 22).

### C.      MEG and Almagarby were in the "Business" of Buying and Selling Securities

The undisputed facts establish that MEG and Almagarby were clearly engaged in the "business" of buying and selling securities—by any conceivable measure.  At his deposition, Almagarby was asked "[W]hat was the business of Microcap Equity Group?"  His response: "Purchasing and selling securities."  (Facts ¶ 16).

The undisputed facts show that Almagarby regarded himself—and conducted himself as—a microcap financing entrepreneur, not as a so-called "ordinary trader":

1.  Almagarby chartered MEG as a *limited liability company* in order to purchase and sell securities (Facts ¶ 1), instead of trading in his individual capacity.  MEG was at least the *third* company that Almagarby formed for the purpose of buying and selling securities.  (Facts ¶ 3).

2. MEG employed a sophisticated mechanism for acquiring the shares that it sold:  It purchased aged debt from the debtholders of issuers and entered into various agreements with the debtholders and the issuers that were drafted for the company by outside counsel.  (Facts ¶¶ 7, 9).  It then converted the debt into common stock of the issuers to obtain unrestricted shares pursuant to a Rule 144 exemption.  (Facts ¶ 7).  It used at least ten different attorneys to draft "Rule 144 Opinion Letters" to prove to transfer agents and brokerage firms that the shares he received from the issuers qualified for the Rule 144 exemption and were unrestricted.  (Facts ¶ 8).

3. MEG made extensive use of "finders" to identify microcap issuers with debt on their books who would allow MEG to convert the debt to shares if MEG purchased it.  (Facts ¶¶ 31-38).  In the case of MEG's principal finder, Anthony Fusco of Bridgewater Capital, Almagarby would wire advances so that Bridgewater could pay its subcontractors, each of whom would solicit 40-60 issuers a day in search of referrals for MEG.  (Facts ¶¶ 33-37).

4. Almagarby personally negotiated with issuers the terms of convertible debentures, including interest rates and the discounted price at which MEG would be entitled to convert the debt into shares.  (Facts ¶¶ 39-40).

5. In discussions with an individual from another firm about the possibility of "joining forces," Almagarby stated that he could "bring a sales force on the table that is already in place that has been cold calling companies and bringing deals in consistently," and that he had "a network of deal finders."  (Facts ¶ 38).  Almagarby stated that he "relish[ed] the idea of creating a professional top notch firm that has a solid structure in place (accounting, leads management, callers, etc).  Taking over this micro-cap space, where we would be the GO TO institutional firm that everyone turns to for their funding needs, whether it's cleaning the balance sheet up, 3A10's, debt financing, etc."  (Facts ¶ 54).

6. In a November 2014 email to an associate, Almagarby wrote: "I'd love to be able to broaden the markets I am involved in and not just be involved in this tedious, highly scrutinized space filled with piker con artists working from their basements … and, later, "Trying to get into the big boys league [be]cause this space is a joke." (Facts ¶ 55).

The foregoing conduct and statements are consistent with being engaged in the business of buying and selling securities and are inconsistent with being an ordinary trader or investor.[14]

### D. The Defendants had the Requisite Volume of Securities Transactions to be "Dealers" Under 15 U.S.C. § 78c(a)(5)

The Commission has stated that "[t]he primary indicia in determining that a person has

'engaged in the business' within the meaning of the term 'dealer' is that the level of participation

---

[14] The Defendants will likely contend that there is a "longstanding public policy" by the Commission against treating as "dealers" those who buy and sell securities for their own account "but who are not in the business of providing services to third-parties." (MTD at 3). There is no such "longstanding public policy," however, as evidenced by court and Commission decisions regarding "dealer," and by recent enforcement actions by the Commission against participants in the microcap funding space for acting as unregistered dealers in violation of Exchange Act Section 15(a)(1). *See, e.g., In the Matter of Ironridge Global Partners, LLC, et al.,* Administrative Proceeding File No. 3-16649, Exchange Act Release No. 81443, August 21, 2017 (settled order requiring respondents to disgorge $4.4 million for acting as unregistered dealers in violation of Exchange Act Section 15(a)(1) in connection with acquiring shares through exchanges for bona fide outstanding claims pursuant to Section 3(a)(10) of the Securities Act of 1933 ["Securities Act"] and liquidating the shares, and to cease and desist from any future violations); *In the Matter of IBC Funds, LLC*, Administrative Proceeding File No. 3-17125, Exchange Act Release No. 77195, February 19, 2016 (settled order requiring respondents to disgorge $2,738,850 in disgorgement, prejudgment interest, and civil penalties for acting as unregistered dealers in violation of Exchange Act Section 15(a)(1) in connection with the purchase and sale of shares obtained through Securities Act Section 3(a)(10) exchanges and for unregistered distributions in violation of Securities Act Section 5, and to cease and desist from any future violations). In any event, the outcome of the Commission's claims turns on the relevant statutes and case law, not Defendants' purported perception of Commission policy. It is also worth noting that MEG *did* provide services to third parties; it afforded issuers a means of paying off their debts through the issuance of shares without the need to file a registration statement.

