# DECLARATION OF JEROME DEWITT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : |
| Plaintiff, | : Case No. 17-62255-Civ-COOKE/HUNT : |
| v. | : : |
| IBRAHIM ALMAGARBY and MICROCAP EQUITY GROUP, LLC, | : : : |
| Defendants. | : : : |

## DECLARATION OF JEROME DEWITT IN SUPPORT OF SEC'S MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS IBRAHIM ALMAGARBY AND MICROCAP EQUITY GROUP, LLC

I, Jerome DeWitt, pursuant to 28 U.S.C. § 1746, do hereby declare as follows:

1.      I am over 21 years of age and am a citizen of the United States.  I have been a resident of Atlanta, Georgia from 1986 through the present.

2.      I am an Investigations Case Analyst in the Atlanta Regional Office of the United States Securities and Exchange Commission ("Commission"), where I have been employed since 2005.

3.      I submit this declaration in support of the Commission's Motion for Summary Judgment ("Commission's Motion") against Defendants Ibrahim Almagarby ("Almagarby") and Microcap Equity Group, LLC ("MEG") (collectively, "Defendants").

4.      I have personal knowledge of the matters set forth in this declaration.

5.      In preparation for making this declaration, I reviewed relevant documents and data gathered by the Commission staff in connection with the investigation entitled "In the

Matter of Oxford Capital Fund, L.P.," Case No. SL-02649, which led to this litigation, and

documents obtained through civil discovery in the instant case. Included in my review were

documents produced by Defendants as well as brokerage account statements and other trading

data provided by a number of broker-dealers used by Defendants during the period from January

2013 through July 2016 (the "relevant period").[1]

      6.      The brokerage documents I reviewed show that during the relevant period, MEG

and Almagarby engaged in at least 57 purchases of aged debt from the debtholders of at least 38

different issuers. Using the data I reviewed, I prepared a table summarizing the transactions

entitled "Summary of Debt Purchases and Conversion Discounts." A true and correct copy of

that table is attached to this declaration as Exhibit 1.

      7.      The documents and evidence gathered by the Commission staff during the

investigation showed that, at or around the time that it entered into the agreements to purchase

aged debt from the debtholders of the issuers, MEG obtained convertible debentures or

convertible notes ("convertible debentures") from the issuers whose debt MEG had agreed to

purchase, which convertible debentures gave MEG the right to convert the debt of the issuers

that MEG had acquired, or any portion of them, into discounted shares of the issuer.

      8.      The account documents I reviewed showed that MEG maintained in its own name

no fewer than six brokerage accounts into which it received deposits of shares from the issuers

---

[1]     My review included brokerage statements and/or trade blotters from the following
broker-dealers: Alpine Securities Corp., ACAP Financial Inc., J.H. Darbie & Co., Inc., Primary
Capital, LLC, Scottsdale Capital Advisors Corp., and Spencer Edwards, Inc.

that had executed convertible debentures for the benefit of MEG, and from which it sold the shares.

9.      MEG's brokerage account records show that, during the relevant period, MEG received deposits of shares in MEG's brokerage accounts from issuers as a result of issuing notices of conversion and reset notices on no fewer than 167 occasions.  Using the data I reviewed, I prepared a table summarizing MEG's acquisition of shares resulting in brokerage account deposits entitled "Stock Transactions – Acquisitions by MEG."  A true and correct copy of that table is attached to this declaration as Exhibit 2.

10.     My review of MEG's account documents showed that the total number of shares (actual, non-split adjusted) that MEG received between January 2013 and July 2016 as a result of issuing notices of conversion and reset notices was approximately 8.5 billion shares, and the total number of shares MEG sold during this period exceeded 7.6 billion.  Using the data I reviewed, I prepared a table summarizing MEG's sales of shares during the relevant period entitled "Stock Transactions – Sales of Shares."  A true and correct copy of that table is attached to this declaration as Exhibit 3.

