# EXHIBIT A

UNITED STATES DISTRCIT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-62255-CIV-COOKE/HUNT

SECURITIES AND EXCHANGE COMMISSION,

       Plaintiff,

v.

IBRAHIM ALMAGARBY and
MICROCAP EQUITY GROUP LLC,

       Defendants,

---

### REPORT OF JAMES R. BURNS, ESQ.

November 4, 2019

FOR DEFENDANTS

IBRAHIM ALMAGARBY and
MICROCAP EQUITY GROUP LLC

- 2 -

Table of Contents

I. Introduction ............................................................................................................................ 3

II. Professional Background ...................................................................................................... 4

III. Scope of Review .................................................................................................................... 5

IV. The Allegations ...................................................................................................................... 6

V. Background ............................................................................................................................ 8

VI. Discussion .............................................................................................................................. 9

    a. Distinction Between a "Dealer" and a "Trader" ............................................................. 9

    b. Policy Considerations ................................................................................................... 15

VII. Conclusion ........................................................................................................................... 19

I. <u>Introduction</u>

I was retained on July 12, 2019, on behalf of Ibrahim Almagarby ("Mr. Almagarby") and Microcap Equity Group LLC ("MEG") (collectively, "Defendants") to perform an independent analysis and evaluation of certain issues raised by the Securities and Exchange Commission ("SEC") in its civil proceeding in the United States District Court for the Southern District of Florida captioned *Securities and Exchange Commission v. Ibrahim Almagarby and Microcap Equity Group LLC*, Case No. 17-62255-CIV-COOKE/HUNT.  Specifically, I was asked to review and assess whether, based on my experience in private practice and with the SEC, the SEC is deviating from longstanding guidance and enforcement practice by advancing its theory why the Defendants each fall within the definition of "dealer" set forth in Section 3(a)(5) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act") and, as such, are required to register as a dealer under Section 15(b) of that Act.  The hourly rates charged by my law firm, Willkie Farr & Gallagher LLP, for professional services provided in this matter range from $370 to $1,070 for staff, and my time has been billed at $1,350 per hour.

As described below, based upon my professional experience both as a former regulator and a practitioner, I believe that the allegations set forth in the SEC's complaint are insufficient to demonstrate that the Defendants violated Section 15(a) of the Exchange Act by not registering as dealers.  Rather, I believe the Defendants should be considered "traders" under longstanding SEC guidance.

II.     Professional Background

I am currently a partner at the law firm of Willkie Farr & Gallagher LLP ("Willkie"), where I advise broker-dealer and investment management clients on regulatory, compliance, and enforcement matters affecting their businesses. Among other matters, I advise market participants on broker-dealer status issues. Prior to joining Willkie in November 2014, I served for two and a half years as the Deputy Director of the SEC's Division of Trading and Markets ("Trading and Markets"), the second-highest position in the Division, where I oversaw the Office of the Chief Counsel, the Office of Trading Practices, the Office of Market Supervision, the Office of Derivatives Policy, and the Office of Analytics and Research. Trading and Markets has responsibility for helping the SEC evaluate who is a "dealer" for purposes of the Exchange Act. My direct reports included the Chief Counsel, as well as four other Associate Directors. Through them, I oversaw the work of around two hundred attorneys, economists, and other professionals. Among other things, I regularly discussed and worked with the Chief Counsel and his staff on broker-dealer status issues and the dealer/trader distinction, as well as on issues arising in connection with administrative actions and other matters raised by the SEC's Division of Enforcement that concerned Exchange Act interpretations and policies.

Prior to serving as Deputy Director of Trading and Markets, I was the Deputy Chief of Staff and Counsel to SEC Chairman Mary Schapiro, for whom I worked for just over two years. My duties for Chairman Schapiro included oversight of routine ongoing rulemaking and policy initiatives as well as initiatives mandated by passage of the Dodd-Frank Act and the JOBS Act. As the Chairman's Counsel, I advised her primarily on issues relating to broker-dealer and investment management law, including evaluating matters brought before the Commission by the Division of Enforcement. Before serving Chairman Schapiro, I worked for SEC Commissioner

Kathleen Casey in a similar advisory capacity for just under two years. I advised Chairman Schapiro and Commissioner Casey in connection with their consideration of hundreds of matters on the SEC's enforcement calendar over a four year period.

