# EXHIBIT C

James Burns
11/14/2019

1     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF FLORIDA
2
       Case No. 17-62255-Civ-COOKE/HUNT
3
4  SECURITIES AND EXCHANGE    )
    COMMISSION,            )
5                          )
      Plaintiff,           )
6                          )
      -vs-                 )
7                          )
    IBRAHIM ALMAGARBY and     )
8  MICROCAP EQUITY GROUP, LLC,  )
9      Defendants.       )
    _____)
10
11
12
13
14      DEPOSITION OF JAMES BURNS
15         Washington, D.C.
16      Thursday, November 14, 2019
17           9:32 a.m.
18
19
20
21
22
23
24  Reported by:
    Tammy S. Newton
25  JOB No. 191114TN

                    1

1     UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF FLORIDA
2
       Case No. 17-62255-Civ-COOKE/HUNT
3
4  SECURITIES AND EXCHANGE    )
    COMMISSION,            )
5                          )
      Plaintiff,           )
6                          )
      -vs-                 )
7                          )
    IBRAHIM ALMAGARBY and     )
8  MICROCAP EQUITY GROUP, LLC,  )
9      Defendants.       )
    _____)
10
11
12
13
14
15     Deposition of James Burns taken on behalf
16  of Plaintiff, at Wilkie Farr & Gallagher, 1875 K
17  Street, N.W., Washington, D.C., beginning at
18  9:32 a.m. and ending at 1:26 p.m., on Thursday,
19  November 14, 2019, before Tammy S. Newton.
20
21
22
23
24
25

                    2

1          A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF:
3      ROBERT K. GORDON, ESQUIRE
4      W. SHAWN MURNAHAN, ESQUIRE
5      Securities and Exchange Commission
6      950 East Paces Ferry Road, N.E.
7      Suite 900
8      Atlanta, Georgia 30326
9      (404) 842-7652
10     gordonr@sec.gov
11
12  ON BEHALF OF DEFENDANT:
13      JOSHUA KATZ, ESQUIRE
14      Sallah Astarita & Cox
15      3010 North Military Trail
16      Suite 210
17      Boca Raton, Florida 33431
18      (561) 989-9080
19      jak@sallahlaw.com
20
21
22
23
24
25

                    3

1                INDEX
2  WITNESS                  EXAMINATION
3  James Burns
4      By Mr. Gordon              5
5      By Mr. Katz              139
6
7            EXHIBITS
8  NUMBER      DESCRIPTION          PAGE
9  Exhibit 1   Curriculum Vitae        6
10 Exhibit 2   Expert Report        40
11 Exhibit 3   Sources of Facts or Data    49
12 Exhibit 4   Respondents' Notice of Filing
13             Expert Report     71
14 Exhibit 5   Excerpt from Louis Loss    108
15
16
17     (All exhibits attached to transcript.)
18
19
20
21
22
23
24
25

                    4

```
 1          P R O C E E D I N G S
 2          James Burns,
 3   having been sworn by the notary, testified as
 4   follows:
 5          MR GORDON:  This is the deposition of
 6   James R. Burns in SEC versus Ibrahim Almagarby
 7   and Microcap Equity Group.  For all permissible
 8   purposes under the federal rules, Mr. Burns has
 9   been proffered as an expert witness by the
10   defendants in this matter.
11          My name is Robert Gordon, and I am an
12   attorney with the SEC.  I work out of our Atlanta
13   Regional Office.  And with me is my colleague
14   William Shawn Murnahan, also an attorney at the
15   SEC in the Atlanta Regional Office.
16          EXAMINATION BY COUNSEL FOR THE PLAINTIFF
17   BY MR. GORDON:
18      Q    Mr. Burns, I'll be asking you
19   questions today relating to your expert report in
20   this case, you're qualifications, and your
21   understanding of the matter today and other
22   questions relating to your expert engagement.  I
23   just ask that you, please, wait until I finish my
24   question before answering so that the court
25   reporter can create a clean record.
```

5

```
 1          Mr. Katz will likely be objecting to
 2   some of my questions during today's deposition.
 3   This is not unusual.  When he objects, unless he
 4   instructs you to not answer the question, you
 5   should answer the question and not be concerned
 6   with the objection.
 7          MR. GORDON:  Is that agreeable to you,
 8   Mr. Katz?
 9          MR. KATZ:  Absolutely.
10   BY MR. GORDON:
11      Q    If you don't hear a question or don't
12   understand it, feel free to ask me to repeat it
13   or rephrase it or to have the court reporter read
14   it back.  If you need a break, just let me know,
15   and I'll be happy to arrange for one at a
16   convenient breaking point.
17          I control the record, so I need to be
18   the one to tell the court reporter when we're
19   going off the record and back on the record.
20          Is that okay?
21      A    Yes.
22      Q    Let me first start by marking an
23   exhibit.  We'll call this JB1.
24          (Deposition Exhibit 1 was marked for
25   identification and attached to the transcript.)
```

6

```
 1   BY MR. GORDON:
 2      Q    Mr. Burns, is Exhibit JB1 a current
 3   copy of your CV?
 4      A    Yes, a version of it.  I may have
 5   others, but yes.  My glasses, I left them
 6   downstairs.
 7      Q    Why don't we go off the record and
 8   take a break.
 9      A    I'm so sorry.
10          (A brief recess was taken.)
11   BY MR. GORDON:
12      Q    Mr. Burns, now that you have your
13   glasses and can see, take a look at Exhibit JB1.
14      A    Yes.
15      Q    I'll represent to you that this copy
16   of your CV was provided to me by Mr. Katz.  Is
17   this a -- is this your CV?
18      A    Yes.
19      Q    And is everything in here accurate, to
20   the best of your knowledge?
21      A    To the best of my knowledge.  I
22   haven't looked at it in a while.
23      Q    Okay.  Did you write it?
24      A    I would have, yes.
25      Q    Okay.  And everything you would have
```

7

```
 1   put in there would have been accurate, correct?
 2      A    I would have thought so, yeah.  Yeah.
 3      Q    I just want to briefly go over your
 4   education and employment starting with law
 5   school.
 6      A    Okay.
 7      Q    So you graduated from Georgetown
 8   University Law Center with a J.D. in 2001; is
 9   that correct?
10      A    December I got out, yes.
11      Q    Okay.
12      A    I think they gave me my diploma in
13   2002.
14      Q    I see.
15          And then in 2002 and 2003, you clerked
16   for a judge on the U.S. Court of Appeals for the
17   Fourth Circuit; is that correct?
18      A    Yes.
19      Q    And then --
20      A    Filling in that gap, that's -- the
21   American Council on Education was the stub
22   period.  I worked there through law school and
23   then at night.
24      Q    Understood.
25          You went to work as an attorney at the
```

8

1  firm then known as Wilmer Cutler Pickering Hale
2  and Dorr in 2003, correct?
3      A    Yes.  In 2003, it was still Wilmer
4  Cutler Pickering.  It became Wilmer Cutler
5  Pickering Hale and Dorr a couple years after
6  that.
7      Q    And you worked at that firm until
8  sometime in 2008, correct?
9      A    Yes.  Around August or so, I think.
10     Q    Okay.  And would it be fair to say
11  that you did securities-related work while you
12  were an attorney at Wilmer Cutler?
13     A    Yes.
14     Q    Can you just very briefly describe the
15  kind of work that you did during your
16  approximately five years of employment at Wilmer
17  Cutler?
18     A    Sure.
19          It would have covered asset manager
20  and broker-dealer regulatory work, support for
21  compliance examinations, drafting memoranda
22  related to regulatory issues for advisors and for
23  broker-dealers, information-barrier work for
24  broker-dealers, and then support around some
25  rather large enforcement matters relating -- that

9

1  were being brought by the SEC, New York Stock --
2  New York Attorney General, and I think the Mass
3  Secretary -- either Secretary of State there.
4  Anyhow --
5      Q    Would it be fair to say that the work
6  you did at Wilmer Cutler was legal work?
7      A    It was, yeah.
8      Q    When did you become a member of any
9  state bar for the first time?
10     A    In --
11     Q    Just the year is fine.
12     A    I think 2002.
13     Q    And which states' bar did you become a
14  member of in 2002?
15     A    It would have been Maryland and then
16  followed by D.C.  In time I would have joined --
17  I don't know exactly when.  It was probably when
18  I started at Wilmer.
19     Q    Okay.  And are you a member currently
20  of any state bars in addition to Maryland and
21  D.C.?
22     A    I think those two.  Those two.
23     Q    You indicated in your CV that during
24  your employment at Wilmer Cutler, your
25  assignments included working on no-action letter

10

1  requests, correct?
2      A    Yes.
3      Q    How many no-action requests did you
4  work on during -- approximately during your five
5  years at Wilmer Cutler?
6      A    I haven't -- I just don't recall.
7      Q    Was it more than one?
8      A    I'm -- I think so.  It's a rather dim
9  recollection, and I don't know whether they ever
10  ultimately saw the light of day.  I just don't
11  recall.  I'm sorry.
12     Q    Okay.  So you're not certain whether
13  or not you worked on any no-action letter during
14  your time at Wilmer Cutler that was actually
15  submitted to the SEC.
16          Is that what you're saying?
17     A    I -- I'm sure we did.  I'm sure -- and
18  it may well have been in relation to the
19  collateral consequences attendant to the -- to
20  some settlements that the firm more broadly was
21  working on.  I'm so sorry I can't remember.
22     Q    Okay.
23     A    And it would have been, at that point,
24  under the supervision of ultimately whoever --
25  there would have been a partner who would have

11

1  been, you know, the signatory on anything like
2  that at the time.
3      Q    Understood.
4      A    So I might have had a piece of it.
5  You know, might have been asked to scope it out
6  in terms of, you know, thinking through, as one
7  strategy, how to put one together that would be
8  effective.  Whether they saw the light of day,
9  I'm sorry, I don't remember.
10     Q    And was your -- was it through your
11  employment at Wilmer Cutler that you first became
12  familiar with the no-action letter process?
13     A    That would have been, yeah.  Yeah.  It
14  might have been touched on in law school.  I had
15  a very good securities law professor, but I don't
16  recall that to be the case.
17     Q    All right.  You worked at the
18  Securities and Exchange Commission from starting
19  sometime in 2008 through sometime in 2014; is
20  that correct?
21     A    Yep.  Yes, sir.
22     Q    And let me ask you:  For all of the
23  positions that you had at the SEC, was a law
24  degree a requirement?
25     A    No.  Well, I guess styled as counsel,

12

1 but I know of a couple of commissioner counsels
2 or advisors for each of the several SEC
3 commissioners I know and for Chairman Shapiro --
4 many of them were -- it was customary -- but a
5 number of them were not.
6   **Q**   Okay.
7   **A**   Sometimes you want a market expert.
8 Sometimes you want someone with industry
9 insights.  I think some have hired economists.
10 Some have hired former Hill staffers.  There
11 could be any number of things one is looking for
12 in a counsel, sort of small C.
13   **Q**   When you served as counsel at the
14 SEC -- and I see that you served as both counsel
15 to former Chairman Shapiro and to --
16   **A**   Commissioner Casey --
17   **Q**   -- Commissioner Casey as well.  When
18 you served in those positions, did you use your
19 training and experience as an attorney in your
20 job?
21   **A**   I certainly used it.  And one
22 additional benefit was it gave me an opportunity
23 to broaden my understanding of markets.  And a
24 lot of the job of a Commission counsel is to hear
25 from industry participants as they describe what

13

1 they do and how they do it and what public good
2 they serve and how the law affects them, but also
3 how market pressures affect them and what
4 industry practices.
5        Commissioners regularly, week in and
6 week out, are paid visits by all sorts of
7 industry participants.  So while -- I would say
8 legal background, while important, was a
9 relatively small part of the job.  It certainly
10 helped.  It certainly made me better at what I
11 did for my various bosses.  But just having, you
12 know, an inquisitive mind in thinking about how
13 all the different pieces of our -- of the
14 securities markets worked together really are
15 what's behind being an advisor to the Commission.
16        Because as you know, the commissioners
17 have their advisors, but they also have the
18 general counsel's office.  They have enforcement,
19 and they have others to also describe to them
20 what the requirements of the law are.
21   **Q**   During your time as counsel for those
22 two commissioners, did you provide them with
23 advice on legal matters from time to time?
24   **A**   I did.  I also provided feedback based
25 on meetings I had with industry representatives

14

1 about what the other concerns they might have
2 about what was going on -- what were going on in
3 markets, what their interests were, what their
4 financial interests were, what their concerns
5 were about the potential impact of agency actions
6 on businesses they'd established.
7        So it was -- certainly legal was an
8 important part of it, but it was by no means the
9 only part of what I was advising them.
10   **Q**   Understood.
11        And I just have to ask this as part of
12 due diligence.  Have you ever been suspended or
13 subject to disciplinary action by any bar?
14   **A**   No.  Not that I'm aware of.
15   **Q**   You were deputy director of the
16 Division of Trading and Markets from sometime in
17 2012 until sometime in 2014; is that correct?
18   **A**   That's correct.  And that followed
19 that -- if you don't want to talk about chief of
20 staff, we don't have to talk about it.  That was
21 a much more broad-based policy and
22 strategy-related job that preceded that.  But
23 yes.
24   **Q**   I mean I have your CV.  I don't intend
25 to ask you about every detail.

15

1   **A**   Of course.  But yes, those were the
2 years.
3   **Q**   You've authenticated it, and it speaks
4 for itself, so I just have selective questions --
5   **A**   Of course.
6   **Q**   -- in order to expedite the process.
7   **A**   Certainly.
8        MR. KATZ:  If I may, just to make sure
9 for the record you're not talking over his
10 questions and that type of thing just to keep --
11 so the record --
12        MR. GORDON:  Yes.  Thank you.
13 BY MR. GORDON:
14   **Q**   And I'll just remind you -- I know
15 it's hard because it's not normal human
16 interaction, but please wait for me to finish
17 speaking before you answer, and I will try not to
18 interrupt your answers with a question.
19   **A**   Thank you.  Thank you.  I'm sorry
20 about that.  Thanks.
21   **Q**   So at the time that you were a deputy
22 director of the Division of Trading and Markets,
23 was there just one deputy director or more than
24 one?
25   **A**   It depended.  When I commenced, there

16

1 were -- I joined one who was there.  He left --
2 he -- when the Director Cook left, he became the
3 acting director, and I was the sole deputy for
4 about a third of the time I was there.  I'm not
5 exactly sure.  I don't know whether the court
6 reporter could catch the inflection in my voice.
7 But yeah, not sure.
8   Q    For the other two-thirds of the time,
9 was there another deputy director besides you?
10   A    There was.  John Ramsay.
11   Q    So the most deputy directors at any
12 time you were there were two, correct?
13   A    Correct.
14   Q    You joined Wilkie Farr in 2014 as a
15 partner in its asset management group; is that
16 correct?
17   A    That's correct, in or around -- I
18 think it was around October of 2014.
19   Q    Okay.  And you've remained in that
20 position until the present day, correct?
21   A    I have.  I'll put a little asterisk,
22 if I may, a pair of asterisks.
23   Q    Yes.
24   A    To say "asset management group"
25 connotes a focus on the regulatory affairs of the

17

1 Division of Investment Management.  I'm a
2 broker-dealer -- I'm someone with both
3 broker-dealer and investment management
4 expertise, and I work with several other
5 broker-dealer experts within that group.
6        And my second asterisk was -- I can't
7 remember it now.  I had another observation
8 about -- oh, I'm sorry.  From then to the
9 present.  Yes.  Additionally for a period of
10 time, about a year and a half or so, I've been
11 focusing on the affairs of a client, systemically
12 important financial market utility, which caused
13 me to also really be serving as primary counsel
14 for them while they've been searching for a
15 general counsel.
16   Q    Okay.  And I appreciate your
17 volunteering this information.
18   A    You don't want all this extra.
19   Q    But it will -- it will expedite
20 things --
21   A    -- if I just answer the question.
22   Q    -- if you focus on the question.
23   A    I did it again.
24   Q    Again, if you think there's something
25 important to volunteer, by all means, let me

18

1 know.  But just try to get through the day a
2 little more quickly, I'd just make that comment.
3   A    Mr. Gordon, may I offer one other
4 thing?
5   Q    Sure.
6   A    That was just interesting that upon my
7 departure from the division, the next director of
8 the division was not a lawyer.  He was himself
9 a -- another market expert, Brett Redfearn,
10 R-E-D-F-E-A-R-N.
11   Q    I appreciate that, but that is not
12 responsive to any question I asked.  That's the
13 sort of thing we can skip.
14   A    Okay.
15   Q    And your -- again, I'm not going to go
16 into detail about your current practice except to
17 ask a few specific questions --
18   A    Sure.
19   Q    -- in that there is a pretty fulsome
20 description here provided in your CV, okay?
21   A    Yes.  It doesn't provide details as I
22 was describing to you about the work with that
23 systemically important financial market utility
24 very lately.  It just means I haven't updated the
25 CV in terms of that -- those bullets.

19

1   Q    Okay.  I note that in your description
2 in your CV, you mentioned that you have done work
3 related to SEC enforcement matters.  Apart from
4 this expert engagement that you have taken, can
5 you elaborate on what other kinds of work related
6 to SEC enforcement matters that you have done?
7   A    Sure.
8        I have taken at least -- I've taken --
9 supported or myself taken a few folks through --
10 sometimes because of the -- of course, the ethics
11 obligations in terms of representations in front
12 of the agency, I was advising on a number of
13 investment advisor or broker-dealer-related
14 enforcement matters over the last couple of years
15 in ways large or small.
16        In addition, the systemically
17 important financial market utility just settled a
18 large -- of course, it's overseen by Trading and
19 Markets -- overseen a large settlement -- SRO
20 settlement with the Agency.  Just settled a case
21 where I was really supervising -- well, no.  I
22 guess I was interacting with staff there
23 directly, too, on a private equity fee case in
24 the hopper.
25        I've got an active case right now I'd

20

1  rather not go into the details of.  And I have
2  consulted almost a shadow counsel a number of
3  other entities that have live matters with the
4  Agency where the general counsel might be
5  double-checking on the work being performed by
6  counsel who's making an appearance.
7      Q    So you mentioned that in at least one
8  SEC enforcement action that you did directly
9  interface with folks at the SEC in dealing with
10 that enforcement?
11     A    Yes.
12     Q    Okay.  And was that unique, or is
13 that -- have you dealt with SEC enforcement
14 people as defense counsel on a number of
15 occasions?
16     A    On a number of occasions.  I just
17 can't tell you how often through the years.
18     Q    So is your -- has your role in any of
19 these enforcement matters been as -- whether in
20 whole or in part, as litigator in the case?
21     A    I'm usually in as a regulatory expert.
22 But, you know, the worlds meld.  One knows how to
23 practice before the Agency.  But I'm usually
24 trying to bring to bear my regulatory expertise
25 or questions or thoughts about how, you know --

21

1  it could be anything from regulatory expertise to
2  strategy.
3      Q    Have you ever had a role either in
4  writing or reviewing briefs that were submitted
5  on behalf of defendants or potential defendants
6  in securities-enforcement matters?
7      A    Yes.
8      Q    Is that something that you've done
9  frequently?
10     A    With some regularity, yes.  Frequently
11 is -- if I may, frequently is just one of those
12 words I don't know what your view of frequently
13 is.  Commensurate with the practice that's
14 primarily advisory -- regulatory advisory and
15 compliance advisory -- and mercifully,
16 enforcement cases don't emerge very, very, very
17 often.  But, you know, to the extent they have
18 emerged and I've been involved with them, which
19 has happened with -- alas for some clients, with
20 regularity, I'm involved in different aspects.
21     Q    Since you sort of raised the issue
22 about quantification, would you say -- just
23 estimating now, would you say that you have
24 participated in writing or editing briefs on
25 behalf of defendants or putative defendants in

22

1  enforcement matters over half a dozen times at
2  your time at Wilkie?
3      A    I would have thought so, but I'm not
4  sure.
5      Q    More than 10 times?
6      A    I doubt, but I'm not sure.  I'm sorry.
7  I'm just not -- things kind of come over the
8  transom, "Hey, would you take a look at this?"
9  So it's very difficult.
10     Q    So a reasonable ballpark estimate of
11 the amount of times you've done whatever --
12     A    Enforcement --
13     Q    -- would be maybe between 6 and 10?
14     A    Let's say that.  I'm not sure.
15     Q    Okay.  But is that a fair estimate?
16     A    It's probably a fair estimate.
17     Q    Now, in your CV, in your description
18 of your experience at Wilkie Farr & Gallagher,
19 you don't mention expert-witness work, correct?
20     A    I --
21     Q    Is that correct?
22     A    Correct.
23     Q    And --
24     A    I'm reading it.  I'm sorry.
25     Q    Okay.  After you've had a chance to

23

1  read it, tell me whether or not my statement was
2  correct.
3      A    There's no express mention of it, no.
4      Q    And why is that not mentioned?
5      A    Perhaps because this looks like the
6  more IM-focused version of my CV that I --
7  because I think, as I said earlier, it doesn't
8  look like I've updated it very recently to
9  include the -- previously -- I have one currently
10 as well, but previously, the one other instance
11 in which I've served as an expert -- been
12 retained to serve as an expert.
13     Q    Okay.  And is there -- is there
14 another version of your CV that you have created
15 that mentions your expert work?
16     A    I'm sure it does not.
17     Q    And I'll ask you more questions about
18 the expert-witness work that you mentioned in a
19 moment.  We'll get back to that.
20          During your time at Wilkie -- and I'm
21 going to refer to your law firm as Wilkie.
22     A    That's fine.
23     Q    -- if that's okay.
24          During your time at Wilkie, have you
25 done any work involving no-action letters?

24

1    **A**    I have certainly -- yes.  I can't say
2  that I have been lead on preparing no-action
3  requests.  I simply don't remember.  But I have
4  been involved in and reviewed a fair number
5  through the -- through the years.
6        **Q**    Okay.  And again, I know it's taxing
7  to ask you to do so.
8        **A**    Yeah.
9        **Q**    Can you estimate how many of these
10 no-action letters, whether or not they were
11 actually submitted or saw the light of day as you
12 said or not, that you worked on?
13       **A**    May I ask a qualifying question?
14 Where Wilkie has been retained to write one or
15 where I have been called by clients about whether
16 or not to prepare one?
17       **Q**    Both.
18       **A**    Okay.  Well, easily between your 6 and
19 10.
20       **Q**    Okay.
21       **A**    I think.
22       **Q**    Do you remember -- again, I don't want
23 you to reveal any confidences, but do you
24 remember sort of the legal issues at a
25 30,000 foot level for any of the no-action

25

1  letters that you worked on?
2        **A**    Sure.
3              Reg M issues, Reg SHO issues, issues
4  relating to at least advising people -- let me
5  think through a few more.
6        **Q**    Let me ask it this way.
7        **A**    Okay.
8        **Q**    Have you worked on any no-action
9  letters that involve the issue of the definition
10 of a broker or dealer?
11       **A**    I have certainly advised on the -- for
12 private equity clients.
13       **Q**    Hold on.
14       **A**    Sorry.
15       **Q**    To make sure you heard my question,
16 the question is whether you worked on any
17 no-action letters that relate to the definition
18 of a broker-dealer, not whether you've worked on
19 these issues generally.  Right now my question
20 has to do with no-action letters.
21       **A**    The way I was -- thank you.  What I
22 was trying to say is, in advising clients who
23 have -- who have queried -- where the question's
24 arised whether someone might have broker-dealer
25 status, I have talked through, as one potential

26

1  strategy, whether the activity they've engaged in
2  might warrant seeking no-action relief.
3              Does that make sense?
4        **Q**    Yes.
5        **A**    Okay.  But writing a letter seeking
6  no-action relief for someone from the definition
7  of broker or dealer, I don't believe I have
8  worked on -- written one myself or worked on one
9  for anyone.
10       **Q**    Okay.  I'm just going to follow up
11 with a general question.
12       **A**    Yeah.
13       **Q**    And again, I don't want to go into
14 anything privileged.  I'm not going to ask you
15 the names of any clients.
16       **A**    Yep.
17       **Q**    When you have advised clients about
18 the option of seeking a no-action letter, was it
19 in the context of trying to get clarity on
20 whether or not they would be considered to be a
21 broker or a dealer by the SEC?
22             MR. KATZ:  I'm going to object to the
23 extent it does not invade attorney-client
24 communications.
25             THE WITNESS:  And now do you mind

27

1  repeating the question?  I'm sorry.
2              MR. GORDON:  I'm going to ask the
3  court reporter to read it back.
4        (The record was read by the reporter.)
5              THE WITNESS:  Yes.  And I think in
6  talking through such a strategy, I would have
7  indicated that it's difficult to obtain that kind
8  of clarity, and therefore, seeking no-action
9  relief might be -- might not yield an answer.
10 BY MR. GORDON:
11       **Q**    The answer to my question is "yes"?
12       **A**    Yes.  I think so.
13       **Q**    When you worked at the SEC, did you
14 have any involvement in the no-action letter
15 process?
16       **A**    Yes.
17       **Q**    Can you elaborate on that?
18       **A**    Well, I was regularly -- so as the
19 deputy, I had about four or five associate
20 directors working for me, and from time to time,
21 they would come in with -- or I would even hear
22 directly from market participants who were trying
23 to work with staff to obtain no-action relief in
24 respective of positions.  So I would have said
25 numerous times, whether -- generally, from the

28

1  Office of the Chief Counsel or from the Office of
2  Derivatives Policy, they would come in to
3  describe no-action relief they were either
4  comfortable or not comfortable providing.
5      Q    Okay.  And at a very high level and as
6  briefly as you can --
7      A    Sorry.
8      Q    -- tell me what is your understanding
9  of the no-action letter process.
10     A    It's an opportunity for a firm that is
11 seeking some assurance that if it takes a course
12 of action, the regulatory staff would not
13 recommend to either -- to enforcement that action
14 against that firm would be taken for taking
15 whatever those actions are.
16     Q    Okay.
17     A    Does that make sense?
18     Q    There's no requirement that an
19 individual or entity seeking a no-action letter
20 do so through counsel, as far as you know, is
21 there?
22     A    No, I don't -- I don't know of a
23 requirement.  I would have -- I've never seen
24 someone who did not do so.
25     Q    Okay.  All right.  Let's -- you

29

1  mentioned before one other expert engagement.  So
2  beyond the engagement for which you're currently
3  testifying, do I correctly understand that you've
4  done just one other expert engagement?
5      A    In the past, and I'm currently doing
6  another now.
7      Q    Okay.  So why don't you first start by
8  telling me about your expert engagement in the
9  past.  Which one was that?
10     A    So that was for the IronRidge metal
11 matter that settled -- you guys will know.  I
12 don't remember.
13     Q    Okay.  I'll have some more questions
14 about that in a bit.
15          And is the matter that you're
16 currently engaged as an expert in, is that
17 something where you can tell me about that
18 without violating any privilege?
19     A    That I -- you're talking about not
20 this one but the --
21     Q    Correct.
22     A    -- the other one?
23     Q    Yes.
24     A    I don't know what I should or should
25 not say.

30

1      Q    Okay.  I'll ask a specific question.
2          What is the -- what is the subject
3  matter of the expert retention?  What are you
4  being retained as an expert for?
5      A    Currently I've been -- I was asked to
6  write a letter expressing my views on the
7  dealer/trader distinction.
8      Q    Was that in connection with a Wells
9  submission that somebody was making?
10     A    Yes.
11     Q    And you did in fact write such a
12 letter, and the Wells submission, including your
13 letter, was in fact submitted to the SEC,
14 correct?
15     A    I provided it.  I think it was
16 submitted.
17     Q    So the three expert experiences that
18 you have mentioned, including the current one,
19 the one you did for IronRidge, and the one that
20 you have done in connection with the Wells
21 submission, that's the totality of your
22 experience as an expert witness, correct?
23     A    Yes.
24     Q    And would it be fair to say that in
25 all three of those engagements, the issue was

31

1  whether or not an individual or an entity was a
2  dealer under the definition of the Exchange Act?
3      A    Yes.
4      Q    And would it be further fair to say,
5  in all three of those expert engagements, you
6  have opined that the defendant or putative
7  defendant in the case of the Wells submission was
8  not a dealer?
9      A    Yes, based on what was -- what I had
10 reviewed and seen and understood that they -- it
11 wasn't enough there to persuade me they ought to
12 be treated as a dealer.
13     Q    So --
14     A    Without -- may I?  I'm so sorry.
15     Q    Go ahead.
16     A    I'm a little fuzzy on IronRidge and
17 I'm -- it's very nascent with the other.  So for
18 where we are now, that's what I recall.
19     Q    Okay.  I'll represent to you that I
20 was lead counsel for the SEC in the IronRidge
21 matter.
22          You've never been qualified as an
23 expert in any court, have you?
24     A    No, not -- I don't know what that
25 means exactly.  But no, I don't believe I've

32

1 gone -- never gone to court as an expert, no.
2    Q    And you have not -- I take it then,
3 based on what you just told me that you have
4 not -- you've never given live expert testimony
5 in any proceeding with the exception of this
6 deposition?
7    A    That's exactly right.  Written
8 materials, never testified.
9    Q    And I take it that you have not,
10 therefore, previously been deposed in connection
11 with any engagement as an expert witness,
12 correct?
13    A    Correct.
14    Q    Have you ever been asked to be an
15 expert witness for the SEC?
16    A    I don't believe so.  No, not -- I'm
17 sorry to sound so fuzzy.  Kids and sleep and
18 being in my 50s.  I don't know.
19    Q    Of course.  Just give me your best
20 recollection.
21    A    My best recollection is no.
22    Q    And have you ever been asked to be an
23 expert witness for any other government
24 regulatory agency?
25    A    No.