in purchasing and selling securities involves more than a few isolated transactions." *In re Gordon Wesley Sodorff, Jr*. 50 S.E.C. 1249, at \*4 (1992).[15]

During the relevant period, MEG and Almagarby engaged in at least 57 purchases of aged debt from the debtholders of 38 different issuers.  (Facts ¶ 11).  Each of these debt purchases resulted in the receipt by MEG of a convertible debenture from an issuer giving MEG the right to convert the debt into stock.[16]  (Facts ¶ 12).  From January 2013 through July 2016, the MEG acquired 57 convertible debentures, received at least 167 deposits of shares in its brokerage accounts (Facts ¶ 19), and completed at least 962 sales of shares (Facts ¶ 21), for a total of at least 1,186 securities transactions.  The total number of shares (actual, non-split adjusted) that MEG received from the issuers during this period was approximately 8.5 billion, and the total number of shares sold by MEG during the relevant period was over 7.6 billion.  (Facts ¶ 20).  As shown in Exhibits 2, 3 and 5 to the October 18, 2019 Declaration of Jerome DeWitt ("DeWitt Decl."), filed in support of this Motion, MEG bought and sold securities on a continuous basis throughout the relevant period.  The volume and frequency of the defendants' buying and selling activity are hallmarks of a "dealer."

---

[15] *See also Mass. Fin. Servs., Inc. v. Sec. Investor Prot. Corp*., 411 F. Supp. 411, 415 (D. Mass. 1976); *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990); *SEC v. Benger*, 697 F. Supp.2d 932, 944 (N.D. Ill. 2010); *SEC v. Hansen*, No. 83 CIV. 3692, 1984 WL 2413, at \*10 (S.D.N.Y. Apr. 6, 1984); *SEC v. American Institute Counselors, Inc*., No. 75-1965, 1975 WL 440, at \*17 (D.D.C. Dec. 30, 1975); and Louis Loss & Joel Seligman, *Securities Regulation* 3009 (3d ed. 2002).

[16] Debentures convertible to common stock are securities because they are akin to an option or entitlement to purchase shares.  *Briggs v. Sterner*, 529 F. Supp. 1155, 1166 (S.D. Iowa 1981).  Also, Section 3(a)(13) of the Exchange Act defines both "buy" and "purchase" to "include any contract to buy, purchase, or otherwise acquire."  *See also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750-51 (1975) ("[C]ontract to purchase … securities is expressly defined by § 3(a) of the 1934 Act … as a purchase … of securities for the purpose of that Act.")

### E.   MEG Obtained Shares at Deep Discounts and Did Not
   Rely on Appreciation in the Value of the Securities

Trading profits which result not from the appreciation in the value of securities, but rather from

the purchase of stock at deep discounts negotiated with the issuer, are a hallmark of dealer activity, as

opposed to ordinary trading.  *See Big Apple*, 783 F.3rd at 810; *In Re Gordon Wesley Sodorff, Jr.*, 1992

WL 224082, at *5.

MEG profited by acquiring stock at highly discounted prices and selling it in the market.

(Facts ¶ 24).  MEG consistently acquired shares at deep discounts, most commonly at 50 percent of the

lowest trading price of the shares over an established "look back" period of 30 trading days.  (Facts ¶¶ 24-

26).[17]  The speed at which MEG liquidated the shares upon conversion shows MEG's lack of investment

intent (*see* Section F below), and its intention to profit from the discount.

MEG had additional protection from possible downward price movements: at least 13 of the 57

convertible debentures had "reset" provisions which gave MEG the right to additional shares if the share

price dropped to a level below the lowest "look back" period level between the time that MEG issued the

conversion notice and the time that the shares were deposited and cleared for sale.  (Facts ¶ 27).  MEG's

ability to profit from the securities regardless of whether they went up or down in value, and the price

protection provisions that it negotiated, are clearly not advantages enjoyed by the ordinary "trader" or

"investor."