11.     My review of Defendants' brokerage records showed that, during the relevant period, MEG, through its brokerage accounts, completed no fewer than 962 sales of shares that it received as a result of issuing notices of conversion and reset notices.  The 962 sales are reflected in my table, "Stock Transactions – Sales of Shares," attached as Exhibit 3.

12.     My review of the transaction documents and Defendants' brokerage records revealed that, during the relevant period, MEG obtained more than $2.8 million in proceeds from

3

selling shares obtained pursuant to the convertible debentures and related documents. Using the data I reviewed, I prepared a table summarizing MEG's proceeds during the relevant period entitled "MEG Proceeds from DPA Sales." A true and correct copy of that table is attached to this declaration as Exhibit 4.

13.     Defendants' transaction records demonstrate that, although the terms of the discounted rate of conversion of the debt varied, the discount rate was typically expressed as a fixed percentage—most often 50 percent—of the lowest trading price of the shares over an established "look back" period expressed as a number of trading days, typically 30. My table "Summary of Debt Purchases and Conversion Discounts," attached as Exhibit 1, summarizes the discount rate MEG received through conversion discounts it received when obtaining convertible debentures from issuers related to MEG's purchases of the issuers' debt.

14.     Based on my review of the transaction documents, at least 13 convertible debentures issued to MEG during the relevant period had reset provisions, which gave MEG the right to demand additional shares if the share price dropped to a level below the lowest "look back" period level between the time that MEG issued the conversion notice and the time that the shares were deposited and cleared for sale.

15.     My review of MEG's transaction documents showed that, during the relevant period, MEG received at least 167 deposits of shares in one or another of its brokerage accounts as a result of issuing conversion or reset notices. Almagarby and MEG typically sold the shares very quickly. In fact, about half the time (84 instances, or 50.3%), MEG sold all the shares from a given deposit within 7 days. Within 14 days from receipt, MEG sold all the shares in 108

instances, or 65% of the time.  At the 21 day mark, the number jumped to 72.5% (121 instances).

And within 30 days of receipt, MEG had sold all the shares that it received from 130 of the 167

deposits, or approximately 78% of the deposits..

16.     I also reviewed Bloomberg trading data for the issuers involved in MEG's debt

purchase transactions, which revealed that MEG's sales of the issuers' shares frequently

represented a significant percentage of the total volume of shares sold on a given day for the

issuer in question.  During the relevant period, on the days when MEG sold shares acquired from

the issuers, the volume of the pertinent issuer's shares sold by MEG comprised over 90% of the

sales activity on the day in question 13 times; over 75% of the sales activity on the day in

question 21 times; over 50% of the sales activity on the day in question 63 times; more than 25%

of the sales activity on the day in question 324 times; and more than 10% of the sales activity on

the day in question 509 times.  Using the data I reviewed, I prepared a table entitled "Percentage

of MEG's Sales Relative to Market."  A true and correct copy of that table is attached to this

declaration as Exhibit 5.

17.     As a member of the Commission staff assigned to this litigation, I have personal

knowledge regarding the materials within the staff's files.  This includes documents produced by

Defendants to the Commission and documents produced by third-parties.  In this regard, I have

reviewed and can identify the document attached to this declaration as Exhibit 6 as a true and

correct copy of a November 7-20, 2014 email chain between Defendant Almagarby and

Antoinette Sy-Mak.  Exhibit 6 was produced to the Commission by Defendants.

18.     In addition, I have reviewed Exhibit A to the Commission's Motion, and, based on that knowledge, can identify the document as a true and correct excerpt from the transcript of the June 27, 2019 Deposition of Defendant Ibrahim Almagarby ("Almagarby Deposition").

19.     Similarly, I have reviewed Exhibit C to the Commission's Motion and can identify that document as a true and correct excerpt from the transcript of the May 1, 2019 Deposition of Anthony P. Fusco.

20.     I have also reviewed Exhibit D to the Commission's Motion and can identify that document as a true and correct copy of Exhibit 8 to the Almagarby Deposition, which consists of a November 11, 2013 email chain produced to the Commission by Defendants.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 18, 2019

Jerome DeWitt
United States Securities and Exchange Commission

6