I was an attorney in private practice at Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale") for over five years before joining the SEC, and focused primarily on investment management and broker-dealer regulatory, compliance, and enforcement matters. Before joining WilmerHale, I clerked for Judge William B. Traxler on the U.S. Court of Appeals for the Fourth Circuit after completing my J.D., *cum laude,* at Georgetown University Law Center. Prior to law school, I completed doctoral and masters degrees at Oxford University and obtained my bachelor's degree, *magna cum laude,* from Harvard College.

### III.    Scope of Review

The views set forth herein are based on my review of the allegations in the complaint, consultation with the Defendants, deposition testimony by Mr. Almagarby provided to the SEC during its investigation, and such legal and regulatory precedents as I have deemed relevant to the matter. This report includes references to the specific documents and precedents I have relied on. The information I reviewed is consistent with that typically relied upon by legal experts in an analysis of issues regarding registration as a dealer under the Exchange Act. I have also relied upon my experience as a practitioner who has for many years closely followed market practices and who routinely evaluates regulatory questions that arise on the part of broker-dealers and investment advisers to private funds, as well as my experiences as a senior officer at the SEC. The views set forth herein are limited to the issue of the Defendants' status as "dealers"

under the Exchange Act as alleged in the SEC's complaint and do not address any other issues under the federal securities laws.

### IV. The Allegations

In its complaint, the SEC alleges that, between January 2013 and July 2016, Mr. Almagarby, acting through his wholly owned company MEG, engaged in the practice of purchasing outstanding debt issued by small companies and, through a series of transactions, converting debt instruments issued by those companies into equity securities that MEG would then sell into the public market. The SEC alleges that, during this time, the Defendants "bought more than $1.1 million of convertible debt of 39 different microcap issuers and subsequently sold more than 7.4 billion shares of the microcap issuers' stock into the market."[1] The SEC alleges that, over the course of approximately three and a half years, the Defendants engaged in 58 transactions in which they acquired aged debt from third-party holders involving 39 microcap issuers, converted debt securities into equity shares of the issuer, and sold the stock received from exercising the conversion rights into the market for total gain of $1,474,901.63.[2]

---

[1]  Complaint ¶ 11. The term "microcap" typically refers to small public companies with low-priced stocks and, consequently, small market capitalizations of less than $150 or $300 million. *See* Investment Company Act Release No. 27,539 (Oct. 25, 2006) (noting that, although there is no single definition of "microcap," the use of the term "typically refers to companies with market capitalization of less than $150 million to less than $300 million"). I note that many microcap issues trade for fractions of a penny per share; however, the Complaint does not indicate the value of the approximately 7.4 billion shares that were sold. The example used by the SEC in Paragraph 13 of the Complaint alleges that the Defendants sold 25,230,125 shares of Halitron common stock over the course of approximately two weeks for a net profit of $35,993.42, which would put the profit on those sales at approximately $0.0014 per share.

[2]  Complaint ¶ 14. In the aggregate, the complaint alleges that the Defendants' total gain on the sales was $1,474,901.63 on the sale of approximately 7.4 billion shares, or $0.0002 per share.

> Section 15(a) of the Exchange Act provides that
>
> [i]t shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with [Section 15(b) of the Exchange Act].[3]

Section 3(a)(5) of the Exchange Act defines a "dealer" generally as a person that is "engaged in the business of buying and selling securities" for its own account, through a broker or otherwise, but excepts persons who do not buy or sell securities "as part of a regular business."[4] The SEC alleges that the Defendants acted as unregistered dealers in violation of Section 15(a) of the Exchange Act by "the buying of more than $1.1 million of convertible debt of microcap (*i.e.*, penny stock) issuers and the subsequent selling of more than 7.4 billion shares of the microcap issuers' stock into the market . . . without either registering with the [SEC] as a dealer or being associated with an entity that was registered with the [SEC] as a dealer."[5] The SEC also alleges that Mr. Almagarby violated Section 15(a)(1) of the Exchange Act as a control person of MEG under Section 20(a) of the Exchange Act.[6]

---

[3]   15 U.S.C. § 78o(a).