33

1    Q    Have you ever done any work of any
2 kind before for the firm where Mr. Katz works,
3 Sallah Astarita & Cox?
4    A    No.
5    Q    Tell me generally -- in regard to your
6 expert report, generally speaking, what was your
7 process for preparing your expert report in this
8 case?
9    A    Okay.  Well, I reviewed the complaint.
10 I reviewed the answer.  I would have looked at
11 the Interrogatories and the other back and forth
12 and the transcript of Mr. Almagarby's deposition.
13 And then I would have gone back to -- I might
14 have looked at the materials I prepared for
15 IronRidge.  But I would have refreshed my
16 recollection with the standard treatises and --
17 but primarily those -- the complaint and the
18 record as it was provided to me back when I
19 received it sometime in the late summer.
20 Sometime in the summer.
21    Q    Okay.  So what I'm trying to get a
22 handle on now is the factual information that you
23 reviewed as distinguished from -- let me
24 finish -- as distinguished from the allegations
25 or the contentions.

34

1        You mentioned just now in your answer
2 that you looked at Interrogatory responses and
3 transcript of Mr. Almaqby's deposition.  Were
4 those -- beyond the answers to the
5 Interrogatories and the transcript of
6 Mr. Almagarby's deposition, did you review any
7 other materials of a factual nature in connection
8 with your preparation of your report?
9    A    The report -- so the report, really
10 that's what I focused -- those were the materials
11 I focused on in preparing it.  It may be the --
12 I'm sure that just before the submission of the
13 report I got some additional materials.
14    Q    So I'm -- let me ask the question.
15    A    Okay.
16    Q    I ask you to pay attention to exactly
17 what I'm asking --
18    A    Sorry.
19    Q    -- and answer that question.
20        Other than the responses to
21 Interrogatories and the transcript of
22 Mr. Almagarby's deposition, did you review any
23 other materials of a factual nature in connection
24 with the preparation of your report?
25    A    I -- I think -- I think I focused on

35

1 those materials.
2    Q    Did you review any -- I'm trying to
3 get a clear answer to the question.  You say you
4 "think I focused on those materials."  I'm asking
5 you whether you reviewed any other materials of a
6 factual nature.  And either you did, you didn't,
7 or you don't remember.
8        MR. KATZ:  I'm going to object.
9        THE WITNESS:  Before the submission of
10 the report, the additional -- what I understand
11 to be the dueling motions for summary judgment
12 and some additional exhibits came through.  I
13 indicated them in the materials that I -- that
14 were sent over yesterday that I -- I saw the
15 other materials that came in and glanced at them,
16 but they were not my focus in preparing my
17 submission.
18        Does that make sense?
19 BY MR. GORDON:
20    Q    I'm still a little bit fuzzy.  I mean
21 the question is did you -- it's a pretty simple
22 question.  Did you review any other materials of
23 a factual nature besides the Interrogatory
24 responses and Mr. Almagarby's deposition?  Did
25 you consider any other materials of a factual

36

1  nature that you used to prepare your report?
2      MR. KATZ:  Objection.
3      THE WITNESS:  I looked through
4  exhibits that -- that came in in that second
5  traunch of materials prior to the submission of
6  the report.  So I was still preparing it in the
7  sense of proofing it.
8  BY MR. GORDON:
9      Q    Okay.  You -- you --
10      Let's go ahead and mark this as an
11  exhibit.
12      Before we mark this, you -- you
13  acknowledge that you prepared and submitted to
14  your attorney for production to the SEC a
15  three-page document listing sources of facts or
16  data?
17      A    Yes.
18      Q    And I just -- I'm just going to read a
19  sentence from this on Page 2.
20      A    Okay.
21      Q    It says, "Before the submission of my
22  report, I became aware of the following
23  additional sources of potential facts and data
24  which I understand are the subject of ongoing
25  briefing and may become the subject of subsequent

37

1  evaluation and testimony on my part; however, I
2  did not consider them in developing the opinions
3  expressed in my report."
4      And then it goes on to list the --
5  essentially the summary judgment filings and the
6  papers related to those.
7      A    Right.
8      Q    So when you said that you did not
9  consider these documents in developing the
10  opinions expressed in your report, was that an
11  accurate statement?
12      A    Yes.  And in this -- and in this
13  sense, my task was to review the complaint and
14  its adequacy to allege -- to establish that
15  Mr. Almagarby was a dealer.  So I was trying
16  to -- whether correctly or incorrectly, I was
17  trying to focus on the record as it was
18  provided -- provided to me and what -- what the
19  complaint was focused on.
20      I'm -- my challenge is this word
21  "considered."  I -- I looked at but nothing
22  really was altered in my review of the -- my
23  looking through those other materials.  But I
24  understood my task to be to focus on the
25  materials associated with the complaint as it was

38

1  initially provided.
2      Does that make sense?
3      Q    Well, you say your challenge is the
4  the word "considered."  That's the word you chose
5  to use, correct?
6      A    Yes.
7      Q    So you also say that you were
8  concerned with reviewing the record as it was
9  provided to you.  The word "record" means
10  different things to different people.  What do
11  you mean when you say "the record"?
12      A    The materials that precede -- I tried
13  to lay things out chronologically so you could
14  see the materials I had and that really -- I
15  prepared the report late in the summer, just
16  before its submission.  New materials came in.  I
17  understood my task to be to focus on the
18  complaint and the allegations in the complaint.
19  So -- and things as they stood there, which was
20  informed by the factual record that then had been
21  set out or provided.  So those materials, that's
22  what I had.
23      Subsequent to it, those additional
24  materials came in.  I did not see any -- I did
25  glance through them.  I did not see anything that

39

1  altered -- caused me to say, "Hey.  Time out.
2  Stop."  But I did not focus on them.  So if I
3  misused the word "considered," you know -- I'm
4  laying this out in a rather expository way
5  because I'm trying to give you a sense of what
6  I -- the process.
7      Q    Okay.  Let's mark your report at this
8  point and move on.  I'll return to some of the
9  subjects we just covered later --
10      A    Sure.
11      Q    -- but for now, we'll move on.
12      MR. GORDON:  Let's mark the report
13  JB2.
14      (Deposition Exhibit 2 was marked for
15  identification and attached to the transcript.)
16      THE WITNESS:  I'm sorry for being so
17  expository when I speak.  I'm an old English lit
18  guy.  I used to get paid by the words.  I guess I
19  still do.  I should have asked to be taken off
20  the record for that.
21  BY MR. GORDON:
22      Q    So you agree that the exhibit that
23  we've just marked, JB2 that's been placed in
24  front of you, is a copy of your expert report in
25  this case?

40

1    **A**    Yes.
2    **Q**    Do you -- again, certain standard
3   questions that I need to ask.  Do you have any
4   clarifications or corrections to your report as
5   you sit here today?
6    **A**    I -- no.
7    **Q**    And does the report contain all the
8   subject matter upon which you will express
9   opinions at trial if you're permitted to testify?
10      MR. KATZ:  Objection.
11      THE WITNESS:  I don't know.  If I'm
12   asked to report more broadly than this, I suppose
13   I'll do it in accordance with whatever you guys
14   negotiate.  But so far, that's what I know I'm
15   supposed to be doing.  That's what I've been
16   retained to do so far.
17   BY MR. GORDON:
18      **Q**    So are there opinions or subject areas
19   about which you intend to express opinions that
20   are not covered in this report?
21      MR. KATZ:  Objection.
22      THE WITNESS:  I suppose it depends on
23   if you ask me something that's outside the scope
24   of this document.  But otherwise, no.
25   BY MR. GORDON:

41

1    **Q**    Okay.  If you develop any opinions or
2   subject areas upon which you intend to express an
3   opinion, will you agree to disclose those to me?
4    **A**    Sure.
5      MR. KATZ:  Objection.
6   BY MR. GORDON:
7    **Q**    Can you tell me how this expert
8   engagement came about, how you came to get this
9   assignment?
10      MR. KATZ:  I'm going to object to the
11   extent it could contain anything that would be
12   attorney-client protected.
13      THE WITNESS:  Josh's partner Jim
14   Sallah called me and asked if I would be -- if I
15   would consider taking the job on.
16   BY MR. GORDON:
17      **Q**    Okay.
18      **A**    S-A-L-L-A-H.
19      **Q**    And turn to Page 3 of your report.
20   About in the middle of that first paragraph in
21   the introduction it -- you state, "Specifically I
22   was asked to review and assess whether, based on
23   my experience in private practice and with the
24   SEC, the SEC is deviating from long-standing
25   guidance and enforcement practice by advancing

42

1   its theory why the defendants each fall within
2   the definition of dealer set forth in section
3   3(a)(5) of the Securities and Exchange Act of
4   1934 and, as such, are required to register as a
5   dealer under Section 15(b) of that act."
6      Is that an accurate statement of the
7   scope of your assignment?
8    **A**    Yes.
9    **Q**    Does that accurately state the full
10   extent of the scope of your assignment?
11      **A**    Yes, I think so.
12      **Q**    So let me ask you this.  Apart from
13   whether you believe that the SEC is deviating
14   from guidance and enforcement practice by
15   alleging that the defendants are dealers, do you
16   have an opinion that it would be incorrect, as a
17   matter of statutory interpretation, to find that
18   the defendants are dealers under Section 3(a)(5)
19   of the Exchange Act?
20      MR. KATZ:  Objection.
21      THE WITNESS:  I think, as the report
22   lays out, the definition of dealer has been left
23   to itself.  It could apply a wide array of market
24   participants, and that's exactly why it's been
25   further interpreted through Commission releases

43

1   and otherwise.  So can't be read just, you know,
2   as a -- I think that's the whole reason we have
3   the guidance that has come out from the Agency
4   because otherwise, the definition itself by
5   itself is too stark.  Could capture them, could
6   capture just about any market participant.
7   BY MR. GORDON:
8      **Q**    So is it your opinion that the
9   statute, Section -- statutory provision
10   Section 3(a)(5) is broad enough to include
11   Mr. Almagarby as a dealer based on your
12   understanding of the facts?
13      **A**    The -- the words on the page, without
14   further understanding and interpretation and
15   gloss could do so.
16      **Q**    Okay.  And is it your opinion that the
17   guidance and enforcement practice of the SEC
18   changes the meaning of the statute?
19      MR. KATZ:  Objection.
20      THE WITNESS:  Well, a quick
21   history le- -- I'm sorry.  You don't want --
22   BY MR. GORDON:
23      **Q**    I don't want a quick history lesson.
24   I'd like you to answer the question.
25      MR. KATZ:  I'm going to object.  You

44

1  asked the question.  He's going to answer the
2  question, and he should be allowed to answer the
3  question.
4  BY MR. GORDON:
5      Q     Okay.  I mean we're going to be here
6  for, you know, until it gets dark if we can't
7  expedite this thing.  You can answer the question
8  as you see fit.
9      A     When the -- when the definition was
10 established in 1930, it clearly was addressed to
11 market makers.  When amendments were made -- with
12 an exception for Exchange members in 1975,
13 Exchange members were then included in the
14 definition.  The definition of dealer
15 notwithstanding, the stark words on the page have
16 always been focused on primarily and has really
17 been focused on market professionals.
18           But -- I'm sorry -- to answer your
19 question, the words on the page would ensnare not
20 just Mr. Almagarby but others.
21     Q     What do you mean "ensnare"?
22     A     Would touch upon.  I'm sorry.  I don't
23 mean to use a loaded expression.
24     Q     You're saying that the statutory
25 definition is -- by itself, is broad enough to

45

1  include Mr. Almagarby and MEG as dealers?
2      A     Yes.
3      Q     Now, you stated -- and correct me if I
4  get this wrong.  In answer to an earlier question
5  of mine, you stated that your focus was on the --
6  one of your focuses was on the allegations in the
7  complaint filed by SEC.
8            Is that accurate?
9      A     Yes.
10     Q     And was the principal or one of the
11 principal purposes of your expert engagement to
12 determine whether or not those allegations were
13 sufficient to state a claim against Mr. Almagarby
14 as a dealer?
15     A     Yes.
16     Q     So that -- that part of your
17 assignment, would it be fair to say, is
18 completely independent of whatever facts may
19 exist in the world, but rather, they're confined
20 to the way the SEC pled the complaint?
21           MR. KATZ:  Objection.
22           THE WITNESS:  I'm not sure I really
23 understood that.  Sorry to be obtuse.
24 BY MR. GORDON:
25     Q     Okay.  So your analysis of the

46

1  complaint --
2      A     Yes.
3      Q     -- was confined to allegations rather
4  than evidence?
5            MR. KATZ:  Objection.
6  BY MR. GORDON:
7      Q     Is that fair?
8      A     No.  I would say it was -- it was
9  both -- the sufficiency -- the sufficiency of the
10 complaint paired against the -- certainly say the
11 deposition -- the deposition of Mr. Almagarby, so
12 such facts as had been developed and I saw.
13     Q     By which you mean Mr. Almagarby's
14 deposition transcript and responses to
15 Interrogatories?
16     A     Yes, and whatever materials are in
17 that first -- on the first page of that document.
18     Q     Well, what other materials -- factual
19 materials do you recall looking at beyond the
20 Interrogatory responses and Mr. Almagarby's
21 transcript?
22           MR. KATZ:  Objection.
23           THE WITNESS:  This takes us back to
24 the end of things.  My assignment was in respect
25 to the complaint and the factual record as it

47

1  existed then.  Prior to the submission of the
2  report but after I completed the substantive
3  preparation, more materials came in.  In looking
4  at those, I didn't see anything that changed my
5  view.
6  BY MR. GORDON:
7      Q     Let's go to Page 5 of your report.
8  You have a Section 3 there in the middle of the
9  page called "Scope of Review."  Do you see that?
10     A     Mm-hmm.
11     Q     And the first sentence reads, "The
12 views set forth herein are based on my review of
13 the allegations in the complaint, consultation
14 with defendants, deposition testimony by
15 Mr. Almagarby provided to the SEC during its
16 investigation, and such legal and regulatory
17 precedents as I have deemed relevant to this
18 matter.  This report includes references to the
19 specific documents and precedents I have relied
20 on."
21           Is that statement in your expert
22 report accurate?
23     A     Yes, I think so.  Yeah.
24     Q     Other than -- in terms of factual
25 materials, other than consultation with the

48

1  defendants and deposition by Mr. Almagarby, there
2  are no other factual sources of information
3  mentioned anywhere in your report, are there?
4        MR. KATZ:  Objection.
5        THE WITNESS:  I don't -- I don't -- I
6  don't believe so.
7        MR. GORDON:  Let's go ahead and mark
8  the sources of facts or data document that I read
9  from earlier as Exhibit JB3.
10        (Deposition Exhibit 3 was marked for
11  identification and attached to the transcript.)
12        MR. GORDON:  Joshua, I apologize.  I
13  only have two copies for this one.  Do you mind
14  sharing with the witness?
15        MR. KATZ:  That's no problem.
16  BY MR. GORDON:
17        Q    Let me refer you to Page 2 -- first of
18  all, is it correct -- can you identify this as --
19  document as one that you prepared at the request
20  of your counsel recently and provided to your
21  counsel for production to the SEC?
22        A    Yes.
23        Q    And on the second page, at Item C, it
24  lists that one of the sources of information that
25  you relied on was a telephone conversation with

49

1  Ibrahim Almagarby on August 19, 2019, correct?
2        A    Yes.
3        Q    Was that the only time that you spoke
4  to Mr. Almagarby?
5        A    Yes.
6        Q    Can you tell me approximately how long
7  that conversation was?
8        A    Half an hour, hour.  Half an hour.
9        Q    Okay.  And what was the purpose of the
10  conversation?
11        A    I think it was to just -- given the
12  deposition record, to see if I understood what
13  was, you know -- that I was reading and hearing
14  the words on the page, just if there -- if there
15  was anything obscure about it.
16        And there would have been one -- yeah,
17  and I think there was at least one -- the one
18  substantive question I recall asking was -- you
19  know, noting he had counsel for the 144(A), the
20  144 opinions, whether in any of those
21  circumstances anyone had -- I think I observed it
22  looks like "You were really trying to follow
23  rules here.  You spoke to a variety of lawyers.
24  Did anyone ever suggest that you should be
25  registered as a broker-dealer?" and his answer

50

1  was "No.  No one ever brought this up.  No one
2  ever brought that up."
3        Q    Okay.  What else do you remember about
4  that conversation?  Essentially I'd like to ask
5  you to tell me everything that you can remember
6  from the conversation as you sit here today.
7        A    Sure.
8        Very little.  I recall that he was
9  in -- he was abroad.  We had a very poor
10  connection.  And I don't -- I don't even recall
11  that I took contemporaneous notes.  I didn't
12  create a memo to file.  I think I just -- it was
13  a little bit of an introduction.  I think he was
14  also just trying to decide whether to -- you
15  know, I was to be, you know -- I can imagine
16  wanting to know who the person on whose behalf
17  you're speaking.
18        I think I provided some background and
19  biographical information.  I may have spoken
20  about -- may have spoken about IronRidge and may
21  have expressed concerns about the Agency bringing
22  actions in this area.  And substantively, all I
23  remember as I sit here right now, in terms of
24  what I asked or anything that was in my own mind
25  or giving me, you know, just something I wanted

51

1  to hear for myself, it was in the question of did
2  any of the lawyers he ever worked with or any of
3  the professionals he ever worked with suggest he
4  should be registered as a dealer, and his answer
5  to that was no.
6        Q    Did -- you said that you don't
7  remember whether you took contemporaneous notes?
8        A    I did not take contemporaneous notes.
9  I might have scribbled something in the margin of
10  a -- something that I didn't hold onto because it
11  didn't -- it was just -- it was as much as
12  anything a passing -- passing conversation.  It
13  was not a formal interview as such.
14        Q    Did you make any notes or record of
15  the call apart from contemporaneous notes?  For
16  example, after the call, did you create notes of
17  the call?
18        A    No, not to my recollection.
19        Q    Was anybody else, to your knowledge,
20  listening to the conversation that you had with
21  Mr. Almagarby?
22        A    Someone from the Sallah firm would
23  have been on the call.
24        Q    Okay.  You don't recall which person?
25        A    Which person.  I think it was Jim

52

1  Sallah, but I'm not sure.
2      Q    Okay.  And when you spoke to
3  Mr. Almagarby, did you -- were you trying to --
4  did you ask him questions to try to determine
5  whether or not he could be considered a dealer?
6  Did you ask probing questions on that subject?
7      A    No, no.
8      Q    Did you go through with him the
9  factors that you think are relevant to
10 determining whether or not one is a dealer with
11 Mr. Almagarby?
12     A    I don't recall having done that.
13     Q    Okay.
14     A    If there are notes that Mr. Sallah
15 has, that may be the case, but I don't recall
16 having done that, no.
17     Q    Okay.  Didn't you want to know whether
18 or not he -- his activities would meet the
19 definition of dealer before you took the
20 assignment?
21         MR. KATZ:  Objection.
22         THE WITNESS:  I had the -- I had
23 the -- well, I think I had the record.  I had --
24 which is why I asked the question about the --
25 you know, had any of the lawyers ever said

53

1  anything.  No, I was -- I was looking to the
2  record.  I wasn't trying to do any independent
3  factual development other than that one
4  particular question I had for myself, which I
5  don't think is necessarily outcome determinative
6  of anything.  I merely wanted to know.
7  BY MR. GORDON:
8      Q    And when you say you were focused on
9  the record, you mean the record as you've
10 described it in your report?
11     A    Yes.
12     Q    And you can put Exhibit 3 aside for
13 now and go back to Exhibit 2, which is your
14 expert report.
15     A    Okay.
16     Q    I just want to read a couple other
17 statements from the report and ask you some
18 questions about them.
19     A    Sure.  What page?
20     Q    Let's look at Page 6.  Just give me a
21 moment.  Sorry.  I just need to find my place
22 here.
23         Look at Page 8.  Okay.  The very first
24 sentence there after the heading background says,
25 "This section sets forth my understanding of the

54

1  facts based on the allegations in the complaint
2  and the deposition testimony of Mr. Almagarby and
3  the related exhibits."
4         First of all, have I read that
5  correctly?
6      A    Yes.
7      Q    And is that an accurate statement, to
8  the best of your knowledge?
9      A    To the best of my knowledge.
10     Q    Let's go to Page 14 of your report.
11         MR. KATZ:  Sorry, Counsel, 14?
12         MR. GORDON:  Yes.
13 BY MR. GORDON:
14     Q    Give me a moment.  I have to find what
15 I'm looking for.
16         If you look at the top of Page 14, you
17 state, "I believe that the activities by the
18 defendants pled in the complaint lack the indicia
19 of dealer activity as set forth by the SEC and
20 the SEC staff, and a full consideration of the
21 various factors articulated by the SEC supports
22 the conclusion that the defendants should be
23 considered traders."
24         Have I read that accurately?
25     A    Yes.

55

1      Q    Again, your focus here is on the
2  activities that were pled in the complaint, the
3  allegations in the complaint, correct?
4      A    That was the focus of the report, yes.
5      Q    And then just to skip a sentence and
6  the next sentence on Page 14, you say, "On its
7  face, the SEC's complaint, which simply outlines
8  purchases of debt instruments and subsequent
9  sales of equity securities by the defendants, I
10 believe is insufficient to establish that the
11 defendants were dealers under the Exchange Act."
12         Have I read that accurately?
13     A    Yes.
14     Q    And is that -- you stand by that
15 statement?
16     A    Yes.
17     Q    Again, the focus there is on the
18 sufficiency of the allegations of the complaint.
19 Fair enough?
20     A    Yes.
21     Q    And that was really the core of your
22 assignment, correct?
23         MR. KATZ:  Objection.
24         THE WITNESS:  Yes.  So far.
25 BY MR. GORDON:

56

1    **Q**    So, Mr. Burns, were you aware that the
2  defendants in this case filed a motion to dismiss
3  in which they alleged that the allegations in the
4  complaint were insufficient to establish that the
5  defendants were dealers?
6    **A**    I -- yes, I -- yes, I think so.
7    **Q**    And did you -- did you read -- do you
8  need a minute?
9    **A**    The motion to dismiss or motion to --
10  motion for summary judgment?
11    **Q**    A motion to dismiss.
12    **A**    I'm not sure about -- about that
13  particular one.  I don't recall that one.
14    **Q**    Okay.  So you're -- you are not sure whether you
15  that you weren't -- you are not sure whether you
16  knew that the defendants filed a motion to
17  dismiss in this case?
18    **A**    Right.  What I am aware of is what I
19  have laid out in the documents.  In terms of the
20  record, that's what I have --
21    **Q**    Okay.  So there's no reference
22  anywhere in your materials considered or in your
23  expert report to a motion to dismiss by the
24  defendants, is there?
25    **A**    No, I don't think so.

57

1    **Q**    And does that mean that you didn't
2  know about it or didn't review the motion?
3    **A**    I didn't -- well, I didn't -- not
4  aware of it.  It doesn't surprise me there is
5  one.  I don't recall having been asked to or
6  reviewing it.
7    **Q**    Do you -- do you know what a motion to
8  dismiss for failure to state a claim is,
9  generally speaking?
10    **A**    Casting my mind way back.  Sort of.
11    **Q**    And is it your understanding that it
12  is a motion that alleges that the allegations in
13  the complaint are insufficient to establish a
14  claim on their face?
15    **A**    That's what I would have thought.
16    **Q**    Okay.  And that's essentially the
17  subject of your expert testimony, right?
18        MR. KATZ:  Objection.
19        THE WITNESS:  It was addressed to the
20  complaint, so I don't know if it -- it's
21  coterminous with this motion to dismiss.
22  BY MR. GORDON:
23    **Q**    Well, would it surprise you to know
24  that in attempting to have the charges against
25  their clients dismissed at the "motion to

58

1  dismiss" stage, that defense counsel in this case
2  made legal and policy arguments very similar to
3  the opinions that you express in your report?
4        MR. KATZ:  Objection.
5        THE WITNESS:  It wouldn't in the sense
6  that I think the materials would have been
7  very -- some of the underlying arguments would
8  have been very similar to those in IronRidge.  So
9  it wouldn't have surprised me in that sense.  But
10  I don't know.
11  BY MR. GORDON:
12    **Q**    Okay.  Did you -- I take it, then, you
13  were not aware that Mr. Sallah and myself
14  participated in a hearing in front of Judge
15  Cooke, the judge assigned in this case, on --
16  regarding the defense motion to dismiss?
17        MR. KATZ:  Objection.
18        THE WITNESS:  No, I don't have any
19  knowledge of it.
20  BY MR. GORDON:
21    **Q**    Okay.  At any time did you become
22  aware that Judge Cooke denied the defense's
23  motion to dismiss?
24    **A**    Nope.
25    **Q**    So you're just learning about this for

59

1  the first time -- assuming that I'm representing
2  it to you accurately, you're just learning about
3  it now for the first time?
4    **A**    I just don't recall having heard it
5  before.  I don't think so.  I haven't spoken with
6  Mr. Sallah very frequently.
7    **Q**    Okay.  If you assume the accuracy of
8  what I'm representing, which is these are matters
9  of records, and I think that Mr. Katz won't
10  disagree, but if you take it on faith that the
11  defendants filed a motion to dismiss alleging
12  that the complaint was insufficient on its face
13  to show that the defendants were dealers, it
14  appears to me that you're offering the legal
15  opinion that's contrary to an issue that the
16  judge in the case already ruled on.
17        MR. KATZ:  Objection.
18  BY MR. GORDON:
19    **Q**    Am I wrong about that?
20        MR. KATZ:  Objection.
21        THE WITNESS:  I don't think I'm here
22  to express a legal opinion.  And if the scope of
23  what I'm asked to -- called upon to do
24  encompasses more than the complaint, I'm very
25  happy to, you know, broaden -- broaden the -- and

60

```
 1   I've seen nothing here forward that would change
 2   my view to broaden this statement to encompass
 3   the rest of what's in the record and things where
 4   they stand right now.
 5   BY MR. GORDON:
 6      Q    So if Judge Cooke entertained a motion
 7   that the complaint was insufficient on its face
 8   to establish that the defendants were dealers and
 9   she denied the motion, is it your view that she
10   got it wrong?
11         MR. KATZ:  Objection.
12         THE WITNESS:  Well, my view is that
13   there are not -- the complaint's insufficient to
14   establish the kind of case I think should be
15   brought.
16   BY MR. GORDON:
17      Q    Is that the defendants are dealers?
18      A    That the defendants are dealers.
19      Q    Okay.  So if the Court found the
20   contrary to the opinion you just expressed, it's
21   your view that you're right and the Court is
22   wrong?
23         MR. KATZ:  Objection.
24         THE WITNESS:  Based on what I have
25   seen and -- yes, in my -- in my expert view, not
```

61

```
 1   as a legal matter but as a matter of broader
 2   expertise.  And I'm not saying I agree or
 3   disagree as a legal matter.  I'm just saying, in
 4   terms of motion to dismiss, I'm just saying this
 5   does not look like dealer activity to me.
 6   BY MR. GORDON:
 7      Q    So as an expert witness, based on your
 8   report, it's your intention -- it will be your
 9   intention to go before the jury and tell them
10   that the allegations in the complaint are
11   insufficient to establish that the defendants in
12   this case were dealers, correct?
13         MR. KATZ:  Objection.
14         THE WITNESS:  If that remains the
15   scope of the assignment.  If it's broadened to
16   encompass a broader part of the record, then it
17   might be more encompassing than just the
18   allegations in the complaint.
19   BY MR. GORDON:
20      Q    Okay.  But I want to stick to the
21   opinions that you have said that you intend to
22   address and that are embodied in this report,
23   which you've already acknowledge relate to the
24   allegations in the complaint, true?
25         MR. KATZ:  Objection.
```

62

```
 1         THE WITNESS:  Yes.
 2   BY MR. GORDON:
 3      Q    So do you think it would be
 4   appropriate to go in front of a jury and
 5   basically tell them, basically, legal opinions
 6   about the sufficiency of the complaint that are
 7   contrary to the ruling that the judge already
 8   made in the case?
 9         MR. KATZ:  Objection.
10         THE WITNESS:  Depending on what I'm
11   asked, I would offer that as an expert, I
12   don't -- in my expertise and experience and what
13   I have seen in markets, that it's inappropriate
14   to denominate Mr. Almagarby as a dealer.
15   BY MR. GORDON:
16      Q    Based on the allegations in the
17   complaint, correct?
18         MR. KATZ:  Objection.
19         THE WITNESS:  Based on the allegations
20   in the complaint and what I have since seen
21   doesn't dissuade me from that point of view.
22   BY MR. GORDON:
23      Q    Do you think it is permissible or
24   appropriate expert testimony to -- for you to
25   tell the jury that the allegations in the
```

63

```
 1   complaint are insufficient --
 2         MR. KATZ:  Objection.
 3   BY MR. GORDON:
 4      Q    -- when that issue has already been
 5   ruled on by the Court?
 6         MR. KATZ:  Objection.
 7         THE WITNESS:  I'm afraid I don't know
 8   enough about the proprieties of that part of the
 9   civil procedure.  I would answer the questions
10   that are asked of me and try to answer them.
11   BY MR. GORDON:
12      Q    As part of your expert assignment, did
13   you give any consideration to whether or not the
14   expert opinions that you propose to testify to
15   would be -- would be permissible or appropriate
16   under the law?
17         MR. GORDON:  I'm sorry.  Would you
18   read that back to me.
19      (The record was read by the reporter.)
20         MR. KATZ:  Objection.
21         THE WITNESS:  I certainly considered
22   whether I had enough knowledge of the subject to
23   provide -- provide an opinion.
24   BY MR. GORDON:
25      Q    That was not my question.
```

64

1    **A**    I don't --
2         MR. KATZ:  I'm going to object.
3    There's no question pending.  If you want to ask
4    the question a different way, please.
5    BY MR. GORDON:
6    **Q**    Do you want to hear the question again
7    and see whether you can give a responsive answer?
8    **A**    Please.
9         MR. GORDON:  Okay.  Can you read it
10   back again.
11       (The record was read by the reporter.)
12       MR. KATZ:  Objection.
13       THE WITNESS:  I didn't go through --
14   no, in the sense that I wasn't looking to
15   establish whether everything was -- what I was
16   being asked to do was following local court
17   procedures or expectations of the Court.  I was
18   merely focused on whether I could provide
19   expertise in respect of a matter.
20   BY MR. GORDON:
21   **Q**    Okay.  And my question wasn't confined
22   to the local rules.  My question was --
23   **A**    -- under federal rules --
24   **Q**    And under the law.
25   **A**    Under the law.