### F.   MEG Lacked Investment Intent, as Demonstrated
   by Almagarby's Admissions and MEG's Rapid Stock Sales

MEG's rapid liquidation of the shares it received underscores the Defendants' lack of investment

intent and the dealer-like nature of their securities transactions.  Almagarby makes no secret of the fact

---

[17] The particular discount specified in the pertinent 57 convertible debentures that MEG obtained from
the issuers is set forth in Exhibit 1 to the DeWitt Decl.

that his goal was to sell the shares as quickly as possible, stating, "I typically went to a transaction to try [to] be in and out of it as soon as possible.  My idea wasn't to hold on to it" (Facts ¶ 41), and "I really wanted to turn my money around as fast as possible."  (Facts ¶ 43).

For over 50% of the share deposits, MEG sold all of the shares received within 7 days.  For approximately 65% of the share deposits, MEG liquidated all of the shares within 14 days.  For approximately 72.5% of the share deposits, MEG liquidated the shares within 21 days.  For approximately 78% of the share deposits, MEG sold all of the shares received within 30 days.  (Facts ¶ 45).  Similarly, the Defendants wasted no time in converting debt into shares: for most of the convertible debentures that MEG received during the relevant period, Almagarby began converting the debentures into shares within ten trading days of receiving the convertible debenture from the issuer.  (Facts ¶ 44).

Almagarby's repeated purchases of securities that he, with the assistance of the lawyers who drafted his Rule 144 opinion letters (Facts ¶ 8), deemed likely to qualify for immediate resale into the market pursuant to the Rule 144 safe harbor is indicative of dealer activity rather than investment intent.  Similarly, the high percentages of share sales of the various issuers that was attributable to MEG on the days when MEG traded show that MEG was engaged in dealer activity, not the activity of an ordinary trader.  (Facts ¶ 46).

In addition, unlike an ordinary investor, Almagarby did no research or due diligence on the companies whose stock he acquired as long-term investments because he was not concerned with the quality of the stock, but only with his ability to dump it into the market quickly in order to cash in on the discounted price at which he obtained it.  (Facts ¶ 43).  He stated, "Typically because I don't have…such deep pockets I didn't even have the luxury of even…going down [the due diligence] path.  I really wanted to turn my money around as fast as possible."  (Facts ¶ 43).

**G.    Almagarby has Primary Liability for Violating Section 15(a)(1) as MEG's Alter Ego; Alternatively, Almagarby is Liable for MEG's Violation as a Control Person**

Almagarby has primary liability for the Section 15(a)(1) violation, as well as MEG, because MEG was his alter ego, and Almagarby's actions, effected through MEG, are within the definition of "dealer" under the Exchange Act. Alternatively, Almagarby is liable for MEG's violation of Section 15(a)(1) as a control person. Under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], a person who, directly or indirectly, controls an entity liable for a violation of the Exchange Act or a rule promulgated thereunder shall be liable jointly and severally with and to the same extent as that controlled entity.[18]

## CONCLUSION

As demonstrated herein, that there is no genuine issue of material fact as to the Defendants' liability for violating Section 15(a)(1) of the Exchange Act. Accordingly, the Commission respectfully requests that the Court grant summary judgment against MEG and Almagarby for such violations, imposing liability on Almagarby as a primary violator, or, in the alternative, as a control person under Section 20(a) of the Exchange Act.[19]

---

[18] "Control" means the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Section 20(a) violations require a primary violation and that the party "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws…[and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability. *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 397 (11th Cir. 1996). MEG directly violated Section 15(a)(1) by its conduct, and Almagarby had the power to control the general affairs of MEG at the time it committed its violations and, further, he possessed the power to directly or indirectly control or influence MEG's specific policies which resulted in its primary liability. Control person liability for Almagarby is therefore an alternative to direct liability.

[19] If the Court grants the Commission's motion for summary judgment, the Commission will ask the Court to establish a briefing schedule (or order the parties to submit a proposed briefing schedule) for a purposes of determining the appropriate remedies.

Dated: October 18, 2019                    Respectfully submitted,

**Robert K. Gordon**
Robert K. Gordon
William P. Hicks
Securities and Exchange Commission
950 East Paces Ferry Road, NE, Suite 900
Atlanta, GA 30326
Tel.: 404-842-7600
Fax: 404-842-7666

Counsel for Plaintiff