[4]   15 U.S.C. § 78c(a)(5). Section 3(a)(6) of the Exchange Act defines "broker"; however, the SEC's complaint does not allege the Defendants acted as unregistered brokers. *See* 15 U.S.C. § 78c(a)(6).

[5]   Complaint ¶¶ 1, 23-24.

[6]   Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title),

V.   Background

This section sets forth my understanding of the facts based on the allegations in the complaint and the deposition testimony of Mr. Almagarby and the related exhibits. In or around January 2013, Mr. Almagarby established MEG to transact in securities of small public companies (i.e., microcap issuers). Between 2013 and July 2016, MEG engaged in 58 debt purchase transactions involving 39 different companies.[7] Although the specific details of each series of transactions may have differed slightly, they typically followed the same general pattern. First, MEG would acquire outstanding debt (generally in the form of a note) issued by the company and held by a third party. Mr. Almagarby testified that he did not advertise or solicit debtholders for these transactions but, rather, that they were all referred to him by third parties.[8] Second, MEG would enter into an agreement with the company to exchange the acquired debt for a separate convertible debt security, which generally took the form of a convertible debenture that would allow MEG to convert the debenture into shares of common stock (i.e., equity securities) of the company. These debt transactions (both the acquisition of the existing debt instrument from the third-party holder and the issuance of the convertible debenture to MEG in exchange for the acquired debt instrument) were privately negotiated, and the Defendants used outside counsel to advise on the transactions, including, for example, whether the acquired securities were eligible to be resold under the federal securities laws. Third, MEG would exercise the debenture's conversion feature to acquire equity securities of the issuers,

---

unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

[7]   Complaint ¶ 16.

[8]   *See* Almagarby Transcript at 24-25.

which were often acquired at a discount to the current market price under the terms of the debenture, and hold those equity securities in a brokerage account with a registered broker-dealer. Finally, MEG would divest of the equity securities by selling them into the public market.

During the period in question, Mr. Almagarby was the sole owner and operator of MEG, which maintained brokerage accounts with various registered broker-dealers through which it engaged in all of its trading activity in the equity securities. The trading activity at issue in this proceeding was all done through MEG, and MEG's trading activity involving microcap equities was generally limited to sales of the equity securities acquired through conversion of a debt security (i.e., MEG generally did not engage in purchases of microcap equity securities in the public market). Consequently, MEG's purchases and sales during the course of these series of transactions generally involved separate securities of the same issuer: the purchases were privately negotiated (with the assistance and opinion of counsel) and involved debt securities or convertible debt securities; however, the sales were public sales into the market of publicly-traded equity securities.

## VI. Discussion

### a. Distinction Between a "Dealer" and a "Trader"

Section 3(a)(5)(A) of the Exchange Act defines a "dealer" as, in relevant part, "any person engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract

participants) for such person's own account through a broker or otherwise."[9]  Section 3(a)(5)(B) contains an exception from the term "dealer" for "a person that buys or sells securities (not including security based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business."[10]  Taken together, the key factors determining whether a person is a "dealer" are whether the person trades for his or her own account, and whether he or she does so "as part of a regular business."[11]  Both factors must be satisfied for a person to be a dealer.[12]  Unless an exception or exemption is available, dealers must be registered with the SEC as required by Section 15(a) of the Exchange Act.[13]

Taken literally, the definition of "dealer" would cast a broad net; thus, the SEC and its staff have taken the longstanding position that "traders" should not be considered "dealers" subject to the registration requirements of the Exchange Act.[14]  Persons excluded from the definition of "dealer" by Section 3(a)(5)(B) are often referred to as "traders," and as the SEC has

---

[9]  15 U.S.C. § 78c(a)(5)(A).

[10]  15 U.S.C. § 78c(a)(5)(B).

[11]  Robert L.D. Colby, Lanny A. Schwartz, and Zachary J. Zweihorn, *Broker-Dealer Regulation*, 2d. Edition at §2.3.1.A (Practicing Law Institute, 2015) (hereinafter, "Colby").