65

1    **Q**    And under the case law, correct?
2         MR. KATZ:  Is there a question?  I'm
3    going to object again.
4         THE WITNESS:  I guess my challenge was
5    I wasn't looking to come in and provide legal
6    expertise.  I was thinking of things in terms of
7    expertise, seeing participants in markets,
8    although legal issues have been touched upon.  It
9    was really -- you know, I'm looking to counsel to
10   ensure that we're doing what we're supposed to do
11   in keeping with the law.  But I wasn't aware
12   of -- I did not give consideration to whether --
13   I did not give the consideration you asked me
14   about.
15   BY MR. GORDON:
16   **Q**    Okay.
17   **A**    I don't recall having done that.
18       MR. KATZ:  Robert, if we're getting to
19   some sort of stopping point --
20       MR. GORDON:  Why don't we take a
21   five-minute break.
22       (A brief recess was taken.)
23   BY MR. GORDON:
24   **Q**    Mr. Burns, we are back on the record.
25   I'll ask you to turn to Page 5 of your report.

66

1    And under the "Scope of Review" section, I'm just
2    going to read the third sentence that begins with
3    the information.
4         Do you see that?
5    **A**    Mm-hmm.
6    **Q**    You write, "The information I reviewed
7    is consistent with that typically relied upon by
8    legal experts in an analysis of issues regarding
9    registration as a dealer under the Exchange Act."
10       Have I read that correctly?
11   **A**    Yes.
12   **Q**    You include the term here "legal
13   experts" here.  Would it be accurate to say that
14   you are proposing to testify in this case as a
15   legal expert?
16   **A**    No.  I've been asked to speak from my
17   broad regulatory experience.  It's hard to
18   divorce my legal expertise from that.
19   **Q**    But you do use the term "legal
20   experts" in here.
21   **A**    I say that's -- it's typical as
22   compared to that used by legal experts, and I
23   note the sentence that follows.
24   **Q**    The sentence that follows reads, "I
25   have also relied upon my experience as a

67

1    practitioner who has, for many years, closely
2    followed market practices and who routinely
3    evaluates regulatory questions that arise on the
4    part of broker-dealers and investment advisors to
5    provide funds, as well as my experiences as a
6    senior officer at the SEC."
7         Have I read that correctly?
8    **A**    Yes.
9    **Q**    Are you saying here that you're not a
10   legal expert?
11       MR. KATZ:  Objection.
12       THE WITNESS:  I'm certainly that.  The
13   capacity in which I've been retained --
14       Josh, I look to you.  I think talking
15   to market practice here as much as I may be to
16   the legal issues underlying the matter.
17   BY MR. GORDON:
18   **Q**    As a lawyer, you advise clients on --
19   **A**    Routinely.
20   **Q**    Let me finish.
21       As a lawyer, you advise clients on
22   market practice and counsel them based on your
23   experience as a securities lawyer, right?
24   **A**    Yes, routinely.
25   **Q**    So when you -- when you use "legal

68

1 experts" in the context of this report, are you
2 referring to experienced, knowledgeable,
3 securities lawyers, or do you mean something
4 different?
5    **A**    In there I certainly mean that, yes.
6    **Q**    Okay.  You don't necessarily mean
7 legal experts in the sense of people who have
8 been qualified as experts in court, do you?
9    **A**    No.  I don't think I had that in mind
10 in writing that.
11    **Q**    In fact, are you aware of anyone who's
12 been qualified as an expert in court to opine on
13 issues regarding registration as a dealer under
14 the Exchange Act?
15    **A**    I'm not aware one way or the other.
16    **Q**    And would you agree with me that
17 interpreting the federal statutes, statutes,
18 federal court decisions interpreting them,
19 Commission decisions interpreting them, and
20 releases and guidance produced by the Commission
21 are all things that securities lawyers do?
22    **A**    Yes.
23    **Q**    And you are a securities lawyer,
24 correct?
25    **A**    Yes.

69

1    **Q**    So in determining the meaning of the
2 relevant statutes, the Court decisions, the
3 Commission decisions and Commission releases, do
4 you have some special methodology or techniques
5 that somehow stands apart from what other
6 securities lawyers do?
7    **A**    Only in the sense of interactions
8 certainly when I was at the Agency with a broad
9 array of market participants.  So most securities
10 lawyers don't have that experience from within
11 the Agency, whether just having conversations
12 about policy issues and the like.  But otherwise,
13 no.  Mine would be like other securities
14 practitioners.
15    **Q**    Okay.  Is there anything contained in
16 your report or in your opinions that the
17 attorneys in this case would not be able to argue
18 in their arguments and briefings in this case, to
19 your understanding?
20         MR. KATZ:  Objection.
21         THE WITNESS:  Only insofar as my
22 experience might be informed differently than
23 theirs because of my experiences in the Agency
24 and my interactions.  But I can't speak to the
25 lawyers in the case, what their own interactions

70

1 have been in that regard.
2 BY MR. GORDON:
3    **Q**    I understand that there are
4 differences in experience and careers.  But in
5 terms of the arguments you make about the
6 sufficiency of the complaint, the meaning of the
7 guidance and so forth, those are all arguments
8 that they could make if they wanted to, correct?
9         MR. KATZ:  Objection.
10         THE WITNESS:  Yes.
11 BY MR. GORDON:
12    **Q**    Now, you -- let me mark another
13 exhibit.  Let's mark this one JB4.
14         (Deposition Exhibit 4 was marked for
15 identification and attached to the transcript.)
16 BY MR. GORDON:
17    **Q**    Let me see if I have another one of
18 these.
19         Mr. Burns, JB4 is a copy of your
20 expert report in the matter of Ironridge Global
21 Partners, LLC, and Ironridge Global IV, Limited,
22 Administrative Proceeding File Number 3-16649
23 before the Securities and Exchange Commission,
24 correct?
25    **A**    Yes.

71

1    **Q**    Now, do you recall that in the
2 Ironridge matter, as I will refer to it, that the
3 SEC charged Ironridge Global Partners and its
4 parent Ironridge Global IV with being
5 unregistered dealers in violation of Exchange Act
6 Section 15(a)?
7    **A**    Yes.
8    **Q**    And do you recall that IronRidge's
9 business model was to acquire claims against the
10 issuers through the assignment of debt owed by
11 the issuers, then settling the claims through the
12 obtainment of discounted shares from the issuers
13 for which a fairness opinion was obtained from a
14 Court and then selling the shares into the
15 market?
16         Is that an accurate general
17 description of the case?
18    **A**    That's what I recall.
19    **Q**    Okay.  And do you recall that
20 Ironridge used the exception to registration
21 contained in Section 3(a)(10) of the Securities
22 Act for obtaining shares in settlement of a bona
23 fide claim?
24    **A**    That's -- yeah, 3(a)(10) exchanges,
25 yes.

72

1    **Q**    And in your report that we've just
2  marked, you opined that Ironridge was not a
3  dealer and, therefore, had not violated Exchange
4  Act Section 15(a), correct?
5    **A**    I recall that's what I wrote.
6    **Q**    Okay.  And in this report, you also
7  opined on certain policy considerations that you
8  thought were relevant in determining whether or
9  not the respondents in the Ironridge case were
10  dealers, correct?
11    **A**    I -- flip forward, but that sounds
12  like what I would have done, yes.  Yes.
13    **Q**    Yes?
14    **A**    Yes.
15    **Q**    So unlike Ironridge, Microcap Equity
16  Group relied on a Rule 144 exemption as opposed
17  to Section 3(a)(10) of the Securities Act to
18  obtain so-called free-trading shares; is that
19  correct?
20    **A**    That's what I understand.
21    **Q**    Okay.  And by "free-trading shares,"
22  you understand me to be referring to shares that
23  were unrestricted and could be sold without
24  filing a registration statement?
25    **A**    Yes.

73

1    **Q**    Now, I'm not trying to insinuate
2  anything here or suggest that there's anything
3  improper, but would you agree with me that there
4  are some similarities in the format of your
5  respective reports in the Ironridge matter and in
6  the instant case?
7    **A**    Yes.
8    **Q**    And there are some similarities in the
9  opinions you expressed and the basis for those
10  opinions, true?
11    **A**    Yes.  The best I can recall, yes.
12    **Q**    Again, I'm not suggesting there's
13  anything wrong with this, but it is true, is it
14  not, that there's a fair amount of language that
15  is common to both reports?
16    **A**    Oh, yes.  Yes.
17    **Q**    And would it be fair to say that --
18  again, not suggesting anything improper, but it
19  would be fair to say that to some degree, your
20  Ironridge report served as sort of a template for
21  your report in this case?
22    **A**    It absolutely would have, yes.
23    **Q**    And would it be fair to say that you
24  employed the same kinds of legal and policy
25  analysis in the two reports?

74

1    **A**    Generally I would have thought so.  Of
2  course, they differ for the reasons you've
3  described.
4    **Q**    But there's a great deal of overlap,
5  correct?
6    **A**    Yes.
7    **Q**    And would it be accurate to say that
8  you used the same methodologies or techniques to
9  formulate your opinion in the Ironridge report
10  and in the report in this case?
11    **A**    I -- what I can't recall is how much
12  of this was based on -- sorry, how much of
13  Ironridge was based on transcript reviews and, of
14  course, ensuing experiences and observations in
15  the market.  But generally I would have said yes.
16    **Q**    Can you think of any methodologies or
17  techniques that you employed in the instant case,
18  meaning the Microcap Equity Group case, that you
19  didn't employ in the Ironridge case?  When I talk
20  about methodologies or techniques, I'm referring
21  to a higher level of analysis.  Was it the same
22  kind of approach?
23    **A**    It would have been a very similar
24  approach.
25    **Q**    Okay.  You can put the report aside.

75

1         Do you recall that Judge Elliott, the
2  administrative law judge in the Ironridge case,
3  found that your report was a legal opinion and
4  stated it in order that he would not rely on your
5  report and prohibited the respondents from
6  calling you as a witness?
7         Do you recall that?
8    **A**    I don't recall the specifics.  I
9  recall Hess from the matter calling and saying it
10  wasn't going to be used.
11    **Q**    Okay.  That's generally consistent
12  with what I just asked you, right?
13    **A**    Yes.  I agree.
14    **Q**    Did you ever have an opportunity to
15  review Judge Elliott's order finding that your
16  report was a legal opinion and stating that he
17  would not rely on it and prohibiting you from
18  being called as a witness?
19    **A**    Not that I recall.
20    **Q**    Okay.  But you're not disputing that
21  those things happened?
22    **A**    I'm not disputing it, no.  Absolutely
23  not.
24    **Q**    So in view of what transpired in
25  Ironridge with regard to your report and your

76

1  proffered testimony, did you consider making any
2  changes to your report in this case that might
3  increase the chances of your being qualified as
4  an expert and being allowed to testify?
5          MR. KATZ:  Objection.
6          THE WITNESS:  Not that I -- no, not
7  that I recall.
8  BY MR. GORDON:
9      Q    And why not?
10         MR. KATZ:  Objection.
11         THE WITNESS:  Well, I was focused on
12  reviewing the facts and seeing whether I thought
13  Mr. Almagarby should be regarded as a dealer or
14  not.  And I didn't see anything in the record
15  that persuaded me he should.
16  BY MR. GORDON:
17     Q    So would it be fair to say that you
18  are more or less indifferent to whether or not
19  your opinions were admitted and that you were
20  allowed to testify in this case?
21     A    Indifference, I wouldn't have used the
22  word "indifferent."  I was asked to take on an
23  assignment, and I took on the assignment, and I
24  gave notwithstanding language that's similar
25  between the two reports.  I thought the

77

1  underlying facts bore out.
2      Q    Okay.  Your hourly rate in this case
3  was $1,350 per hour, correct?
4      A    I think so.
5      Q    That's what you --
6      A    Yeah.
7      Q    -- disclosed in your report.
8      A    Sure.
9      Q    And so you didn't think that for that
10  amount of money, that it was part of your
11  responsibility to render opinions that would be
12  admissible and write a report from which you
13  could be qualified as an expert in federal court?
14         MR. KATZ:  Objection.
15         THE WITNESS:  Well, I -- I was
16  retained to write a report, and I -- given I
17  believe Mr. Sallah was referred to me by the firm
18  in the Kilpatrick firm, I, you know -- he would
19  have known that record.
20  BY MR. GORDON:
21     Q    Did you discuss with anyone in
22  accepting this assignment the fact that you had
23  essentially -- your opinions had been essentially
24  excluded in the Ironridge matter?
25     A    I don't recall having done so, but I

78

1  don't know that I didn't.
2      Q    Okay.  Did you disclose that to
3  Mr. Almagarby when you had a telephone
4  conversation with him?
5      A    I don't -- no, I don't recall
6  discussing that with him.
7      Q    Okay.  Do you think that would have
8  been important to him?
9          MR. KATZ:  Objection.
10         THE WITNESS:  It might have been.  He
11  was represented by counsel.  I was being retained
12  to serve as an expert.  And I would have said I
13  don't know the court in which the original issue
14  you're describing arose, but different courts can
15  take different views and decide that they're
16  going to use the views of an expert -- they're
17  going to decide they are probative or that they
18  are going to want to use them.
19         So just because it happened in one
20  instance doesn't necessarily mean it will happen
21  in another.
22  BY MR. GORDON:
23     Q    Did you do any sort of inquiry to
24  determine whether or not this was likely to be
25  the case?

79

1      A    No.
2      Q    Did you discuss with anyone at your
3  firm the issue of whether or not your opinions
4  would be admissible in this case?
5      A    I don't recall having done so, but I
6  certainly ran the engagement through our
7  counsel's office -- our business approval office.
8      Q    Did that involve consideration or
9  discussion of whether your opinions would be
10  admissible?
11     A    I don't recall -- I don't recall any
12  express discussions.
13     Q    And again, there's some basic
14  questions that I have to ask and I ask all expert
15  witnesses, and I'm going to ask you these
16  questions as well.
17         So first, are your opinions and
18  conclusions as expressed in your report based on
19  methods that have been generally accepted by
20  others in your field?
21     A    I think so, yes.
22     Q    And what are those methods?
23     A    Reviewing fact and circumstances,
24  being generally aware of statutes, regulations,
25  no-action letters, market practice, and -- and

80

1  taking actions informed by all of those things.
2  **Q**    Those are the methods or the same
3  methods that practicing attorneys employ?
4  **A**    Yes, practicing attorneys would use
5  those.  Yes.
6  **Q**    Beyond the methods and techniques that
7  practicing attorneys employ, I'm talking about
8  methods and techniques, not particular background
9  or experience, there wasn't anything -- there
10  were no other methods or techniques that you
11  applied to reach your conclusions.
12         Would that be correct?
13  **A**    Methods or techniques, no.  I suppose
14  not, other than, once again, my -- you know, I
15  was at the Agency.  I observed rule-making.  I
16  heard from a lot of industry participants.  I am
17  involved in a lot of things that I don't think
18  call upon legal expertise to observe how markets
19  are developing.
20  **Q**    Okay.  Let's look at your report
21  again.  I'll ask you to turn to Page 6, I think
22  it is.  Hold that thought.  I'm sorry.  Page 8.
23  About a third of the way down the page, do you
24  see the sentence beginning "Mr. Almagarby
25  testified"?

81

1  **A**    Right, yes.
2  **Q**    Okay.  Let me just read that sentence.
3  It says, "Mr. Almagarby testified that he did not
4  advertise or solicit debt holders for these
5  transactions but rather that they were all
6  referred to him by third parties."
7         Have I read that accurately?
8  **A**    Yes.
9  **Q**    And would you agree with me that
10  advertising is one consideration in determining
11  whether one is a dealer?
12  **A**    Yes.
13  **Q**    Okay.
14  **A**    One potential consideration, yes.
15  **Q**    Yes.  Did you review the transcript of
16  a Mr. Fusco that was from this case?
17  **A**    I don't think I read Fusco before the
18  preparation of this report.
19  **Q**    Did you read it after?
20  **A**    I may have.  I'm sure I did.  I just
21  don't have any recollection of it.
22  **Q**    I don't see it listed in the materials
23  that you considered.  Would you agree with me
24  that it's not in your list?
25  **A**    In the pre- or the post-list?

82

1  **Q**    Either one.
2  **A**    I do recall it as being among the
3  materials.  It's not on the list.  It was among
4  the materials.  I -- I don't think I -- I don't
5  recall reviewing it in the preparation of this
6  report, and I have since looked at it.  I'm sorry
7  it's not on the list.  That's inadvertent.  And
8  I -- but I don't have a recollection of it -- of
9  its contents.
10  **Q**    Okay.  If -- I would just ask, if
11  there are other materials beyond what you have
12  disclosed in your addendum to your report that
13  you considered in preparing your report, I would
14  ask you to, please, submit an amended list of
15  sources of facts and data.
16  **A**    I absolutely will.  My apologies.
17  **Q**    Do you know who Mr. Fusco is?
18  **A**    Only that he was mentioned as a
19  potential finder in the -- as I recall, in the --
20  in the deposition.
21  **Q**    When you say "a potential finder,"
22  what do you mean by the word "potential"?
23  **A**    Mentioned -- as I recall, you asked
24  Mr. Almagarby about various people with whom he
25  interacted and Mr. -- and who seemed to be acting

83

1  as finders, who -- the line of question suggested
2  we were looking to see if they were finders, and
3  he indicated they were finders.
4  **Q**    What's your recollection, sitting here
5  today, in terms of what Mr. Almagarby said
6  Mr. Fusco's role was and what his relationship
7  with him was?
8  **A**    I'm remembering he had a head for
9  numbers in math, that he pored over potential --
10  looked at potential issuers for people who might
11  be -- include potential investment opportunities
12  for him.
13  **Q**    And he essentially had a staff of
14  subcontractors who cold-called issuers and debt
15  holders in order to look for referrals to the
16  defendants in this case?
17         MR. KATZ:  Objection.
18  BY MR. GORDON:
19  **Q**    Do you recall that?
20  **A**    Mr. Fusco did?
21  **Q**    I'm asking if that rings a bell.  Do
22  you recall knowing that?
23  **A**    Yes.  He had people who made calls and
24  asked, yes.
25  **Q**    Okay.

84

1       MR. KATZ:  I'm going to object.
2  BY MR. GORDON:
3       **Q**    Do you remember anything about -- do
4  you know anything about the number of
5  subcontractors that Mr. Fusco employed to try to
6  find referrals for the defendants in this case?
7       **A**    I don't recall, no.
8       **Q**    Okay.  Do you have any information
9  about the number of calls that Mr. Fusco and his
10  subcontractors were making?
11      **A**    I don't recall.
12      **Q**    Okay.  What -- what do you recall
13  about Mr. Almagarby and MEG having other finders
14  beyond Mr. Fusco and his subcontractors, as you
15  sit here today?
16      **A**    That there were others.
17      **Q**    Okay.  Do you remember how many?
18      **A**    I don't.  I remember a few names in
19  the transcript.
20      **Q**    Okay.  Given what you know and what
21  you knew about Mr. Fusco and his role as a finder
22  for the defendants, would it have been important
23  for you to read the transcript of his testimony?
24      MR. KATZ:  I'm going to object.
25      THE WITNESS:  I -- in looking at it,

85

my recollection of looking at it subsequently is
2  that it didn't change my view about
3  Mr. Almagarby's status as a dealer.
4  BY MR. GORDON:
5       **Q**    So let me clarify.  So you read the
6  transcript before you prepared your report?
7       MR. KATZ:  Objection.
8       THE WITNESS:  I -- I don't recall
9  having read -- I'm sorry.  I don't recall having
10  read Mr. Fusco's materials prior -- considered
11  them in the preparation of the report.
12  Looking -- I have looked at, glanced through,
13  skimmed through Mr. Fusco's materials
14  subsequently because I thought, you know, this is
15  probably going to come in scope at some point.
16  And nothing in there that I read or saw, as I sit
17  here today, seems to me indicative of -- turns
18  Mr. Almagarby into a dealer.
19  BY MR. GORDON:
20      **Q**    Okay.  Do you know if Mr. Almagarby
21  ever personally solicited debt holders to
22  purchase their debt?
23      **A**    My recollection was no.  I don't
24  recall that or seeing that.
25      **Q**    Okay.  So do you know one way or the

86

other?
2       MR. KATZ:  Objection.
3       THE WITNESS:  I'm sorry.  I'm getting
4  a little -- my head's getting a little scrambled
5  here.  I don't recall in the -- in the transcript
6  an instance where he personally was doing the
7  solicitation.  And by the way, I'm sorry.  I just
8  don't recall it.  But I know -- I do recall
9  clearly, you know, his not going out to issuer
10  conferences, his not advertising, his not
11  establishing websites, the other indicia that I
12  would have looked for.
13  BY MR. GORDON:
14      **Q**    But my question has to do with
15  solicitation of debt holders by Mr. Almagarby.
16  When you say you don't recall seeing that, when
17  people say "don't recall," it could mean
18  different things.  It can mean No, that didn't
19  happen, or it could mean I just don't know.
20      **A**    I just have to go back to the record
21  and look through it again.
22      **Q**    As you sit here today, you don't know
23  whether or not Mr. Almagarby personally solicited
24  debt holders?
25      MR. KATZ:  Objection.

87

THE WITNESS:  I don't have a
2  recollection from reviewing the record.
3  BY MR. GORDON:
4       **Q**    One way or the other?
5       **A**    Right, one way or the other.
6       **Q**    Okay.  And if -- if hypothetically
7  Mr. Almagarby did personally go out and solicit
8  debt holders, might that fact have some bearing,
9  along with other factors, on whether he was a
10  dealer?
11      **A**    Yes.
12      **Q**    Okay.  Same question concerning
13  issuers.  Do you know one way or the other if
14  Mr. Almagarby ever personally solicited issuers?
15      **A**    One way or the other, I don't know.
16      **Q**    Okay.  And if he did, might that have
17  some bearing, along with other factors, on
18  whether he was a dealer?
19      MR. KATZ:  Objection.
20      THE WITNESS:  Yes.
21  BY MR. GORDON:
22      **Q**    If Mr. Almagarby had understandings
23  with finders who he knew were contacting numerous
24  issuers on a continual basis in order to find him
25  referrals, might you consider him to be involved

88

```
 1   in the solicitation of issuers?
 2         MR. KATZ:  Objection.
 3         THE WITNESS:  My view is that that --
 4   that's a slippery slope that I wouldn't go down
 5   because there are other market participants who
 6   use finders to look for business opportunities,
 7   individual investors, hedge funds, family
 8   offices.  So that, without a great deal more, no.
 9   BY MR. GORDON:
10      Q    Okay.  But would you agree that it
11   would depend on the facts and circumstances of
12   Mr. Almagarby's arrangement with the finders?
13         MR. KATZ:  Objection.
14         THE WITNESS:  I wouldn't have -- I
15   wouldn't have focused it around the finders.  I
16   would have said the broader set of general facts
17   and circumstances.
18   BY MR. GORDON:
19      Q    Okay.  But I'm asking about the
20   finders and solicitation now.
21      A    Right.
22      Q    So my question is, Would the facts and
23   circumstances surrounding his arrangements with
24   these finders, might that have a bearing on
25   whether or not you regarded him as being involved
```

89

```
 1   in solicitation of issuers?
 2         MR. KATZ:  Objection.
 3         THE WITNESS:  It might.
 4   BY MR. GORDON:
 5      Q    Okay.  Suppose, for example, that --
 6   hypothetically suppose these finders were
 7   employees of Microcap Equity Group.  That would
 8   make Microcap Equity Group and Mr. Almagarby
 9   involved in solicitation, would it not?
10      A    I think that would have -- that would
11   make it look more like that was going on.
12      Q    Okay.  So if the finders were not
13   employees but independent contractors, would you
14   agree that there would have to be a
15   facts-and-circumstances analysis to understand
16   the relationship in order to opine on whether or
17   not the defendants were involved in solicitation?
18         MR. KATZ:  Objection.
19         THE WITNESS:  If a case is being
20   brought, there would absolutely have to be a
21   facts-and-circumstances consideration for the
22   reasons I was describing before.  I would have
23   thought there would be a lot of family offices,
24   hedge funds, others who would be very concerned
25   if that's the way the law develops.
```

90

```
 1   BY MR. GORDON:
 2      Q    If Mr. Almagarby and Microcap Equity
 3   Group were providing advanced cash payments for
 4   the finders to run their office and pay their
 5   subcontractors, would that be a factor that would
 6   be relevant to an inquiry as to whether or not
 7   Mr. Almagarby and MEG were involved in
 8   solicitation?
 9         MR. KATZ:  Objection.
10         THE WITNESS:  I wouldn't have -- that
11   wouldn't have caught my eye in particular.  But,
12   you know, I -- it would be, I suppose, one of
13   many facts you might look at.  I think there
14   is -- how people are -- upfront payments, and I
15   think here payments that weren't transaction or
16   success or profits dependent at the end, but just
17   a fee also is, you know -- that's also -- that's
18   also a fact and circumstance one would also want
19   to consider.  A whole host of things, as you say.
20   BY MR. GORDON:
21      Q    Do you know how the various finders
22   that Mr. Almagarby -- that made referrals to
23   Mr. Almagarby got connected with him in the first
24   place?  Do you have any knowledge of that?
25      A    I don't recall seeing -- I don't
```

91

```
 1   recall reading what -- what the transcripts had
 2   in respect of that.  I'm sorry.
 3      Q    Okay.  If -- again, hypothetically --
 4      A    I recall at least one instance I think
 5   where it indicated people had reached out to him,
 6   but I don't -- I don't recall if there were other
 7   instances where he was reaching out or how it
 8   came about.
 9      Q    Okay.  If you assume, for the purposes
10   of my question, that Mr. Almagarby made it
11   generally known to finders and potential finders
12   that he was interested in obtaining referrals and
13   would compensate them for referrals, might this
14   be considered advertising in your view?
15         MR. KATZ:  Objection.
16   BY MR. GORDON:
17      Q    Or would that be a factor in
18   determining whether or not this was advertising?
19         MR. KATZ:  Objection.
20         THE WITNESS:  I think -- well, I think
21   the advertising has to do with advertising that
22   one is, you know, in the business of buying and
23   selling securities on an otherwise continuous
24   basis and really in the business of doing that as
25   opposed to -- I would distinguish that from an
```

92

1  investor, an active investor of a hedge fund, a
2  family office who might let it be known in any of
3  a number of context that, hey, I've got money,
4  and I want to invest it, and here are the sectors
5  I'm interested in, here's the kind I want to
6  invest.
7        I don't think that turns them into
8  dealers.  I think that's stretching the
9  definition.
10  BY MR. GORDON:
11     Q    Okay.  So it's your view that if
12  Mr. Almagarby made it generally known to finders
13  and potential finders that he was willing to
14  accept referrals and do these deals that involved
15  buying and selling securities, that that would be
16  irrelevant to whether or not he was advertising?
17        MR. KATZ:  Objection.
18        THE WITNESS:  No, I wouldn't have said
19  it was irrelevant.
20  BY MR. GORDON:
21     Q    Would it have some bearing on whether
22  or not --
23     A    Yes, it would have some bearing --
24  could have some bearing.
25     Q    Is it -- is it -- do you believe that

93

1  it would have some bearing -- if he engaged in
2  this practice that I described hypothetically,
3  might that have some bearing on whether or not he
4  was deemed to be holding himself out as willing
5  to purchase convertible debt?
6        MR. KATZ:  Objection.
7        THE WITNESS:  It -- right.  It
8  would -- it would certainly have some bearing on
9  that, but it wouldn't be dispositive or
10  determinative.
11  BY MR. GORDON:
12     Q    Because it's a facts-and-circumstances
13  test, correct?
14     A    Yes.  And in my experience, my just
15  broad professional experience, I really do think
16  of advertising as sort of almost like the shingle
17  theory of being in the business of being a broker
18  or a dealer.  That is someone who really is out
19  there turning the lights on every morning and
20  buying or selling essentially the same book of
21  securities day in and day out.
22     Q    We're doing pretty well in terms of
23  moving along.  It's not going to be a problem to
24  finish well before the hard stop I would say.  I
25  would propose that maybe we can take a 45-minute

94

1  break.
2     A    Whatever you gents like.
3        MR. GORDON:  Is that okay with
4  everyone?  Let's go off the record, and why don't
5  we come back at -- why don't we say 12:15.
6        (A lunch recess was taken.)
7  BY MR. GORDON:
8     Q    We're back on the record.  Do you have
9  your report there in front of you?
10     A    Yes.
11     Q    So on Page 10, I guess go to the first
12  full sentence that starts on that page that says
13  "Taken together."
14     A    "Taken literally"?
15     Q    "Taken together."
16     A    Oh, I beg your pardon.  "Taken
17  together," yes.
18     Q    I'll just read it.  "Taken together,
19  the key factors determining whether a person is a
20  dealer are whether the person trades for his or
21  her own account and whether he or she does so as
22  part of a regular business."
23        Have I read that correctly?
24     A    Yes.
25     Q    And do you agree with that statement?