[12]  *See* Definition of Terms in and Specific Exemption for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, Exchange Act Release No. 46745 (Oct. 30, 2002), 67 Fed. Reg. 67,496, at 67,498 (Nov. 5, 2002) (hereinafter, "Release 46745").

[13]  15 U.S.C. § 78o(a).

[14]  *See, e.g.,* Letter from Susan J. Walters, Office of Chief Counsel, SEC Division of Market Regulation to Martin E. Lybecker, National Council of Savings Institutions (July 27, 1986) (discussing the distinction between a dealer and a trader) (hereinafter, "Walters Letter").

noted, "[a] 'trader' does not have to register as a broker-dealer."[15]  It has been noted that "[t]his approach is necessary to distinguish dealers from investors who buy and sell a security for investment purposes, but sometimes hold the position for only a short amount of time.  The distinction between active trader and dealer can be very fine."[16]

In 2002, the SEC proposed rules regarding bank securities activities under the Exchange Act as part of its implementation of the Gramm-Leach-Bliley Act of 1999.[17]  In the release proposing those rules, the SEC discussed the dealer/trader distinction at some length, describing the distinction as follows:

> As developed over the years, the dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of business (or participate in the distribution of new issues), and generally transact a substantial portion of their business with investors (or, in the case of dealers who are market makers, principally trade with other professionals).  In contrast, traders have a less regular volume, do not handle others' money or securities, do not make a market, and do not furnish dealer-type services such as rendering investment advice, extending or arranging for credit, or lending securities.[18]

---

[15]  Release 46745, *supra* note 12.

[16]  Colby, *supra* note 11, at §2.3.1.B.

[17]  *See* Release 46745, *supra* note 12.

[18]  *Id.* at text accompanying n.32 (citations omitted).  *See also* Louis Loss, Joel Seligman, and Troy Paredes, *Securities Regulation* § 8.A.3.b (2018) (citations omitted) (hereinafter, "Loss"):

> When does a person's trading activities make him or her a dealer? There is no ready distinction. However, a dealer has characteristic attributes: He or she ordinarily tries to obtain a regular clientele, and is apt to transact a substantial portion of his or her business directly with investors rather than with other dealers or through exchange members, although there are market makers who trade principally with other professionals. A dealer ordinarily holds himself or herself out as one engaged in buying and selling securities at a regular place of business. The business (except when the dealer participates in underwriting) is ordinarily characterized by a regular turnover, while a trader's transactions are generally more irregular in both volume and time. A trader, on the other hand, does not handle other people's money or securities, does not make a market, and does not furnish the services that are usually provided by a dealer, such as quoting the

The SEC went on to explain that the determination of whether a person is a dealer depends on all of the facts and circumstances, and stated that a person may fall within the definition of "dealer" by engaging in the following activities:

(1) underwriting;

(2) acting as a market maker or specialist on an organized exchange or trading system;

(3) acting as a de facto market maker whereby market professionals or the public look to the firm for liquidity; or

(4) buying and selling directly to securities customers together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in connection with transactions in securities, and carrying a securities account.[19]

Over the years, the SEC staff has also described factors that may indicate that a person is acting as a dealer. For example, in response to a no-action request regarding securities trading activities by certain savings institutions, the SEC staff took the position that a person who buys and sells securities for its own account in the capacity of a trader is generally not considered to be "engaged in the business" of buying and selling securities, and therefore would not be deemed a "dealer."[20] The staff then noted that generally,

> a trader does not handle other people's money or securities; he does not hold himself out as being willing to buy and sell securities for his own account on a continuous basis; and he does not furnish the services which are usually provided by dealers, such as quoting the market in one or more securities rendering incidential [sic] investment advice, or extending or arranging for the extension of credit in connection with securities activities.[21]

---

    market, rendering incidental investment advice, extending or arranging for the extension of credit, and lending securities to customers. . . .

[19]     *See* Release 46745, *supra* note 12, at text following n.32.

[20]     Walters Letter, *supra* note 14.

[21]     *Id. See also* United Savings Association of Texas, SEC No-Action Letter (avail. Apr. 12, 1987) (describing a similar list of factors that could require registration as a government securities dealer under Section 15C of the Exchange Act).