95

1     A    Yes.
2     Q    Then on the same page, the very last
3  sentence that starts on the second line up from
4  the bottom, "Persons excluded."  Do you see that?
5     A    Yes.
6     Q    I'll just read that one.  "Persons
7  excluded from the definition of dealer by Section
8  3(a)(5)(b) are often referred to as traders, and
9  as the SEC has noted, a trader does not have to
10  register as a broker-dealer."  On Page 11 --
11  okay.  The very next sentence reads, "It has been
12  noted 'this approach is necessary to distinguish
13  dealers from investors who buy and sell security
14  for investment purposes but sometimes hold the
15  position for only a short time.'  The distinction
16  between active trader and dealer can be very
17  fine."
18        Have I read that correctly?
19     A    Yes.
20     Q    And that is -- the quote that I read
21  there is from the Colby's treatise, correct?
22     A    Yes.
23     Q    And I take it that you quoted from the
24  Colby treatise because you believe it to be an
25  authoritative source?

96

1     A    Yeah, I think it's a good source, as
2  authoritative as you'll allow for a treatise.
3  You know what I mean.
4     Q    Understood.  But to you --
5     A    Yeah, it's -- yes.  It's good stuff.
6     Q    So in that sentence, it uses the term
7  "investment purposes", and again let me just read
8  the sentence to give you the context.  "It has
9  been noted that 'this approach is necessary to
10  distinguish dealers from investors who buy and
11  sell securities for investment purposes.'"  And
12  then it goes on.
13          So I want to explore for a moment your
14  understanding of the term "investment purpose" or
15  "investment purposes."  So I guess my first
16  question is, if a purchaser obtains stock at deep
17  discounts with the intention to sell it into the
18  market as quickly as possible, might this be a
19  factor having any bearing on whether the purchase
20  and sales were done for investment purposes?
21     A    Yes.
22     Q    And that would cut against the
23  investment purposes test, correct?
24     A    It could.  I'd have to understand the
25  thesis behind what the person is doing.

97

1  High-frequency trader, of course, wouldn't really
2  have an investment purpose.
3     Q    So let's say a purchaser of stock at a
4  deep discount was willing to sell quickly
5  regardless of whether the shares appreciated or
6  depreciated and could profit either way because
7  of the discount, would that be a factor that
8  might cut against the purchase and sales being
9  done for investment purposes?
10     A    I'm sorry.  I'm trying to parse that.
11  I could see someone trying to negotiate a
12  discount in obtaining a note for a host of
13  attendant reasons and then sell on into a market.
14  One consideration, of course, would be, you know,
15  trying to insulate against market movements,
16  market movements against him.
17     Q    Understood.  I understand your
18  concern.  So let me ask the question this way.
19  If -- if the trader was relying primarily on the
20  discount and could profit regardless of which way
21  the shares moved, would that have -- would that
22  cut against a finding that the buyer and seller
23  of securities had an investment purpose?
24     A    It absolutely could.
25     Q    Let's say an individual or an entity

98

1  purchased stock at deep discounts performed
2  little or no due diligence on the investment
3  quality of the stock that they were buying and
4  then selling quickly, would that be a factor that
5  would cut against a finding that the buyer and
6  seller was transacting for investment purposes?
7          MR. KATZ:  Objection.
8          THE WITNESS:  It could.  Again, a
9  high-frequency trader won't necessarily.  So
10  there are different categories.  But yes, it
11  could.
12  BY MR. GORDON:
13     Q    Okay.  And have you formed any
14  conclusions based on your knowledge of the facts
15  in this case about whether the defendants in this
16  case bought and sold securities for investment
17  purposes?
18     A    He spoke about -- Mr. Almagarby spoke
19  about trying to move in and out of the market
20  quickly.  But I also, you know, am -- I'm sorry.
21  Say the question one more time.
22          MR. GORDON:  You can read it back.
23       (The record was read by the reporter.)
24          THE WITNESS:  I -- I haven't formed an
25  opinion about whether they bought and sold for

99

1  investment purposes.  His testimony suggested he
2  wanted to get in and out of the market quickly,
3  but I'm -- you know, I haven't plumbed the depths
4  of that.
5  BY MR. GORDON:
6     Q    And the statement that you are
7  testifying about that Mr. Almagarby made about
8  wanting to get in and out quickly, that would
9  tend to suggest that he did not have investment
10  purpose in your view?
11     A    Just that he wanted to liquidate the
12  position quickly.  I mean, when I think of for
13  investment purposes, he might have wished to
14  liquidate quickly so that he could have the
15  wherewithal to go into his next investment and
16  his next investment and his next investment.
17          So in a broad sense, there's an
18  investment purpose.  I could -- of course, one
19  could distinguish that from someone who's been
20  doing fundamental research on a security in order
21  to try to figure out whether to make that
22  investment.
23     Q    You're not saying that if someone buys
24  and sells quickly in order to profit on the
25  discount and then uses that money for something

100

1  else that that's investment purpose as Colby is
2  using the term, are you?
3    **A**  Well, Colby didn't really -- I don't
4  know of any -- anything in what Mr. Colby is
5  saying -- who's terrific. I can't -- I can't
6  define precisely what he means by the words
7  "investment purposes." But for my own purposes,
8  it can mean something broader than fundamental
9  research.
10   **Q**  Okay. But you -- you quoted Colby and
11 therefore -- in your report and therefore presume
12 that you agree with him that one cannot be
13 considered to be a trader unless one has
14 investment purposes.
15      MR. KATZ: Objection.
16      THE WITNESS: No, I wouldn't say I
17 agree with that. The way I phrase it, I said
18 he's noted it. I'm quoting from him being --
19 trying to be thorough in citing him. That
20 doesn't mean that that's a --
21 BY MR. GORDON:
22   **Q**  Do you disagree with his conclusion
23 about investment purposes?
24      MR. KATZ: Objection.
25      THE WITNESS: I think it's a more

101

1  complicated analysis than trying to read that
2  phrase in isolation.
3  BY MR. GORDON:
4    **Q**  Okay. But you will acknowledge that
5  there's one at least authoritative commentator
6  who has written a treatise that you relied on
7  that believes that in order to be deemed a
8  trader, you have to be buying and selling for
9  investment purposes. That's what he said, right?
10      MR. KATZ: Objection.
11      THE WITNESS: Well, he -- we're
12 leaving out the phrase that follows, "but
13 sometimes holds the position for only a short
14 amount of time."
15 BY MR. GORDON:
16   **Q**  Okay.
17   **A**  And in that -- to the extent he's
18 modified it by the notion that it's -- an
19 investment, I can make a profit. An investment
20 is something from which I make -- making a
21 profit. I don't have to necessarily hold that
22 for a long period of time.
23   **Q**  So Mr. Almagarby --
24   **A**  He also -- I'm so sorry. I shouldn't
25 interrupt.

102

1    **Q**  Mr. Almagarby held his stocks for a
2  short period of time, correct?
3    **A**  I -- I think that was the case
4  sometimes, other times not. It depends on your
5  definition of a long or short period of time.
6    **Q**  Okay. Did you see the -- did you have
7  an opportunity to look at the spreadsheets that
8  were submitted in connection with the declaration
9  in support of the SEC's motion of support that
10 actually analyzed the amount of time that Mr.
11 Almagarby held on to his shares?
12      MR. KATZ: Objection.
13      THE WITNESS: Yes. Those fall into
14 that second category and I think are encompassed
15 by at least one or several of the DeWitt
16 declarations.
17 BY MR. GORDON:
18   **Q**  So if you -- assuming that Mr.
19 DeWitt's spreadsheets regarding how quickly he
20 turned over his shares are accurate, would you
21 consider that to be short period of time?
22      MR. KATZ: Objection.
23      THE WITNESS: Not necessarily. A
24 high-frequency trader might get in and out of
25 positions many, many times during a day. As I

103

1  recall, and I have a very fuzzy recollection of
2  this, but some -- he pointed to percentages where
3  holdings -- he held on to the position for seven
4  days, sometimes for 14, sometimes for 30. I
5  might be misremembering. But I think during
6  those periods of time, given that Mr. Almagarby
7  had exposure, he was exposed to investment risk.
8      So in someone's universe that's --
9  high-frequency trader would say that's a position
10 being held for -- in and out in a day and many
11 times during a day. A mutual fund might hold for
12 years. Holding for a week or two weeks or three
13 months -- it gets to the inherent ambiguity of
14 what we're talking about here.
15 BY MR. GORDON:
16   **Q**  I think you've acknowledged that Mr.
17 Almagarby testified that he wanted to get in and
18 out of the shares as quickly as he could, right?
19   **A**  I think he -- that's one of the -- a
20 line along those lines is what he said.
21   **Q**  Assuming he said that, that would
22 indicate that his intention, regardless of how
23 long he wound up holding the shares, his
24 intention was to move them into the market as
25 quickly as possible. Do you agree?

104

1    **A**    It sounds as if that's what he said.
2    **Q**    Do you have any facts or information
3    that you can relate at this time that convinced
4    you that Mr. Almagarby and MEG had investment
5    purpose in their purchase and sales of stocks?
6    **A**    What -- well, again, the DeWitt
7    declaration, given that it speaks to holdings --
8    his holding for 7 or 14 or 30 days meant there
9    was exposure.  Exposure meant investment risk.
10   So, you know, there's investment -- I see an
11   investment purpose there, notwithstanding what
12   he -- potential investment purpose,
13   notwithstanding what he said at one point
14   during -- in his transcript.
15   **Q**    And how does -- if the -- Mr.
16   Almagarby's deposition transcript reflected that
17   he did little to no due diligence on the shares,
18   how would that affect your view of whether or not
19   he had investment purpose?
20        MR. KATZ:  Objection.
21        THE WITNESS:  There are different
22   kinds of traders who -- who can invest again for
23   reasons that aren't fundamental to the security
24   they're purchasing or selling.
25   BY MR. GORDON:

105

1    portion of his or her business directly with
2    investors rather than with other dealers or
3    through exchange members, although there are
4    market makers who trade principally with other
5    professionals.  A dealer ordinarily holds himself
6    or herself out as one engaged in buying and
7    selling securities at a regular place of
8    business.  The business (except when the dealer
9    participates in underwriting) is ordinarily
10   characterized by a regular turnover, while a
11   trader's transactions are generally more
12   irregular in both volume and time.  A trader, on
13   the other hand, does not handle other people's
14   money or securities, does not make a market, and
15   does not furnish the services that are usually
16   provided by a dealer, such as quoting the market,
17   rendering incidental investment advice, extending
18   or arranging for extension of credit and lending
19   securities to customers," and then there are
20   ellipses.
21        Have I read that accurately?
22   **A**    Yes.
23   **Q**    What do the ellipses mean here?
24   **A**    I don't recall.  I don't know what --
25   just don't know what follows.

107

1    **Q**    Take a look at Page 11 of your report.
2    You've got a footnote on that page -- you have
3    Footnote 18.  I just want to read that into the
4    record and ask you some questions about it.
5        This is -- the footnote in particular
6    I'm interested in the portion where you cite to
7    the Louis Loss treatise, securities regulation.
8    Do you see what I'm referring to?
9    **A**    Yes.
10   **Q**    Okay.  And first of all, I take it
11   that you would acknowledge that the Loss treatise
12   is considered to be an authoritative treatise, if
13   not legal precedent, but as a treatise, it's
14   considered authoritative?
15   **A**    Yeah, it's a pretty standard hornbook.
16   **Q**    So -- and you -- I presume you quoted
17   it here because you think it's reputable and
18   reliable?
19   **A**    Yes.
20   **Q**    So let me just read the quote.  "When
21   does a person's trading activities make him or
22   her a dealer?  There is no ready distinction.
23   However, a dealer has characteristic attributes.
24   He or she ordinarily tries to obtain a regular
25   clientele and is apt to transact a substantial

106

1    **Q**    Do they -- does it -- when you use
2    ellipses, does it mean some text has been
3    omitted?
4    **A**    Probably.  Yes, usually that's what I
5    would --
6    **Q**    And did you -- let me ask you, did you
7    write this report?
8    **A**    I did.  I worked with a colleague.
9    But yes.
10   **Q**    Okay.  And did you -- did you decide
11   which portion of the quote to include here and
12   which portion to replace with an ellipses?
13   **A**    I don't know whether he or I made the
14   ultimate editorial decision.
15   **Q**    Okay.  But I presume regardless of
16   whether you wrote this or edited it that you were
17   comfortable with the presentation of the material
18   in this footnote?
19   **A**    Yes, so far as I recall.
20   **Q**    Okay.  Let me mark another document.
21   I think we're up to number JB Number 5.
22        (Deposition Exhibit 5 was marked for
23   identification and attached to the transcript.)
24   BY MR. GORDON:
25   **Q**    I will represent to you -- do you have

108

1  the document in front of you, Mr. Burns?
2      **A**   Yes, I do.
3      **Q**   I will represent to you that this is
4  an excerpt from the Loss treatise that includes
5  the text that you quoted in your report, and
6  basically it's -- I'll represent for the record
7  that it is -- if you go to the last sentence
8  where the ellipses appear in your quote, it
9  reads, "Needless to say, a person does not have
10 to exhibit all or any given number of these
11 dealer characteristics in order to be considered
12 a dealer."
13     Have I read that correctly?
14     **A**   Yes, you have.
15     **Q**   And then it has a Footnote 26 there
16 that cites to a handful of cases.  Do you see?
17     **A**   Yes, I see that.
18     **Q**   Okay.  So can you tell me why this
19 portion of the quotation from the Loss treatise
20 was omitted from your report?
21     **A**   To the extent I have a supposition, it
22 would follow from the first phrase of that
23 sentence, which is that it says, "Needless to
24 say."  It's a truism, and I should say I should
25 not have had ellipses.  I should have had a

109

1  period.  That was grammatically incorrect.
2      **Q**   Well, isn't it -- don't you opine in
3  your report that one who buys and sells
4  securities must exhibit various factors that have
5  been articulated in SEC guidance in order to be
6  considered a dealer?
7      **A**   Yes.
8      **Q**   So when Loss says, "Needless to say a
9  person doesn't have to exhibit all or any given
10 number of these dealer characteristics in order
11 to be considered a dealer," isn't that -- doesn't
12 that go against your opinion?
13     MR. KATZ:  Objection.
14     THE WITNESS:  In fact, I have the
15 deepest respect for him and for Commissioner
16 Paredes who wrote this.  I think it ends up being
17 kind of a throwaway line.  It doesn't really
18 carry any meaning.
19     From that enumerated list in the
20 treatise or in the 2002 amendments or otherwise,
21 one might look at a host of different factors in
22 making a determination whether someone's a dealer
23 or not.  It's part of I think -- I'll stop
24 opining why we're here today.  Things are quite
25 murky.

110

1  BY MR. GORDON:
2      **Q**   So I take it then that you would agree
3  with the statement in the Loss treatise that one
4  does not need to exhibit any of the factors
5  articulated in SEC guidance in order to be
6  legally considered a dealer?
7      **A**   Well, I think one would have a hard
8  time asserting in court, unless one did have a
9  certain number of dealer characteristics, being
10 determined to be a dealer.  I think of this as
11 again sort of a throwaway line.  I don't know
12 that I would agree with "any given number."  If
13 they were a single factor in isolation that
14 someone was straining to turn someone into a
15 dealer, I don't -- I actually don't know that I
16 agree with this language.
17     **Q**   So -- okay.  So you disagree with the
18 Loss treatise?
19     **A**   No, I don't --
20     MR. KATZ:  Objection.
21     THE WITNESS:  -- disagree with the
22 Loss treatise.  I don't think this line adds
23 anything of any substance, and I think it's a
24 little dangerous to say that "any given number"
25 of -- to the extent that one could find a single

111

1  attribute of someone's behavior and turn them
2  into a dealer, I think -- again, I think that's
3  dangerous and concerning.
4  BY MR. GORDON:
5      **Q**   Well, you've already written in your
6  report that the main characteristics of a dealer
7  is that they regularly engage in the business of
8  buying and selling securities, correct?
9      MR. KATZ:  Objection.
10     THE WITNESS:  If I wrote it, yes.
11 BY MR. GORDON:
12     **Q**   Okay.
13     **A**   Yes.
14     **Q**   Now, the -- you see the cases in
15 Footnote 26?
16     **A**   Yes.
17     **Q**   Are you familiar with those cases?
18     **A**   I am.  Probably been a while since I
19 read them.
20     **Q**   Okay.  Can you tell me whether, for
21 example, in Eastside Church of Christ versus
22 National Plan, whether there was any finding
23 there that someone was a dealer without any
24 finding that they met any of the factors in the
25 SEC guidance?

112

1       MR. KATZ:  Objection.
2       THE WITNESS:  I'm afraid I don't -- I
3  won't recall particulars of any of these cases.
4  BY MR. GORDON:
5       Q    Do you know if there is legal
6  authority out there that has found that
7  individuals or entities are dealers without any
8  of the -- without analyzing any of the factors
9  set forth in any of the SEC guidance?
10      MR. KATZ:  Objection.
11      THE WITNESS:  I -- I don't know.  I
12 know that people have wrestled with and the SEC
13 has wrestled with these various factors for
14 years.  I don't -- I just don't recall in respect
15 to these cases, and I'm sort of also trying to
16 shy away from legal -- legal analysis in that
17 sense.
18 BY MR. GORDON:
19      Q    Why are you trying to shy away from
20 legal analysis?
21      A    Just in the sense that, you know, each
22 of these cases, to the extent any of them might
23 be brought to bear on Mr. Almagarby's matters,
24 I'm sure counsel is going to go through and
25 evaluate them and seek to distinguish them.

113

1       Q    Well, you're offering an opinion as to
2  whether or not there's sufficient allegations to
3  find that Mr. Almagarby is a dealer, right?
4       A    Right, and I do that -- and I'm doing
5  that based on SEC -- the SEC's own words in that
6  regard.  It's great to talk about the treatises,
7  but I think it's even more germane what the SEC
8  has had to say about the matter in the
9  Commission's own releases, such as the 2002
10 release.
11      Q    When you say that you're doing that
12 based on the SEC's allegations --
13      A    Statements.  The SEC statements.
14      Q    Are you saying that you yourself have
15 not conducted a searching analysis of all the
16 factors that might or might not make the
17 defendants dealers, such as investment intent,
18 holding one's self out, advertising?  You have
19 not conducted such a searching analysis in order
20 to make a determination based on all the
21 available facts available to you, including Mr.
22 Almagarby's availability to you, as to whether or
23 not Mr. Almagarby and his company acted as
24 dealers?
25      MR. KATZ:  I'm going to object.

114

1       THE WITNESS:  So I -- I looked at the
2  record.  I looked at the complaint.  I looked at
3  the factors that the SEC and I did sort of -- I
4  tried to do a common sense evaluation of whether
5  any of the factors would -- were met, such as
6  regular clientele, holding one's self out at a
7  regular place of business, regular turnover of
8  business, all the factors that I think people in
9  my position would be evaluating on behalf of a
10 client if I were advising them about whether or
11 not they needed to register.
12 BY MR. GORDON:
13      Q    But were you evaluating whether or not
14 the SEC had sufficiently alleged these factors,
15 or were you trying to determine whether -- what
16 the actual facts were behind the allegations?
17      A    Well, I was looking at the allegations
18 as laid out in the complaint and to the -- and in
19 reviewing the deposition whether I saw trip wires
20 that made me feel that he was -- ought to be
21 characterized and charges brought against him as
22 a dealer.
23      Q    So, for example, you made no attempt
24 to -- let's say on the advertising component, you
25 made no attempt to go to Mr. Almagarby and say,

115

1  "Wait a minute.  Let me ask you this.  What was
2  your relationship with these finders?  How did
3  they -- how do you interact with them?  How do
4  they fund themselves?  I need to determine
5  whether or not you were engaged in solicitation."
6       Did you do that sort of inquiry?
7       MR. KATZ:  Objection.
8       THE WITNESS:  I did not.
9  BY MR. GORDON:
10      Q    Okay.
11      A    I did, however, have the statement of
12 facts provided by the -- by Mr. Almagarby through
13 counsel.
14      Q    Which statement of facts are you
15 referring to?
16      A    Well, statement of facts.  What is
17 the -- whatever it was.  It was the -- perhaps
18 the affirmative defenses.  I just have some
19 general -- or perhaps it was the --
20      Q    You considered assertion of
21 affirmative defenses to be a statement of facts?
22      A    No.
23      MR. KATZ:  Objection.
24      THE WITNESS:  I'm not -- I'm tripping
25 over my words here.  At any rate, I didn't do any

116

1  of my -- my point is I didn't do any of my own
2  independent -- I didn't conduct factual -- fact
3  gathering on my own other than as I described
4  early -- earlier in the day.
5  BY MR. GORDON:
6      Q    Okay.  Let's go to Page 12 of your
7  report.  Give me one moment.
8      A    Sure.
9      Q    Okay.  Now, on Page 12 at the top, you
10 list various factors that, if present, according
11 to the SEC may indicate that an individual may
12 fall within the definition of a dealer, correct?
13     A    Yes.
14     Q    And one of those factors listed there
15 is underwriting, correct?
16     A    Yes.
17     Q    And there's guidance -- are you --
18 there is guidance out there from the SEC
19 including who was a dealer publication on its
20 website from Trading and Markets that says that
21 one may be a dealer if one engages in
22 underwriting.
23     A    That sounds right.
24     Q    If you want, I can -- we can bring it
25 out and I can show it to you.  But if you'll

117

1  accept that it says that, we can skip that.
2      A    Great.
3      Q    Okay.  So the SEC has basically put
4  out there on its website to the public that if
5  you engage in underwriting, absent any other
6  factors, you may be a dealer, correct?
7      A    Yes.
8      Q    Okay.  Underwriting, do you agree with
9  me that underwriting means obtaining large
10 volumes of shares from issuers and selling them
11 into the marketplace?
12     MR. KATZ:  Objection.
13     THE WITNESS:  I don't think that's the
14 definition.  I don't have it in front of me.  I
15 thought it was purchases from the issuer -- it's
16 putting together a book.  It's definitely not
17 this.  It's what Morgan Stanley or any of a
18 number of firms do sometimes successfully,
19 sometimes not successfully.  It's not this.
20 BY MR. GORDON:
21     Q    If one -- do you know what a
22 distribution is?
23     A    Yes.
24     Q    What is a distribution to you?
25     A    Well, it's a -- a distribution is a --

118

1  standing up a sale to put it out into the -- into
2  the market.  An issuer can do it.  Underwriters
3  do it on their behalf from time to time.  I
4  usually think of it as a very structured way of
5  going about one's business.  I'm not really a
6  corporate lawyer --
7      Q    I'm not asking about the traditional
8  definition of these things or what comes to mind
9  when you think of this term.  I'm asking about
10 your understanding of what the legal definition
11 is.  I haven't asked a question.
12     MR. KATZ:  I didn't say the objection
13 yet.
14 BY MR. GORDON:
15     Q    My question is, if one is engaging in
16 obtaining shares directly from an issuer and
17 moving those shares into the market, that's
18 considered a distribution, correct?
19     MR. KATZ:  Objection.
20     THE WITNESS:  I would have to parse
21 the language a lot more carefully.  I want to say
22 the definition includes the word purchase, not
23 obtaining.  But -- that's the gist of how things
24 happen.  I just don't know the words you're using
25 is square with the definition.

119

1  BY MR. GORDON:
2      Q    So you acknowledge then if one
3  purchases shares directly from an issuer with
4  the -- and with the intention of moving them into
5  the market and actually does so, that that's a
6  distribution?
7      MR. KATZ:  Objection.
8      THE WITNESS:  That's the way I
9  commonly -- commonly think of a distribution
10 happening.
11 BY MR. GORDON:
12     Q    Okay.  And in order to determine
13 whether --
14     A    Like by the lead underwriter and by
15 the syndicate and something that's happening in
16 people hanging out their shingle and that's what
17 they're doing and that's what they're about.
18     Q    You don't have to hang out a shingle
19 that says you're an underwriter in order to be
20 considered an underwriter under the law, do you?
21     A    No.  Certainly people can get -- fall
22 under the definition of a dealer for underwriting
23 activities.
24     Q    Okay.  Do you have a view as to
25 whether or not Mr. Almagarby and MEG's obtaining

120

1 of shares from issuers and moving them into the
2 market was underwriting?
3    **A**   I think it was not.
4    **Q**   Okay.  Why do you believe that?
5    **A**   Because if it were the case for him,
6 then anyone who has a convertible debenture could
7 be described as a dealer.
8    **Q**   Okay.  Aside from what would follow
9 from that holding and your -- I guess some sort
10 of common sense view, why else do you believe --
11 based on the definition, why do you believe he
12 was not an underwriter?
13    **A**   In the course of practice, I -- it
14 just doesn't -- I'm sorry.  It just doesn't look
15 like underwriting activity.  It doesn't look like
16 the way an issuance of IBM would happen.  It
17 doesn't look like the way a principal underwriter
18 would do what it's doing or a member of a
19 syndicate would participate.
20      It feels to me like a guy who
21 negotiated a convertible debenture.  It looks
22 like -- it is a guy who negotiated a convertible
23 debenture.  And when he put the note to the
24 issuer, the issuer provided him the securities in
25 accordance with the terms of the debenture.