In other no-action letters involving investment funds, the SEC staff has said that a fund would not be a "dealer" if it did not:

(1) advertise or otherwise hold itself out as willing to buy or sell securities from its own account on a continuous basis;

(2) purchase or sell securities as principal from or to customers;

(3) carry a dealer inventory in securities;

(4) quote a market in securities;

(5) provide investment advice;

(6) extend or arrange for the extension of credit in connection with securities transactions;

(7) run a book of repurchase and reverse repurchase agreements;

(8) use an interdealer broker for securities transactions;

(9) lend securities to customers;

(10) issue or originate securities;

(11) guarantee contract performance or indemnify the parties for any loss or liability from the failure of the transaction to be successfully consummated; and

(12) participate in a selling group or act as an underwriter.[22]

Thus the dealer/trader distinction has for decades provided a well-familiar framework for distinguishing between persons that fall within the definition of "dealer" and traders who merely trade for their own accounts but do not fall within the definition of "dealer."[23] Many different types of market participants that actively engage in trading securities rely on this distinction and do not register as dealers, including hedge funds, proprietary trading firms, and private equity

---

[22] Acqua Wellington North American Equities Fund, Ltd., SEC No-Action Letter (avail. Oct. 11, 2001) (hereinafter, "Acqua Wellington"); *see also* Davenport Management, Inc., SEC No-Action Letter (avail. Apr. 13, 1993); Fairfield Trading Corporation, SEC No-Action Letter (avail. Jan. 10, 1988); Louis Dreyfus Corporation, SEC No-Action Letter (avail. Jul. 23, 1987); Burton Securities, SEC No-Action Letter (avail. Dec. 5, 1977). I note that at times a court may list certain other factors, but they basically seem to refer to the factors on this list.

[23] *See* Mark D. Fitterman, Merri Jo Gillette, Michael M. Phillipp, Ignacio A. Sandoval, Steven W. Stone and John V. Ayanian, Challenges in Requiring High-Frequency Traders to Register as Dealers, June 10, 2014, avail. at http://www.morganlewis.com/pubs/finservices_lf_challengesrequiringhighfreqtradersregisterasdealers_10june14.

firms. I believe that the activities by the Defendants pled in the complaint lack the indicia of "dealer" activity as set forth by the SEC and the SEC staff, and a full consideration of the various factors articulated by the SEC supports a conclusion that the Defendants should be considered "traders."

Mr. Almagarby established MEG to engage in securities transactions and to make money doing so. Such is also the case for hedge funds, high frequency traders, private equity funds, and myriad other market participants that do not register as dealers. On its face, the SEC's complaint, which simply outlines purchases of debt instruments and subsequent sales of equity securities by the Defendants, I believe is insufficient to establish that the Defendants were "dealers" under the Exchange Act.[24] In my view, a thorough consideration of the various factors noted above set forth in the SEC's long-standing guidance indicates that the Defendants should not be deemed "dealers" under the Exchange Act. In particular, rather than holding themselves out as engaged in regular buying and selling of particular securities, quoting a market in those securities, or standing willing to engage in the purchase and sale of the same securities, MEG and Mr. Almagarby engaged in purchases and sales that involved different instruments. Moreover, neither MEG nor Mr. Almagarby appears to have had customers; all of the trading activity at issue was for MEG's own account. As commenters have noted, "[i]ndividuals who buy and sell securities for their own investment accounts and do not carry on a public securities

---

[24]  *See* Complaint ¶¶ 2, 11-14. I note that the "contemporaneous" activities alleged by the SEC were not the purchase and sale of the same securities but, rather, the purchase of a debt instrument of an issuer from a third party with the execution of a separate debt instrument issued by the company that included conversion rights. The sale of the equity securities would then occur afterwards. In the example provided by the SEC in the complaint at Paragraph 13, the purchase and agreement occurred "on or about July 1"; however, the sale of the equity securities that were acquired through the conversion did not take place until between July 22 and August 8, a gap of over three weeks. *See* Colby, *supra* note 11, at §2.3.2.B ("The SEC has taken the position that a dealer must buy and sell, or be willing to buy and sell, contemporaneously.") (citing the Walters Letter).