121

1    **Q**   I mean I understand that MEG is not
2 Morgan Stanley or anything like that.  What is it
3 about the definition of underwriter, aside from
4 what may come to mind when you think about
5 underwriter, what is it about the definition of
6 underwriter that makes you conclude that Mr.
7 Almagarby and MEG were not underwriting?
8    MR. KATZ:  Objection.
9    THE WITNESS:  Among other things,
10 beyond the common sense, I don't know that you
11 would call this a purchase of the -- those shares
12 themselves as a debenture that was convertible
13 for those purposes.
14 BY MR. GORDON:
15    **Q**   Is it your view that the conversion of
16 a convertible note into shares is not -- does not
17 constitute a purchase under the law?
18    **A**   Certainly not in a common sense sort
19 of way.  Certainly not in a way that an
20 individual investor would have thought of
21 himself.
22    **Q**   Okay.  How about in terms of any
23 authority or definitions that exist out there in
24 the law?
25    **A**   I'm just not aware.  I can't recall as

122

1 we sit here.
2    **Q**   So this -- hypothetically, if it
3 turned out that there was authoritative law that
4 said the conversion of a note in exchange for
5 shares constituted a purchase under the law,
6 would you then change your opinion in order to
7 opine that Mr. Almagarby and MEG were engaged in
8 underwriting?
9    MR. KATZ:  Objection.
10    THE WITNESS:  I might.  It would
11 probably depend on the facts and circumstances
12 and how persuasive I -- I guess it would
13 constitute a legal authority.
14 BY MR. GORDON:
15    **Q**   So a lot of your opinion about whether
16 or not he was engaged in underwriting would then
17 turn on the legal definition of purchase which
18 you don't have a full handle on right now,
19 correct?
20    MR. KATZ:  Objection.
21    THE WITNESS:  It would -- it really
22 turns on two things.  One, my common sense view
23 of it in observing market practice and the
24 collateral consequences for a host of different
25 other market participants if the conversion of --

123

1 if the tendering of a convertible debenture would
2 turn the purchaser of that debenture into a
3 dealer.  That strains the definition of dealer
4 beyond all bounds to me.
5 BY MR. GORDON:
6    **Q**   But you're not asserting that your
7 common sense view of things takes precedent over
8 legal authority in terms of what the law is, are
9 you?
10    **A**   No.
11    **Q**   And is your conclusion that the SEC's
12 allegations in its complaints against the
13 defendants are insufficient to show that they
14 make out a claim that they are a dealer, is that
15 based on your common sense understanding of
16 things as opposed to legal authority?
17    **A**   I'd say it's sort of a combination of
18 the two because I think, you know -- depending on
19 precisely what the definition says, and forgive
20 me for not recalling, I would parse that very
21 carefully.  It just doesn't -- it doesn't sound
22 like -- I'm just not familiar with this.  This is
23 thinking of this from a trading market context as
24 underwriting.
25    **Q**   Are your opinions sort of grounded on

124

1  what you think the law should be and what makes
2  sense, or is it based on the controlling legal
3  authorities that are out there?
4       MR. KATZ:  Objection.
5       THE WITNESS:  I would say -- it's --
6  it's certainly the latter over the former.  If
7  you look at the history, as I'm sure you have,
8  the 34 Act definition of dealer.  It's very clear
9  that it inures in -- in what was going on in the
10  OTC markets and market making as a traditional
11  matter and some exceptions that were made for
12  Exchange members at the very outset.  And then in
13  1975, drawing in additional categories of folks,
14  all of whom -- all of whom are trading under --
15  in very formal capacities as part of regular
16  businesses with regular clientele, and it's
17  that -- it's that context that informs my view.
18       Q    And your understanding, is the length
19  of the holding period of shares a relevant factor
20  in determining whether or not one is engaged in
21  underwriting?
22       A    It can be.  Again, I'm not -- I don't
23  spend as much time in the corporate side of
24  things.  I do recall Mr. Almagarby got 144
25  opinions relating to his ability to -- the shares

125

1  were sufficiently aged to sell them.
2       Q    Okay.  Do you know whether the volume
3  of shares sold by someone in comparison with the
4  total volume of shares sold by other persons on a
5  given day or over a given time period is relevant
6  to the inquiry as to whether or not one is
7  engaged in underwriting?
8       A    I think of that in a broad general
9  markets context when you're talking about penny
10  stocks, any kind of trading, given there is no
11  liquidity in these market, it's going to
12  constitute a significant amount of trading in any
13  particular day.
14       Q    On Page 14 of your report, you started
15  with the first full paragraph.  I'm just going to
16  read the first two sentences.  It states, "Mr.
17  Almagarby established MEG to engage in securities
18  transactions and to make money doing so.  Such is
19  also the case for hedge funds, high frequently
20  traders, private equity funds, and myriad other
21  market participants that do not register as
22  dealers."
23       So I just want to clarify something
24  about this statement.  Is it your view that hedge
25  funds can never be dealers no matter what the

126

1  facts and circumstances surrounding their
2  activities?
3       MR. KATZ:  Objection.
4       THE WITNESS:  No.  Potentially I
5  suppose they could.  Many have, in fact,
6  registered a captive broker-dealer.
7  BY MR. GORDON:
8       Q    Okay.  Same question for
9  high-frequency traders.  Are there potential
10  facts and circumstances that could make a
11  high-frequency trader be considered a dealer?
12       MR. KATZ:  Objection.
13       THE WITNESS:  It could be.
14       MR. GORDON:  Did you get that?
15       THE WITNESS:  Do I need to wait for
16  you to object -- I beg your pardon -- before I --
17       MR. KATZ:  I'm trying to get it in as
18  fast as I can and after his question.
19  BY MR. GORDON:
20       Q    The same question for the other
21  specific term you mentioned here, private equity
22  funds.  Is it your view that there could be facts
23  and circumstances that exist that would result in
24  a private equity fund being considered a dealer
25  under law?

127

1       MR. KATZ:  Objection.
2       THE WITNESS:  I think of -- and in
3  fact, for each of these, I'm more familiar with
4  the notion that they might register as
5  broker-dealers because in each instance they were
6  concerned with a much broader definition of
7  broker than they are that of being a dealer.
8  BY MR. GORDON:
9       Q    Okay.  But my question has to do with
10  whether -- you answered it for hedge funds and
11  high-frequency traders.  But my question
12  specifically relates to whether you believe there
13  could be facts and circumstances that would
14  result in a private equity fund being a dealer.
15       MR. KATZ:  Objection.
16       THE WITNESS:  There might be.  I just
17  haven't run into circumstances where I thought
18  that to be the case.  In some circumstances, I
19  have run into situations where I thought they
20  might be brokers.
21  BY MR. GORDON:
22       Q    But you're not --
23       A    I'm not extinguishing the possibility
24  that anyone could be deemed to be a dealer.
25       Q    Okay.  To be clear, it's not your --

128

1  you are not of the opinion that there is a
2  categorical exception from being a dealer for
3  hedge funds, high-frequency traders, or private
4  equity fund?
5      **A**    Correct.
6      **Q**    And in fact, you have opined that you
7  think there could be circumstances under which
8  any of those market participants might be
9  considered dealers if the right facts and
10  circumstances were present?
11      **A**    If the right facts and circumstances
12  were present.
13      **Q**    Let's look at Page 15 of your report.
14  I want to go to the section entitled "Policy
15  considerations."  In this section is it correct
16  that you state your opinions regarding policy
17  considerations relevant to any finding that the
18  defendants are dealers?
19      **A**    Yes.
20      **Q**    And is it fair to say that other than
21  sort of reasoning and using your training and
22  experience that there's not any particular or
23  special methodology that you employ in discussing
24  these policy considerations?
25          MR. KATZ:  Objection.

129

1          THE WITNESS:  I think, if I understand
2  the question, I'm applying my experience and my
3  views in the -- and all the analysis that's come
4  up to that point.
5  BY MR. GORDON:
6      **Q**    Would you agree those views
7  essentially come from knowing a great deal about
8  the field and thinking about or projecting how
9  participants in the securities industry might be
10  affected from a finding that the defendants are
11  dealers?
12      **A**    That sounds -- that sounds right.
13      **Q**    Okay.  Now, you're not a litigator,
14  correct?
15      **A**    No.  I've been pulled into things from
16  time to time.  No, that's not what I do.
17      **Q**    How much litigation work have you
18  done?
19          MR. KATZ:  Objection.
20          THE WITNESS:  Preparation for
21  litigation -- I have assisted people in
22  preparation.  Well -- does a Wells submission
23  count, or are we talking about --
24  BY MR. GORDON:
25      **Q**    Okay.  But from time to time you

130

1  involve yourself in litigation, correct?
2      **A**    Preparation for litigation, yeah.
3      **Q**    So you're familiar with the process by
4  which a judge instructs a jury on the law before
5  they go out to deliberate as part of your sort of
6  general knowledge as a lawyer?
7      **A**    General knowledge, yeah.  Sure.
8      **Q**    And would you agree with me that as a
9  matter of general knowledge that the judge
10  customarily tells the jury that its job is to
11  apply the law as set forth in the judge's
12  instructions to the jury, to the facts as they
13  determine them in order to reach a verdict?
14      **A**    Yes.
15      **Q**    Okay.  Are you aware of any instance
16  in which a judge instructed a jury not merely to
17  apply the law as instructed to the facts but
18  further to consider the policy implications of
19  any verdict that it might reach?
20          MR. KATZ:  Objection.
21          THE WITNESS:  I'm not aware of any.
22  BY MR. GORDON:
23      **Q**    Based on your understanding of legal
24  procedure and your -- do you think such an
25  instruction by the Court would be appropriate?

131

1          MR. KATZ:  Objection.
2          THE WITNESS:  I don't -- no, I -- no.
3  BY MR. GORDON:
4      **Q**    It would not be appropriate?
5      **A**    It would not -- I don't know all the
6  ins and outs, but I wouldn't have expected a
7  judge to ask such a thing.
8      **Q**    Okay.
9      **A**    However, if I may, I just don't know
10  what the instruction would encompass.  So to the
11  extent -- I don't know.  If there's a contention
12  that there's not sufficient notice of the
13  requirements, to the extent there's a suggestion
14  there might be administrative procedure, concerns
15  in respect of a particular issue, due process,
16  you know, to the extent any of the policy issues
17  that I have described here touch upon those,
18  those things would be the appropriate way, I
19  think, to phrase them.  Policy broadly I would
20  not have thought a judge would instruct a jury
21  to.
22      **Q**    So you are -- given that this report
23  reflects your expert opinions that you formulated
24  so far, I presume then that it would be your
25  intention to go in front of a jury and testify

132

1  about what you believe the policy implications
2  would be if you found that the defendants were
3  dealers in this case?
4         MR. KATZ:  Objection.
5         THE WITNESS:  I suppose it would
6  depend on the question I was asked and whether I
7  was permitted to answer the question.  But if
8  someone called on me to do it and the judge said
9  yeah, please talk about that, I would.  If I was
10  told not, I'd keep my focus on the other issues.
11  BY MR. GORDON:
12         Q    Okay.  Do you think that reciting
13  these policy considerations to a jury would be
14  appropriate given your understanding of the way
15  judges instruct juries on the law and tell them
16  to follow the law?
17         MR. KATZ:  Objection.
18         THE WITNESS:  To the extent a judge
19  didn't object and thought it was probative.  If
20  the judge instructed them not to consider it, it
21  would not -- then they should not consider it.
22  BY MR. GORDON:
23         Q    Okay.  Just some sort of housekeeping
24  questions about -- that I need to ask you about
25  how you prepared your report.  You mentioned

133

1  earlier that someone else assisted you --
2         A    Yes.
3         Q    -- with this report?
4         A    Yes.
5         Q    So who was that person?
6         A    That was Brant Brown, a colleague of
7  mine here.  B-R-A-N-T Brown.
8         Q    Okay.  And what is he, associate,
9  partner counsel?
10         A    He's a counsel.  He had -- would you
11  like his -- rundown of his qualifications or no?
12         Q    No.  Is he assigned to a particular
13  section of the law firm?
14         A    Within the asset management group,
15  he's another of the broker-dealer lawyers.
16         Q    And what was his role in preparing the
17  report?
18         A    Reviewing the same -- reviewing the
19  same record I reviewed and preparing the
20  materials using, you know, research -- you know,
21  we had IronRidge.  We had the record, and we had
22  whatever might have come along subsequent to that
23  to just consider.
24         Q    Did one or the other of you prepare a
25  first draft of the report or parts of the report?

134

1  Who drafted it?
2         A    He -- he would have had the first cut
3  at drafting it.  We would have both reviewed
4  materials.  He would have had the first cut at
5  preparing it.
6         Q    Okay.  And then you would have
7  reviewed and revised it?
8         A    Yes.
9         Q    And did you revise it?
10         A    Yes.
11         Q    And other than the two of you, are
12  there any other legal professionals here who
13  worked on this report or this expert engagement?
14         A    I don't believe so.  I suggested he
15  might speak with someone, but I don't think he
16  ended up needing to.
17         Q    Okay.
18         A    I will correct that if that's wrong.
19         Q    Can you tell me or estimate for me the
20  number of hours that you and your colleague spent
21  on this expert engagement so far?
22         A    I'm afraid I just don't recall.  I can
23  go back and look at hours.  I'm just not sure.
24         Q    Can you give me a ballpark or a range,
25  any way to estimate it?

135

1         A    I don't know if it was in the nature
2  of -- I can look at his time.  I don't know --
3  the nature of 20 to 30 hours, 10 to 20 hours.  I
4  just don't recall.  I'm sorry.  30 to 40, I'm
5  just not sure.
6         Q    That would be the two of you combined?
7         A    I would have thought so.  Just not
8  sure.  I'm sorry.
9         Q    Can you tell me or estimate for me --
10         A    By the way, excuse me.  Was that --
11  just in the preparation of the report and then,
12  of course, getting ready for today.  So I don't
13  know what that would have added to the total.
14         Q    Okay.  Do you know what the total
15  amount of fees accrued to date for this
16  engagement is?
17         A    I'm afraid I don't.  I'm afraid I
18  wouldn't be able to estimate.  We would have sent
19  a bill?  Sorry.
20         Q    I mean, do you know whether it's --
21  the total amount accrued is more than $25,000?
22         A    The amount billed might be around --
23  billed to date might have been around 20, and
24  there's probably been a good bit since then.  20,
25  30.  I'm not sure.  I just don't recall.  I'm

136

1 sorry.
2    **Q**    You think the total amount accrued
3 might be in the neighborhood of $30,000?
4    **A**    I think it's probably north of that by
5 now. I'm not sure. I'll just have to look, if
6 you like.
7    **Q**    Have you been paid anything yet?
8    **A**    I have.
9    **Q**    How much have you been paid?
10   **A**    That, I don't recall. Whatever bill I
11 submitted late in the summer would have been --
12 would have been paid.
13   **Q**    Okay. And who do you submit the bill
14 to?
15   **A**    I think it went to -- I'm sorry. I
16 don't remember that either. I don't know whether
17 it went via Mr. Sallah to Mr. Almagarby or it was
18 forwarded on directly to him.
19   **Q**    Okay.
20   **A**    I can figure that out.
21   **Q**    Do you know how the bill gets paid,
22 like whether it's by check or wire?
23   **A**    My secretary handles that.
24   **Q**    Okay. Do you know -- understanding
25 that you don't remember whether you -- and you

137

1    MR. GORDON:  Those are all the
2 questions I have.  Thank you.
3    MR. KATZ:  Can we take a few minutes?
4    (A brief recess was taken.)
5    EXAMINATION BY COUNSEL FOR THE DEFENDANTS
6 BY MR. KATZ:
7    **Q**    I just wanted to add one thing. Among
8 the materials that you reviewed, and of course
9 you have a list that's already there, did you
10 review the SEC's responses to defendants' request
11 for admission?
12   **A**    Yes.
13   MR. KATZ:  No further questions.
14 (Whereupon, the signature not having been waived,
15 the deposition concluded at 1:26 p.m.)
16
17
18
19
20
21
22
23
24
25

139

1 correct me if I get this wrong. You don't
2 remember whether you sent the bill to Mr. Katz's
3 firm or to Mr. Almagarby directly; is that right?
4 You're not sure?
5    **A**    I just don't recall.
6    **Q**    Do you know who paid the fees that
7 have been paid so far?
8    **A**    I don't.
9    **Q**    Okay. Do you know whether -- for
10 example, do you know whether Mr. Almagarby is the
11 sole source of the payments of your fees that you
12 have received so far?
13   MR. KATZ:  Objection.
14   THE WITNESS:  I just -- I don't know,
15 I'm afraid.
16 BY MR. GORDON:
17   **Q**    Do you have any knowledge one way or
18 the other about whether Mr. Almagarby obtained
19 money from family members to pay your fees?
20   **A**    No, I don't know.
21   **Q**    Do you have any knowledge one way or
22 the other whether persons besides Mr. Almagarby
23 and his family are the source of some or all of
24 the funding to pay your fees?
25   **A**    I'm afraid I don't know.

138

1              *   *   *
2         ACKNOWLEDGMENT OF DEPONENT
3
4 I, James Burns, do hereby acknowledge I have read
5 and examined the foregoing pages of testimony,
6 and the same is a true, correct and complete
7 transcription of the testimony given by me, and
8 any changes and/or corrections, if any, appear in
9 the attached errata sheet signed by me.
10
11
12 _____   _____
13 Date      James Burns
14
15
16
17
18
19
20
21
22
23
24
25

140

1   CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC
2        I, Tammy S. Newton, the officer before
3   whom the foregoing proceedings was taken, do
4   hereby certify that the foregoing transcript is a
5   true and correct record of the proceedings; that
6   said proceedings were taken by me
7   stenographically and thereafter reduced to
8   typewriting under my supervision; and that I am
9   neither counsel for, related to, nor employed by
10  any of the parties to this case and have no
11  interest, financial or otherwise, in its outcome.
12       Dated:  November 15, 2019
13  My commission expires:
14  7/31/2022
15
16  _____
17       Notary Public in and for the
18       District of Columbia
19
20
21
22
23
24
25

141

1        ERRATA SHEET
2   Deposition of: JAMES BURN
    Date taken:  November 14, 2019
3   Case: SEC vs. Ibrahim Almagarby, et al.
    PAGE LINE
4   _____ _____ CHANGE: _____
           REASON: _____
5
6          CHANGE: _____
    _____ _____ REASON: _____
7   _____ _____ CHANGE: _____
           REASON: _____
8
9          CHANGE: _____
    _____ _____ REASON: _____
10  _____ _____ CHANGE: _____
           REASON: _____
11
12         CHANGE: _____
    _____ _____ REASON: _____
13  _____ _____ CHANGE: _____
           REASON: _____
14
15         CHANGE: _____
    _____ _____ REASON: _____
16  _____ _____ CHANGE: _____
           REASON: _____
17
18         CHANGE: _____
    _____ _____ REASON: _____
19  _____ _____ CHANGE: _____
           REASON: _____
20
21         CHANGE: _____
    _____ _____ REASON: _____
22  _____ _____ CHANGE: _____
           REASON: _____
23
24
    Signed _____
25  Dated  _____

142

**A**

**a.m** 1:17 2:18
**ability** 125:25
**able** 70:17 136:18
**abroad** 51:9
**absent** 118:5
**absolutely** 6:9 74:22 76:22
83:16 90:20 98:24
**accept** 93:14 118:1
**accepted** 80:19
**accepting** 78:22
**account** 95:21
**accrued** 136:15,21 137:2
**accuracy** 60:7
**accurate** 7:19 8:1 38:11
43:6 46:8 48:22 55:7 67:13
72:16 75:7 103:20
**accurately** 43:9 55:24 56:12
60:2 82:7 107:21
**acknowledge** 37:13 62:23
102:4 106:11 120:2 140:4
**acknowledged** 104:16
**ACKNOWLEDGMENT**
140:2
**acquire** 72:9
**act** 32:2 43:3,5,19 56:11
67:9 69:14 72:5,22 73:4,17
125:8
**acted** 114:23
**acting** 17:3 83:25
**action** 15:13 21:8 29:12,13
**actions** 15:5 29:15 51:22
81:1
**active** 20:25 93:1 96:16
**activities** 53:18 55:17 56:2
106:21 120:23 127:2
**activity** 27:1 55:19 62:5
121:15
**actual** 115:16
**add** 139:7
**added** 136:13
**addendum** 83:12
**addition** 10:20 20:16
**additional** 13:22 35:13
36:10,12 37:23 39:23
125:13
**Additionally** 18:9
**address** 62:22
**addressed** 45:10 58:19
**adds** 111:22
**adequacy** 38:14
**administrative** 71:22 76:2
132:14
**admissible** 78:12 80:4,10
**admission** 139:11
**admitted** 77:19

**advanced** 91:3
**advancing** 42:25
**advertise** 82:4
**advertising** 82:10 87:10
92:14,18,21,21 93:16
94:16 114:18 115:24
**advice** 14:23 107:17
**advise** 68:18,21
**advised** 26:11 27:17
**advising** 15:9 20:12 26:4,22
115:10
**advisor** 14:15 20:13
**advisors** 9:22 13:2 14:17
68:4
**advisory** 22:14,14,15
**affairs** 17:25 18:11
**affect** 14:3 105:18
**affirmative** 116:18,21
**afraid** 64:7 113:2 135:22
136:17,17 138:15,25
**aged** 126:1
**agency** 15:5 20:12,20 21:4
21:23 33:24 44:3 51:21
70:8,11,23 81:15
**agree** 40:22 42:3 62:2 69:16
74:3 76:13 82:9,23 89:10
90:14 95:25 101:12,17
104:25 111:2,12,16 118:8
130:6 131:8
**agreeable** 6:7
**ahead** 32:15 37:10 49:7
**al** 142:3
**alas** 22:19
**allegations** 34:24 39:18
46:6,12 47:3 48:13 55:1
56:3,18 57:3 58:12 62:10
62:18,24 63:16,19,25
114:2,12 115:16,17 124:12
**allege** 38:14
**alleged** 57:3 115:14
**alleges** 58:12
**alleging** 43:15 60:11
**allow** 97:2
**allowed** 45:2 77:4,20
**Almagarby** 1:7 2:7 5:6 38:15
44:11 45:20 46:1,13 47:11
48:15 49:1 50:1,4 52:21
53:3,11 55:2 63:14 77:13
79:3 81:24 82:3 83:24 84:5
85:13 86:18,20 87:15,23
88:7,14,22 90:8 91:2,7,22
91:23 92:10 93:12 99:18
100:7 102:23 103:1,11
104:6,17 105:4 114:3,23
115:25 116:12 120:25
122:7 123:7 125:24 126:17

137:17 138:3,10,18,22
142:3
**Almagarby's** 34:12 35:3,6
35:22 36:24 47:13,20 86:3
89:12 105:16 113:23
114:22
**altered** 38:22 40:1
**ambiguity** 104:13
**amended** 83:14
**amendments** 45:11 110:20
**American** 8:21
**amount** 23:11 74:14 78:10
102:14 103:10 126:12
136:15,21,22 137:2
**analysis** 46:25 67:8 74:25
75:21 90:15 102:1 113:16
113:20 114:15,19 130:3
**analyzed** 103:10
**analyzing** 113:8
**and/or** 140:8
**answer** 6:4,5 16:17 18:21
28:9,11 34:10 35:1,19 36:3
44:24 45:1,2,7,18 46:4
50:25 52:4 57:14 64:9,10
65:7 133:7
**answered** 128:10
**answering** 5:24
**answers** 16:18 35:4
**anybody** 52:19
**apart** 20:3 43:12 52:15 70:5
**apologies** 83:16
**apologize** 49:12
**Appeals** 8:16
**appear** 109:8 140:8
**appearance** 21:6
**appears** 60:14
**applied** 81:11
**apply** 43:23 131:11,17
**applying** 130:2
**appreciate** 18:16 19:11
**appreciated** 98:5
**approach** 75:22,24 96:12
97:9
**appropriate** 63:4,24 64:15
131:25 132:4,18 133:14
**approval** 80:7
**approximately** 9:16 11:4
50:6
**apt** 106:25
**area** 51:22
**areas** 41:18 42:2
**argue** 70:17
**arguments** 59:2,7 70:18
71:5,7
**arised** 26:24
**arose** 79:14

**arrange** 6:15
**arrangement** 89:12
**arrangements** 89:23
**arranging** 107:18
**array** 43:23 70:9
**articulated** 55:21 110:5
111:5
**aside** 54:12 75:25 121:8
122:3
**asked** 12:5 19:12 31:5 33:14
33:22 40:19 41:12 42:14
42:22 45:1 51:24 53:24
58:5 60:23 63:11 64:10
65:16 66:13 67:16 76:12
77:22 83:23 84:24 119:11
133:6
**asking** 5:18 35:17 36:4
50:18 84:21 89:19 119:7,9
**aspects** 22:20
**asserting** 111:8 124:6
**assertion** 116:20
**assess** 42:22
**asset** 9:19 17:15,24 134:14
**assigned** 59:15 134:12
**assignment** 42:9 43:7,10
46:17 47:24 53:20 56:22
62:15 64:12 72:10 77:23
77:23 78:22
**assignments** 10:25
**assisted** 130:21 134:1
**associate** 28:19 134:8
**associated** 38:25
**assume** 60:7 92:9
**assuming** 60:1 103:18
104:21
**assurance** 29:11
**Astarita** 3:14 34:3
**asterisk** 17:21 18:6
**asterisks** 17:22
**Atlanta** 3:8 5:12,15
**attached** 4:17 6:25 40:15
49:11 71:15 108:23 140:9
**attempt** 115:23,25
**attempting** 58:24
**attendant** 11:19 98:13
**attention** 35:16
**attorney** 5:12,14 8:25 9:12
10:2 13:19 37:14
**attorney-client** 27:23 42:12
**attorneys** 70:17 81:3,4,7
**attribute** 112:1
**attributes** 106:23
**August** 9:9 50:1
**authenticated** 16:3
**authoritative** 96:25 97:2
102:5 106:12,14 123:3

**authorities** 125:3
**authority** 113:6 122:23
  123:13 124:8,16
**availability** 114:22
**available** 114:21,21
**aware** 15:14 37:22 57:1,18
  58:4 59:13,22 66:11 69:11
  69:15 80:24 122:25 131:15
  131:21

_____

**B**
**B-R-A-N-T** 134:7
**back** 6:14,19 24:19 28:3
  34:11,13,18 47:23 54:13
  58:10 64:18 65:10 66:24
  87:20 95:5,8 99:22 135:23
**background** 14:8 51:18
  54:24 81:8
**ballpark** 23:10 135:24
**bar** 10:9,13 15:13
**bars** 10:20
**based** 14:24 32:9 33:3 42:22
  44:11 48:12 55:1 61:24
  62:7 63:16,19 68:22 75:12
  75:13 80:18 99:14 114:5
  114:12,20 121:11 124:5
  125:2 131:23
**basic** 80:13
**basically** 63:5,5 109:6 118:3
**basis** 74:9 88:24 92:24
**bear** 21:24 113:23
**bearing** 88:8,17 89:24 93:21
  93:23,24 94:1,3,8 97:19
**beg** 95:16 127:16
**beginning** 2:17 81:24
**begins** 67:2
**behalf** 2:15 3:2,12 22:5,25
  51:16 115:9 119:3
**behavior** 112:1
**believe** 27:7 32:25 33:16
  43:13 49:6 55:17 56:10
  78:17 93:25 96:24 121:4
  121:10,11 128:12 133:1
  135:14
**believes** 102:7
**bell** 84:21
**benefit** 13:22
**best** 7:20,21 33:19,21 55:8,9
  74:11
**better** 14:10
**beyond** 30:2 35:4 47:19
  81:6 83:11 85:14 122:10
  124:4
**bill** 136:19 137:10,13,21
  138:2
**billed** 136:22,23

**biographical** 51:19
**bit** 30:14 36:20 51:13 136:24
**Boca** 3:17
**bona** 72:22
**book** 94:20 118:16
**bore** 78:1
**bosses** 14:11
**bottom** 96:4
**bought** 99:16,25
**bounds** 124:4
**Brant** 134:6
**break** 6:14 7:8 66:21 95:1
**breaking** 6:16
**Brett** 19:9
**brief** 7:10 66:22 139:4
**briefing** 37:25
**briefings** 70:18
**briefly** 8:3 9:14 29:6
**briefs** 22:4,24
**bring** 21:24 117:24
**bringing** 51:21
**broad** 44:10 45:25 67:17
  70:8 94:15 100:17 126:8
**broad-based** 15:21
**broaden** 13:23 60:25,25
  61:2
**broadened** 62:15
**broader** 62:1,16 89:16 101:8
  128:6
**broadly** 11:20 41:12 132:19
**broker** 26:10 27:7,21 94:17
  128:7
**broker-dealer** 9:20 18:2,3,5
  26:18,24 50:25 96:10
  127:6 134:15
**broker-dealer-related** 20:13
**broker-dealers** 9:23,24 68:4
  128:5
**brokers** 128:20
**brought** 10:1 51:1,2 61:15
  90:20 113:23 115:21
**Brown** 134:6,7
**bullets** 19:25
**BURN** 142:2
**Burns** 1:14 2:15 4:3 5:2,6,8
  5:18 7:2,12 57:1 66:24
  71:19 109:1 140:4,13
**business** 72:9 80:7 89:6
  92:22,24 94:17 95:22
  107:1,8,8 112:7 115:7,8
  119:5
**businesses** 15:6 125:16
**buy** 96:13 97:10
**buyer** 98:22 99:5
**buying** 92:22 93:15 94:20
  99:3 102:8 107:6 112:8