business generally are traders and not dealers." The SEC's attempt in this complaint to take these types of transactions across 39 different issuers over a span of three and a half years and deem such trading to be dealer activity strikes me as an extension from the customary approach taken by Trading and Markets to this kind of analysis. Similarly, recent regulatory actions taken by the Commission and Trading and Markets do not suggest that the number of transactions made by a market participant (e.g., a retail day trader or a high-frequency trading firm) is itself indicative of activity that should be deemed to be that of a "dealer." [25]

      b.  Policy Considerations

The SEC's allegations as set forth in the complaint also raise broader policy concerns. I first would like to note that many types of investment funds, including private equity funds, hedge funds, venture capital funds, and even mutual funds, rely on the trader exception in Section 3(a)(5)(B).[26] My experience is that many of these investment funds engage directly with issuers in negotiating private investments in equity or debt securities for their own accounts, as did the Defendants, and, in addition, engage in the purchase and sale of securities. In light of this, my concern is that the SEC's action against Mr. Almagarby and MEG threatens to create regulatory uncertainty for those market participants relying on the dealer/trader distinction, including the investment fund industry. This action also runs contrary to the obligation the SEC

---

[25] I note that the SEC recently approved a proposed rule change filed by the Cboe EDGX Exchange involving order book priority for equity orders submitted on behalf of retail investors. For purposes of that proposed rule change, the order frequency threshold to be deemed a "retail investor" was 390 orders *per day*, which represents one order each minute during regular trading hours. *See* Securities Exchange Act Release No. 87200 (Oct. 2, 2019). The SEC thus allowed the exchange to treat an investor potentially submitting hundreds of orders per day as not only not a "dealer," but as a "retail" investor. *See also* Colby, *supra* note 11, at § 2.3.2.A.

[26] *See* Colby, *supra* note 11, at § 2.3.2.B ("The trader exception to the definition of dealer is often claimed by private equity funds, venture capital funds and hedge funds.").

- 15 -

and its staff have to provide fair notice of a change in an interpretive position before pursuing an enforcement action.

Private investment funds have long relied on the distinction that has been drawn in the Exchange Act and interpretations by the SEC and its staff between dealers and traders in order to operate their businesses without registering as broker-dealers. It would be troubling to me to find that if the SEC thinks that the sort of activity that the Defendants engaged in requires registration as a dealer, the agency would not first seek to clarify the matter through a rulemaking proceeding subject to the notice and comment process provided for in the Administrative Procedures Act.[27] This would give investment fund managers, issuers and other members of the public an opportunity to consider the matter and comment on the proposal to help ensure that the right actors are brought within the definition and that the scope of the regulation is appropriately delineated so that market participants can adapt their conduct accordingly.

By way of example of the more customary and appropriate way of effecting a change in a regulatory interpretation or policy, I would point to former SEC Chair White's June 2014 speech on her plans for a number of equity markets rule proposals, where she declared that the SEC was examining the possibility of regulating high-frequency trading firms as dealers.[28] In relevant part, her speech noted the approach she was taking to the matter of requiring such firms, which currently rely on the trader exception, to register as dealers:

---

[27]   *See* 5 U.S.C. § 553.

[28]   *See* Mary Jo White, Chair, Securities and Exchange Commission, Speech: Enhancing our Equity Market Structure (Jun. 5, 2014), avail. at http://www.sec.gov/News/Speech/Detail/Speech/1370542004312.

> We also are focused on using our core regulatory tools of registration and firm oversight. I have asked the SEC staff to prepare two recommendations for the Commission: the first, a rule to clarify the status of unregistered active proprietary traders to subject them to our rules as dealers; and second, a rule eliminating an exception from FINRA membership requirements for dealers that trade in off-exchange venues. Dealer registration and FINRA membership should significantly strengthen regulatory oversight over active proprietary trading firms and the strategies they use.[29]

Notably, former Chair White made clear that a rule was needed to clarify the status of a group of traders: firms that go in and out of markets (that is, purchase and sell securities) at many times the frequency associated with the Defendants' trading and that themselves often make two-sided markets, though they do not hold themselves out as market makers or underwriters.  Indeed, the SEC placed just such a rulemaking on its Spring 2015 agenda of rulemaking actions pursuant to the Regulatory Flexibility Act ("Reg. Flex Agenda"), noting that Trading and Markets was "considering recommending that the [SEC] propose a new, metrics-based rule to establish that a person engaged in a large volume of intraday trading activity for its own account without holding a significant overnight position is a dealer."[30]  In its Spring 2016 Reg. Flex Agenda, the SEC broadened the potential rulemaking to note that Trading and Markets was "considering recommending that the [SEC] provide additional guidance regarding the statutory definition of