**buys** 100:23 110:3

_____

**C**
**C** 3:1 5:1 3:12 49:23
**call** 6:23 52:15,16,17,23
  81:18 122:11
**called** 25:15 42:14 48:9
  60:23 76:18 133:8
**calling** 76:6,9
**calls** 84:23 85:9
**capacities** 125:15
**capacity** 68:13
**captive** 127:6
**capture** 44:5,6
**careers** 71:4
**carefully** 119:21 124:21
**carry** 110:18
**case** 1:2 2:2 5:20 12:16
  20:20,23,25 21:20 32:7
  34:8 40:25 53:15 57:2,17
  59:1,15 60:16 61:14 62:12
  63:8 66:1 67:14 70:17,18
  70:25 72:17 73:9 74:6,21
  75:10,17,18,19 76:2 77:2
  77:20 78:2 79:25 80:4
  82:16 84:16 85:6 90:19
  99:15,16 103:3 121:5
  126:19 128:18 133:3
  141:10 142:3
**cases** 22:16 109:16 112:14
  112:17 113:3,15,22
**Casey** 13:16,17
**cash** 91:3
**Casting** 58:10
**catch** 17:6
**categorical** 129:2
**categories** 99:10 125:13
**category** 103:14
**caught** 91:11
**caused** 18:12 40:1
**Center** 83:8
**certain** 11:12 41:2 73:7
  111:9
**certainly** 13:21 14:9,10 15:7
  16:7 25:1 26:11 47:10
  64:21 68:12 69:5 70:8 80:6
  94:8 120:21 122:18,19
  125:6
**CERTIFICATE** 141:1
**certify** 141:4
**Chairman** 13:3,15
**challenge** 38:20 39:3 66:4
**chance** 23:25
**chances** 77:3
**change** 61:1 86:2 123:6
  142:4,5,7,8,10,11,13,14,16

142:17,19,20,22
**changed** 48:4
**changes** 44:18 77:2 140:8
**characteristic** 106:23
**characteristics** 109:11
  110:10 111:9 112:6
**characterized** 107:10
  115:21
**charged** 72:3
**charges** 58:24 115:21
**check** 137:22
**chief** 15:19 29:1
**chose** 39:4
**Christ** 112:21
**chronologically** 39:13
**Church** 112:21
**Circuit** 8:17
**circumstance** 91:18
**circumstances** 50:21 80:23
  89:11,17,23 123:11 127:1
  127:10,23 128:13,17,18
  129:7,10,11
**cite** 106:6
**cites** 109:16
**citing** 101:19
**civil** 64:9
**claim** 46:13 58:8,14 72:23
  124:14
**claims** 72:9,11
**clarifications** 41:4
**clarify** 86:5 126:23
**clarity** 27:19 28:8
**clean** 5:25
**clear** 36:3 125:8 128:25
**clearly** 45:10 87:9
**clerked** 8:15
**client** 18:11 115:10
**clientele** 106:25 115:6
  125:16
**clients** 22:19 25:15 26:12,22
  27:15,17 58:25 68:18,21
**closely** 68:1
**Colby** 96:24 101:1,3,4,10
**Colby's** 96:21
**cold-called** 84:14
**collateral** 11:19 123:24
**colleague** 5:13 108:8 134:6
  135:20
**Columbia** 141:18
**combination** 124:17
**combined** 136:6
**come** 23:7 28:21 29:2 44:3
  66:5 86:15 95:5 122:4
  130:3,7 134:22
**comes** 119:8
**comfortable** 29:4,4 108:17

commenced 16:25
Commensurate 22:13
comment 19:2
commentator 102:5
commission 1:4 2:4 3:5
12:18 13:24 14:15 43:25
69:19,20 70:3,3 71:23
141:13
Commission's 114:9
commissioner 13:1,16,17
110:15
commissioners 13:3 14:5
14:16,22
common 74:15 115:4
121:10 122:10,18 123:22
124:7,15
commonly 120:9,9
communications 27:24
company 114:23
compared 67:22
comparison 126:3
compensate 92:13
complaint 34:9,17 38:13,19
38:25 39:18,18 46:7,20
47:1,10,25 48:13 55:1,18
56:2,3,7,18 57:4 58:13,20
60:12,24 61:7 62:10,18,24
63:6,17,20 64:1 71:6 115:2
115:18
complaint's 61:13
complaints 124:12
complete 140:6
completed 48:2
completely 46:18
compliance 9:21 22:15
complicated 102:1
component 115:24
concern 98:18
concerned 6:5 39:8 90:24
128:6
concerning 88:12 112:3
concerns 15:1,4 51:21
132:14
conclude 122:6
concluded 139:15
conclusion 55:22 101:22
124:11
conclusions 80:18 81:11
99:14
conduct 117:2
conducted 114:15,19
conferences 87:10
confidences 25:23
confined 46:19 47:3 65:21
connected 91:23
connection 31:8,20 33:10

connotes 17:25
consequences 11:19
123:24
consider 36:25 38:2,9 42:15
77:1 88:25 91:19 103:21
131:18 133:20,21 134:23
consideration 55:20 64:13
66:12,13 80:8 82:10,14
90:21 98:14
considerations 73:7 129:15
129:17,24 133:13
considered 27:20 38:21
39:4 40:3 53:5 55:23 57:22
64:21 82:23 83:13 86:10
92:14 101:13 106:12,14
109:11 110:6,11 111:6
116:20 119:18 120:20
127:11,24 129:9
consistent 67:7 76:11
constitute 122:17 123:13
126:12
constituted 123:5
consultation 48:13,25
consulted 21:2
contacting 88:23
contain 41:7 42:11
contained 70:15 72:21
contemporaneous 51:11
52:7,8,15
contention 132:11
contentions 34:25
contents 83:9
context 27:19 69:1 93:3
97:8 124:23 125:17 126:9
continual 88:24
continuous 92:23
contractors 90:13
contrary 60:15 61:20 63:7
control 6:17
controlling 125:2
convenient 6:16
conversation 49:25 50:7,10
51:4,6 52:12,20 79:4
conversations 70:11
conversion 122:15 123:4,25
convertible 94:5 121:6,21
121:22 122:12,16 124:1
convinced 105:3
Cook 17:2
Cooke 59:15,22 61:6
copies 49:13
copy 7:3,15 40:24 71:19
core 56:21
corporate 119:6 125:23
correct 8:1,9,17 9:2,8 11:1

12:20 15:17,18 17:12,13
17:16,17,20 23:19,21,22
24:2 30:21 31:14,22 33:12
33:13 39:5 46:3 49:18 50:1
56:3,22 62:12 63:17 66:1
69:24 71:8,24 73:4,10,19
75:5 78:3 81:12 94:13
96:21 97:23 103:2 112:8
117:12,15 118:6 119:18
123:19 129:5,15 130:14
131:1 135:18 138:1 140:6
141:5
corrections 41:4 140:8
correctly 30:3 38:16 55:5
67:10 68:7 95:23 96:18
109:13
coterminous 58:21
Council 8:21
counsel 5:16 12:25 13:12,13
13:14,24 14:21 18:13,15
21:2,4,6,14 29:1,20 32:20
49:20,21 50:19 55:11 59:1
66:9 68:22 79:11 113:24
116:13 134:9,10 139:5
141:9
counsel's 14:18 80:7
counsels 13:1
count 130:23
couple 9:5 13:1 20:14 54:16
course 16:1,5 20:10,18
29:11 33:19 75:2,14 98:1
98:14 100:18 121:13
136:12 139:8
court 1:1 2:1 5:24 6:13,18
8:16 17:5 28:3 32:23 33:1
61:19,21 64:5 65:16,17
69:8,12,18 70:2 72:14
78:13 79:13 111:8 131:25
courts 79:14
covered 9:19 40:9 41:20
Cox 3:14 34:3
create 5:25 51:12 52:16
created 24:14
credit 107:18
current 7:2 19:16 31:18
currently 10:19 24:9 30:2,5
30:16 31:5
Curriculum 4:9
customarily 131:10
customary 13:4
customers 107:19
cut 97:22 98:8,22 99:5 135:2
135:4
Cutler 9:1,4,4,12,17 10:6,24
11:5,14 12:11
CV 7:3,16,17 10:23 15:24

19:20,25 20:2 23:17 24:6
24:14

**D**

D 5:1
D.C 1:15 2:17 10:16,21
dangerous 111:24 112:3
dark 45:6
data 4:11 37:16,23 49:8
83:15
date 136:15,23 140:13 142:2
Dated 141:12 142:25
day 11:10 12:8 17:20 19:1
25:11 94:21,21 103:25
104:10,11 117:4 126:5,13
days 104:4 105:8
deal 75:4 89:8 130:7
dealer 26:10 27:7,21 32:2,8
32:12 38:15 43:2,5,22
44:11 45:14 46:14 52:4
53:5,10,19 55:19 62:5
63:14 67:9 69:13 73:3
77:13 82:11 86:3,18 88:10
88:18 94:18 95:20 96:7,16
106:22,23 107:5,8,16
109:11,12 110:6,10,11,22
111:6,9,10,15 112:2,6,23
114:3 115:22 117:12,19,21
118:6 120:22 121:7 124:3
124:3,14 125:8 127:11,24
128:7,14,24 129:2
dealer/trader 31:7
dealers 43:15,18 46:1 56:11
57:5 60:13 61:8,17,18
62:12 72:5 73:10 93:8
96:13 97:10 107:2 113:7
114:17,24 126:22,25 129:9
129:18 130:11 133:3
dealing 21:9
deals 93:14
dealt 21:13
debenture 121:6,21,23,25
122:12 124:1,2
debt 56:8 72:10 82:4 84:14
86:21,22 87:15,24 88:8
94:5
December 8:10
decide 51:14 79:15,17
108:10
decision 108:14
decisions 69:18,19 70:2,3
declaration 103:8 105:7
declarations 103:16
deemed 48:17 94:4 102:7
128:24
deep 97:16 98:4 99:1

**deepest** 110:15
**defendant** 3:12 32:6,7
**defendants** 1:9 2:9 5:10
22:5,5,25,25 43:1,15,18
48:14 49:1 55:18,22 56:9
56:11 57:2,5,16,24 60:11
60:13 61:8,17,18 62:11
84:16 85:6,22 90:17 99:15
114:17 124:13 129:18
130:10 133:2 139:5
**defendants'** 139:10
**defense** 21:14 59:1,16
**defense's** 59:22
**defenses** 116:18,21
**define** 101:6
**definitely** 118:16
**definition** 26:9,17 27:6 32:2
43:2,22 44:4 45:9,14,14,25
53:19 93:9 96:7 103:5
117:12 118:14 119:8,10,22
119:25 120:22 121:11
122:3,5 123:17 124:3,19
125:8 128:6
**definitions** 122:23
**degree** 12:24 74:19
**deliberate** 131:5
**denied** 59:22 61:9
**denominate** 63:14
**departure** 19:7
**depend** 89:11 123:11 133:6
**depended** 16:25
**dependent** 91:16
**depending** 63:10 124:18
**depends** 41:22 103:4
**DEPONENT** 140:2
**deposed** 33:10
**deposition** 1:14 2:15 5:5 6:2
6:24 33:6 34:12 35:3,6,22
36:24 40:14 47:11,11,14
48:14 49:1,10 50:12 55:2
71:14 83:20 105:16 108:22
115:19 139:15 142:2
**depreciated** 98:6
**depths** 100:3
**deputy** 15:15 16:21,23 17:3
17:9,11 28:19
**Derivatives** 29:2
**describe** 9:14 13:25 14:19
29:3
**described** 54:10 75:3 94:2
117:3 121:7 132:17
**describing** 19:22 79:14
90:22
**description** 4:8 19:20 20:1
23:17 72:17
**detail** 15:25 19:16

**details** 19:21 21:1
**determination** 110:22
114:20
**determinative** 54:5 94:10
**determine** 46:12 53:4 79:24
115:15 116:4 120:12
131:13
**determined** 111:10
**determining** 53:10 70:1 73:8
82:10 92:18 95:19 125:20
**develop** 42:1
**developed** 47:12
**developing** 38:2,9 81:19
**development** 54:3
**develops** 90:25
**deviating** 42:24 43:13
**DeWitt** 103:15 105:6
**DeWitt's** 103:19
**differ** 75:2
**differences** 71:4
**different** 14:13 22:20 39:10
39:10 65:4 69:4 79:14,15
87:18 99:10 105:21 110:21
123:24
**differently** 70:22
**difficult** 23:9 28:7
**diligence** 15:12 99:2 105:17
**dim** 11:8
**diploma** 8:12
**directly** 20:23 21:8 28:22
107:1 119:16 120:3 137:18
138:3
**director** 15:15 16:22,23 17:2
17:3,9 19:7
**directors** 17:11 28:20
**disagree** 60:10 62:3 101:22
111:17,21
**disciplinary** 15:13
**disclose** 42:3 79:2
**disclosed** 78:7 83:12
**discount** 98:4,7,12,20
100:25
**discounted** 72:12
**discounts** 97:17 99:1
**discuss** 78:21 80:2
**discussing** 79:6 129:23
**discussion** 80:9
**discussions** 80:12
**dismiss** 57:2,9,11,17,23
58:8,21 59:1,16,23 60:11
62:4
**dismissed** 58:25
**dispositive** 94:9
**disputing** 76:20,22
**dissuade** 63:21
**distinction** 31:7 96:15

106:22
**distinguish** 92:25 96:12
97:10 100:19 113:25
**distinguished** 34:23,24
**distribution** 118:22,24,25
119:18 120:6,9
**District** 1:1,1 2:1,1 141:18
**division** 15:16 16:22 18:1
19:7,8
**divorce** 67:18
**document** 37:15 41:24
47:17 49:8,19 108:20
109:1
**documents** 38:9 48:19
57:19
**doing** 30:5 41:15 66:10 87:6
92:24 94:22 97:25 100:20
114:4,11 120:17 121:18
126:18
**Dorr** 9:2,5
**double-checking** 21:5
**doubt** 23:6
**downstairs** 7:6
**dozen** 23:1
**draft** 134:25
**drafted** 135:1
**drafting** 9:21 135:3
**drawing** 125:13
**due** 15:12 99:2 105:17
132:15
**dueling** 36:11

**E**

**E** 3:1,1 5:1,1
**earlier** 24:7 46:4 49:9 117:4
134:1
**early** 117:4
**easily** 25:18
**East** 3:6
**Eastside** 112:21
**economists** 13:9
**edited** 108:16
**editing** 22:24
**editorial** 108:14
**education** 8:4,21
**effective** 12:8
**either** 10:3 22:3 29:3,13
36:6 83:1 98:6 137:16
**elaborate** 20:5 28:17
**Elliott** 76:1
**Elliott's** 76:15
**ellipses** 107:20,23 108:2,12
109:8,25
**embodied** 62:22
**emerge** 22:16
**emerged** 22:18

**employ** 75:19 81:3,7 129:23
**employed** 74:24 75:17 85:5
141:9
**employees** 90:7,13
**employment** 8:4 9:16 10:24
12:11
**encompass** 61:2 62:16
132:10
**encompassed** 103:14
**encompasses** 60:24
**encompassing** 62:17
**ended** 135:16
**ends** 110:16
**enforcement** 9:25 14:18
20:3,6,14 21:8,10,13,19
22:16 23:1,12 29:13 42:25
43:14 44:17
**engage** 112:7 118:5 126:17
**engaged** 27:1 30:16 94:1
107:6 116:5 123:7,16
125:20 126:7
**engagement** 5:22 20:4 30:1
30:2,4,8 33:11 42:8 46:11
80:6 135:13,21 136:16
**engagements** 31:25 32:5
**engages** 117:21
**engaging** 119:15
**English** 40:17
**ensnare** 45:19,21
**ensuing** 75:14
**ensure** 66:10
**entertained** 61:6
**entities** 21:3 113:7
**entitled** 129:14
**entity** 29:19 32:1 98:25
**enumerated** 110:19
**equity** 1:8 2:8 5:7 20:23
26:12 56:9 73:15 75:18
90:7,8 91:2 126:20 127:21
127:24 128:14 129:4
**errata** 140:9 142:1
**ESQUIRE** 3:3,4,13
**essentially** 38:5 51:4 58:16
78:23,23 84:13 94:20
130:7
**establish** 38:14 56:10 57:4
58:13 61:8,14 62:11 65:15
**established** 15:6 45:10
126:17
**establishing** 87:11
**estimate** 23:10,15,16 25:9
135:19,25 136:9,18
**estimating** 22:23
**et** 142:3
**ethics** 20:10
**evaluate** 113:25

evaluates 68:3
evaluating 115:9,13
evaluation 38:1 115:4
evidence 47:4
exactly 10:17 17:5 32:25
  33:7 35:16 43:24
EXAMINATION 4:2 5:16
  139:5
examinations 9:21
examined 140:5
example 52:16 90:5 112:21
  115:23 138:10
exception 33:5 45:12 72:20
  129:2
exceptions 125:11
excerpt 4:14 109:4
exchange 1:4 2:4 3:5 12:18
  32:2 43:3,19 45:12,13
  56:11 67:9 69:14 71:23
  72:5 73:3 107:3 123:4
  125:12
exchanges 72:24
excluded 78:24 96:4,7
excuse 136:10
exemption 73:16
exhibit 4:9,10,11,12,14 6:23
  6:24 7:2,13 37:11 40:14,22
  49:9,10 54:12,13 71:13,14
  108:22 109:10 110:4,9
  111:4
exhibits 4:7,17 36:12 37:4
  55:3
exist 46:19 122:23 127:23
existed 48:1
expectations 65:17
expected 132:6
expedite 16:6 18:19 45:7
experience 13:19 23:18
  31:22 42:23 63:12 67:17
  67:25 68:23 70:10,22 71:4
  81:9 94:14,15 129:22
  130:2
experienced 69:2
experiences 31:17 68:5
  70:23 75:14
expert 4:10,13 5:9,19,22
  13:7 19:9 20:4 21:21 24:11
  24:12,15 30:1,4,8,16 31:3
  31:4,17,22 32:5,23 33:1,4
  33:11,15,23 34:6,7 40:24
  42:7 46:11 48:21 54:14
  57:23 58:17 61:25 62:7
  63:11,24 64:12,14 67:15
  68:10 69:12 71:20 77:4
  78:13 79:12,16 80:14
  132:23 135:13,21

expert-witness 23:19 24:18
expertise 18:4 21:24 22:1
  62:2 63:12 65:19 66:6,7
  67:18 81:18
experts 18:5 67:8,13,20,22
  69:1,7,8
expires 141:13
explore 97:13
exposed 104:7
expository 40:4,17
exposure 104:7 105:9,9
express 24:3 41:8,19 42:2
  59:3 60:22 80:12
expressed 38:3,10 51:21
  61:20 74:9 80:18
expressing 31:6
expression 45:23
extending 107:17
extension 107:18
extent 22:17 27:23 42:11
  43:10 102:17 109:21
  111:25 113:22 132:11,13
  132:16 133:18
extinguishing 128:23
extra 18:18
eye 91:11

_____ F _____
face 56:7 58:14 60:12 61:7
fact 31:11,13 69:11 78:22
  80:23 88:8 91:18 110:14
  117:2 127:5 128:3 129:6
factor 91:5 92:17 97:19 98:7
  99:4 111:13 125:19
factors 53:9 55:21 88:9,17
  95:19 110:4,21 111:4
  112:24 113:8,13 114:16
  115:3,5,8,14 117:10,14
  118:6
facts 4:11 37:15,23 44:12
  46:18 47:12 49:8 55:1
  77:12 78:1 83:15 89:11,16
  89:22 91:13 99:14 105:2
  114:21 115:16 116:12,14
  116:16,21 123:11 127:1,10
  127:22 128:13 129:9,11
  131:12,17
facts-and-circumstances
  90:15,21 94:12
factual 34:22 35:7,23 36:6
  36:23,25 39:20 47:18,25
  48:24 49:2 54:3 117:2
failure 58:8
fair 9:10 10:5 23:15,16 25:4
  31:24 32:4 46:17 47:7
  56:19 74:14,17,19,23

77:17 129:20
fairness 72:13
faith 60:10
fall 43:1 103:13 117:12
  120:21
familiar 12:12 112:17
  124:22 128:3 131:3
family 89:7 90:23 93:2
  138:19,23
far 29:20 41:14,16 56:24
  108:19 132:24 135:21
  138:7,12
Farr 2:16 17:14 23:18
fast 127:18
federal 5:8 65:23 69:17,18
  78:13
fee 20:23 91:17
feedback 14:24
feel 6:12 115:20
feels 121:20
fees 136:15 138:6,11,19,24
Ferry 3:6
fide 72:23
field 80:20 130:8
figure 100:21 137:20
file 51:12 71:22
filed 46:7 57:2,16 60:11
filing 4:12 73:24
filings 38:5
Filling 8:20
financial 15:4 18:12 19:23
  20:17 141:11
find 43:17 54:21 55:14 85:6
  88:24 111:25 114:3
finder 83:19,21 85:21
finders 84:1,2,3 85:13 88:23
  89:6,12,15,20,24 90:6,12
  91:4,21 92:11,11 93:12,13
  116:2
finding 76:15 98:22 99:5
  112:22,24 129:17 130:10
fine 10:11 24:22 96:17
finish 5:23 16:16 34:24
  68:20 94:24
firm 9:1,7 11:20 24:21 29:10
  29:14 34:2 52:22 78:17,18
  80:3 134:13 138:3
firms 118:18
first 6:22 10:9 12:11 30:7
  42:20 47:17,17 48:11
  49:17 54:23 55:4 60:1,3
  80:17 91:23 95:11 97:15
  106:10 109:22 126:15,16
  134:25 135:2,4
fit 45:8
five 9:16 11:4 28:19

five-minute 66:21
flip 73:11
Florida 1:1 2:1 3:17
focus 17:25 18:22 36:16
  38:17,24 39:17 40:2 46:5
  56:1,4,17 133:10
focused 35:10,11,25 36:4
  38:19 45:16,17 54:8 65:18
  77:11 89:15
focuses 46:6
focusing 18:11
folks 20:9 21:9 125:13
follow 27:10 50:22 109:22
  121:8 133:16
followed 10:16 15:18 68:2
following 37:22 65:16
follows 5:4 67:23,24 102:12
  107:25
foot 25:25
footnote 106:2,3,5 108:18
  109:15 112:15
foregoing 140:5 141:3,4
forgive 124:19
formal 52:13 125:15
format 74:4
formed 99:13,24
former 13:10,15 125:6
formulate 75:9
formulated 132:23
forth 34:11 43:2 48:12 54:25
  55:19 71:7 113:9 131:11
forward 61:1 73:11
forwarded 137:18
found 61:19 76:3 113:6
  133:2
four 28:19
Fourth 8:17
free 6:12
free-trading 73:18,21
frequently 22:9,10,11,12
  60:6 126:19
front 20:11 40:24 59:14 63:4
  95:9 109:1 118:14 132:25
full 43:9 55:20 95:12 123:18
  126:15
fulsome 19:19
fund 93:1 104:11 116:4
  127:24 128:14 129:4
fundamental 100:20 101:8
  105:23
funding 138:24
funds 68:5 89:7 90:24
  126:19,20,25 127:22
  128:10 129:3
furnish 107:15
further 32:4 43:25 44:14

131:18 139:13
**Fusco** 82:16,17 83:17 84:20
85:5,9,14,21
**Fusco's** 84:6 86:10,13
**fuzzy** 32:16 33:17 36:20
104:1

**G**

**G** 5:1
**Gallagher** 2:16 23:18
**gap** 8:20
**gathering** 117:3
**general** 10:2 14:18 18:15
21:4 27:11 72:16 89:16
116:19 126:8 131:6,7,9
**generally** 26:19 28:25 34:5,6
58:9 75:1,15 76:11 80:19
80:24 92:11 93:12 107:11
**gents** 95:2
**Georgetown** 8:7
**Georgia** 3:8
**germane** 114:7
**getting** 66:18 87:3,4 136:12
**gist** 119:23
**give** 33:19 40:5 54:20 55:14
64:13 65:7 66:12,13 97:8
117:7 135:24
**given** 33:4 50:11 78:16
85:20 104:6 105:7 109:10
110:9 111:12,24 126:5,5
126:10 132:22 133:14
140:7
**giving** 51:25
**glance** 39:25
**glanced** 36:15 86:12
**glasses** 7:5,13
**Global** 71:20,21 72:3,4
**gloss** 44:15
**go** 7:7 8:3 19:15 21:1 27:13
32:15 37:10 48:7 49:7 53:8
54:13 55:10 62:9 63:4
65:13 87:20 88:7 89:4 95:4
95:11 100:15 109:7 110:12
113:24 115:25 117:6
129:14 131:5 132:25
135:23
**goes** 38:4 97:12
**going** 6:19 15:2,2 19:15
24:21 27:10,14,22 28:2
36:8 37:18 42:10 44:25
45:1,5 65:2 66:3 67:2
76:10 79:16,17,18 80:15
85:1,24 86:15 87:9 90:11
94:23 113:24 114:25 119:5
125:9 126:11,15
**good** 12:15 14:1 97:1,5

136:24
**Gordon** 3:3 4:4 5:5,11,17
6:7,10 7:1,11 16:12,13
19:3 28:2,10 36:19 37:8
40:12,21 41:17,25 42:6,16
44:7,22 45:4 46:24 47:6
48:6 49:7,12,16 54:7 55:12
55:13 56:25 58:22 59:11
59:20 60:18 61:5,16 62:6
62:19 63:2,15,22 64:3,11
64:17,24 65:5,9,20 66:15
66:20,23 68:17 71:2,11,16
77:8,16 78:20 79:22 84:18
85:2 86:4,19 87:13 88:3,21
89:9,18 90:4 91:1,20 92:16
93:10,20 94:11 95:3,7
99:12,22 100:5 101:21
102:3,15 103:17 104:15
105:25 108:24 111:1 112:4
112:11 113:4,18 115:12
116:9 117:5 118:20 119:14
120:1,11 122:14 123:14
124:5 127:7,14,19 128:8
128:21 130:5,24 131:22
132:3 133:11,22 138:16
139:1
**gordonr@sec.gov** 3:10
**government** 33:23
**graduated** 8:7
**grammatically** 110:1
**great** 75:4 89:8 114:6 118:2
130:7
**grounded** 124:25
**group** 1:8 2:8 5:7 17:15,24
18:5 73:16 75:18 90:7,8
91:3 134:14
**guess** 12:25 20:22 40:18
66:4 95:11 97:15 121:9
123:12
**guidance** 42:25 43:14 44:3
44:17 69:20 71:7 110:5
111:5 112:25 113:9 117:17
117:18
**guy** 40:18 121:20,22
**guys** 30:11 41:13

**H**

**Hale** 9:1,5
**half** 18:10 23:1 50:8,8
**hand** 107:13
**handful** 109:16
**handle** 34:22 107:13 123:18
**handles** 137:23
**hang** 120:18
**hanging** 120:16
**happen** 79:20 87:19 119:24

121:16
**happened** 22:19 76:21
79:19
**happening** 120:10,15
**happy** 6:15 60:25
**hard** 16:15 67:17 94:24
111:7
**head** 84:8
**head's** 87:4
**heading** 54:24
**hear** 6:11 13:24 28:21 52:1
65:6
**heard** 26:15 60:4 81:16
**hearing** 50:13 59:14
**hedge** 89:7 90:24 93:1
126:19,24 128:10 129:3
**held** 103:1,11 104:3,10
**helped** 14:10
**Hess** 76:9
**hey** 23:8 40:1 93:3
**high** 29:5 126:19
**high-frequency** 98:1 99:9
103:24 104:9 127:9,11
128:11 129:3
**higher** 75:21
**Hill** 13:10
**hired** 13:9,10
**history** 44:21,23 125:7
**hold** 26:13 52:10 81:22
96:14 102:21 104:11
**holders** 82:4 84:15 86:21
87:15,24 88:8
**holding** 94:4 104:12,23
105:8 114:18 115:6 121:9
125:19
**holdings** 104:3 105:7
**holds** 102:13 107:5
**hopper** 20:24
**hornbook** 106:15
**host** 91:19 98:12 110:21
123:24
**hour** 50:8,8,8 78:3
**hourly** 78:2
**hours** 135:20,23 136:3,3
**housekeeping** 133:23
**human** 16:15
**hypothetically** 88:6 90:6
92:3 94:2 123:2