---

[29] *Id.*

[30] Securities and Exchange Commission, *Dealer Status of Active Intraday Proprietary Trading Firms*, Agency Rule List (Spring 2015), available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201504&RIN=3235-AL64.  The SEC's Reg. Flex Agenda is approved by the SEC pursuant to the Regulatory Flexibility Act, which requires agencies to publish a regulatory flexibility agenda in April and October of each year that contains, among other things, "a brief description of the subject area of any rule which the agency expects to propose or promulgate which is likely to have a significant economic impact on a substantial number of small entities."  5 U.S.C. § 602(a).

'dealer' under the Exchange Act."[31]  That the former Chair made clear that SEC action in connection with these market participants needed to be predicated on clear guidance and a regulatory foundation established by rulemaking stands in contrast to the matter asserted by the SEC here.  Since her departure, other (now current) Commissioners have made clear that they think action is needed to take the guesswork out of the broker-dealer status of market participants.[32]

The line of demarcation between a dealer and a trader can be admittedly fine at times and generally requires a detailed and careful analysis of all of the facts and circumstances.  The SEC's complaint in this matter falls woefully short of demonstrating any such analysis.  In my opinion, for the reasons set forth above, the facts the SEC and its staff have set forth in the complaint are insufficient to find that the Defendants are dealers within the meaning of the Exchange Act.  Moreover, the fact that the SEC chose to pursue this as an enforcement matter

---

[31]  Securities and Exchange Commission, *Dealer Status of Active Intraday Proprietary Trading Firms*, Agency Rule List (Spring 2016), available at https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201604&RIN=3235-AL64.

[32]  *See, e.g.*, Commissioner Elad Roisman, SIFMA Equity Market Structure Conference Keynote (Sept. 19, 2019), available at https://www.sec.gov/news/speech/roisman-remarks-sifma-equity-market-structure-conference-091919  ("Now, I will wind up my remarks by moving beyond our public equities markets to discuss what has been known to be a regulatory gray area for some time. I believe we need to consider the role of "finders"– those who help small businesses, seeking to raise capital, identify and locate potential investors (typically for a fee). Finders can play an important role in filling the gap to help small businesses obtain early stage financing. But, the regulatory framework that governs them has been ambiguous at best. On the one hand, the role of these companies or individuals is akin to that of a broker, including that they receive transaction-based compensation, but they are not subject to the same requirements as broker-dealers. On the flip side, they frequently do not handle securities or funds, rendering the purpose of some broker-dealer requirements inapplicable. I believe it is time for the SEC to put some clear rules in place, not just staff no-action letters and enforcement actions, so that we can clarify for our markets and investors the benefits and obligations of finders. Such clarity would also allow finders to operate with greater certainty and would give issuers peace of mind that their offerings are not being facilitated by unregistered brokers. I welcome your thoughts on this topic, especially those who are existing brokers and have experience being subject to our current broker-dealer regime.").

will tend to further blur the already unclear line between dealers and traders, and could have a negative impact on the willingness of fund managers in other contexts to engage in transactions that are of potential benefit both to their investors and to microcap issuers.

VII. Conclusion

As described above, based on my review, the SEC's and its staff's historical guidance, other legal precedents, and other information referenced herein, and based also on my years of experience as an attorney in private practice and as a senior member of the SEC staff, I conclude that when one weighs all of the factors that the SEC and its staff have said should be considered, and when one compares the Defendants' activities as set forth in the complaint with those of other industry participants, I believe that the SEC's complaint does not allege facts sufficient to find that the Defendants were required to register as dealers under Section 15(b) of the Exchange Act. Moreover, I believe that a decision to the contrary risks raising significant questions regarding years of established guidance and practice to the detriment of markets, market participants, and investors.

_____     _____
James R. Burns                                         November 4, 2019