**I**

**IBM** 121:16
**Ibrahim** 1:7 2:7 5:6 50:1
142:3
**identification** 6:25 40:15
49:11 71:15 108:23
**identify** 49:18

**IM-focused** 24:6
**imagine** 51:15
**impact** 15:5
**implications** 131:18 133:1
**important** 14:8 15:8 18:12
18:25 19:23 20:17 79:8
85:22
**improper** 74:3,18
**inadvertent** 83:7
**inappropriate** 63:13
**incidental** 107:17
**include** 24:9 44:10 46:1
67:12 84:11 108:11
**included** 10:25 45:13
**includes** 48:18 109:4 119:22
**including** 31:12,18 114:21
117:19
**incorrect** 43:16 110:1
**incorrectly** 38:16
**increase** 77:3
**independent** 46:18 54:2
90:13 117:2
**INDEX** 4:1
**indicate** 104:22 117:11
**indicated** 10:23 28:7 36:13
84:3 92:5
**indicative** 86:17
**indicia** 55:18 87:11
**Indifference** 77:21
**indifferent** 77:18,22
**individual** 29:19 32:1 89:7
98:25 117:11 122:20
**individuals** 113:7
**industry** 13:8,25 14:4,7,25
81:16 130:9
**inflection** 17:6
**information** 18:17 34:22
49:2,24 51:19 67:3,6 85:8
105:2
**information-barrier** 9:23
**informed** 39:20 70:22 81:1
**informs** 125:17
**inherent** 104:13
**initially** 39:1
**inquiry** 79:23 91:6 116:6
126:6
**inquisitive** 14:12
**ins** 132:6
**insights** 13:9
**insinuate** 74:1
**insofar** 70:21
**instance** 24:10 79:20 87:6
92:4 128:5 131:15
**instances** 92:7
**instant** 74:6 75:17
**instruct** 132:20 133:15

instructed 131:16,17 133:20
instruction 131:25 132:10
instructions 131:12
instructs 6:4 131:4
instruments 56:8
insufficient 56:10 57:4
58:13 60:12 61:7,13 62:11
64:1 124:13
insulate 98:15
intend 15:24 41:19 42:2
62:21
intent 114:17
intention 62:8,9 97:17
104:22,24 120:4 132:25
interact 116:3
interacted 83:25
interacting 20:22
interaction 16:16
interactions 70:7,24,25
interest 141:11
interested 92:12 93:5 106:6
interesting 19:6
interests 15:3,4
interface 21:9
interpretation 43:17 44:14
interpreted 43:25
interpreting 69:17,18,19
Interrogatories 34:11 35:5
35:21 47:15
Interrogatory 35:2 36:23
47:20
interrupt 16:18 102:25
interview 52:13
introduction 42:21 51:13
inures 125:9
invade 27:23
invest 93:4,6 105:22
investigation 48:16
investment 18:1,3 20:13
68:4 84:11 96:14 97:7,11
97:14,15,20,23 98:2,9,23
99:2,6,16 100:1,9,13,15,16
100:16,18,22 101:1,7,14
101:23 102:9,19,19 104:7
105:4,9,10,11,12,19
107:17 114:17
investor 93:1,1 122:20
investors 89:7 96:13 97:10
107:2
involve 26:9 80:8 131:1
involved 22:18,20 25:4
81:17 88:25 89:25 90:9,17
91:7 93:14
involvement 28:14
involving 24:25
IronRidge 30:10 31:19

32:16,20 34:15 51:20 59:8
71:20,21 72:2,3,4,20 73:2
73:9,15 74:5,20 75:9,13,19
76:2,25 78:24 134:21
IronRidge's 72:8
irregular 107:12
irrelevant 93:16,19
isolation 102:2 111:13
issuance 121:16
issue 22:21 26:9 31:25
60:15 64:4 79:13 80:3
132:15
issuer 87:9 118:15 119:2,16
120:3 121:24,24
issuers 72:10,11,12 84:10
84:14 88:13,14,24 89:1
90:1 118:10 121:1
issues 9:22 25:24 26:3,3,3
26:19 66:8 67:8 68:16
69:13 70:12 132:16 133:10
Item 49:23
IV 71:21 72:4

<hr/>

**J**

J.D 8:8
jak@sallahlaw.com 3:19
James 1:14 2:15 4:3 5:2,6
140:4,13 142:2
JB 108:21
JB1 6:23 7:2,13
JB2 40:13,23
JB3 49:9
JB4 71:13,19
Jim 42:13 52:25
job 1:25 13:20,24 14:9 15:22
42:15 131:10
John 17:10
joined 16:10 17:1,14
Josh 68:14
Josh's 42:13
Joshua 3:13 49:12
judge 8:16 59:14,15,22
60:16 61:6 63:7 76:1,2,15
131:4,9,16 132:7,20 133:8
133:18,20
judge's 131:11
judges 133:15
judgment 36:11 38:5 57:10
juries 133:15
jury 62:9 63:4,25 131:4,10
131:12,16 132:20,25
133:13

<hr/>

**K**

K 2:16 3:3
Katz 3:13 4:5 6:1,8,9 7:16

16:8 27:22 34:2 36:8 37:2
41:10,21 42:5,10 43:20
44:19,25 46:21 47:5,22
49:4,15 53:21 55:11 56:23
58:18 59:4,17 60:9,17,20
61:11,23 62:13,25 63:9,18
64:2,6,20 65:2,12 66:2,18
68:11 70:20 71:9 77:5,10
78:14 79:9 84:17 85:1,24
86:7 87:2,25 88:19 89:2,13
90:2,18 91:9 92:15,19
93:17 94:6 99:7 101:15,24
102:10 103:12,22 105:20
110:13 111:20 112:9 113:1
113:10 114:25 116:7,23
118:12 119:12,19 120:7
122:8 123:9,20 125:4
127:3,12,17 128:1,15
129:25 130:19 131:20
132:1 133:4,17 138:13
139:3,6,13
Katz's 138:2
keep 16:10 133:10
keeping 66:11
key 95:19
Kids 33:17
Kilpatrick 78:18
kind 9:15 23:7 28:7 34:2
61:14 75:22 93:5 110:17
126:10
kinds 20:5 74:24 105:22
knew 57:16 85:21 88:23
know 6:14 10:17 11:9 12:1,5
12:6 13:1,3 14:12,16 16:14
17:5 19:1 21:22,25 22:12
22:17 25:6 29:20,22 30:11
30:24 32:24 33:18 40:3
41:11,14 44:1 45:6 50:13
50:19 51:15,15,16,25
53:17,25 54:6 58:2,7,20,23
59:10 60:25 64:7 66:9
78:18 79:1,13 81:14 83:17
85:4,20 86:14,20,25 87:8,9
87:19,22 88:13,15 91:12
91:17,21 92:22 97:3 98:14
99:20 100:3 101:4 105:10
107:24,25 108:13 111:11
111:15 113:5,11,12,21
118:21 119:24 122:10
124:18 126:2 132:5,9,11
132:16 134:20,20 136:1,2
136:13,14,20 137:16,21,24
138:6,9,10,14,20,25
knowing 84:22 130:7
knowledge 7:20,21 52:19
55:8,9 59:19 64:22 91:24

99:14 131:6,7,9 138:17,21
knowledgeable 69:2
known 9:1 78:19 92:11 93:2
93:12
knows 21:22

<hr/>

**L**

lack 55:18
laid 57:19 115:18
language 74:14 77:24
111:16 119:21
large 9:25 20:15,18,19 118:9
late 34:19 39:15 137:11
lately 19:24
law 8:4,8,22 12:14,15,23
14:2,20 24:21 64:16 65:24
65:25 66:1,11 76:2 90:25
120:20 122:17,24 123:3,5
124:8 125:1 127:25 131:4
131:11,17 133:15,16
134:13
lawyer 19:8 68:18,21,23
69:23 119:6 131:6
lawyers 50:23 52:2 53:25
69:3,21 70:6,10,25 134:15
lay 39:13
laying 40:4
lays 43:22
le- 44:21
lead 25:2 32:20 120:14
learning 59:25 60:2
leaving 102:12
left 7:5 17:1,2 43:22
legal 10:6 14:8,23 15:7
25:24 48:16 59:2 60:14,22
62:1,3 63:5 66:5,8 67:8,12
67:15,18,19,22 68:10,16
68:25 69:7 74:24 76:3,16
81:18 106:13 113:5,16,16
113:20 119:10 123:13,17
124:8,16 125:2 131:23
135:12
legally 111:6
lending 107:18
length 125:18
lesson 44:23
let's 23:14 29:25 37:10 40:7
40:12 48:7 49:7 54:20
55:10 71:13 81:20 95:4
98:3,25 115:24 117:6
129:13
letter 10:25 11:13 12:12
27:5,18 28:14 29:9,19 31:6
31:12,13
letters 24:25 25:10 26:1,9
26:17,20 80:25

**level** 25:25 29:5 75:21
**light** 11:10 12:8 25:11
**lights** 94:19
**Limited** 71:21
**line** 84:1 96:3 104:20 110:17 111:11,22 142:3
**lines** 104:20
**liquidate** 100:11,14
**liquidity** 126:11
**list** 38:4 82:24 83:3,7,14 110:19 117:10 139:9
**listed** 82:22 117:14
**listening** 52:20
**listing** 37:15
**lists** 49:24
**lit** 40:17
**literally** 95:14
**litigation** 130:17,21 131:1,2
**litigator** 21:20 130:13
**little** 17:21 19:2 32:16 36:20 51:8,13 87:4,4 99:2 105:17 111:24
**live** 21:3 33:4
**LLC** 1:8 2:8 71:21
**loaded** 45:23
**local** 65:16,22
**long** 50:6 102:22 103:5 104:23
**long-standing** 42:24
**look** 7:13 23:8 24:8 54:20,23 55:16 62:5 68:14 81:20 84:15 87:21 89:6 90:11 91:13 103:7 106:1 110:21 121:14,15,17 125:7 129:13 135:23 136:2 137:5
**looked** 7:22 34:10,14 35:2 37:3 38:21 83:6 84:10 86:12 87:12 115:1,2,2
**looking** 13:11 38:23 47:19 48:3 54:1 55:15 65:14 66:5 66:9 84:2 85:25 86:1,12 115:17
**looks** 24:5 50:22 121:21
**Loss** 4:14 106:7,11 109:4,19 110:8 111:3,18,22
**lot** 13:24 81:16,17 90:23 119:21 123:15
**Louis** 4:14 106:7
**lunch** 95:6

**M**

**M** 26:3
**main** 112:6
**makers** 45:11 107:4
**making** 21:6 31:9 77:1 85:10 102:20 110:22 125:10

**management** 17:15,24 18:1 18:3 134:14
**manager** 9:19
**margin** 52:9
**mark** 37:10,12 40:7,12 49:7 71:12,13 108:20
**marked** 6:24 40:14,23 49:10 71:14 73:2 108:22
**market** 13:7 14:3 18:12 19:9 19:23 20:17 28:22 43:23 44:6 45:11,17 68:2,15,22 70:9 72:15 75:15 80:25 89:5 97:18 98:13,15,16 99:19 100:2 104:24 107:4 107:14,16 119:2,17 120:5 121:2 123:23,25 124:23 125:10 126:11,21 129:8
**marketplace** 118:11
**markets** 13:23 14:14 15:3 15:16 16:22 20:19 63:13 66:7 81:18 117:20 125:10 126:9
**marking** 6:22
**Maryland** 10:15,20
**Mass** 10:2
**material** 108:17
**materials** 33:8 34:14 35:7 35:10,13,23 36:1,4,5,13,15 36:22,25 37:5 38:23,25 39:12,14,16,21,24 47:16 47:18,19 48:3,25 57:22 59:6 82:22 83:3,4,11 86:10 86:13 134:20 135:4 139:8
**math** 84:9
**matter** 5:10,21 30:11,15 31:3 32:21 41:8 43:17 48:18 62:1,1,3 65:19 68:16 71:20 72:2 74:5 76:9 78:24 114:8 125:11 126:25 131:9
**matters** 9:25 14:23 20:3,6 20:14 21:3,19 22:6 23:1 60:8 113:23
**mean** 15:24 36:20 39:11 45:5,21,23 47:13 54:9 58:1 69:3,5,6 79:20 83:22 87:17 87:18,19 97:3 100:12 101:8,20 107:23 108:2 122:1 136:20
**meaning** 44:18 70:1 71:6 75:18 110:18
**means** 15:8 18:25 19:24 32:25 39:9 101:6 118:9
**meant** 105:8,9
**meet** 53:18
**meetings** 14:25
**MEG** 46:1 85:13 91:7 105:4

122:1,7 123:7 126:17
**MEG's** 120:25
**meld** 21:22
**member** 10:8,14,19 121:18
**members** 45:12,13 107:3 125:12 138:19
**memo** 51:12
**memoranda** 9:21
**mention** 23:19 24:3
**mentioned** 20:2 21:7 24:4 24:18 30:1 31:18 35:1 49:3 83:18,23 127:21 133:25
**mentions** 24:15
**mercifully** 22:15
**merely** 54:6 65:18 131:16
**met** 112:24 115:5
**metal** 30:10
**methodologies** 75:8,16,20
**methodology** 70:4 129:23
**methods** 80:19,22 81:2,3,6 81:8,10,13
**Microcap** 1:8 2:8 5:7 73:15 75:18 90:7,8 91:2
**middle** 42:20 48:8
**Military** 3:15
**mind** 14:12 27:25 49:13 51:24 58:10 69:9 119:8 122:4
**mine** 46:5 70:13 134:7
**minute** 57:8 116:1
**minutes** 139:3
**misremembering** 104:5
**misused** 40:3
**Mm-hmm** 48:10 67:5
**model** 72:9
**modified** 102:18
**moment** 24:19 54:21 55:14 97:13 117:7
**money** 78:10 93:3 100:25 107:14 126:18 138:19
**months** 104:13
**Morgan** 118:17 122:2
**morning** 94:19
**motion** 57:2,9,9,10,11,16,23 58:2,7,12,21,25 59:16,23 60:11 61:6,9 62:4 103:9
**motions** 36:11
**move** 40:8,11 99:19 104:24
**moved** 98:21
**movements** 98:15,16
**moving** 94:23 119:17 120:4 121:1
**murky** 110:25
**Murnahan** 3:4 5:14
**mutual** 104:11
**myriad** 126:20

**N**

**N** 3:1 5:1
**N.E** 3:6
**N.W** 2:17
**name** 5:11
**names** 27:15 85:18
**nascent** 32:17
**National** 112:22
**nature** 35:7,23 36:6,23 37:1 136:1,3
**necessarily** 54:5 69:6 79:20 99:9 102:21 103:23
**necessary** 96:12 97:9
**need** 6:14,17 41:3 54:21 57:8 111:4 116:4 127:15 133:24
**needed** 115:11
**needing** 135:16
**Needless** 109:9,23 110:8
**negotiate** 41:14 98:11
**negotiated** 121:21,22
**neighborhood** 137:3
**neither** 141:9
**never** 29:23 32:22 33:1,4,8 126:25
**New** 10:1,2 39:16
**Newton** 1:24 2:19 141:2
**night** 8:23
**no-action** 10:25 11:3,13 12:12 24:25 25:2,10,25 26:8,17,20 27:2,6,18 28:8 28:14,23 29:3,9,19 80:25
**Nope** 59:24
**normal** 16:15
**north** 3:15 137:4
**notary** 5:3 141:1,17
**note** 20:1 67:23 98:12 121:23 122:16 123:4
**noted** 96:9,12 97:9 101:18
**notes** 51:11 52:7,8,14,15,16 53:14
**notice** 4:12 132:12
**noting** 50:19
**notion** 102:18 128:4
**notwithstanding** 45:15 77:24 105:11,13
**November** 1:16 2:19 141:12 142:2
**number** 4:8 13:5,11 20:12 21:2,14,16 25:4 71:22 85:4 85:9 93:3 108:21,21 109:10 110:10 111:9,12,24 118:18 135:20
**numbers** 84:9
**numerous** 28:25 88:23

**O**

**O** 5:1
**object** 27:22 36:8 42:10
  44:25 65:2 66:3 85:1,24
  114:25 127:16 133:19
**objecting** 6:1
**objection** 6:6 37:2 41:10,21
  42:5 43:20 44:19 46:21
  47:5,22 49:4 53:21 56:23
  58:18 59:4,17 60:17,20
  61:11,23 62:13,25 63:9,18
  64:2,6,20 65:12 68:11
  70:20 71:9 77:5,10 78:14
  79:9 84:17 86:7 87:2,25
  88:19 89:2,13 90:2,18 91:9
  92:15,19 93:17 94:6 99:7
  101:15,24 102:10 103:12
  103:22 105:20 110:13
  111:20 112:9 113:1,10
  116:7,23 118:12 119:12,19
  120:7 122:8 123:9,20
  125:4 127:3,12 128:1,15
  129:25 130:19 131:20
  132:1 133:4,17 138:13
**objects** 6:3
**obligations** 20:11
**obscure** 50:15
**observation** 18:7
**observations** 75:14
**observe** 81:18
**observed** 50:21 81:15
**observing** 123:23
**obtain** 28:7,23 73:18 106:24
**obtained** 72:13 138:18
**obtaining** 72:22 92:12 98:12
  118:9 119:16,23 120:25
**obtainment** 72:12
**obtains** 97:16
**obtuse** 46:23
**occasions** 21:15,16
**October** 17:18
**offer** 19:3 63:11
**offering** 60:14 114:1
**office** 5:13,15 14:18 29:1,1
  80:7,7 91:4 93:2
**officer** 68:6 141:2
**offices** 89:8 90:23
**oh** 18:8 74:16 95:16
**okay** 6:20 7:23,25 8:6,11
  9:10 10:19 11:12,22 13:6
  17:19 18:16 19:14,20 20:1
  21:12 23:15,25 24:13,23
  25:6,18,20 26:7 27:5,10
  29:5,16,25 30:7,13 31:1
  32:19 34:9,21 35:15 37:9
  37:20 40:7 42:1,17 44:16

45:5 46:25 50:9 51:3 52:24
  53:2,13,17 54:15,23 57:14
  57:21 58:16 59:12,21 60:7
  61:19 62:20 65:9,21 66:16
  69:6 70:15 72:19 73:6,21
  75:25 76:11,20 78:2 79:2,7
  81:20 82:2,13 83:10 84:25
  85:8,12,17,20 86:20,25
  88:6,12,16 89:10,19 90:5
  90:12 92:3,9 93:11 95:3
  96:11 99:13 101:10 102:4
  102:16 103:6 106:10
  108:10,15,20 109:18
  111:17 112:12,20 116:10
  117:6,9 118:3,8 120:12,24
  121:4,8 122:22 126:2
  127:8 128:9,25 130:13,25
  131:15 132:8 133:12,23
  134:8 135:6,17 136:14
  137:13,19,24 138:9
**old** 40:17
**omitted** 108:3 109:20
**once** 81:14
**one's** 114:18 115:6 119:5
**ongoing** 37:24
**opine** 69:12 90:16 110:2
  123:7
**opined** 32:6 73:2,7 129:6
**opining** 110:24
**opinion** 42:3 43:16 44:8,16
  60:15,22 61:20 64:23
  72:13 75:9 76:3,16 99:25
  110:12 114:1 123:6,15
  129:1
**opinions** 38:2,10 41:9,18,19
  42:1 50:20 59:3 62:21 63:5
  64:14 70:16 74:9,10 77:19
  78:11,23 80:3,9,17 124:25
  125:25 129:16 132:23
**opportunities** 84:11 89:6
**opportunity** 13:22 29:10
  76:14 103:7
**opposed** 73:16 92:25
  124:16
**option** 27:18
**order** 16:6 76:4,15 84:15
  88:24 90:16 100:20,24
  102:7 109:11 110:5,10
  111:5 114:19 120:12,19
  123:6 131:13
**ordinarily** 106:24 107:5,9
**original** 79:13
**OTC** 125:10
**ought** 32:11 115:20
**outcome** 54:5 141:11
**outlines** 56:7

**outs** 132:6
**outset** 125:12
**outside** 41:23
**overlap** 75:4
**overseen** 20:18,19
**owed** 72:10

**P**

**P** 3:1,1 5:1
**p.m** 2:18 139:15
**Paces** 3:6
**page** 4:8 37:19 42:19 44:13
  45:15,19 47:17 48:7,9
  49:17,23 50:14 54:19,20
  54:23 55:10,16 56:6 66:25
  81:21,22,23 95:11,12 96:2
  96:10 106:1,2 117:6,9
  126:14 129:13 142:3
**pages** 140:5
**paid** 14:6 40:18 137:7,9,12
  137:21 138:6,7
**pair** 17:22
**paired** 47:10
**papers** 38:6
**paragraph** 42:20 126:15
**pardon** 95:16 127:16
**Paredes** 110:16
**parent** 72:4
**parse** 98:10 119:20 124:20
**part** 14:9 15:8,9,11 21:20
  38:1 46:16 62:16 64:8,12
  68:4 78:10 95:22 110:23
  125:15 131:15
**participant** 44:6
**participants** 13:25 14:7
  28:22 43:24 66:7 70:9
  81:16 89:5 123:25 126:21
  129:8 130:9
**participate** 121:19
**participated** 22:24 59:14
**participates** 107:9
**particular** 54:4 57:13 81:8
  91:11 106:5 126:13 129:22
  132:15 134:12
**particulars** 113:3
**parties** 82:6 141:10
**partner** 11:25 17:15 42:13
  134:9
**Partners** 71:21 72:3
**parts** 134:25
**passing** 52:12,12
**pay** 35:16 91:4 138:19,24
**payments** 91:3,14,15
  138:11
**pending** 65:3
**penny** 126:9

**people** 21:14 26:4 39:10
  69:7 83:24 84:10,23 87:17
  91:14 92:5 113:12 115:8
  120:16,21 130:21
**people's** 107:13
**percentages** 104:2
**performed** 21:5 99:1
**period** 8:22 18:9 102:22
  103:2,5,21 110:1 125:19
  126:5
**periods** 104:6
**permissible** 5:7 63:23 64:15
**permitted** 41:9 133:7
**person** 51:16 52:24,25
  95:19,20 97:25 109:9
  110:9 134:5
**person's** 106:21
**personally** 86:21 87:6,23
  88:7,14
**persons** 96:4,6 126:4
  138:22
**persuade** 32:11
**persuaded** 77:15
**persuasive** 123:12
**phrase** 101:17 102:2,12
  109:22 132:19
**Pickering** 9:1,4,5
**piece** 12:4
**pieces** 14:13
**place** 54:21 91:24 107:7
  115:7
**placed** 40:23
**Plaintiff** 1:5 2:5,16 3:2 5:16
**Plan** 112:22
**please** 5:23 16:16 65:4,8
  83:14 133:9
**pled** 46:20 55:18 56:2
**plumbed** 100:3
**point** 6:16 11:23 40:8 63:21
  66:19 86:15 105:13 117:1
  130:4
**pointed** 104:2
**policy** 15:21 29:2 59:2 70:12
  73:7 74:24 129:14,16,24
  131:18 132:16,19 133:1,13
**poor** 51:9
**pored** 84:9
**portion** 106:6 107:1 108:11
  108:12 109:19
**position** 17:20 96:15 100:12
  102:13 104:3,9 115:9
**positions** 12:23 13:18 28:24
  103:25
**possibility** 128:23
**possible** 97:18 104:25
**post-list** 82:25

**potential** 15:5 22:5 26:25
  37:23 82:14 83:19,21,22
  84:9,10,11 92:11 93:13
  105:12 127:9
**Potentially** 127:4
**practice** 19:16 21:23 22:13
  42:23,25 43:14 44:17
  68:15,22 80:25 94:2
  121:13 123:23
**practices** 14:4 68:2
**practicing** 81:3,4,7
**practitioner** 68:1
**practitioners** 70:14
**pre-** 82:25
**precede** 39:12
**preceded** 15:22
**precedent** 106:13 124:7
**precedents** 48:17,19
**precisely** 101:6 124:19
**preparation** 35:8,24 48:3
  82:18 83:5 86:11 130:20
  130:22 131:2 136:11
**prepare** 25:16 37:1 134:24
**prepared** 34:14 37:13 39:15
  49:19 86:6 133:25
**preparing** 25:2 34:7 35:11
  36:16 37:6 83:13 134:16
  134:19 135:5
**present** 17:20 18:9 117:10
  129:10,12
**presentation** 108:17
**pressures** 14:3
**presume** 101:11 106:16
  108:15 132:24
**pretty** 19:19 36:21 94:22
  106:15
**previously** 24:9,10 33:10
**primarily** 22:14 34:17 45:16
  98:19
**primary** 18:13
**principal** 46:10,11 121:17
**principally** 107:4
**prior** 37:5 48:1 86:10
**private** 20:23 26:12 42:23
  126:20 127:21,24 128:14
  129:3
**privilege** 30:18
**privileged** 27:14
**probably** 10:17 23:16 86:15
  108:4 112:18 123:11
  136:24 137:4
**probative** 79:17 133:19
**probing** 53:6
**problem** 49:15 94:23
**procedure** 64:9 131:24
  132:14

**procedures** 65:17
**proceeding** 33:5 71:22
**proceedings** 141:3,5,6
**process** 12:12 16:6 28:15
  29:9 34:7 40:6 131:3
  132:15
**produced** 69:20
**production** 37:14 49:21
**professional** 94:15
**professionals** 45:17 52:3
  107:5 135:12
**professor** 12:15
**proffered** 5:9 77:1
**profit** 98:6,20 100:24 102:19
  102:21
**profits** 91:16
**prohibited** 76:5
**prohibiting** 76:17
**projecting** 130:8
**proofing** 37:7
**propose** 64:14 94:25
**proposing** 67:14
**proprieties** 64:8
**protected** 42:12
**provide** 14:22 19:21 64:23
  64:23 65:18 66:5 68:5
**provided** 7:16 14:24 19:20
  31:15 34:18 38:18,18 39:1
  39:9,21 48:15 49:20 51:18
  107:16 116:12 121:24
**providing** 29:4 91:3
**provision** 44:9
**public** 14:1 118:4 141:1,17
**publication** 117:19
**pulled** 130:15
**purchase** 86:22 94:5 97:19
  98:8 105:5 119:22 122:11
  122:17 123:5,17
**purchased** 99:1
**purchaser** 97:16 98:3 124:2
**purchases** 56:8 118:15
  120:3
**purchasing** 105:24
**purpose** 50:9 97:14 98:2,23
  100:10,18 101:1 105:5,11
  105:12,19
**purposes** 5:8 46:11 92:9
  96:14 97:7,15,20,23 98:9
  99:6,17 100:1,13 101:7,7
  101:14,23 102:9 122:13
**purposes.'** 97:11
**put** 8:1 12:7 17:21 54:12
  75:25 118:3 119:1 121:23
**putative** 22:25 32:6
**putting** 118:16

**Q**

**qualifications** 5:20 134:11
**qualified** 32:22 69:8,12 77:3
  78:13
**qualifying** 25:13
**quality** 99:3
**quantification** 22:22
**queried** 26:23
**question** 5:24 6:4,5,11
  16:18 18:21,22 19:12
  25:13 26:15,16,19 27:11
  28:1,11 31:1 35:14,19 36:3
  36:21,22 44:24 45:1,2,3,7
  45:19 46:4 50:18 52:1
  53:24 54:4 64:25 65:3,4,6
  65:21,22 66:2 84:1 87:14
  88:12 89:22 92:10 97:16
  98:18 99:21 119:11,15
  127:8,18,20 128:9,11
  130:2 133:6,7
**question's** 26:23
**questions** 5:19,22 6:2 16:4
  16:10 19:17 21:25 24:17
  30:13 41:3 53:4,6 54:18
  64:9 68:3 80:14,16 106:4
  133:24 139:2,13
**quick** 44:20,23
**quickly** 19:2 97:18 98:4 99:4
  99:20 100:2,8,12,14,24
  103:19 104:18,25
**quite** 110:24
**quotation** 109:19
**quote** 96:20 106:20 108:11
  109:8
**quoted** 96:23 101:10 106:16
  109:5
**quoting** 101:18 107:16

**R**

**R** 3:1 5:1,6
**R-E-D-F-E-A-R-N** 19:10
**raised** 22:21
**Ramsay** 17:10
**ran** 80:6
**range** 135:24
**rate** 78:2 116:25
**Raton** 3:17
**reach** 81:11 131:13,19
**reached** 92:5
**reaching** 92:7
**read** 6:13 24:1 28:3,4 37:18
  44:1 49:8 54:16 55:4,24
  56:12 57:7 64:18,19 65:9
  65:11 67:2,10 68:7 82:2,7
  82:17,19 85:23 86:5,9,10
  86:16 95:18,23 96:6,18,20

**Q**

97:7 99:22,23 102:1 106:3
  106:20 107:21 109:13
  112:19 126:16 140:4
**reading** 23:24 50:13 92:1
**reads** 48:11 67:24 96:11
  109:9
**ready** 106:22 136:12
**really** 14:14 18:13 20:21
  35:9 38:22 39:14 45:16
  46:22 50:22 56:21 66:9
  92:24 94:15,18 98:1 101:3
  110:17 119:5 123:21
**reason** 44:2 142:4,6,7,9,10
  142:12,13,15,16,18,19,21
  142:22
**reasonable** 23:10
**reasoning** 129:21
**reasons** 75:2 90:22 98:13
  105:23
**recall** 11:6,11 12:16 32:18
  47:19 50:18 51:8,10 52:24
  53:12,15 57:13 58:5 60:4
  66:17 72:1,8,18,19 73:5
  74:11 75:11 76:1,7,8,9,19
  77:7 78:25 79:5 80:5,11,11
  83:2,5,19,23 84:19,22 85:7
  85:11,12 86:8,9,24 87:5,8
  87:8,16,17 91:25 92:1,4,6
  104:1 107:24 108:19 113:3
  113:14 122:25 125:24
  135:22 136:4,25 137:10
  138:5
**recalling** 124:20
**received** 34:19 138:12
**recess** 7:10 66:22 95:6
  139:4
**reciting** 133:12
**recollection** 11:9 33:20,21
  34:16 52:18 82:21 83:8
  84:4 86:1,23 88:2 104:1
**recommend** 29:13
**record** 5:25 6:17,19,19 7:7
  16:9,11 28:4 34:18 38:17
  39:8,9,11,20 40:20 47:25
  50:12 52:14 53:23 54:2,9,9
  57:20 61:3 62:16 64:19
  65:11 66:24 77:14 78:19
  87:20 88:2 95:4,8 99:23
  106:4 109:6 115:2 134:19
  134:21 141:5
**records** 60:9
**Redfearn** 19:9
**reduced** 141:7
**refer** 24:21 49:17 72:2
**reference** 57:21
**references** 48:18

**referrals** 84:15 85:6 88:25
  91:22 92:12,13 93:14
**referred** 78:17 82:6 96:8
**referring** 69:2 73:22 75:20
  106:8 116:15
**reflected** 105:16
**reflects** 132:23
**refreshed** 34:15
**Reg** 26:3,3
**regard** 34:5 71:1 76:25
  114:6
**regarded** 77:13 89:25
**regarding** 59:16 67:8 69:13
  103:19 129:16
**regardless** 98:5,20 104:22
  108:15
**Regional** 5:13,15
**register** 43:4 96:10 115:11
  126:21 128:4
**registered** 50:25 52:4 127:6
**registration** 67:9 69:13
  72:20 73:24
**regular** 95:22 106:24 107:7
  107:10 115:6,7,7 125:15
  125:16
**regularity** 22:10,20
**regularly** 14:5 28:18 112:7
**regulation** 106:7
**regulations** 80:24
**regulatory** 9:20,22 17:25
  21:21,24 22:1,14 29:12
  33:24 48:16 67:17 68:3
**relate** 26:17 62:23 105:3
**related** 9:22 20:3,5 38:6
  55:3 141:9
**relates** 128:12
**relating** 5:19,22 9:25 26:4
  125:25
**relation** 11:18
**relationship** 84:6 90:16
  116:2
**relatively** 14:9
**release** 114:10
**releases** 43:25 69:20 70:3
  114:9
**relevant** 48:17 53:9 70:2
  73:8 91:6 125:19 126:5
  129:17
**reliable** 106:18
**relied** 48:19 49:25 67:7,25
  73:16 102:6
**relief** 27:2,6 28:9,23 29:3
**rely** 76:4,17
**relying** 98:19
**remained** 17:19
**remains** 62:14

**remember** 11:21 12:9 18:7
  25:3,22,24 30:12 36:7 51:3
  51:5,23 52:7 85:3,17,18
  137:16,25 138:2
**remembering** 84:8
**remind** 16:14
**render** 78:11
**rendering** 107:17
**repeat** 6:12
**repeating** 28:1
**rephrase** 6:13
**replace** 108:12
**report** 4:10,13 5:19 34:6,7
  35:8,9,9,13,24 36:10 37:1
  37:6,22 38:3,10 39:15 40:7
  40:12,24 41:4,7,12,20
  42:19 43:21 48:2,7,18,22
  49:3 54:10,14,17 55:10
  56:4 57:23 59:3 62:8,22
  66:25 69:1 70:16 71:20
  73:1,6 74:20,21 75:9,10,25
  76:3,5,16,25 77:2 78:7,12
  78:16 80:18 81:20 82:18
  83:6,12,13 86:6,11 95:9
  101:11 106:1 108:7 109:5
  109:20 110:3 112:6 117:7
  126:14 129:13 132:22
  133:25 134:3,17,25,25
  135:13 136:11
**Reported** 1:24
**reporter** 5:25 6:13,18 17:6
  28:3,4 64:19 65:11 99:23
  141:1
**reports** 74:5,15,25 77:25
**represent** 7:15 32:19 108:25
  109:3,6
**representations** 20:11
**representatives** 14:25
**represented** 79:11
**representing** 60:1,8
**reputable** 106:17
**request** 49:19 139:10
**requests** 11:1,3 25:3
**required** 43:4
**requirement** 12:24 29:18,23
**requirements** 14:20 132:13
**research** 100:20 101:9
  134:20
**respect** 47:24 65:19 92:2
  110:15 113:14 132:15
**respective** 28:24 74:5
**respondents** 73:9 76:5
**Respondents'** 4:12
**responses** 35:2,20 36:24
  47:14,20 139:10
**responsibility** 78:11

**responsive** 19:12 65:7
**rest** 61:3
**result** 127:23 128:14
**retained** 24:12 25:14 31:4
  41:16 68:13 78:16 79:11
**retention** 31:3
**return** 40:8
**reveal** 25:23
**review** 35:6,22 36:2,22
  38:13,22 42:22 48:9,12
  58:2 67:1 76:15 82:15
  139:10
**reviewed** 25:4 32:10 34:9,10
  34:23 36:5 67:6 134:19
  135:3,7 139:8
**reviewing** 22:4 39:8 58:6
  77:12 80:23 83:5 88:2
  115:19 134:18,18
**reviews** 75:13
**revise** 135:9
**revised** 135:7
**right** 12:17 20:25 26:19
  29:25 33:7 38:7 51:23
  57:18 58:17 61:4,21 68:23
  76:12 82:1 88:5 89:21 94:7
  102:9 104:18 114:3,4
  117:23 123:18 129:9,11
  130:12 138:3
**rings** 84:21
**risk** 104:7 105:9
**Road** 3:6
**Robert** 3:3 5:11 66:18
**role** 21:18 22:3 84:6 85:21
  134:16
**routinely** 68:2,19,24
**Rule** 73:16
**rule-making** 81:15
**ruled** 60:16 64:5
**rules** 5:8 50:23 65:22,23
**ruling** 63:7
**run** 91:4 128:17,19
**rundown** 134:11

_____
**S**
_____
**S** 1:24 2:19 3:1 5:1 141:2
**S-A-L-L-A-H** 42:18
**sale** 119:1
**sales** 56:9 97:20 98:8 105:5
**Sallah** 3:14 34:3 42:14 52:22
  53:1,14 59:13 60:6 78:17
  137:17
**saw** 11:10 12:8 25:11 36:14
  47:12 86:16 115:19
**saying** 11:16 45:24 62:2,3,4
  68:9 76:9 100:23 101:5
  114:14

**says** 37:21 54:24 82:3 95:12
  109:23 110:8 117:20 118:1
  120:19 124:19
**school** 8:5,22 12:14
**scope** 12:5 41:23 43:7,10
  48:9 60:22 62:15 67:1
  86:15
**scrambled** 87:4
**scribbled** 52:9
**searching** 18:14 114:15,19
**SEC** 5:6,12,15 10:1 11:15
  12:23 13:2,14 20:3,6 21:8
  21:9,13 27:21 28:13 31:13
  32:20 33:15 37:14 42:24
  42:24 43:13 44:17 46:7,20
  48:15 49:21 55:19,20,21
  68:6 72:3 96:9 110:5 111:5
  112:25 113:9,12 114:5,7
  114:13 115:3,14 117:11,18
  118:3 142:3
**SEC's** 56:7 103:9 114:5,12
  124:11 139:10
**second** 18:6 37:4 49:23 96:3
  103:14
**secretary** 10:3,3 137:23
**section** 43:2,5,18 44:9,10
  48:8 54:25 67:1 72:6,21
  73:4,17 96:7 129:14,15
  134:13
**sectors** 93:4
**securities** 1:4 2:4 3:5 12:15
  12:18 14:14 43:3 56:9
  68:23 69:3,17,21,23 70:6,9
  70:13 71:23 72:21 73:17
  92:23 93:15 94:21 97:11
  98:23 99:16 106:7 107:7
  107:14,19 110:4 112:8
  121:24 126:17 130:9
**securities-enforcement**
  22:6
**securities-related** 9:11
**security** 96:13 100:20
  105:23
**see** 7:13 8:14 13:14 39:14
  39:24,25 45:8 48:4,9 50:12
  65:7 67:4 71:17 77:14
  81:24 82:22 84:2 96:4
  98:11 103:6 105:10 106:8
  109:16,17 112:14
**seeing** 66:7 77:12 86:24
  87:16 91:25
**seek** 113:25
**seeking** 27:2,5,18 28:8
  29:11,19
**seen** 29:23 32:10 61:1,25
  63:13,20

selective 16:4
self 114:18 115:6
sell 96:13 97:11,17 98:4,13
126:1
seller 98:22 99:6
selling 72:14 92:23 93:15
94:20 99:4 102:8 105:24
107:7 112:8 118:10
sells 100:24 110:3
senior 68:6
sense 27:3 29:17 36:18 37:7
38:13 39:2 40:5 59:5,9
65:14 69:7 70:7 100:17
113:17,21 115:4 121:10
122:10,18 123:22 124:7,15
125:2
sent 36:14 136:18 138:2
sentence 37:19 48:11 54:24
56:5,6 67:2,23,24 81:24
82:2 95:12 96:3,11 97:6,8
109:7,23
sentences 126:16
serve 14:2 24:12 79:12
served 13:13,14,18 24:11
74:20
services 107:15
serving 18:13
set 39:21 43:2 48:12 55:19
89:16 113:9 131:11
sets 54:25
settled 20:17,20 30:11
settlement 20:19,20 72:22
settlements 11:20
settling 72:11
seven 104:3
shadow 21:2
Shapiro 13:3,15
shares 72:14,22 73:18,21
73:22 98:5,21 103:11,20
104:18,23 105:17 118:10
119:16,17 120:3 121:1
122:11,16 123:5 125:19,25
126:3,4
sharing 49:14
Shawn 3:4 5:14
sheet 140:9 142:1
shingle 94:16 120:16,18
SHO 26:3
short 96:15 102:13 103:2,5
103:21
SHORTHAND 141:1
show 60:13 117:25 124:13
shy 113:16,19
side 125:23
signatory 12:1
signature 139:14

signed 140:9 142:24
significant 126:12
similar 59:2,8 75:23 77:24
similarities 74:4,8
simple 36:21
simply 25:3 56:7
single 111:13,25
sir 12:21
sit 41:5 51:6,23 85:15 86:16
87:22 123:1
sitting 84:4
situations 128:19
skimmed 86:13
skip 19:13 56:5 118:1
sleep 33:17
slippery 89:4
slope 89:4
small 13:12 14:9 20:15
so-called 73:18
sold 73:23 99:16,25 126:3,4
sole 17:3 138:11
solicit 82:4 88:7
solicitation 87:7,15 89:1,20
90:1,9,17 91:8 116:5
solicited 86:21 87:23 88:14
somebody 31:9
someone's 104:8 110:22
112:1
sorry 7:9 11:11,21 12:9
16:19 18:8 23:6,24 26:14
28:1 29:7 32:14 33:17
35:18 40:16 44:21 45:18
45:22 46:23 54:21 55:11
64:17 75:12 81:22 83:6
86:9 87:3,7 92:2 98:10
99:20 102:24 121:14 136:4
136:8,19 137:1,15
sort 13:12 19:13 22:21
25:24 58:10 66:19 74:20
79:23 94:16 111:11 113:15
115:3 116:6 121:9 122:18
124:17,25 129:21 131:5
133:23
sorts 14:6
sound 33:17 124:21
sounds 73:11 105:1 117:23
130:12,12
source 96:25 97:1 138:11
138:23
sources 4:11 37:15,23 49:2
49:8,24 83:15
SOUTHERN 1:1 2:1
speak 40:17 67:16 70:24
135:15
speaking 16:17 34:6 51:17
58:9

speaks 16:3 105:7
special 70:4 129:23
specific 19:17 31:1 48:19
127:21
specifically 42:21 128:12
specifics 76:8
spend 125:23
spent 135:20
spoke 50:3,23 53:2 99:18,18
spoken 51:19,20 60:5
spreadsheets 103:7,19
square 119:25
SRO 20:19
staff 15:20 20:22 28:23
29:12 55:20 84:13
staffers 13:10
stage 59:1
stand 56:14 61:4
standard 34:16 41:2 106:15
standing 119:1
stands 70:5
Stanley 118:17 122:2
stark 44:5 45:15
start 6:22 30:7
started 10:18 126:14
starting 8:4 12:18
starts 95:12 96:3
state 10:3,9,20 42:21 43:9
46:13 55:17 58:8 129:16
stated 46:3,5 76:4
statement 24:1 38:11 43:6
48:21 55:7 56:15 61:2
73:24 95:25 100:6 111:3
116:11,14,16,21 126:24
statements 54:17 114:13,13
states 1:1 2:1 126:16
states' 10:13
stating 76:16
status 26:25 86:3
statute 44:9,18
statutes 69:17 70:2 80:24
statutory 43:17 44:9 45:24
stenographically 141:7
stick 62:20
stock 10:1 97:16 98:3 99:1,3
stocks 103:1 105:5 126:10
stood 39:19
stop 40:2 94:24 110:23
stopping 66:19
straining 111:14
strains 124:3
strategy 12:7 22:2 27:1 28:6
strategy-related 15:22
Street 2:17
stretching 93:8
structured 119:4

stub 8:21
stuff 97:5
styled 12:25
subcontractors 84:14 85:5
85:10,14 91:5
subject 15:13 31:2 37:24,25
41:8,18 42:2 53:6 58:17
64:22
subjects 40:9
submission 31:9,12,21 32:7
35:12 36:9,17 37:5,21
39:16 48:1 130:22
submit 83:14 137:13
submitted 11:15 22:4 25:11
31:13,16 37:13 103:8
137:11
subsequent 37:25 39:23
56:8 134:22
subsequently 86:1,14
substance 111:23
substantial 106:25
substantive 48:2 50:18
substantively 51:22
success 91:16
successfully 118:18,19
sufficiency 47:9,9 56:18
63:6 71:6
sufficient 46:13 114:2
132:12
sufficiently 115:14 126:1
suggest 50:24 52:3 74:2
100:9
suggested 84:1 100:1
135:14
suggesting 74:12,18
suggestion 132:13
Suite 3:7,16
summary 36:11 38:5 57:10
summer 34:19,20 39:15
137:11
supervising 20:21
supervision 11:24 141:8
support 9:20,24 103:9,9
supported 20:9
supports 55:21
suppose 41:12,22 81:13
90:5,6 91:12 127:5 133:5
supposed 41:15 66:10
supposition 109:21
sure 9:18 11:17,17 16:8 17:5
17:7 19:5,18 20:7 23:4,6
23:14 24:16 26:2,15 35:12
40:10 42:4 46:22 51:7 53:1
54:19 57:12,15 78:8 82:20
113:24 117:8 125:7 131:7
135:23 136:5,8,25 137:5

138:4
**surprise** 58:4,23
**surprised** 59:9
**surrounding** 89:23 127:1
**suspended** 15:12
**sworn** 5:3
**syndicate** 120:15 121:19
**systemically** 18:11 19:23
  20:16

---

**T**

**take** 7:8,13 23:8 33:2,9 52:8
  59:12 60:10 66:20 77:22
  79:15 94:25 96:23 106:1
  106:10 111:2 139:3
**taken** 2:15 7:10 20:4,8,8,9
  29:14 40:19 66:22 95:6,13
  95:14,15,16,18 139:4
  141:3,6 142:2
**takes** 29:11 47:23 124:7
**talk** 15:19,20 75:19 114:6
  133:9
**talked** 26:25
**talking** 16:9 28:6 30:19
  68:14 81:7 104:14 126:9
  130:23
**Tammy** 1:24 2:19 141:2
**task** 38:13,24 39:17
**taxing** 25:6
**techniques** 70:4 75:8,17,20
  81:6,8,10,13
**telephone** 49:25 79:3
**tell** 6:18 21:17 24:1 29:8
  30:17 34:5 42:7 50:6 51:5
  62:9 63:5,25 109:18
  112:20 133:15 135:19
  136:9
**telling** 30:8
**tells** 131:10
**template** 74:20
**tend** 100:9
**tendering** 124:1
**term** 67:12,19 97:6,14 101:2
  119:9 127:21
**terms** 12:6 19:25 20:11
  48:24 51:23 57:19 62:4
  66:6 71:5 84:5 94:22
  121:25 122:22 124:8
**terrific** 101:5
**test** 94:13 97:23
**testified** 5:3 33:8 81:25 82:3
  104:17
**testify** 41:9 64:14 67:14 77:4
  77:20 132:25
**testifying** 30:3 100:7
**testimony** 33:4 38:1 48:14

55:2 58:17 63:24 77:1
  85:23 100:1 140:5,7
**text** 108:2 109:5
**thank** 16:12,19,19 26:21
  139:2
**Thanks** 16:20
**theirs** 70:23
**theory** 43:1 94:17
**thesis** 97:25
**they'd** 15:6
**thing** 16:10 19:4,13 45:7
  132:7 139:7
**things** 13:11 18:20 23:7
  39:10,13,19 47:24 61:3
  66:6 69:21 76:21 81:1,17
  87:18 91:19 110:24 119:8
  119:23 122:9 123:22 124:7
  124:16 125:24 130:15
  132:18
**think** 8:12 9:9 10:2,12,22
  11:8 13:9 17:18 18:24 24:7
  25:21 26:5 28:5,12 31:15
  35:25,25 36:4 43:11,21
  44:2 48:23 50:11,17,21
  51:12,13,18 52:25 53:9,23
  54:5 57:6,25 59:6 60:5,9
  60:21 61:14 63:3,23 68:14
  69:9 75:16 78:4,9 79:7
  80:21 81:17,21 82:17 83:4
  90:10 91:13,15 92:4,20,20
  93:7,8 94:15 97:1 100:12
  101:25 103:3,14 104:5,16
  104:19 106:17 108:21
  110:16,23 111:7,10,22,23
  112:2,2 114:7 115:8
  118:13 119:4,9 120:9
  121:3 122:4 124:18 125:1
  126:8 128:2 129:7 130:1
  131:24 132:19 133:12
  135:15 137:2,4,15
**thinking** 12:6 14:12 66:6
  124:23 130:8
**third** 17:4 67:2 81:23 82:6
**thorough** 101:19
**thought** 8:2 23:3 58:15 73:8
  75:1 77:12,25 81:22 86:14
  90:23 118:15 122:20
  128:17,19 132:20 133:19
  136:7
**thoughts** 21:25
**three** 31:17,25 32:5 104:12
**three-page** 37:15
**throwaway** 110:17 111:11
**Thursday** 1:16 2:18
**time** 10:9,16 11:14 12:2
  14:21,23,23 16:21 17:4,8

17:12 18:10 23:2 24:20,24
  28:20,20 40:1 50:3 59:21
  60:1,3 99:21 102:14,22
  103:2,5,10,21 104:6 105:3
  107:12 111:8 119:3,3
  125:23 126:5 130:16,16,25
  130:25 136:2
**time.'** 96:15
**times** 23:1,5,11 28:25 103:4
  103:25 104:11
**today** 5:19,21 41:5 51:6 84:5
  85:15 86:17 87:22 110:24
  136:12
**today's** 6:2
**told** 33:3 133:10
**top** 55:16 117:9
**total** 126:4 136:13,14,21
  137:2
**totality** 31:21
**touch** 45:22 132:17
**touched** 12:14 66:8
**trade** 107:4
**trader** 96:9,16 98:1,19 99:9
  101:13 102:8 103:24 104:9
  107:12 127:11
**trader's** 107:11
**traders** 55:23 96:8 105:22
  126:20 127:9 128:11 129:3
**trades** 95:20
**trading** 15:16 16:22 20:18
  106:21 117:20 124:23
  125:14 126:10,12
**traditional** 119:7 125:10
**Trail** 3:15
**training** 13:19 129:21
**transact** 106:25
**transacting** 99:6
**transaction** 91:15
**transactions** 82:5 107:11
  126:18
**transcript** 4:17 6:25 34:12
  35:3,5,21 40:15 47:14,21
  49:11 71:15 75:13 82:15
  85:19,23 86:6 87:5 105:14
  105:16 108:23 141:4
**transcription** 140:7
**transcripts** 92:1
**transom** 23:8
**transpired** 76:24
**traunch** 37:5
**treated** 32:12
**treatise** 96:21,24 97:2 102:6
  106:7,11,12,13 109:4,19
  110:20 111:3,18,22
**treatises** 34:16 114:6
**trial** 41:9

**tried** 39:12 115:4
**tries** 106:24
**trip** 115:19
**tripping** 116:24
**true** 62:24 74:10,13 140:6
  141:5
**truism** 109:24
**try** 16:17 19:1 53:4 64:10
  85:5 100:21
**trying** 21:24 26:22 27:19
  28:22 34:21 36:2 38:15,17
  40:5 50:22 51:14 53:3 54:2
  74:1 98:10,11,15 99:19
  101:19 102:1 113:15,19
  115:15 127:17
**turn** 42:19 66:25 81:21
  111:14 112:1 123:17 124:2
**turned** 103:20 123:3
**turning** 94:19
**turnover** 107:10 115:7
**turns** 86:17 93:7 123:22
**two** 10:22,22 14:22 17:12
  49:13 74:25 77:25 104:12
  123:22 124:18 126:16
  135:11 136:6
**two-thirds** 17:8
**type** 16:10
**typewriting** 141:8
**typical** 67:21
**typically** 67:7

---

**U**

**U.S** 8:16
**ultimate** 108:14
**ultimately** 11:10,24
**underlying** 59:7 68:16 78:1
**understand** 6:12 30:3 36:10
  37:24 71:3 73:20,22 90:15
  97:24 98:17 122:1 130:1
**understanding** 5:21 13:23
  29:8 44:12,14 54:25 58:11
  70:19 97:14 119:10 124:15
  125:18 131:23 133:14
  137:24
**understandings** 88:22
**understood** 8:24 12:3 15:10
  32:10 38:24 39:17 46:23
  50:12 97:4 98:17
**underwriter** 120:14,19,20
  121:12,17 122:3,5,6
**Underwriters** 119:2
**underwriting** 107:9 117:15
  117:22 118:5,8,9 120:22
  121:2,15 122:7 123:8,16
  124:24 125:21 126:7
**unique** 21:12

**UNITED** 1:1 2:1
**universe** 104:8
**University** 8:8
**unregistered** 72:5
**unrestricted** 73:23
**unusual** 6:3
**updated** 19:24 24:8
**upfront** 91:14
**use** 13:18 39:5 45:23 67:19
68:25 79:16,18 81:4 89:6
108:1
**uses** 97:6 100:25
**usually** 21:21,23 107:15
108:4 119:4
**utility** 18:12 19:23 20:17

---

**V**

**variety** 50:23
**various** 14:11 55:21 83:24
91:21 110:4 113:13 117:10
**verdict** 131:13,19
**version** 7:4 24:6,14
**versus** 5:6 112:21
**view** 22:12 48:5 61:2,9,12
61:21,25 63:21 76:24 86:2
89:3 92:14 93:11 100:10
105:18 120:24 121:10
122:15 123:22 124:7
125:17 126:24 127:22
**views** 31:6 48:12 79:15,16
130:3,6
**violated** 73:3
**violating** 30:18
**violation** 72:5
**visits** 14:6
**Vitae** 4:9
**voice** 17:6
**volume** 107:12 126:2,4
**volumes** 118:10
**volunteer** 18:25
**volunteering** 18:17
**vs** 142:3
**vs-** 1:6 2:6

---

**W**

**W** 3:4
**wait** 5:23 16:16 116:1
127:15
**waived** 139:14
**want** 8:3 13:7,8 15:19 18:18
25:22 27:13 44:21,23
53:17 54:16 62:20 65:3,6
79:18 91:18 93:4,5 97:13
106:3 117:24 119:21
126:23 129:14
**wanted** 51:25 54:6 71:8

100:2,11 104:17 139:7
**wanting** 51:16 100:8
**warrant** 27:2
**Washington** 1:15 2:17
**wasn't** 32:11 54:2 65:14,21
66:5,11 76:10 81:9
**way** 26:6,21 40:4 46:20
58:10 65:4 69:15 81:23
86:25 87:7 88:4,5,13,15
90:25 98:6,18,20 101:17
119:4 120:8 121:16,17
122:19,19 132:18 133:14
135:25 136:10 138:17,21
**ways** 20:15
**we'll** 6:23 24:19 40:11
**we're** 6:18 45:5 66:10,10,18
94:22 95:8 102:11 104:14
108:21 110:24
**we've** 40:23 73:1
**website** 117:20 118:4
**websites** 87:11
**week** 14:5,6 104:12
**weeks** 104:12
**Wells** 31:8,12,20 32:7
130:22
**went** 8:25 137:15,17
**weren't** 57:15 91:15
**wherewithal** 100:15
**wide** 43:23
**Wilkie** 2:16 17:14 23:2,18
24:20,21,24 25:14
**William** 5:14
**willing** 93:13 94:4 98:4
**Wilmer** 9:1,3,4,12,16 10:6
10:18,24 11:5,14 12:11
**wire** 137:22
**wires** 115:19
**wished** 100:13
**witness** 4:2 5:9 27:25 28:5
31:22 33:11,15,23 36:9
37:3 40:16 41:11,22 42:13
43:21 44:20 46:22 47:23
49:5,14 53:22 56:24 58:19
59:5,18 60:21 61:12,24
62:7,14 63:1,10,19 64:7,21
65:13 66:4 68:12 70:21
71:10 76:6,18 77:6,11
78:15 79:10 85:25 86:8
87:3 88:1,20 89:3,14 90:3
90:19 91:10 92:20 93:18
94:7 99:8,24 101:16,25
102:11 103:13,23 105:21
110:14 111:21 112:10
113:2,11 115:1 116:8,24
118:13 119:20 120:8 122:9
123:10,21 125:5 127:4,13

127:15 128:2,16 130:1,20
131:21 132:2 133:5,18
138:14
**witnesses** 80:15
**word** 38:20 39:4,4,9 40:3
77:22 83:22 119:22
**words** 22:12 40:18 44:13
45:15,19 50:14 101:6
114:5 116:25 119:24
**work** 5:12 8:25 9:11,15,20
9:23 10:5,6 11:4 18:4
19:22 20:2,5 21:5 23:19
24:15,18,25 28:23 34:1
130:17
**worked** 8:22 9:7 11:13 12:17
14:14 25:12 26:1,8,16,18
27:8,8 28:13 52:2,3 108:8
135:13
**working** 10:25 11:21 28:20
**works** 34:2
**world** 46:19
**worlds** 21:22
**wouldn't** 59:5,9 77:21 89:4
89:14,15 91:10,11 93:18
94:9 98:1 101:16 132:6
136:18
**wound** 104:23
**wrestled** 113:12,13
**write** 7:23 25:14 31:6,11
67:6 78:12,16 108:7
**writing** 22:4,24 27:5 69:10
**written** 27:8 33:7 102:6
112:5
**wrong** 46:4 60:19 61:10,22
74:13 135:18 138:1
**wrote** 73:5 108:16 110:16
112:10

---

**X**

---

**Y**

**yeah** 8:2,2 10:7 12:13,13
17:7 25:8 27:12 48:23
50:16 72:24 78:6 97:1,5
106:15 131:2,7 133:9
**year** 10:11 18:10
**years** 9:5,16 11:5 16:2 20:14
21:17 25:5 68:1 104:12
113:14
**Yep** 12:21 27:16
**yesterday** 36:14
**yield** 28:9
**York** 10:1,2

---

**Z**

---

**0**

---

**1**

**1** 4:9 6:24
**1,350** 78:3
**1:26** 2:18 139:15
**10** 23:5,13 25:19 95:11
136:3
**108** 4:14
**11** 96:10 106:1
**12** 117:6,9
**12:15** 95:5
**139** 4:5
**14** 1:16 2:19 55:10,11,16
56:6 104:4 105:8 126:14
142:2
**144** 50:20 73:16 125:24
**144(A)** 50:19
**15** 129:13 141:12
**15(a)** 72:6 73:4
**15(b)** 43:5
**17-62255-Civ-COOKE/HU...**
1:2 2:2
**18** 106:3
**1875** 2:16
**19** 50:1
**191114TN** 1:25
**1930** 45:10
**1934** 43:4
**1975** 45:12 125:13

---

**2**

**2** 4:10 37:19 40:14 49:17
54:13
**20** 136:3,3,23,24
**2001** 8:8
**2002** 8:13,15 10:12,14
110:20 114:9
**2003** 8:15 9:2,3
**2008** 9:8 12:19
**2012** 15:17
**2014** 12:19 15:17 17:14,18
**2019** 1:16 2:19 50:1 141:12
142:2
**210** 3:16
**25,000** 136:21
**26** 109:15 112:15

---

**3**

**3** 4:11 42:19 48:8 49:10
54:12
**3-16649** 71:22
**3(a)(10)** 72:21,24 73:17
**3(a)(5)** 43:3,18 44:10
**3(a)(5)(b)** 96:8
**30** 104:4 105:8 136:3,4,25

**30,000** 25:25 137:3
**3010** 3:15
**30326** 3:8
**33431** 3:17
**34** 125:8

**4**

**4** 4:12 71:14
**40** 4:10 136:4
**404** 3:9
**45-minute** 94:25
**49** 4:11

**5**

**5** 4:4,14 48:7 66:25 108:21
   108:22
**50s** 33:18
**561** 3:18

**6**

**6** 4:9 23:13 25:18 54:20
   81:21

**7**

**7** 105:8
**7/31/2022** 141:14
**71** 4:13

**8**

**8** 54:23 81:22
**842-7652** 3:9

**9**

**9:32** 1:17 2:18
**900** 3:7
**950** 3:6
**989-9080** 3:18