# EXHIBIT D

# WILLKIE FARR & GALLAGHER LLP

1875 K Street, NW
Washington, DC 20006-1238
Tel: 202 303 1000
Fax: 202 303 2000

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

ADMINISTRATIVE PROCEEDING
File No. 3-1664

_____

In the Matter of

    Ironridge Global Partners, LLC,
    Ironridge Global IV, Ltd.

Respondents

_____

REPORT OF JAMES R. BURNS, ESQ.
November 2, 2015

FOR RESPONDENTS

IRONRIDGE GLOBAL PARTNERS, LLC, AND
IRONRIDGE GLOBAL IV, LTD.

3024184.5

## Table of Contents

I.     Introduction ............................................................................................................... 3

II.    Professional Background ........................................................................................... 4

III.   Scope of Review ........................................................................................................ 5

IV.    The Allegations ......................................................................................................... 6

V.     Background ................................................................................................................ 7

VI.    Discussion ............................................................................................................... 10

    a.   Distinction Between a "Dealer" and a "Trader" ................................................ 10

    b.   Underwriter. ...................................................................................................... 16

    c.   Investment advice. ............................................................................................. 23

    d.   Policy Considerations ........................................................................................ 25

VII.   Conclusion .............................................................................................................. 28

Appendices

Exhibits

3024184.5

I.   <u>Introduction</u>

I was retained in October 2015 on behalf of Ironridge Global IV, Ltd. ("Global") and Ironridge Global Partners, LLC ("Partners") to perform an independent analysis and evaluation of certain issues raised by the Securities and Exchange Commission ("SEC") in its administrative proceeding captioned *In the Matter of Ironridge Global Partners*, LLC, Ironridge Global IV, Ltd., Respondents, Admin. Proc. File No. 3-16649.  Specifically, I was asked to review and assess whether, based on my experience with the Commission, the SEC's Division of Enforcement ("Enforcement") is deviating from longstanding guidance and enforcement practice by advancing its theory why Global falls within the definition of "dealer" set forth in Section 3(a)(5) of the Securities Exchange Act of 1934 ("Exchange Act" or "Act") and, as such, is required to register as a broker-dealer under Section 15(a) of that Act.  The hourly rates charged by Willkie for professional services provided in this matter range from $140 to $915 per hour for staff, and my time has been billed at $1,100 per hour.

Based on my review of the available documents, the information cited herein, and my professional experience both as a former regulator and a practitioner, I conclude that the SEC's allegation that Global has violated Section 15(a) by not registering as a broker-dealer deviates from existing regulatory guidance and longstanding enforcement practice.  It is my opinion that Global would not be deemed a dealer under longstanding guidance and enforcement practice, and therefore would not have been required to register under Section 15(a) of the Exchange Act.

II.    Professional Background

      I am currently a partner at the law firm of Willkie, Farr & Gallagher LLP, where I advise broker-dealer and investment management clients on regulatory, compliance and enforcement matters affecting their businesses.   Among other matters, I advise advisers to private funds on broker-dealer status issues.   Prior to joining the firm in November 2014, I served for two and a half years as the Deputy Director of the SEC's Division of Trading and Markets ("Trading and Markets"), the second-highest position in the Division, where I oversaw the Office of the Chief Counsel, the Office of Trading Practices, the Office of Market Supervision, the Office of Derivatives Policy, and the Office of Analytics and Research.   The Division of Trading and Markets has responsibility for helping the Commission evaluate who is a dealer for purposes of Section 15(a).  My direct reports included the Chief Counsel, as well as four other Associate Directors.   Through them, I oversaw the work of around two hundred attorneys, economists, and other professionals. Among other things, I regularly discussed and worked with the Chief Counsel and his staff on broker-dealer status issues and the dealer-trader distinction, as well as on issues arising in connection with administrative actions and other matters raised by Enforcement that concerned Exchange Act interpretations and policies.

      Prior to serving as Deputy Director of Trading and Markets, I was the Deputy Chief of Staff and Counsel to Chairman Mary Schapiro, for whom I worked for just over two years.  My duties for Chairman Schapiro included oversight of routine ongoing rulemaking and policy initiatives as well as initiatives mandated by passage of the Dodd-Frank Act and the JOBS Act.  As the Chairman's Counsel, I advised her primarily on issues relating to broker-dealer and investment management law.   Before serving Chairman Schapiro, I worked for SEC Commissioner Kathleen Casey in a similar advisory capacity for just under two years.  I also

3024184.5

advised Chairman Schapiro and Commissioner Casey in connection with their consideration of hundreds of matters on the agency's Enforcement calendar over a four year period.

I was an attorney in private practice at Wilmer Cutler Pickering Hale & Dorr LLP ("WilmerHale") for over five years before joining the SEC, and focused primarily on investment management and broker-dealer regulatory, compliance, and enforcement matters. Before joining WilmerHale, I clerked for Judge William B. Traxler, on the U.S. Court of Appeals for the Fourth Circuit after completing my J.D., *cum laude,* at Georgetown University Law Center. Prior to law school, I completed doctoral and masters degrees at Oxford University, and obtained my bachelor's degree, *magna cum laude,* from Harvard College.

I have not previously served as an expert witness in a case at trial or by deposition. A list of publications is included at Appendix 2, below.

III.     Scope of Review

The conclusions set forth herein are based on my review of documents, information, meetings and consultation with personnel associated with Partners and Global, examination testimony provided to the SEC during its investigation, and such legal and regulatory precedents as I have deemed relevant to the matter. I have referenced and/or noted the specific documents and precedents relied on in my report in Appendix 1 and throughout the report. The information I reviewed is consistent with that typically relied upon by legal experts in an analysis of legal and regulatory issues such as this. I have also relied upon my experience as a practitioner who has for many years closely followed market practices and who routinely evaluates regulatory questions that arise on the part of broker-dealers and investment advisers to private funds, as well as my recent and longstanding experiences as a senior officer at the SEC.

3024184.5

For the sake of efficiency and respect for the court's busy docket, I have avoided to a great extent repeating observations and arguments made by Partners and Global in prior submissions; however, I would note at the outset that I consider the views expressed in the submissions made by counsel on behalf of Partners and Global on issues on which I have been asked to opine as describing orthodox, mainstream legal perspectives on these matters. Their arguments seemed to me both reasonable and in fidelity with long-established regulatory and practical doctrine on the subject of Section 15(a) status under the Exchange Act. Thus, as an independent expert, I will seek to offer my own observations and additional considerations, but I want to emphasize both the familiarity and persuasiveness of Respondents' arguments made to date.

## IV.     The Allegations

Global IV is an institutional investor. Among other things, it invests in equity securities of small companies through "Section 3(a)(10) exchanges." A salient feature of a Section 3(a)(10) exchange is that, as required by the statute, the exchange must be approved by a court or authorized government agency "after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear."[1] In Section 3(a)(10) exchanges, a public company issues common stock to Global and, in return, Global pays off certain debts of the issuer. The common stock issued in a Section 3(a)(10) exchange is exempt from registration or regulation under the Securities Act of 1933 ("Securities Act").

---

[1]      Section 3(a)(10) of the Securities Act, 15 U.S.C. §77c(a)(10).

3024184.5

The SEC alleges that Global acted as an unregistered dealer in violation of Section 15(a) of the Exchange Act "by engaging in serial underwriting activity, providing related investment advice, and receiving and selling over five billion shares of capital stock worth more than $56 million in connection with microcap financing services that relied on a novel use of the exemption contained in Section 3(a)(10) of the [Securities Act]."[2]   The SEC also alleges that Partners violated Section 20(b) of the Exchange Act by using Global to violate Section 15(a).

V.    Background

This section draws on facts that are more completely described in the Respondents' various submissions, which are listed in Appendix 1. Global is a British Virgin Islands business company that was formed in 2011. Its sole place of business is the British Virgin Islands. Global does not have any offices, employees or bank accounts in the United States. Global maintains brokerage accounts with various broker-dealers, including registered broker-dealers in the United States and broker-dealers outside the United States, through which it engaged in all of its trading activity.

Partners is a Delaware limited liability company and was formed in 2011. Partners has four individual members (the "Members"), each of whom has significant experience in the securities industry – one as a securities attorney, one as an investment banker, and two as investment advisers. Partners has no outside investors.

---

[2]    In the Matter of Ironridge Global Partners, LLC, Ironridge Global IV, Ltd., Respondents, Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Exchange Act Release No. 75272 (Jun. 23, 2015) (hereinafter, the "OIP").

3024184.5

During the period in question, Global was a wholly owned subsidiary of Partners.[3] It was formed to make direct equity investments in small public companies. All of the investment transactions effected by Global were financed by capital contributed by the four Members through Partners, and any profit and income generated by Global's investments. Global's board of directors initially consisted of three of the Members and two independent directors. Beginning in 2013, a registered corporate director based in the British Virgin Islands, Navigator Management Ltd., became an independent corporate director of Global.

Global invests in small public companies in various ways. Among other things, Global invests in such entities through private investments in public equity ("PIPEs"), registered direct offerings, exchanges of securities subject to Section 3(a)(9) of the Securities Act, and the aforementioned Section 3(a)(10) exchanges, which generally represented less than 40% of the value of Global's investments.[4] Global does not purchase securities on the open market. Cahir Capital Management, LLC ("Cahir"), then registered with the State of California as an investment adviser, served as investment adviser to Global.[5] Two of the Members are principals of Cahir and advise Global on a day-to-day basis in connection with its transactions.

Section 3(a)(10) of the Securities Act provides, in relevant part, that the provisions of that Act shall not apply to

---

[3]     I understand that Partners sold its entire interest in Global in early 2015.

[4]     According to Brendan O'Neil, Section 3(a)(10) transactions represented approximately 39% of Global's investments, based on the amount of its cash expenditures, and approximately 35% of the gross proceeds of its sales of securities, in the aggregate. *See* Global IV Deals Analysis Prepared by Brendan O'Neal, attached as Exhibit A.

[5]     According to the SEC's Investment Adviser Public Disclosure website, http://www.adviserinfo.sec.gov/IAPD/Content/Search/iapd_Search.aspx, Cahir withdrew its California investment adviser registration, effective January 23, 2015.

3024184.5

> . . . any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval . . . .

In other words, securities issued in accordance with Section 3(a)(10) need not be registered, nor comply with other provisions of the Securities Act. Thus, there would be no restriction on the resale of securities received as a result of a Section 3(a)(10) exchange, as would be the case for other unregistered securities in the absence of an exemption.

In connection with its Section 3(a)(10) exchanges, Global typically followed the following process. An issuer would approach Global about entering into a transaction in which, in exchange for stock in the issuer, Global would pay off certain of the issuer's indebtedness. In many cases, though not always, the issuer would be represented by a registered broker-dealer acting as its financial advisor in the transaction.

After conducting due diligence and evaluating the investment, Global's independent directors in the British Virgin Islands would determine whether to proceed with the transaction. On the directors' approval, Global would enter into a receivable purchase agreement with the relevant creditor. Under the terms of the receivable purchase agreement, in return for payment in accordance with an agreed-upon schedule, the creditor would immediately transfer the debt to Global. The creditor would represent that the debt is *bona fide* and that the creditor

3024184.5

"did not enter into the transaction giving rise to the [debt] in contemplation of any sale or distribution of [the issuer's] common stock or other securities."[6]

Global then would file an action in the Superior Court of the State of California in and for County of Los Angeles and negotiate a settlement agreement with the issuer. When the parties agreed to the terms of the settlement agreement, the parties would file a motion for the court to approve it. Then the court would hold a fairness hearing regarding the proposed settlement. If the judge concluded that the terms of the exchange are fair, the court would issue an order approving the settlement and the issuer's issuance of exempt shares.

The shares that Global received from an issuer in a Section 3(a)(10) exchange approved by the court were deposited in a brokerage account. When Global decided to begin selling those shares, they were sold through one or more broker-dealers. Global's strategy for selling shares received in a Section 3(a)(10) exchange was developed by one of its outside directors and implemented by Cahir, its investment adviser. The shares then would be sold over a period of days, weeks, or months, though Global generally would retain some part of the investment.

VI.   <u>Discussion</u>

a.   <u>Distinction Between a "Dealer" and a "Trader"</u>

Section 3(a)(5)(A) of the Exchange Act defines "dealer" as, in relevant part, "any person engaged in the business of buying and selling securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract

---

[6]   Exhibit L to Respondents' Motion for Summary Disposition, at 5.

3024184.5

participants) for such person's own account through a broker or otherwise."[7]  The key factors determining whether a person is a "dealer" are whether the person trades for his or her own account, and whether he or she does so "as part of a regular business."[8]  Both factors must be satisfied in order for a person to be a dealer.[9]  Unless an exception or exemption is available, dealers must be registered with the SEC as required by Section 15(a) of the Exchange Act.[10]

Section 3(a)(5)(B) of the Exchange Act contains an exception for "a person that buys or sells securities (not including security based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business."[11]  The SEC has taken the position that to be a dealer, a person must buy *and* sell securities, or be willing to do so, contemporaneously.[12]  It has been noted that "[t]his approach is necessary to distinguish dealers from investors who buy and sell a security for investment purposes, but sometimes hold the position for only a short amount of time.  The distinction between active trader and dealer can be very fine."[13]

---

[7]     Section 3(a)(5)(A) of the Exchange Act, 15 U.S.C. §78c(a)(5)(A).

[8]     Robert L.D. Colby, Lanny A. Schwartz, and Zachary J. Zweihorn, Broker-Dealer Regulation, 2d. Edition at §2.3.1.A (Practicing Law Institute, 2015) (hereinafter, "Colby").

[9]     *See* Definition of Terms in and Specific Exemption for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, Exchange Act Release No. 46745 (Oct. 30, 2002), 67 Fed. Reg. 67,496, 67,498 (Nov. 5, 2002) (hereinafter, Release 46745").

[10]    Section 15(a) of the Exchange Act, 15 U.S.C. §78o(a).

[11]    Section 3(a)(5)(B) of the Exchange Act, 15 U.S.C. §78c(a)(5)(B).

[12]    *See, e.g.,* Letter from Susan J. Walters, Office of Chief Counsel, SEC Division of Market Regulation to Martin E. Lybecker, National Council of Savings Institutions (July 27, 1986) (discussing the distinction between a dealer and a trader) (hereinafter, "Walters").

[13]    Colby, *supra* note 8, at §2.3.1.B.

3024184.5

Persons excluded from the definition of "dealer" by Section 3(a)(5)(B) are often referred to as "traders."  For more than sixty years, the dealer-trader distinction has provided a well-familiar framework for distinguishing between persons that fall within the definition of "dealer" and traders who merely trade for their own accounts but do not fall within the definition of "dealer."[14]

In 2002, the SEC proposed rules regarding bank securities activities under the Exchange Act as part of its implementation of the Gramm-Leach-Bliley Act of 1999.[15]  In the release proposing those rules, the SEC discussed the dealer-trader distinction at some length, describing the distinction as follows:

> As developed over the years, the dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of business (or participate in the distribution of new issues), and generally transact a substantial portion of their business with investors (or, in the case of dealers who are market makers, principally trade with other professionals).  In contrast, traders have a less regular volume, do not handle others' money or securities, do not make a market, and do not furnish dealer-type services such as rendering investment advice, extending or arranging for credit, or lending securities. [citations omitted][16]

---

[14]   *See* Mark D. Fitterman, Merri Jo Gillette, Michael M. Phillipp, Ignacio A. Sandoval, Steven W. Stone and John V. Ayanian, Challenges in Requiring High-Frequency Traders to Register as Dealers, June 10, 2014, avail. at http://www.morganlewis.com/pubs/finservices_lf_challengesrequiringhighfreqtradersregisterasdealers_10june14.

[15]   *See* Release 46745, *supra* note 9.

[16]   *Id.* at text accompanying n.32. *See also*  Louis Loss, Joel Seligman, Troy Paredes, Securities Regulation (Aspen Publishers, 2015) (hereinafter, "Loss"):

> When does a person's trading activities make him or her a dealer? There is no ready distinction. However, a dealer has characteristic attributes: He or she ordinarily tries to obtain a regular clientele, and is apt to transact a substantial portion of his or her business directly with investors rather than with other dealers or through exchange members, although there are  market makers who trade principally with other professionals. A dealer ordinarily holds himself or herself out as one engaged in buying and selling securities at a regular place of business. The business (except when the dealer participates in underwriting) is ordinarily characterized by a regular turnover, while a trader's transactions are generally more irregular in both volume and time. A trader, on the other hand, does not handle other people's money or securities, does not  make a market, and does

3024184.5

The SEC went on to explain that the determination of whether a person is a dealer depends on all of the facts and circumstances, and stated that a person *may* fall within the definition of "dealer" by engaging in the following activities:

(1) underwriting;

(2) acting as a market maker or specialist on an organized exchange or trading system;

(3) acting as a de facto market maker whereby market professionals or the public look to the firm for liquidity; or

(4) buying and selling directly to securities customers together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in connection with transactions in securities, and carrying a securities account.[17]

The SEC further explained that

[a] person must evaluate *the totality of its securities activities* to determine if those activities may constitute engaging in dealer activities for which there is no exception or exemption from the dealer registration requirements. By analogy when analyzing whether a security exists, some courts have used an analysis that turns on the "economic realities" underlying a transaction and not the name appended to the transaction. [emphasis added][18]

Over the years, the SEC staff has also described factors that may indicate that a person is acting as a dealer. For example, in response to a no-action request regarding securities trading activities by certain savings institutions, the SEC staff stated that the determination of whether an entity is a dealer or a trader "would depend upon an analysis of *all* of that Member's

---

not furnish the services that are usually provided by a dealer, such as quoting the market, rendering incidental investment advice, extending or arranging for the extension of credit, and lending securities to customers. . . .

*Id.* at § 8.A.3.b (citations omitted).

[17]   *See* Release 46745, *supra* note 9, at text following n. 32.

[18]   *Id.* at text accompanying n.33 (citing United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 849, *rehearing denied*, 423 U.S. 884 (1975).

3024184.5

securities activities, and not just one portion of such activities." (emphasis added)[19]  In that letter, the staff said that it took the position that a person who buys and sells securities for its own account in the capacity of a trader is generally not considered to be "engaged in the business" of buying and selling securities, and therefore would not be deemed a "dealer."  The staff then noted that generally,

> a trader does not handle other people's money or securities; he does not hold himself out as being willing to buy and sell securities for his own account on a continuous basis; and he does not furnish the services which are usually provided by dealers, such as quoting the market in one or more securities rendering incidental [sic] investment advice, or extending or arranging for the extension of credit in connection with securities activities.[20]

In other no-action letters involving investment funds, the SEC staff has said that a fund would not be a "dealer" if it did not:

(i)     advertise publicly that it makes a market in securities

(ii)    hold it out as being willing to buy and sell a particular security on a continuous basis;

(iii)   run a matched book of repurchase agreements;

(iv)    issue or originate securities that he also buys and sells;

(v)     advertise that it is in the business of buying and selling securities;

(vi)    do business with the public (either retail or institutional);[21]

(vii)   make a market in, or quote prices for both purchases and sales of, securities;

(viii)  participate in a "selling group" or otherwise underwrite securities;

(ix)    provide services to investors, such as handling money and securities, extending credit, or providing incidental investment advice; or

(x)     write derivatives contracts that are securities.[22]

---

[19]     Walters, *supra* note 12.

[20]     *Id. See also* United Savings Association of Texas, SEC No-Action Letter (avail. Apr. 12, 1987) (describing a similar list of factors that could require registration as a government securities dealer under Section 15C of the Exchange Act).

[21]     I note that in its Opposition to Respondents' Motion for Summary Disposition, the SEC asserts also that Global bought securities directly from the issuers and resold them in the open market as evidence of its having acted as a dealer.  The issuers are parties to a contract that is the subject of a court-supervised exchange sanctioned by Section 3(a)(10).  This does not make the issuers "customers" for purposes of broker-dealer regulation.  Rather, the issuer's role vis-à-vis would be that of a counterparty.

3024184.5

In my view, Global exhibited none of the twelve factors set forth in this long-standing guidance, and it should not be deemed a "dealer" if one applies the SEC's and its staff's admonition to evaluate a person's status in consideration of "the totality" or "all" of its securities activities. For its part, the SEC seems to focus on two of the factors, alleging that Global engaged in "serial underwriting activity" and provided "related investment advice,"[23] without regard to its past admonitions that all of the facts and circumstances must be considered in determining a person's status under the Exchange Act. This strikes me as a departure, and rather a sharp one, from the customary approach taken by Trading and Markets tot his kind of analysis. Even isolated to those two factors, I do not believe that Global would have been deemed a dealer under longstanding regulatory guidance or enforcement practice.

Below, I discuss the SEC's assertions regarding the underwriting and investment advice factors in more detail below, but I first would like to note that many types of investment funds, like Global, including private equity funds, hedge funds, venture capital funds, and even mutual funds rely on the trader exception in Section 3(a)(5)(B).[24] My experience is that many of these investment funds engage directly with issuers in negotiating private investments in equity or debt securities for their own accounts, as did Global and Partners. And my concern is that the SEC's administrative action against Global and Partners, with its heavy emphasis on just two of the

---

[22]   *See, e.g.,* Acqua Wellington North American Equities Fund, Ltd., SEC No-Action Letter (avail. Oct. 11, 2001) (hereinafter, "Acqua Wellington"); Davenport Management, Inc., SEC No-Action Letter (avail. Apr. 13, 1993); Fairfield Trading Corporation, SEC No-Action Letter (avail. Jan. 10, 1988); Louis Dreyfus Corporation, SEC No-Action Letter (avail. Jul. 23, 1987); Burton Securities, SEC No-Action Letter (avail. Dec. 5, 1977). I note that at times a court may list certain other factors, but they basically seem to refer to the factors on this list.

[23]   *See* OIP, *supra* note 2.

[24]   *See* Colby, *supra* note 8, at §2.3.2.B.

3024184.5

many factors that historically have been weighed in considering an entity's status under the Exchange Act, threatens to create significant regulatory uncertainty for the investment fund industry and, to my mind, runs counter to the SEC's and its staff's long-standing position that "all" or "the totality" of the facts and circumstances surrounding a person's business activities must be considered in determining the person's status under the Exchange Act and the obligation of the SEC and its staff have to provide fair notice of a change in an interpretive position before pursuing an enforcement action.[25]

b. Underwriter.

In my view, the SEC's assertion that Global acted as an underwriter, and therefore should be deemed a dealer, is a departure from longstanding guidance and practice. The SEC and its staff have, as noted above, listed serving as an underwriter as one of the factors to consider in determining whether a person falls within the Exchange Act definition of dealer. Section 3(a)(20) of the Exchange Act[26] defines "underwriter" for purposes of the Act by incorporating the definition used in Section 202(a)(20) of the Investment Advisers Act of 1940:

> "Underwriter" means any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an underwriter or dealer not in excess of the usual and customary distributor's or seller's commission. As used in this paragraph the term "issuer" shall include in addition to an issuer, any

---

[25]     Similarly, in evaluating whether a person is a "broker" for purposes of Section 15(a) of the Exchange Act, the SEC considers a variety of factors, and "no one factor is dispositive." *See* In the Matter of David Bandimere, Securities Act Release No. 9972 (Oct. 29, 2015), at text accompanying n. 41 (Opinion of the Commission).

[26]     Section 3(a)(20) of the Exchange Act, 15 U.S.C. §78c(a)(20).

3024184.5

person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.[27]

In the Order Instituting Proceedings against Global and Partners, the SEC asserts that Global engaged in "serial underwriting activity" through the Section 3(a)(10) exchanges and that this makes Global a dealer for purposes of Section 15(a) of the Exchange Act.[28] This assertion misconstrues how the Section 3(a)(10) exchanges are conducted as compared with underwriting as it has been described by regulators and as it occurs in actual practice.

As has been described by the SEC staff, in order for an issuer to rely on the Section 3(a)(10) exemption, several conditions must be met:

(1) The securities to be issued must be in exchange for securities, claims or property interests, not for cash;[29]

(2) A court or authorized government entity must approve the fairness of the terms and conditions of the exchange;

(3) The approving court or government authority must find that the terms and conditions of the exchange are fair to the parties to whom securities will be issued, and be advised that the issuer will rely on the Section 3(a)(10) exemption based on the court's or government entity's approval of the transaction;

(4) The court or government authority must hold a hearing before approving the fairness of the transaction's terms and conditions;

(5) If a government entity is to approve the terms, it must be authorized by law to hold the hearing;

(6) The fairness hearing must be open to everyone to whom securities would be issued in the exchange;

(7) There must be adequate notice to the prospective recipients of the securities; and

---

[27] Section 202(a)(20) of the Investment Advisers Act of 1940, 15 U.S.C. §80b-202(a)(20).

[28] OIP, *supra* note 2.

[29] The staff has allowed that an exchange may qualify if it is partly for cash in order to permit flexibility in structuring an exchange, but that it must be predominantly an exchange for securities, claims or other property interests. *See id.* at n. 6.

3024184.5

(8) There cannot be any improper impediments to such persons appearing at the hearing.[30]

The staff then noted that in the view of the Division of Corporation Finance, securities received under a Section 3(a)(10) exchange may be resold without regard to the restrictions of Rule 144, provided the transaction does not involve a shell company and provided further that the sellers are not affiliates of the issuer and have not been so affiliated within 90 days of the Section 3(a)(10) exchange.[31]

The conditions set forth above in connection with Section 3(a)(10) exchanges are not conditions that are normally associated with real-world underwritings, in my experience and observation. My understanding is that Global acquired claims against issuers from third parties and then exchanged those claims for shares of stock from the issuer in transactions approved by a court after proceedings that met the requirements described above. This is a distinct activity from the activity of a customary underwriter, one with its own history and established expectations. While Global did then start selling its shares after the Section 3(a)(10) exchange was completed, it also did so in a manner that does not resemble the activity of an underwriter. Global did not sell all of its shares at once, as an underwriter typically seeks to do. Rather, like an institutional investor, Global sold the shares over a period of time in a manner calculated to maximize its profits and minimize its losses in consideration of factors relevant to the issuer's business and the market. Accordingly, Global was exposed to the market risk associated with the shares for a longer period of time than would be the case for a typical underwriter.

---

[30] *See* Staff Legal Bulletin No. 3A (CF), June 18, 2008 (describing views of the SEC staff regarding the Section 3(a)(10) exemption).

[31] *See id.* at §5.

3024184.5

Global did not make a market in the shares or purchase shares in the open market or hedge its position by selling short, as underwriters often do.  Nor does Global appear to have engaged in the sort of special selling efforts or aftermarket activities commonly associated with underwriters, such as road shows, having sell-side research analysts publish research about the issuer or engaging in stabilizing efforts.[32]  Moreover, all of Global's sales took place in open market transactions through registered broker-dealers over some period of days, weeks or months.  By contrast, an underwriter may sell its allotment of securities directly to investors, or it may sell through other broker-dealers.  All of these factors support the view that Global was acting as an investor and trader, closely resembling many in the marketplace, and not as an underwriter.[33]  Moreover, I am not aware of any precedent suggesting that (as Enforcement contends) an investor who acquires shares as a result of a court-supervised Section 3(a)(10) exchange must hold those shares for two years before beginning to sell some of them, lest the investor be deemed an underwriter.  To the contrary, I am familiar with a number of court orders declaring that securities issued pursuant to Section 3(a)(10) are unrestricted and freely tradable.[34]  Considering that these securities are completely exempt from the requirements of the Securities Act, except for the specific requirements of Section 3(a)(10), this would strike me as a very

---

[32]   For more information about aftermarket activities commonly engaged in by underwriters, *see* Reena Aggarwal, *Stabilization Activities by Underwriters After Initial Public Offerings*, The Journal of Finance, June 2000 at 1075-81.

[33]   *See* Examination of Keith Coulston, Mar. 12, 2014 at 22-26, 32-38 (discussing Coulston's role in analyzing investment purchase and sale opportunities).

[34]   *See, e.g.,* In Re Comverse Technology, Inc. Securities Litigation, 2010 U.S. Dist. LEXIS 63342; Fed. Sec. L. Rep. (CCH) ¶95,781 (E.D.N.Y. 2010) ("Pursuant to Section 3(a)(10) of the Securities Act of 1933, any Settlement Shares issued pursuant to the Settlement do not constitute "restricted securities."); In Re Raytheon Company Securities Litigation, 2004 U.S. Dist. LEXIS 30985 (Mass. 2004) ("the Settlement Warrants are . . . unrestricted and freely tradable exempted securities pursuant to Section 3(a)(10) of the Securities Act of 1933"); Garst v. Franklin Life Insurance Co., 1999 U.S. Dist. LEXIS 22666 (W.D. Pa. 1999); *but see* Continental Assurance Co. v. Macleod-Stedman, Inc., 694 F. Supp. 449; 1988 U.S. Dist. LEXIS 10379 (N.D. Ill. 1988) (holding that the terms of a settlement is fair pursuant to Section 3(a)(10) does not require court to say whether registration of securities is required).

3024184.5

surprising result indeed, and one that would inject uncertainty in an area where firms feel the practical rules of the road are well settled.

Further, a typical underwriter assists issuers in raising capital from investors. They work with an issuer to understand the issuer's business and the market for the issuer's securities, prepare and deliver offering documents, and market the issuer's securities. The underwriter usually engages in various pre-offering activities intended to put it in a position to be able to sell the entire offering immediately when it is able to do so. Underwriters are compensated in the form of fees and commissions, as well as the underwriting spread, which is the difference, negotiated by the underwriter and the issuer, between the price at which the underwriter purchases the securities from the issuer and the price at which the underwriter resells the securities. In my view, none of these indicia appear to be implicated here, as Global's holdings were subject to market risk as it sought, usually over a period of weeks, months and even longer to maximize its returns as it sold its positions

Finally, underwriters do not seek to manage their sales of securities in order to maximize their gain from market movements and developments affecting the issuer or its industry, as Global typically has done and as other investors typically do. As has been noted previously by Respondents' counsel, "both the activities and the compensation of underwriters are designed to avoid speculating in, and realizing profits from, the appreciation in value of the issuer's securities."[35] This is an opinion I share as well and seems like one that should be beyond any reasonable question.

---

[35]   Second Supplemental Wells Submission on Behalf of Ironridge Global IV, Ltd. and Ironridge Global Partners, LLC, Apr. 30, 2015, at 5, *citing* Prohibitions and Restrictions on Proprietary Trading and Certain Interests in, and Relationships With, Hedge Funds and Private Equity Funds, Release No. BHCA-1 (Dec.

3024184.5

On the issue of underwriting as an indicator that a person is acting as a dealer, the contrast between the SEC's assertions in this matter and the position taken by the SEC staff in the well-known *Acqua Wellington* no-action letter strikes me as unsettling, and out of step with the scope of regulatory expectations established by the staff through this letter and practices that have evolved in its wake. In that letter, the SEC staff said it would not recommend enforcement action if Acqua Wellington, an offshore investment fund, invested in equity lines of credit without registering as a broker-dealer under Section 15(a) of the Exchange Act.[36] Acqua Wellington, among others, was named in the prospectus for the equity lines of credit as a statutory underwriter for purposes of the Securities Act. The equity lines of credit gave an issuer the right, but not the obligation, to sell common stock to Acqua Wellington up to a specific dollar amount in a series of draw-downs. Acqua Wellington was obligated to purchase these securities at a predetermined percentage discount determined by a mathematical formula designed to approximate the current market price and it was subject to market risk in that there was no assurance that there would be an active trading market for the securities when it attempted to sell them. Other than being named as an underwriter, Acqua Wellington argued that it did not engage in the other activities described above as characteristic of a dealer, and instead acted merely as an investor. The SEC staff granted no-action to Acqua Wellington, subject to several conditions, including conditions based on the dealer-trader distinction.

Without questioning the SEC staff's decision to grant the *Acqua Wellington* no-action relief, which I believe was the correct policy outcome in that context and which has helped other

---

10, 2013), 79 Fed. Reg. 5,536 (Jan. 31, 2014) (SEC discusses underwriting practices in connection with adoption of "Volcker Rule").

[36]     *See* Acqua Wellington, *supra* note 22.

3024184.5

firms establish reasonable, practical guidelines for their activities, there is no question in my mind that Acqua Wellington had more characteristics of a dealer and underwriter than does Global.  Two differences in particular that militate in Global's favor are the purpose of the relevant transactions and the role of the courts described in connection with Section 3(a)(10) exchanges.  First, Acqua Wellington represented that the purpose of the equity line of credit structure was to "enable the company to determine the timing and dollar amount of securities the investor will receive . . . an equity line provides a company with more flexibility to sell stock when market conditions are most favorable than conducting a series of private placements."[37]  In other words, the transactions were intended to facilitate the raising of capital – a classic characteristic of underwriting.  By contrast, the purpose of a Section 3(a)(10) exchange is to facilitate the process of settling certain proceedings and claims, by allowing for the exchange of securities for other securities, claims or other property.  Thus, my view is that the transactions at issue here stand outside the role typically played by or envisioned in connection with the activities of a traditional underwriter, just as the securities issued in the context of a Section 3(a)(10) are exempt from the registration and other requirements generally imposed on the issuance of securities, including the two-year holding period asserted by the SEC staff in this case.[38]

The second key factor is the role of the courts in a Section 3(a)(10) transaction.  As was noted by the SEC's General Counsel in 1935, "the whole justification for the exemption afforded by Section 3(a)(10) is that the examination and approval by the body in question of the fairness of the issue in question is a substitute for the protection afforded to the investor by the

---

[37]     *Id.*

[38]     *See supra* note 34.

3024184.5

information which would otherwise be made available to him through registration."[39]   This distinction stands as true today in my experience as it would have when the measure was first enacted – such transactions exist outside the customary boundaries that the Congress and the Commission in turn sought to regulate through registration of the securities at issue.   Similarly, I would take the practical view that the court's fairness determination substitutes for the role established in the law for registration and regulation of certain gatekeepers, such as the dealers and underwriters involved in a registered securities offering, and the obligations required of them under the law.   Likewise, the subsequent transactions conducted at arm's length through a registered broker-dealer provide safeguards after the completion of the Section 3(a)(10) exchanges.   In my view, requiring the registration of Global as a dealer would be surplusage, given the roles played by the court and other registered entities.

### c.  Investment advice.

The SEC's assertion that Global provided investment advice in the course of engaging in the Section 3(a)(10) exchanges at issue is inconsistent with its position regarding similar investment activity commonly engaged in by institutional investors.   The fact that an institutional investor like Global may, in the course of negotiating a transaction, describe to an issuer the terms under which it would consider entering into an investment transaction for its own account is not the rendering of incidental investment advice to the issuer.[40]   In my experience, this is a very common practice among institutional investors, a normal part of negotiating an investment with an issuer, and does not constitute investment advice.

---

[39]     Securities Act Release No. 312 (1935).

[40]     *See, e.g.,* Examination of John Kirkland, Dec. 10, 2013, at 198 – 201 (describing Global's discussions with prospective issuers about which business debts were to be paid off) (hereinafter, "Kirkland testimony").

3024184.5

The SEC recognized this issue, in a different context, shortly after it adopted rules in 2013 requiring the registration of municipal advisors. "Municipal advisors" generally are persons who provide advice to a municipal entity with respect to municipal financial products or the issuance of municipal securities, "including advice with respect to the structure, timing, terms, and other similar matters concerning such financial products or issues."[41] After adopting these rules, the SEC staff published some frequently asked questions and answers on the SEC website, which includes the following:

> **Question 1.4: Terms for the Purchase of Securities in a Principal Capacity:** An institutional buyer, such as a mutual fund, seeks to purchase municipal securities for its own account from a municipal entity. If this institutional buyer provides the municipal entity with the structure, timing, and terms under which the institutional buyer would purchase securities for its own account, would the institutional buyer be engaged in municipal advisory activity under the Final Rules?

> **Answer:** If an institutional buyer only provides information regarding the terms under which the institutional buyer would purchase securities for its own account and does not provide advice to the municipal entity with respect to the structure, timing, terms, or other similar matters regarding an issuance of municipal securities to be offered to other investors, the staff believes that this institutional buyer would not be engaged in municipal advisory activity under the Final Rules. The Answer to Question 1.1 of these FAQs regarding the advice standard generally applies and is relevant to this analysis. In the staff's view, the information regarding the terms for this institutional purchase is in the nature of factual information that would meet the general information exclusion to advice under Exchange Act Rule 15Ba1-1(d)(1)(ii). Further, in the scenario described above, the institutional buyer is acting as a principal to purchase securities for its own account, which is consistent with the arm's length nature of a non-advisory business relationship. Absent other facts and circumstances evidencing advice, the staff believes this transaction would not constitute advice to a municipal entity with respect to an issuance of municipal securities. . . . [42]

While the issues surrounding municipal advisor registration clearly are different from those in the present case, they share in common the question of how to treat ordinary

---

[41]   Form MA, Glossary of Terms (definition of "municipal advisor"); *see generally* Registration of Municipal Advisors, Exchange Act Release No. 70462 (Sept 20, 2013).

[42]   Registration of Municipal Advisors Frequently Asked Questions, Last Updated on May 19, 2014, at Question 1.4, available at http://www.sec.gov/info/municipal/mun-advisors-faqs.shtml.

3024184.5

negotiations between an institutional investor and an issuer over the terms and conditions of a securities transaction. Global entered into discussions with issuers, evaluated the attractiveness of investing in the issuer using different structures, and negotiated with the issuers regarding the terms and conditions under which it would be willing to invest, which necessarily meant informing the issuer of what terms and conditions would be acceptable to it, including whether or not it would be willing to invest using a Section 3(a)(10) exchange in a particular case.[43] The SEC's position that Global's communications to issuers in the 3(a)(10) exchanges could constitute investment advice to those issuers stands in sharp contrast with the guidance it has provided elsewhere, but without a good reason and less of a regulatory hook to justify the different approach. Moreover, if the position is allowed to stand in this context, it is likely to have an unintended chilling effect on the ability of institutional investors in a wide variety of common circumstances to conduct their business vis-à-vis issuers without registering as broker-dealers.

### d. Policy Considerations

As I noted earlier, in my experience, Global's negotiation of its Section 3(a)(10) transactions and later sale of the securities it received is, in essence, the same sort of transaction routinely entered into by private investment funds on a daily basis. Private investment funds have long relied on the distinction that has been drawn in the Exchange Act and interpretations by the SEC and it staff between dealers and traders in order to operate their businesses without registering as broker-dealers. Issuers and investors also have long relied on the ability of an

---

[43]     *See* Kirkland testimony, *supra* note 40, at 198-201.

3024184.5

investor to freely trade the securities issued in a Section 3(a)(10) exchange as an inducement to enter into such transactions, as reflected in the cases I noted above.

It would be troubling to me to find that if the SEC thinks that the sort of activity that Global has engaged in as part of its overall investment strategy requires registration as a dealer, the agency would not first seek to clarify the matter through a rulemaking proceeding. This would give investment fund managers, issuers and other members of the public an opportunity to consider the matter and comment on the proposal to help ensure that the right actors are brought within the definition and that the scope of the regulation is appropriately delineated so that market participants can adapt their conduct accordingly. This is especially important since, as I have noted throughout this report and was noted in various submissions by the Respondents, the SEC appears here to be departing in a significant way from its past guidance and no-action positions, as well as court precedent in applying the requirements of Section 3(a)(10).

By way of example of the more customary and appropriate way of effecting a change in a regulatory interpretation or policy, I would point to SEC Chair White's June 2014 speech on her plans for a number of equity markets rule proposals, where she declared that the SEC was examining the possibility of regulating high-frequency trading firms as dealers.[44] In relevant part, her speech noted the approach she was taking to the matter of requiring such firms to register as dealers:

> We also are focused on using our core regulatory tools of registration and firm oversight. I have asked the SEC staff to prepare two recommendations for the Commission: the first, a rule to clarify the status of unregistered active proprietary traders to subject them to our rules as dealers; and second, a rule eliminating an exception from FINRA membership requirements for dealers that trade in off-exchange venues. Dealer

---

[44]   *See* Mary Jo White, Chair, Securities and Exchange Commission, Speech: Enhancing our Equity Market Structure (Jun. 5, 2014), avail. at http://www.sec.gov/News/Speech/Detail/Speech/1370542004312.

3024184.5

registration and FINRA membership should significantly strengthen regulatory oversight over active proprietary trading firms and the strategies they use.[45]

Notably, Chair White made clear that a rule – two, in fact - were needed to clarify the status of a group of traders: firms that go in and out of markets at many times the frequency associated with Global's trading and that themselves often make two-sided markets, though they do not hold themselves out as market makers or underwriters. That the Chair made clear that staff action in connection with these market participants needed to be predicated on clear guidance and a regulatory foundation established by rulemaking stands in contrast to the matter asserted by Enforcement here. In my view, this is all the more striking where Section 3(a)(10) transactions are the subject of a *statutory* mandate and have been effected without requiring registration for many years.[46] By comparison, high frequency traders would have been an easier category of participant to sweep in, as they are a relatively new type of actor in the market. Thus, a decision rendered in this matter also carries the risk that it may have an impact on this and other SEC rulemaking initiatives, calling into question the evenhandedness and consistency of the SEC's approach to giving fair warning to market participants about the agency's requirements and expectations.

The line of demarcation between a dealer and a trader can be admittedly fine at times. In my opinion, however, for the reasons set forth above, this matter does not seem like it should be a close call. Moreover, the fact that the SEC chose to pursue this as an Enforcement matter will tend to blur that line, and could have a negative impact on the willingness of fund managers in other contexts to engage in transactions that are of potential benefit both to their investors and to

---

[45]     *Id.*

[46]     The history of Section 3(a)(10) is described generally in Loss, *supra* note 17, at §3.C.3.a and accompanying nn. 134-45.

3024184.5

the issuers whose debts are paid as a result of these exchanges.   While Section 3(a)(10) exchanges are not focused on capital raising, there can be no doubt that a chilling of such activity would be likely to inhibit the ability of small issuers to enter into exchanges of stock for debt with willing institutional investors and would run counter to the main point of the JOBS Act, which was to help make it easier for small companies to access the financing they need in order to grow.

VII.    Conclusion

Based on my review of available documents, the SEC's and its staff's historical guidance, other legal precedents, and other information referenced herein, and based also on my years of experience as an attorney in private practice and as a senior member of the SEC staff, I conclude that when one weighs all of the factors that the SEC and its staff have said should be considered, and when one compares Global's activities with those of other industry participants, one must conclude that Global acted as an institutional investor and was entitled to rely on the trader exemption contained in Section 3(a)(5)(B) of the Exchange Act.   Therefore, Global was not required to register as a broker-dealer under Section 15(a) of the Exchange Act.   I believe that a decision to the contrary would run counter to years of established precedent, guidance, and practice to the detriment of markets, market participants, and investors.

_____
James R. Burns

_____
November 2, 2015

- 28 -

3024184.5

Appendices

1.    List of Documents and Information Considered

2.    James R. Burns' Background

3024184.5

## Appendix 1

List of Documents and Information Considered

1.    Pertinent statutes, rules, etc.

   a. Statutes, rules and public laws as cited throughout the Report.

   b. Investment adviser registration information available at the SEC's Investment Adviser Public Disclosure website, http://www.adviserinfo.sec.gov/IAPD/Content/Search/iapd_Search.aspx.

2.    Legal Documents

   a. Analyses Prepared by Brendan O'Neil.

      i. Consolidated Trading Worksheet 2014
      ii. Consolidated Trading Worksheet
      iii. Trading Analysis – Investment Risk v2
      iv. Trading Analysis – Last Sale Sheet
      v. 151016 Exhibit I – 90 Percent Analysis
      vi. 151016 Exhibit I - corrections

   b. Division of Enforcement's Opposition to Respondents' Motion for Summary Disposition dated Oct. 13, 2015.

      i. Declaration of Matthew F. McNamara, Oct. 13, 2015, and related exhibits, including Exhibit I "Global IV Section 3(a)(10) Transaction Summary Chart"

   c. In the Matter of Ironridge Global Partners, LLC, Ironridge Global IV, Ltd., Respondents, Order Instituting Administrative and Cease-and-Desist Proceedings Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934, Exchange Act Release No. 75272 (Jun. 23, 2015).

   d. Respondent Ironridge Global IV, Ltd.'s Answer and Affirmative Defenses, Jul. 15, 2015.

   e. Respondent Ironridge Global Partners, LLC's Answer and Affirmative Defenses, Jul. 15, 2015.

   f. Respondents' Motion for Summary Disposition dated Sept. 28, 2015, and Related Exhibits.

   g. Respondents' Reply in Support of Summary Disposition dated Oct. 20, 2015 and Related Exhibits.

3024184.5

    i.  Declaration of Brendan T. O'Neil, Oct. 20, 2015

    ii.  Supplemental Declaration of Josh C. Hess, Oct. 20, 2015
    iii.  Global IV Deals Analysis Prepared by Brendan O'Neal

h.  SEC Order Directing Private Investigation and Designating Officers to Take Testimony, Oct. 30, 2013.

i.  Second Supplemental Wells Submission on Behalf of Ironridge Global IV, Ltd. and Ironridge Global Partners, LLC dated Apr. 30, 2015.

j.  Supplemental Wells Submission on Behalf of Ironridge Global Partners, LLC dated Feb. 23, 2015.

k.  Wells Submission on Behalf of Ironridge Global Partners, LLC dated Sept. 5, 2014.

3.    <u>Depositions and Related Exhibits</u>

a.  Keith Coulston, Mar. 12, 2014.
b.  Bruce Harmon, Jul. 22, 2014.
c.  John Kirkland, Dec. 10, 2013.
d.  Richard Kreger, Apr. 3, 2014.
e.  Brendan O'Neil, Mar. 12, 2014.
f.  Vincent Sbarra, Dec. 4, 2013.
g.  Matthew L. Schissler, Jun. 1, 2014.

4.    <u>Cases</u>

a.  Continental Assurance Co. v. Macleod-Stedman, Inc., 694 F. Supp. 449; 1988 U.S. Dist. LEXIS 10379 (N.D. Ill. 1988).

b.  Garst v. Franklin Life Insurance Co., 1999 U.S. Dist. LEXIS 22666 (W.D. Pa. 1999).

c.  In Re Comverse Technology, Inc. Securities Litigation, 2010 U.S. Dist. LEXIS 63342; Fed. Sec. L. Rep. (CCH) ¶95,781 (E.D.N.Y. 2010).

d.  In Re Raytheon Company Securities Litigation, 2004 U.S. Dist. LEXIS 30985 (Mass. 2004).

e.  In the Matter of David Bandimere, Securities Act Release No. 9972 (Oct. 29, 2015).

5.    <u>SEC Rulemaking, No-Action Letters, Etc.</u>

a.  Acqua Wellington North American Equities Fund, Ltd., SEC No-Action Letter (avail. Oct. 11, 2001), 2001 SEC No-Act. LEXIS 756.

3024184.5

b.  Burton Securities, SEC No-Action Letter (avail. Dec. 5, 1977), 1977 SEC No-Act. LEXIS 2871.

c.  Davenport Management, Inc., SEC No-Action Letter (avail. Apr. 13, 1993), 1993 SEC No-Act. LEXIS 624.

d.  Definition of Terms in and Specific Exemption for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, Exchange Act Release No. 46745 (Oct. 30, 2002), 67 Fed. Reg. 67,496 (Nov. 5, 2002).

e.  Fairfield Trading Corporation, SEC No-Action Letter (avail. Jan. 10, 1988), 1988 SEC No-Act. LEXIS 62.

f.  Form MA, Glossary of Terms (definition of "municipal advisor").

g.  Letter from Susan J. Walters, Office of Chief Counsel, SEC Division of Market Regulation to Martin E. Lybecker, National Council of Savings Institutions (July 27, 1986), 1986 SEC No-Act. LEXIS 2609.

h.  Louis Dreyfus Corporation, SEC No-Action Letter (avail. Jul. 23, 1987), 1987 SEC No-Act. LEXIS 2302.

i.  Prohibitions and Restrictions on Proprietary Trading and Certain Interests in, and Relationships With, Hedge Funds and Private Equity Funds, Release No. BHCA-1 (Dec. 10, 2013), 79 Fed. Reg. 5,536 (Jan. 31, 2014).

j.  Registration of Municipal Advisors, Exchange Act Release No. 70462 (Sept 20, 2013).

k.  Registration of Municipal Advisors Frequently Asked Questions, Last Updated on May 19, 2014, available at http://www.sec.gov/info/municipal/mun-advisors-faqs.shtml.

l.  Securities Act Release No. 312 (Class C) (1935), 11 FR 10953.

m.  Staff Legal Bulletin No. 3A (CF), June 18, 2008, avail at https://www.sec.gov/interps/legal/cfslb3a.htm.

n.  United Savings Association of Texas, SEC No-Action Letter (avail. Apr. 12, 1987), 1987 SEC No-Act. LEXIS 2021.

6.  <u>Publications and Speeches</u>

a.  Reena Aggarwal, *Stabilization Activities by Underwriters After Initial Public Offerings,* The Journal of Finance, June 2000.

3024184.5

b. Robert L.D. Colby, Lanny A. Schwartz, and Zachary J. Zweihorn, Broker-Dealer Regulation, 2d. Edition (Practicing Law Institute, 2015).

c. Mark D. Fitterman, Merri Jo Gillette, Michael M. Phillipp, Ignacio A. Sandoval, Steven W. Stone and John V. Ayanian, Challenges in Requiring High-Frequency Traders to Register as Dealers, June 10, 2014, avail. at http://www.morganlewis.com/pubs/finservices_lf_challengesrequiringhigh freqtradersregisterasdealers_10june14.

d. Louis Loss, Joel Seligman, Troy Paredes, Securities Regulation (Aspen Publishers, 2015).

e. Mary Jo White, Chair, Securities and Exchange Commission, Speech: Enhancing our Equity Market Structure (Jun. 5, 2014), avail. at http://www.sec.gov/News/Speech/Detail/Speech/1370542004312.

3024184.5

<u>Appendix 2</u>

JAMES R. BURNS
1875 K Street. NW
Washington, DC 2006
(202) 303-1241
jburns@willkie.com

<u>EXPERIENCE</u>

**Willkie Farr & Gallagher LLP**                                                                   **2014-Present**

*Partner*

- Partner in Willkie Farr's Asset Management Group, counseling investment managers, broker-dealers, self-regulatory organizations, and other registered entities on regulatory, significant experience in both the trading and markets and investment management areas.
- Provides clients with insights into current issues in SEC examination and enforcement contexts as well as strategic advice on the effects of SEC initiatives on the business operations and compliance programs of registrants overseen by the Division of Trading and Markets and the Division of Investment Management.
- Wide-ranging SEC and private practice experience across broad areas of the asset management industry, covering investment managers and fiduciaries for registered investment companies, private funds and other types of clients.
- Extensive experience counseling advisers to registered and private funds, advising fund boards and addressing various governance, risk, compliance and disclosure-related matters of concern to the asset management industry.
- Represents investment advisers, broker-dealers, mutual funds, and hedge funds in various examination and enforcement-related inquiries by self-regulatory organizations and the SEC.

**U.S. Securities & Exchange Commission**                                                      **2008-2014**

*Deputy Director, Division of Trading and Markets*
*2012-2014*

- Manage over 200 lawyers, economists, and other specialists charged with establishing and maintaining standards for fair, orderly, and efficient markets.
- Oversee major securities market participants, including broker-dealers, self-regulatory organizations (such as FINRA, stock exchanges, and clearing agencies), and transfer agents.  Liase with sell- and buy-side firms and trade associations.
- Oversee planning and coordination of core regulatory functions, including market supervision, oversight and operations; derivatives policy; trading practices; analytics and research; and chief counsel and enforcement liaison programs.
- Coordinate  market structure initiatives, key Dodd-Frank Act and JOBS Act mandates, staff studies, interpretive guidance (*e.g.*, Reg SHO, Rule 15a-6), and long-range policy and planning.
- Collaborate with other Divisions and federal and international authorities on issues of mutual interest, such as Volcker implementation, as well as ongoing FSOC, FSB, IOSCO, and workstreams.

3024184.5

*Deputy Chief of Staff*                                                         *2011-2012*

- Coordinated development and execution of long-term rulemaking, policy and strategy initiatives.
- Managed day-to-day operations of 3,500 person agency with $1.5 billion budget, and served as the Chairman's liaison to and coordinator for administrative, regulatory, inspection, and enforcement functions.

*Counsel to Chairman Mary L. Schapiro*                                          *2010-2012*

- Advised Chairman on securities law matters, particularly market structure and Dodd-Frank Act related rulemakings, studies and other policy initiatives coordinated by the Divisions of Trading and Markets and Investment Management.
- Advised on other rulemakings, enforcement proceedings, and other Commission and staff actions, including appellate matters from the Office of the General Counsel, investigative matters arising from the Office of Compliance Inspections and Examinations, and international coordination issues arising from the Office of International Affairs.

*Counsel to Commissioner Kathleen L. Casey*                                     *2008-2010*

- Advised Commissioner on rulemakings, enforcement proceedings, and other Commission and staff actions, including appellate, investigative, and international coordination matters.

**Wilmer Cutler Pickering Hale and Dorr, LLP**                                  **2003-2008**

*Counsel/Associate*

- Provided regulatory and compliance advice to asset managers (private funds, mutual funds, other investment advisory programs) and broker-dealers. Prepared registration and compliance materials for mutual fund and hedge fund clients. Served as fund board secretary and counsel to closed end fund.
- Assisted asset management and broker-dealer clients in internal investigations, as well as examinations, enforcement matters, Wells submissions, and other proceedings before SEC, states, and SROs.
- Prepared potential liability and collateral consequences memoranda, as well as no-action requests, exemptive relief and waiver requests, adjudicatory materials, and industry comment letters.

**U.S. Court of Appeals for the Fourth Circuit**                                **2002-2003**

*Clerk to Hon. William B. Traxler, Jr.*

- Drafted opinions of first appellate impression involving federal and state regulatory and jurisdictional issues.

**American Council on Education (ACE)**                                         **1997-2002**

*Federal Relations Associate*

- Covered tax, student aid, and other regulatory issues for leading higher education association -- while attending Georgetown Law by night.

3024184.5

<u>EDUCATION</u>

**Georgetown University Law Center (Evening Program)**
  J.D., *cum laude*    2001
  Dean's List, *American Criminal Law Review* (Articles Editor)


**Oxford University**
  D.Phil., Oriel College  1997    M.Phil., Merton College  1994
  Rotary Scholar, ORS Scholar, Delmas Scholar


**Harvard College**
  A.B., *magna cum laude*    1991
  Harvard Scholarship, Dean's List, Rotary Scholarship

<u>SPEAKING ENGAGEMENTS</u>

SIFMA Annual Conference: "Thought Leader Session: Review of the Rulemaking Process and Ways to Improve It" Washington, D.C. (Upcoming 2015)

SIFMA Equity Markets Forum: "Market Structure: A Glimpse into 2016" New York (Upcoming 2015)

InvestoRegulation: "SEC Regulation Outside the United States: The Markets, and SEC and CFTC Developments" London (2015 and 2014)

Regulatory Compliance Association, Practice Edge Session: "SEC Initiates Flash Boy Regulation: A Comprehensive Analysis" (Webcast) (2014)

IDX FIA/FOA International Derivatives Expo: "Regulating a Global Marketplace" London (2014)

PLI: "The Volcker Rule: What it Means for Financial Institutions" New York (2014)

SIFMA Market Structure Conference: "Market Regulation: Considering the Latest Developments" New York (2014)

SIFMA Operations Conference: "Implications of Regulatory Implementation - Understanding the Impact of Implementing New Rules and Regulations in 2014 and Beyond" Boca Raton (2014)

SEC Roundtable on Cybersecurity (Moderator) Washington, DC (2014)

Institute of International Bankers: "Regulatory Issues of Interest to International Banks" Washington, DC (2014) Trader Forum Equity Trading Summit: "Market Structure Overview" New York (2014)

3024184.5

Regulation of Financial Services Forum 2014: "Derivatives Regulations" New York (2014)

PLI Advanced Swaps and Other Derivatives: "Swaps, Security-Based Swaps and Mixed Swaps: CFTC, SEC and Dodd-Frank Implementation Progress" New York (2013)

ICI Capital Markets Conference: "Addressing Operational Risks in the Markets and Examining the Impact on Investor Confidence" New York (2013)

FIA Law & Compliance Division: Regulation of Futures, Derivatives and OTC Products: "An Update on Volcker, the Push-Out Rule and other Systemic Stability Banking Issues Under Dodd-Frank" Baltimore (2013)

SEC Fixed Income Roundtable (Moderator): "Potential Improvements to the Market Structure for Corporate Bonds and Asset-Backed Securities" Washington, DC (2013)

SEC Roundtable on Decimalization (Moderator) Washington, DC (2013)

Financial Information Forum: "Year-End Forum Keynote Address" New York (2012)

Institute of International Bankers: Annual Risk Management and Regulatory Examination/Compliance Seminar: "Title VII and Volcker Update" New York (2012)

SIFMA Market Structure Conference: "Ensuring Market Integrity" New York (2012)

SEC: Roundtable on Technology and Trading (Moderator) Washington, DC (2012)

SELECTED PUBLICATIONS AND LECTURES

James Burns and Justin Browder, "Asset Managers and the Debate over Systemic Risk," The Review of Securities & Commodities Regulation, Vol. 48, No. 16 (Sept 23, 2015).

Georgia Bullitt, James Burns, Rose DiMartino, Benjamin Haskin and James Hahn, "SEC Proposes Changes to Open-End Funds Related to Management of Liquidity Risk," Willkie Farr & Gallagher Client Alert (Oct 6, 2015)

Michael Schachter, Martin Klotz, Barry Barbash, James Burns, Elizabeth Gray, Howard Kramer and Alison Levine, "Ninth Circuit Issues Insider Trading Decision Consistent with Newman," Willkie Farr & Gallagher Client Alert (Jul 9, 2015)

James E. Anderson, Scott A. Arenare, James Burns and Daniel Mencaroni, "Private Equity – Allocation of Broken Deal Expenses," Willkie Farr & Gallagher Client Alert  (Jul 2, 2015)

James R. Burns, Rose F. DiMartino, Margery K. Neale, Justin L. Browder, Dianne E. O'Donnell, "A Detailed Look Into the SEC's Investment Company Reporting Proposals," Willkie Farr & Gallagher Client Alert (June 22, 2015)

Scott A. Arenare, P. Georgia Bullitt, James R. Burns, Benjamin J. Haskin, Christopher S. Petito and Mark A. Vandehaar, "SEC Proposes Public Disclosure Regarding Separately Managed

3024184.5

Accounts, Changes to Adviser Registration and Enhanced Recordkeeping Around Adviser Performance" Willkie Farr & Gallagher Client (Jun 5, 2015)

Scott A. Arenare, James R. Burns, Rose F. DiMartino and Justin L. Browder, "SEC Proposes Significant Changes to Reporting Requirements for Registered Investment Companies and Investment Advisers" Willkie Farr & Gallagher Client (May 21, 2015)

James R. Burns, Elizabeth P. Gray, Martin Klotz, Howard L. Kramer, and Michael S. Schachter, "SEC Brings First Whistleblower Enforcement Action for Overly Restrictive Confidentiality Agreements" Willkie Farr & Gallagher Client (Apr. 2, 2015)

P. Georgia Bullitt, James R. Burns, Howard L. Kramer, Jed E. Doench, "SEC Proposes the First of Several Anticipated Reforms to Address Equity Markets Issues," Willkie Farr & Gallagher Client Alert (Apr 2, 2015)

James R. Burns, P. Georgia Bullitt, and Howard L. Kramer, "SEC Adopts Regulation Systems Compliance and Integrity," Willkie Farr & Gallagher Client Alert (Dec 2, 2014).

WSJ (Jul 10, 2015) –Mr. Burns is quoted discussing the SEC's response to the NYSE market outage.

Law360 (July 2015) – Mr. Burns is quoted discussing a joint federal report on the Oct. 14, 2014 treasury market volatility, the so-called "flash crash."

3024184.5

Exhibits

A.  Ironridge Global IV, Ltd. Deals Analysis Prepared by Brendan O'Neil

B.  Wells Submission on Behalf of Ironridge Global Partners, LLC dated Sept. 5, 2014.

C.  Supplemental Wells Submission on Behalf of Ironridge Global Partners, LLC dated Feb. 23, 2015.

D.  Second Supplemental Wells Submission on Behalf of Ironridge Global IV, Ltd. and Ironridge Global Partners, LLC dated Apr. 30, 2015.

**EXHIBIT A**

## Ironridge Global IV, Ltd. Deals Analysis

## Prepared by Brendan O'Neil

**Global IV Investments (Cash Paid)**

|  | 3(a)10 Investments (mm) | Other Investments (mm) | Total (mm) |
|---|---|---|---|
| Dollars | $            35.00* | $            54.26 | $         89.26 |
| Percent | 39.21% | 60.79% | 100.00% |

**Global IV Gross Receipts From Stock Sales**

|  | 3(a)10 Investments (mm) | Other Investments (mm) | Total (mm) |
|---|---|---|---|
| Dollars | $            56.00* | $           101.90 | $        157.90 |
| Percent | 35.47% | 64.53% | 100.00% |

\* - numbers used from SEC Order Instituting Proceedings

3024184.5

# EXHIBIT B

UNITED STATES OF AMERICA
BEFORE
THE SECURITIES AND EXCHANGE COMMISSION

-------------------------------------------------------------------x
                                    :

IN THE MATTER OF                   :     File No. A-3545
IRONRIDGE GLOBAL PARTNERS, LLC    :
                                      :

-------------------------------------------------------------------x


**WELLS SUBMISSION ON BEHALF OF
IRONRIDGE GLOBAL PARTNERS, LLC**

Erich T. Schwartz
Colleen Mahoney
Daniel J. Sullivan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC  20005
(202) 371-7000

*Attorneys for Ironridge Global Partners, LLC*

Dated:  September 5, 2014

Ironridge Global Partners, LLC requests confidential treatment of this submission for all purposes pursuant to 17 C.F.R. § 200.83 and requests that this submission not be disclosed pursuant to any request under the Freedom of Information Act.

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT .................................................................................1

II.  SUMMARY OF ARGUMENT ...............................................................................2

III.  STATEMENT OF FACTS ......................................................................................4

    A.  Relevant Entities .........................................................................................4

        1.  Ironridge Global IV, Ltd. ................................................................4

        2.  Ironridge Global Partners, LLC .....................................................5

    B.  The Section 3(a)(10) Exchanges ...................................................................6

        1.  Overview ..........................................................................................6

        2.  Global IV's Decision Process ..........................................................8

        3.  Receivable Purchase .......................................................................9

        4.  Execution of the Exchanges ..........................................................10

        5.  Global IV's Sales of Stock .............................................................13

IV.  ARGUMENT ........................................................................................................14

    A.  Securities Registration ................................................................................14

        1.  Section 5 of the Securities Act and the Section 3(a)(10) Exemption ........14

        2.  The Staff's Position With Regard to the Section 3(a)(10) Exchanges Involving Global IV.................................................................16

        3.  The Staff's Statutory Interpretation of Section 3(a)(10) Is Not Entitled to Deference ........................................................................17

        4.  The Claims That Are the Subject of the Exchanges in Which Global IV Participated Meet the Statutory Requirement That Claims Be "Bona Fide Outstanding" ........................................................18

        5.  The Formula Contained Within the Court Order Is Not a Separate Security ...............................................................................27

        6.  The Green Innovations Exchange ..................................................31

i

       7.    An Enforcement Action Based on the Staff's Novel Interpretation of Section 3(a)(10) Would Violate Due Process and Disrupt Settled Market Practice Based on Existing Guidance......................................35

   B.   Broker-Dealer Registration.......................................................................36

       1.    Partners LLC Is Not A Broker-Dealer Within the Meaning of the Securities Laws.........................................................................36

       2.    Global IV Is Not a Broker-Dealer Within the Meaning of the Securities Laws.........................................................................38

       3.    Global IV Is Not An Underwriter .............................................38

       4.    Even If Global IV Were Deemed An Underwriter, Under the Commission's Acqua Wellington No-Action Letter, That Fact Alone Would Not Require Registration As A Broker-Dealer ..................40

       5.    The Purposes of Broker-Dealer Registration Argue Against Alleging that Partners LLC or Global IV Are Broker-Dealers Within the Meaning of the Securities Laws...............................41

       6.    Global IV Is Exempt from Registration Because It Is a Foreign Broker-Dealer .........................................................................43

V.    CONCLUSION.........................................................................................44

## I.   PRELIMINARY STATEMENT

This matter relates to transactions by Ironridge Global IV, Ltd., a British Virgin Islands business company ("Global IV").  Global IV received common stock in exchange for claims against issuers, which it thereafter sold in the open market pursuant to the exemption from registration provided by Section 3(a)(10) of the Securities Act of 1933 ("Securities Act"), as amended, which is available without any action by the Division of Corporation Finance ("Division") of the U.S. Securities and Exchange Commission ("Commission"), and pursuant to the foreign broker-dealer registration exemption provided by Rule 15a-6(b)(3) of the Securities Exchange Act of 1934, as amended ("Exchange Act").

Prior to each exchange, Global IV received approval of the fairness of the terms and conditions of the exchange from the Superior Court of the State of California, following a hearing where the court was advised that the issuer would rely on the Section 3(a)(10) exemption upon the court's approval of the transaction.  In each case the court was provided with relevant transaction documentation and Staff Legal Bulletin No. 3A ("SLB 3A"), which provides the Division's views regarding the Section 3(a)(10) exemption from the Securities Act's registration requirements and the Securities Act resale status of securities that are received in such transactions.[1]  The court in every case made an express finding that Global IV owned bona fide outstanding claims against the issuer and that the shares of common stock issued in the exchange would be exempt under Section 3(a)(10) and free trading, and entered a final and binding order to that effect.  In each case Global IV also received written legal opinions from counsel for the issuer and its own securities lawyers, and promptly filed a Schedule 13G with the Commission disclosing the exchange prior to selling any stock.

On July 23, 2014, the staff of the Commission ("Staff") notified Global IV's parent company, Ironridge Global Partners, LLC ("Partners LLC"), a Delaware limited liability company, that the Staff had made a preliminary determination to recommend that the Commission institute an administrative enforcement action against Partners LLC for alleged violations of Section 5 of the Securities Act and Section 15(a) of the Exchange Act due to Global IV's sales of the common stock it received in the Section 3(a)(10) exchanges, and invited Partners LLC to make a Wells submission.  To the best of Partners LLC's knowledge, the Staff has neither contacted nor attempted any such notification to Global IV.  Partners LLC was not a party to any of the exchanges that are the subject of the Staff's preliminary determination, has never engaged in a Section 3(a)(10) exchange, has never received or sold any shares of common stock, and does not even have a brokerage account.  As has been recognized in a ruling by United States District Court for the Southern District of New York, Partners LLC and Global IV

---

[1] SEC Staff Legal Bulletin No. 3A (June 18, 2008).

are separate legal entities and allegations as to one does not confer jurisdiction on the other.[2] Therefore, Partners LLC is not a proper subject of any enforcement recommendation.[3]

Notwithstanding the above, we observe that there are fatal defects in the legal theories advanced by the Staff in support of the proposed action, regardless of the party to be charged. Accordingly, we urge the Staff not to make any enforcement recommendation against any party relating to these transactions.

## II.    SUMMARY OF ARGUMENT

Section 3(a)(10) is a legislatively created exemption to the requirement that securities be registered with the Commission before they can be offered or sold in that exemption, Congress provided that courts or other specifically authorized government entities — and not the Commission — would review and approve the issuance of securities in exchange for, among other things, bona fide outstanding claims. Congress provided that, subject to compliance with particular procedural requirements and following a fairness hearing and approval by a judge or other expressly authorized tribunal, the securities would be exempt from the Securities Act.

What is now Section 3(a)(10) was originally adopted as part of the Securities Act and then amended and recodified to ensure broader application as part of the adoption of the Exchange Act the following year.[4] Congress' express objective in adopting the amendments to the Securities Act, as stated in the legislative history, was to address "complaints that the present act is too drastic, and is interfering with business." 78 CONG. REC. 8668 (1934) (statement of Senator Duncan Fletcher). With regard to the Section 3(a)(10) exemption in particular, the objective was to "*substantially extend* the present provisions [originally in Section 4 of the Securities Act] in order to cover various forms of readjustments of the rights of holders of outstanding securities, claims and property interests, where *the holders will be protected by court supervision* of the conditions of the issuance of their new securities." *Id.* (emphasis added). Congress did not require that the Commission be named as a party in the proceeding or given notice of the hearing. The legislative history also provides guidance as to the meaning of language included in the exemption that is at issue here, as it explains that "[b]y the requirement that securities, claims and property interests must be bona fide outstanding, the new section will provide protection against resort to the exemption for the purpose of evading the registration

---

[2] *NewLead Holdings Ltd. v. Ironridge Global IV, Ltd.*, No. 14CV3945, 2014 WL 2619588, at *4-5 (S.D.N.Y. June 11, 2014).

[3] There is no basis to disregard Partners LLC and Global IV's distinct corporate forms. "The doctrine of piercing the corporate veil . . . is the rare exception, applied in the case of fraud or certain other exceptional circumstances . . . ." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). The Staff has not, and could not, allege any kind of fraud or bad faith here. *See also SEC v. Hickey*, 322 F.3d 1123 (9th Cir. 2003) (rejecting SEC's argument for piercing the corporate veil because ownership and the specter of fraud are prerequisites to piercing under California law); Daniel R. Lehl, et al., Exchange Act Release No. 45955 (May 17, 2002) (rejecting the SEC's theory for piercing the corporate veil).

[4] A narrower exemption had originally been included in Section 4 of the Securities Act, which exempts only transactions. The amendment broadened the exemption and moved it to Section 3, which entirely exempts the securities. *See* Bruce H. Matson, *Fairness Requirement in Section 3(a)(10) of the Securities Act of 1933*, 23 WM. & MARY L. REV. 549, 551 (1982).

requirements of the act." *Id.* Moreover, "[t]he primary purpose of the amendment is to make clear that the exemptions accorded [by the new sections 3(a)(9), (10) and (11)] extend beyond the particular transactions therein covered, to the security itself." *Id.*

The Section 3(a)(10) exchanges that are at issue in this matter were carefully designed by experienced securities counsel to ensure compliance with the procedural and substantive requirements of Section 3(a)(10), following extensive legal research of the statute, its legislative history, relevant case law, Commission guidance, and law review articles and expert commentary published during the eighty-year history of the exemption.

Strictly following the statutorily mandated process, in all cases a judge of the Superior Court of the State of California correctly found that Global IV owned bona fine outstanding claims against the issuer, and following a hearing on the fairness of the terms and conditions of the exchange, the court approved the exchange and authorized the issuance of exempt shares. The conduct of these exchanges was in full compliance not only with the requirements of Section 3(a)(10), but with no action letters and other interpretive guidance issued by the Division regarding such exchanges. Moreover, the courts were advised that the parties intended to rely on the statute and, to ensure that the judges were fully informed on the applicable law, were provided with SLB 3A.

The Staff is effectively proposing that the Commission reduce the scope of this statutory exemption, not by seeking an amendment of the statute, not by proposing a rule, and not even by issuing guidance. Rather, it proposes that the Commission bring an enforcement action that is premised on entirely novel interpretations of the statute, in direct conflict with the legislative history, that would read the requirement that claims be "bona fide outstanding" to require, not only that the claims be outstanding, but that the circumstances of the exchanging party's ownership of those claims meet some undefined standard that the Staff has invented on a post hoc basis as a means to disqualify Global IV's use of the exemption.

The Commission cannot and should not do so. Not only is the Staff's Section 5 theory inconsistent with the statute, its legislative history and the Division's past guidance, but it would impermissibly collaterally attack scores of valid final judgments in which courts have already rendered contrary rulings on the very issues that underlie the Staff's theory. Moreover, it would attempt to do so with regard to a determination that Congress expressly authorized those courts, and not the Commission, to make. Even if there were some colorable basis for the Staff's approach, which there is not, applying this novel construction for the first time in an administrative enforcement action simply cannot be squared with the requirements of due process.

The Staff's second attempt to reduce the scope of the Section 3(a)(10) exemption is based on a theory that certain of the shares that courts expressly authorized for issuance as part of the exchanges at issue are not shares at all, but rather are somehow akin to an option, simply because the quantity of shares the court authorized to be issued is based on a specific mathematical formula and can, under certain circumstances, depend on the future market price of the issuer's stock. There is no authority supporting the Staff's novel and counterfactual characterization of shares of common stock as an option. Seeking to introduce this new theory by means of an enforcement action would be enormously disruptive, since it would throw into doubt the settled

3

expectations of market participants, based on "no action" positions taken by the Staff, that it is permissible to carry out an exempt exchange where the quantity of securities issued is determined through a formula based on market prices.

Finally, the Staff proposes charges based on a theory that selling exempt securities in the open market requires registration as a broker-dealer. As noted above, Partners LLC has never engaged in any broker-dealer activities of any kind. Although we are not counsel for Global IV in this matter, we observe that its sole involvement was to participate in court approved exchanges, and to thereafter sell the exempt and free trading shares of common stock that it obtained as a result. The assertion that registration as a broker-dealer is required to sell free trading shares of common stock through a brokerage account would be contrary to the statute and interpretive guidance published by the Staff.

The breadth of the novel and unsupported legal theories the Staff proposes to advance here is all the more remarkable given that there is no suggestion of any fraud or concealment in any of the exchanges. Nor could there be, since all the material terms of each transaction are abundantly clear and agreed to by all parties to the exchanges, each of whom was represented by independent counsel, as well as to the courts that reviewed and approved them after full and complete disclosure of all material facts and applicable law. There is also no allegation that the issuers or Global IV, let alone Partners LLC, engaged in any unlawful form of misleading promotion as part of the exchanges. To the contrary, both Global IV and Partners LLC filed Schedule 13Gs fully disclosing their involvement and the materials terms of the exchanges.

We recognize that there is legitimate concern about fraud and manipulation in the market, particularly for small capitalization securities. Those concerns have no expression here. To the contrary, Global IV's exchanges involved the satisfaction of legitimate obligations of genuine companies with promising businesses that employ real people. The Section 3(a)(10) exchanges permitted them meet to their obligations and strengthen their balance sheets, exactly as Congress intended. The Section 3(a)(10) exemption was properly used as an alternative means for issuers to issue securities in exchange for outstanding securities, claims, or property interests such that issuers and claim holders can readjust their rights in a mutually beneficial manner under the supervision of a court. A programmatic concern about misconduct by others in the same market sector supplies no rationale to bring an enforcement action against Global IV for engaging in statutorily compliant transactions that achieve the legitimate objectives of the exemption.

## III.   STATEMENT OF FACTS

### A.   Relevant Entities

#### 1.   Ironridge Global IV, Ltd.

Founded in 2011, Global IV is a British Virgin Islands business company, with its sole place of business in the BVI. Global IV does not have any offices, employees or bank accounts in the United States. It maintains ordinary commercial stock brokerage accounts with licensed U.S. broker-dealers such as TD Ameritrade and Interactive Brokers, as well as with brokerage firms outside the United States. Such brokerage accounts are the sole means by which Global IV

has ever sold any free trading shares of common stock, which are the only securities it has ever sold.

Global IV makes direct equity investments in small public companies. (John C. Kirkland Tr. (Dec. 10, 2013) at 75-78.) It typically does so by means of stock purchase agreements, through which it purchases ordinary, common or preferred stock from issuers. It then holds all of its shares for a period of time, ranging from weeks to months to years, before selling a portion of its common stock into the public markets. Global IV remains a common stockholder of every company it has invested in since inception. It has never, directly or indirectly, engaged in a short sale or in any form of short selling activity. (Brendan O'Neil (Mar. 12, 2014) Tr. at 43.)

Global IV has purchased stock from public companies traded outside the United States in compliance with the applicable regulatory requirements of the relevant country. It has also purchased stock from companies traded in the United States via registered direct ("RD") takedowns of shelf registration statements and private investment in public equity ("PIPE") purchases of restricted stock in reliance upon Regulation S or Regulation D, which is subsequently registered in resale registration statements or after the requisite holding period sold pursuant to Section 4(a)(1) of or Rule 144 promulgated under the Securities Act. In addition, Global IV has purchased outstanding securities from note holders and concurrently entered into agreements with the issuers to convert such securities into common stock which is later sold pursuant to Rule 144 or in reliance upon Section 3(a)(9) of the Securities Act.

Of relevance here, Global IV has also purchased bona fide outstanding claims against issuers and subsequently entered into agreements with the issuers to exchange such claims for common stock which is later sold in reliance upon Section 3(a)(10) of the Securities Act.

## 2.    Ironridge Global Partners, LLC

Partners, LLC is a Delaware limited liability company. (Kirkland Tr. at 26:22-25.) Partners LLC has three subsidiaries that were formed to make direct equity investments in emerging public companies. Two of these, Ironridge Global II, LLC ("Global II") and Ironridge Global III, LLC ("Global III"), are Delaware limited liability companies formed to engage in domestic transactions within the United States. The third, Global IV, was formed to engage in offshore transactions with foreign issuers and in U.S. transactions as a foreign broker-dealer. (Kirkland Tr. at 24:8-16.)

Partners LLC has four individual members, each of whom bring significant and varied experience and expertise to the organization, including with respect to regulatory and compliance matters. They include a licensed securities attorney, an investment banker, and two registered investment advisers. None has ever been the subject of any regulatory or disciplinary proceedings. Partners LLC has no outside investors and funds transactions solely through the principals' own money and internally generated returns.

The directors of Partners LLC include John C. Kirkland, a veteran securities lawyer who has passed the Series 63 exam, Richard H. Kreger, who passed the Series 7, Series 24 and Series 63 exams and was associated with a broker-dealer before joining Partners LLC, Brendan T.

O'Neil, a Chartered Financial Analyst (CFA), and Keith Coulston, both of whom are associated with a registered investment advisor (RIA).

Mr. Kirkland has practiced law for over two decades with a focus on securities transactions and securities litigation. (Kirkland Tr. at 13:1-2, 16:6-23.) He spent the first seven years of his career with Cadwalader, Wickersham & Taft, and has been a full equity partner at several leading law firms, including Greenberg Traurig where he led the firm's West Coast securities practice group. (Kirkland Tr. at 16:19-23.) He is the author of "Practical Approaches to Securities Compliance Issues," *SEC Compliance Best Practices* (Thomson Reuters 2010 ed.), and various articles on securities topics. He has been a licensed attorney in California since 1990 with no record of discipline. (Kirkland Tr. at 12:24-13:2.) He received his B.A. from Columbia University and his J.D. from UCLA School of Law. (Kirkland Tr. at 15:20-22.)

Mr. O'Neil has worked in the financial services industry for over twenty years in positions of increasing responsibility, including as a portfolio manager and investment adviser, at firms including Morgan Stanley and Salomon Smith Barney. (Ex. 33.) He earned the CFA designation and is an RIA in California and a member of the Securities Analysts Association of San Francisco. He received his B.A. in finance and his M.S. in financial analysis from the University of San Francisco.

Mr. Kreger has worked in the financial services industry for over a decade in various positions predominantly as an investment banker with licensed broker-dealers, such as HC Wainwright, and as co-head of investment banking at Source Capital. (Richard Kreger Tr. (Apr. 3, 2014) at 11-19.) He received his B.S. in business administration with a concentration in finance and marketing from the University of Vermont. (Kreger Tr. at 9:8-14.)

Mr. Coulston has worked in the financial services industry for almost twenty years in various positions of increasing responsibility, including as head trader and portfolio manager. (Keith Coulston Tr. (Mar. 12, 2014) at 9:13-14:22.) He received his B.A. in legal studies from University of California, Berkeley.

In conceiving and developing its business model, Partners LLC has been mindful of the regulatory framework in which it operates and has taken care to conduct business in a professional, ethical, and legally compliant manner. (Kirkland Tr. at 19, 21, 54, 93, 259-260, 272-273.)

## B.    The Section 3(a)(10) Exchanges

### 1.    Overview

Global IV identifies promising public companies that are struggling to meet their current obligations and structures solutions that give them an opportunity to strengthen their balance sheets and improve their chances of success. (Kirkland Tr. at 75-78.) It invests in such entities using a variety of transaction structures, including RD offerings, PIPE transactions, and Section 3(a) (9) and Section 3(a)(10) exchanges. (Kirkland Tr. at 139:13:15, 169:13-22; Kreger Tr. at 78:10-21; O'Neil Tr. at 54:1-13.) Section 3(a)(10) exchanges account for approximately a quarter of the total capital that Global IV and Global III have invested. Those exchanges are carried out pursuant to Section 3(a)(10) of the Securities Act, which authorizes the issuance of

exempt securities in exchange for "bona fide outstanding securities, claims or property interests" in a court supervised process provided certain procedural and substantive requirements are met.[5] In a typical transaction Global IV acquires trade payables owed by such companies, which are eligible to be exchanged for securities in that fashion.

Although each transaction is unique and fact specific, as a general matter the Section 3(a)(10) exchanges entered into by Global IV often include the following elements:

- Global IV acquires bona fide outstanding claims by entering into written receivable purchase agreements (RPAs) with one or more of a company's existing trade creditors, which may include vendors such as equipment and product suppliers, or service providers such as law firms and accountants.

- Global IV has a standard form of RPA that was prepared after consultation with counsel. Although payment terms may vary, in each and every case the RPA expressly provides that the creditor sells, transfers and assigns the receivable to Global IV.

- Global IV initiates a court proceeding and enters into a stipulated settlement with the issuer that provides for the exchange of the claims for shares of common stock of the issuer, subject to court approval following a fairness hearing.

- At the parties' joint request, the court holds a hearing at which it considers whether to approve the fairness of the terms and conditions of the agreed upon exchange. The application is supported by declarations from the issuer's Chief Executive Officer ("CEO"), Mr. O'Neil as adviser to Global IV, and Global IV's outside counsel.

- In every case, the court is informed that:
  - o  Global IV acquired the claims by assignment,
  - o  The parties are relying on Section 3(a)(10), and
  - o  Global IV intends to sell the stock it receives in the public market.

- In every case, the court has available to it copies of:
  - o  The RPAs,
  - o  The underlying invoices, purchase orders or other documentation on which the accounts receivable are based, and
  - o  Section 3(a)(10) and SLB 3A.

- In every case, the exchange will proceed only if the court makes all of the following express findings based upon the record and evidence before it:
  - o  Global IV owns bona fide outstanding claims against the issuer,
  - o  The terms and conditions of the exchange are approved by the court, after a hearing upon the fairness of such terms and conditions,

---

[5] 15 U.S.C. §77c(a)(10).

o   Global IV is the only person to whom it is proposed to issue securities in such exchange,

o   The parties' extensive written stipulation that sets forth all relevant circumstances in detail is approved in its entirety, and

o   The issuer shall issue free-trading shares of common stock to Global IV.

Although each judge controls his or her own courtroom and the length of the hearing varies, typically Global IV's experienced trial counsel explains the material elements of the exchange to the court, including the assignment of the claims, the payment terms of the RPAs, and the formula that will determine the number of shares of common stock to be issued to Global IV. Cases are randomly assigned, and Global IV has appeared before numerous judges. However, the comments of the Honorable Norman P. Tarle, Judge of the Superior Court of the County of Los Angeles, following thorough review of the documentation and extensive questioning of both parties' counsel concerning the nature and effect of the exchange, are illustrative:

> The court does make a finding that the terms and conditions of the exchange are fair to the creditor and to the plaintiff in this case to whom the securities will be issued. The court does find that this is a highly sophisticated transaction and commends the parties for its work on this. And I'm very impressed to tell you the truth. And the court will approve this, certainly, and sign . . . an order.[6]

This reaction is no accident. To insure that the exchanges are legally compliant, Global IV utilizes a rigorous, multi-step process to screen, structure, and effectuate the Section 3(a)(10) exchanges it enters into, which are described in more detail below.

### 2.   Global IV's Decision Process

Global IV may choose to invest in promising companies that have pressing current obligations which may threaten their ability to grow or continue in business. Exchanging these outstanding claims for stock provides a means for an issuer to overcome these challenges, clean up its balance sheet, and focus on growing and expanding its business to the potential benefit of all shareholders. (Kirkland Tr. at 75-78.)

Global IV has developed its transaction model based on its observations that Section 3(a)(10) was rarely used by small public companies due to the practical reality that smaller creditors lack the legal resources and sophistication to participate in such transactions. Because of its financial resources Global IV is able to bridge this gap by agreeing to the payment of cash to creditors, while bearing the burden of effectuating the transaction and the risk of accepting common stock as its payment. By voluntarily subordinating itself in the capital structure, agreeing to pay as debt but accepting payment in equity, Global IV's involvement creates a win-win potential to benefit the creditors, the companies and their shareholders.

---

[6] Ex. E, Transcript of Oral Proceedings at 1-10, *Ironridge Global IV, Ltd. v. Sino Ago Food, Inc.*, No. SC114816 (Sup. Ct. L.A. Cnty. Nov. 10, 2011).

8

In assessing a potential investment, Global IV analyzes a company's financial statements, business model, management, and potential for survival and growth, as well as the issuer's secondary market characteristics, such as the company's stock price, market capitalization, average daily trading volume, and trading volatility. (Kirkland Tr. at 75:15-76:11; Kreger Tr. at 101:2-102:25.) If there is interest in proceeding following that review, extensive due diligence is conducted on the claims that the issuer seeks to exchange for its stock to satisfy itself that they are bona fide outstanding. This due diligence includes gaining an understanding from the issuer of the facts regarding the claims, examining related documents such as invoices, bills, and sales contracts, and speaking directly with the creditors. (O'Neil Tr. at 80:9-17; Kirkland Tr. at 56:1-16, 157; Kreger Tr. at 106:1-107:7.) Before proceeding with an exchange, there are always written and oral communications directly with the company's creditors to confirm the validity, nature, and amount of the claims.[7]

### 3.    Receivable Purchase

Following preliminary negotiations with the issuer about the terms of a potential exchange, Global IV purchases claims from a company's creditors. That purchase is typically documented with a written Receivable Purchase Agreement ("RPA") in which the creditor agrees to an immediate transfer and conveyance of all of its right, title and interest in outstanding accounts receivable to Global IV in exchange for Global IV's agreement to pay the creditor in cash, either immediately or on an agreed schedule. (Kirkland Tr. at 49:18-51:10.) Claims are generally purchased for full value. (Kirkland Tr. at 98:23-25.) In every case, creditors are paid some amount either upon signing or immediately upon approval by the court and initial issuance of shares pursuant to the order. In every case, Global IV has paid each creditor in full.

The RPA is a standard form developed over several years in close consultation with securities counsel. As the Staff is aware, in December 2013 the standard form RPA was modified in response to comments by the Staff. The Staff was provided with a copy of the revised form RPA and advised: "As previously indicated, we believe our practices and procedures fully comply with all applicable laws. We continue to welcome any further input from you in this regard, particularly if you believe any modifications would help to ensure better compliance."[8] No response was received from the Staff. Global IV continued to enter into Section 3(a)(10) exchanges using the standard form agreement, and continued to file Schedule 13Gs with the Commission disclosing the exchanges.

The RPAs include several terms that are carefully crafted to ensure that the transaction complies with the statutory requirements. (Kirkland Tr. at 49-53.) Some of the key provisions generally include:

---

[7] O'Neil Tr. at 80:9-17; Kirkland Tr. at 56:1-16; Kreger Tr. at 106:1-107:7. The due diligence approach is very conservative and Global IV will not proceed with an exchange where there is doubt about the validity, nature, or amount of the claim. The exchange will not proceed if there is any indication that the subject claim may not be bona fide outstanding. As Mr. Kirkland stated colloquially but effectively during his examination, "If [a claim] smells fishy, then we run screaming in the other direction." (Kirkland Tr. at 93:13-14, 93:17-18.)

[8] Letter from John C. Kirkland, Managing Dir. and Gen. Counsel, Ironridge Global Partners, LLC, to Kyle A. Bradley, U.S. Sec. & Exch. Comm'n (Dec. 23, 2013).

- In every case, Global IV's purchase of the claim is immediately effective on the date that Global IV and the creditor sign the RPA. As a result, once the agreement is signed by both parties Global IV always legally owns the creditor's claims and is entitled to take appropriate action to enforce its legal rights. (Kirkland Tr. at 52:23-53:7.)

- Global IV must promptly seek approval of the fairness of the terms and conditions of a settlement between Global IV and the company for satisfaction of the claims by a court, official, or agency authorized to grant such approval. (Ex. 64, SEC-Ironridge-0042245.)

- In every case, Global IV must pay the creditor according to a specified payment schedule. Payment may be made in full immediately upon signing of the RPA before any court approval is sought, it may be due immediately upon entry of the court order, or the initial issuance of shares pursuant to the order, or there may be monthly payments with the court order or the issuance of shares. (Kirkland Tr. at 52:23-53:14.)

- The RPA often defines "approval" of the settlement as "the entry and full effectuation of an order approving settlement of the [r]eceivable." (Ex. 64, SEC- Ironridge-0042245.) Full effectuation of the order occurs when Global IV receives the common stock that the company is obligated to issue to Global IV pursuant to the court's order. (Kirkland Tr. at 103:5-10.) Global IV and the creditor both have the right to terminate the RPA if "approval" has not occurred within 30 days after the date the RPA is signed. (Ex. 64, SEC- Ironridge-0042245.)

- In every case, every creditor has received a significant cash payment when the order is entered and initial shares issued.

- In every case, Global IV has paid every creditor in full.

- The RPA generally includes standard representations by the creditor that underscore Global IV's focus on compliance and the arm's length nature of the relationships among Global IV, the issuer, and the seller of the receivables. These include: (a) the receivable is a bona fide outstanding claim against the company; (b) the company is not paying the creditor to sell the receivable to Global IV; (c) the creditor is not paying the company in exchange for entering into the RPA; and (d) the creditor is not controlled by the company or an affiliate of the company. These provisions are included to help ensure that the creditor's claim is bona fide, that there are no undisclosed arrangements between the creditor and the company, and that Global IV's payments to the creditor are not flowing back to the company. (Kirkland Tr. at 51:1-10.)

### 4.    Execution of the Exchanges

#### a.    Court Proceedings

After acquiring the receivables through the RPAs, Global IV files a court action in the Superior Court of the State of California in and for the County of Los Angeles. (Kirkland Tr. at 51:11-16.) Global IV typically attaches to the complaints copies of all of the RPAs it has entered with the company's creditors and the underlying documentation supporting the claims. (Kirkland Tr. at 107:23-108:5.) If the documents are voluminous, counsel may show them to the judge in open court in lieu of attaching them to the pleadings. Global IV is represented by

counsel in the litigation, and the issuer is represented by separate counsel of its own selection. (Kirkland Tr. at 215:7-20; Kreger Tr. at 105:11-22.)

If Global IV and the company are able to reach final agreement for the exchange of Global IV's claims for the issuer's common stock, they enter into a written stipulation for settlement of claims ("settlement agreement"), subject to court approval following a fairness hearing as required by Section 3(a)(10). (Kirkland Tr. at 110; Kreger Tr. at 171:1-172:2.) The settlement agreement expressly states that it is contingent upon obtaining the court's approval of the transaction as required by the Blue Sky provisions of Section 25017(f)(3) of the California Corporations Code[9] and the substantially identical requirement of Section 3(a)(10) of the Securities Act[10] and describes in detail the circumstances, terms and conditions of the settlement.

Like the RPA, the settlement agreement is a standard form developed over several years in close consultation with securities counsel, and is designed to ensure that the exchange complies with the requirements of Section 3(a)(10) and that the court conducting the fairness hearing is fully appraised of the relevant facts and applicable law. Some of the key provisions of the settlement agreement, in addition to those already mentioned, are:

- The company represents that Global IV owns bona fide outstanding claims against the company in a specified amount.

- The stock issued to Global IV can be immediately resold into the public markets without restriction.

- The company must provide a legal opinion, typically furnished by its regular securities counsel, that all shares of common stock to be issued pursuant to the court's order are unrestricted, freely tradable, and exempted from the registration requirements of the Securities Act under Section 3(a)(10). Global IV typically also obtains such an opinion from its own counsel.

- Global IV is prohibited from holding any short position in the company's stock and may not to engage in or effect, directly or indirectly, any short sale until at least 180 days after the end of a measurement period defined by the settlement agreement.

- In every case, Global IV is prohibited from receiving any shares of stock that would cause it to be deemed to beneficially own more than 9.99% of the company's total outstanding shares at any one time.

- In every case, company represents that it has not disclosed any material non-public information, and company is prohibited from providing Global IV or its representatives with any material non-public information in the future.

- In every case, Global IV is prohibited from voting any shares of the company, or from engaging in any control conduct that might make it an affiliate. In every case, this provision cannot be waived without court order.

---

[9] Cal. Corp. Code § 25017(f)(3).

[10] 15 U.S.C. § 77c(a)(10).

- The settlement agreement provides that shares initially will be issued in an amount that represents a discount to the market price at the closing of the transaction. In addition, the agreement includes a pricing term that provides for the issuance of additional shares in the event the share price declines during a defined measurement period following the effectuation of the transaction.

### b.   Fairness Hearings

Global IV and the company jointly file a motion to submit the proposed settlement to the court for its review, and request a fairness hearing to approve the settlement. (Kirkland Tr. at 51:11-18.) The moving papers notify the court that upon its determination that the proposed settlement is fair, the company intends to issue stock to Global IV in exchange for settling its claims against the company. (Kirkland Tr. at 51:1-52:22.) It also notifies the court that the company will rely on Section 25017(f)(3) of the California Corporations Code and Section 3(a)(10) of the Securities Act to issue unregistered free trading securities based on the court's approval of the transaction. (Kirkland Tr. at 51:24-52:7.)

In support of the motion, Global IV and the company submit to the court: (a) the settlement agreement; (b) a proposed order for approval of the settlement agreement; (c) a memorandum of points and authorities that explains the requirements for a Section 3(a)(10) exchange transaction; (d) a copy of Section 3(a)(10); (e) a copy of SLB 3A, which provides the Division's views regarding the Section 3(a)(10) exemption;[11] (f) a declaration from an officer of the company (typically the CEO or Chief Financial Officer ("CFO")) explaining the factual basis for the claims and that the settlement has been considered by its board of directors and found to be fair and in the best interests of the company's shareholders; (g) a declaration from a financial advisor to Global IV stating that the terms and conditions of the issuance and exchange are fair to Global IV; and (h) copies of the RPA and supporting invoices or other underlying documents. (Kirkland Tr. at 107:21-108:21; O'Neil Tr. at 82:1-17.)

As a result of these extensive submissions, at the fairness hearing the court has before it documentation describing in detail every material term of the transaction. In particular, it has the form of the RPA by which Global IV obtained ownership of the claims by assignment, including the payment terms thereof, as well as the terms of the settlement with the company, including the exchange and price protection term. Indeed, as explained to the court, the pricing formula that determines the number of shares to be issued is a material part of why the exchange is fair to Global IV.

At the fairness hearing, counsel for the company and counsel for Global IV are both present to explain the basis for their request and answer any questions the court has for them. (O'Neil Tr. at 82:15-17; Kirkland Tr. at 51:24-52:15, 97:5-20, 109:6-10.) After reviewing the motion and other documents and hearing from counsel, if the court finds the terms and conditions of the transaction to be fair, it will issue an order approving the settlement agreement and the issuance of exempt free-trading shares. (Kreger Tr. at 109:7-9; Kirkland Tr. at 52:16; O'Neil 83:11-16.)

---

[11] SEC Staff Legal Bulletin No. 3A (June 18, 2008).

In every case, promptly following approval, Global IV files a Schedule 13G with the Commission that discloses the Section 3(a)(10) exchange and sets forth the mathematical formula for determining the number of shares it will be owed under the order for all to see.[12] (Kirkland Tr. at 127:21-21; O'Neil Tr. at 114:11-12.)  Typically, Global IV files the Schedule 13G before the stock market opens on the day after the court order approving the settlement and in every case it is filed before Global IV sells any shares.  (Kirkland Tr. at 131:25-132:1.) Global IV also encourages the issuer to disclose the transaction by filing a Current Report on Form 8-K with the Commission.  (Kirkland Tr. at 131:25-132:7, 134:6-10; O'Neil Tr. at 114:11-115:5.)

### c.    Issuances of Stock

After the court issues an order approving the Section 3(a)(10) transaction, the company must issue stock and deliver it to Global IV.  (Kirkland Tr. at 59:3-20, 103:21-25.)  As part of that process, Global IV's counsel and the company's counsel must independently review the transaction to determine whether it satisfies the requirements of Section 3(a)(10).  (O'Neil Tr. at 81:19-24, 84:5-10; Kirkland Tr. at 52:16-19.)  If Global IV's counsel concludes that it does, counsel issues an opinion letter to Global IV.  (O'Neil Tr. at 84:5-19.)  Likewise, if the company's counsel concludes that it does, counsel issues an opinion letter to the company's transfer agent stating that the shares are exempt from registration under Section 3(a)(10). (Kirkland Tr. at 52:1-17.)

In addition to the parties, the transfer agent, receiving broker and clearing broker each typically have their own due diligence process.  In the case of a Section 3(a)(10) exchange, this normally includes obtaining and reviewing copies of the court order, stipulation, RPAs and underlying invoices.  Following satisfactory compliance review by the transfer agent, the transfer agent will issue stock to Global IV.  Similarly, following satisfactory compliance review by the broker, the broker will accept the shares and allow them to be sold.

### 5.    Global IV's Sales of Stock

At some point after delivery of the stock to Global IV's brokerage accounts, typically several weeks after shares have been issued and all creditors have been paid some or all of their money, Global IV begins sales of its stock.  Generally, Global IV sells a portion of its position in a company over the next several months depending on market conditions.  Global IV only engages in long sales.  It does not short sell stocks.  (O'Neil Tr. at 43:18-21.)  Also, it has no margin accounts, does not margin its holdings, and keeps its shares only in cash accounts, so that the shares it holds cannot be borrowed or used to cover anyone else's short position.

---

[12] *Transcon Lines v. A. G. Becker Inc.*, 470 F. Supp. 356, 377 (S.D.N.Y. 1979) ("Moreover, the price at which an issuer's stock is selling is a matter of public information and we see no basis for holding that Section 13(d)(1) requires a party filing Schedule 13D to calculate the number of shares that a given sum of money will purchase, especially when that number will change from day to day and can be calculated by anyone interested in the information.").  *See also Standard Metals Corp. v. Tomlin*, 503 F. Supp. 586, 602 (S.D.N.Y. 1980) ("Moreover, the most recent 13D filed by the Gaylord defendants is sufficient to place shareholders and potential investors on notice as to any possibility of a change in corporate control.").

Though each situation is fact specific Global IV typically does not sell any shares for at least several weeks, in order to provide an opportunity for the share price to appreciate following the exchange and for observation of the secondary market and ongoing analysis of various factors such as the company's business performance, stock performance, and overall stock market conditions. (O'Neil Tr. at 89:17-90:2, 87; Kreger Tr. at 61:7-9; 175:1-10; Coulston Tr. at 36:24-37:4.) When Global IV sells shares, it tries to do so in a manner that does not have an overly negative impact on the share price. Although there are exceptions, for example, when the share price is rising on heavy volume. Global IV generally attempts to represent a minority of the trading volume on a given day. (O'Neil Tr. at 89:11-13.)

## IV.   ARGUMENT

### A.   Securities Registration

#### 1.   Section 5 of the Securities Act and the Section 3(a)(10) Exemption

Section 5 of the Securities Act prohibits the offer or sale of securities unless the securities are registered or exempt from registration.[13] Section 3(a)(10) of the Securities Act provides an exemption from registration for:

> [A]ny security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, or partly in such exchange and partly for cash, where the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in such exchange shall have the right to appear, by any court, or by any official or agency of the United States, or by any State or Territorial banking or insurance commission or other governmental authority expressly authorized by law to grant such approval.[14]

The Division's SLB 3A expresses the Staff's view as to what is required to meet the requirements of Section 3(a)(10).[15] As described in SLB 3A, securities fall within that exemption where the following conditions are met:

---

[13] 15 U.S.C § 77e(a) ("Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale."); 15 U.S.C § 77c(a) ("[T]he provisions of this subchapter shall not apply to any of the following classes of securities . . . .").

[14] 15 U.S.C. §77c(a)(10).

[15] SEC Staff Legal Bulletin No. 3A (June 18, 2008). The Staff derives these conditions from the language of Section 3(a)(10) and the positions expressed in the Commission's interpretive release regarding Section 3(a)(10). SEC Staff Legal Bulletin No. 3A (June 18, 2008) (citing Securities Act of 1933, Release No. 312, 1935 LEXIS 516 (March 15, 1935)).

- "The securities must be issued in exchange for one or more bona fide outstanding securities, claims, or property interests; they cannot be offered for cash." SEC Staff Legal Bulletin No. 3A (June 18, 2008).[16]

- "A court or authorized governmental entity must approve the fairness of the terms and conditions of the exchange." *Id.*

- "The court or authorized governmental entity must hold a hearing before approving the fairness of the terms and conditions of the transaction." *Id.*

- "The fairness hearing must be open to everyone to whom securities would be issued in the proposed exchange," "[a]dequate notice must be given to all those persons," and "[t]here cannot be any improper impediments to the appearance by those persons at the hearing." *Id.*

- Before the hearing, the court or governmental entity must be notified that the issuer will rely on the Section 3(a)(10) exemption based on the court's or governmental entity's approval of the transaction. *Id.*

- The court or governmental entity, before approving the transaction, must find "that the terms and conditions of the exchange are fair to those to whom securities will be issued."[17] *Id.*

If a court finds that the issuer complies with these conditions then it can rely on the Section 3(a)(10) exemption to issue unregistered securities without any action by the Staff or the Commission.[18] Section 3(a)(10) creates a legislative presumption that the procedural protections afforded by this exception are a full and sufficient substitute for the registration requirement of Section 5. Matthew Bender, Securities Law Techniques § 6.01 (2014) ("[Section 3(a)(10)] reflects the policy decision that the prophylactic effects of registration and disclosure are not required where the merits of a proposed transaction have been passed upon by a court or other appropriate governmental authority."). *See also SEC v. Tex. Intern. Co.*, 498 F. Supp. 1231, 1242 (N.D. Ill. 1980) (Section 3(a)(10) "operate[s] on the assumption that the judicial scrutiny provided during the approval and fairness hearings in reorganization proceedings are an adequate substitute for the normal SEC oversight of such transactions."); Securities Act Release No. 312, 1935 LEXIS 516 (March 15, 1935) ("the whole justification for the exemption afforded by section 3(a)(10) is that the examination and approval by the body in question the issue in question is a substitute for the protection afforded to the investor by the information which would otherwise be made available to him through registration."); 78 CONG. REC. 8185 (1934) (statement of Senator Duncan Fletcher) (investors receiving securities issued in a Section

---

[16] We note that this assertion is contrary to the plain language of the statute, which expressly allows for shares to be exchanged "partly for cash." *See City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1864 (2013) ("'If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.'") (quoting *Chevron v. Natural Res. Def. Council*, 467 U.S. 837, 842-43 (1984)).

[17] If a governmental entity holds the fairness hearing an additional condition must be met. The governmental entity must be expressly authorized by law to hold a fairness hearing. SEC Staff Legal Bulletin No. 3A (June 18, 2008).

[18] SEC Staff Legal Bulletin No. 3A (June 18, 2008).

3(a)(10) exchange transaction "will be protected by court supervision of the conditions of the issuance of their new securities.").

Accordingly, the Staff's case must be grounded in the language of the statute and depend on proof that an exchange does not satisfy one or more of the conditions in Section 3(a)(10), such that the protection Congress decided is sufficient was somehow not adequately implemented. In particular, the Staff cannot challenge Section 3(a)(10) exchanges on the ground that they are inconsistent with the Staff's view of the spirit of the registration provisions.[19] As one court held when it rejected a previous Commission attempt to take an expansive view of the registration regime, the Commission may not interpret the registration provisions based on its view of the practical substance of a transaction when its position "neither comports with the plain textual meaning of Section 5 nor advances the statute's underlying purpose." *SEC v. Lyon*, 529 F. Supp. 2d 444, 455 (S.D.N.Y. 2008) (rejecting the SEC's position that short sales made with the intention of covering through a registered PIPE offering violated Section 5 of the Securities Act).

**2.      The Staff's Position With Regard to the Section 3(a)(10) Exchanges Involving Global IV**

In describing its proposed Section 5 case during the Wells process, the Staff informed us that it does not take issue with the compliance with any of the procedural or substantive protections included in the statutory exemption. In particular, the Staff indicated that:

- It does not take issue with the fact that the claims at issue are actual claims that were outstanding (i.e., lawful obligations of the issuer) at the time of the exchange.[20]

- It does not take issue with the judicial process through which the shares were authorized to be issued in satisfaction of those claims, including the authorization of the court to conduct the fairness hearing and approve the issuance of the securities, the adequacy of notice, or the adequacy of the hearing itself.

- It does not contend that the information provided to the court was false or materially incomplete.

---

[19] Commission rules implementing other exemptions the Commission administers provide that even if transactions are in technical compliance with the regulatory requirements it can still challenge the availability of the exemption if it concludes the transactions are part of a "scheme to evade the registration provisions of the Act." *See, e.g.*, 17 C.F.R. 230.500(f) (Regulation D) ("In view of the objectives of Regulation D and the policies underlying the Act, Regulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with Regulation D, is part of a plan or scheme to evade the registration provisions of the Act. In such cases, registration under the Act is required."); 17 C.F.R. 230.144 (Rule 144) ("The Rule 144 safe harbor is not available to any person with respect to any transaction or series of transactions that, although in technical compliance with Rule 144, is part of a plan or scheme to evade the registration requirements of the Act"). That argument is not available to the Commission under Section 3(a)(10).

[20] The Staff asserts that some of the claims that Global IV exchanged for stock of one issuer were related to inventory purchases made in connection with the exchange transaction, and that it may take issue with whether those claims were outstanding. Because we believe the Staff's view is based on a misunderstanding of both the facts and the law in that transaction, we have addressed it in detail in Section IV.A.5 of this memorandum.

- It does not contend that notice to the court indicating that the issuer would rely on its fairness determination to issue securities under the Section 3(a)(10) exemption was deficient.

- It does not contend that the fairness determinations were substantively flawed, at least as to Global IV.[21]

Rather, the Staff has expressed the opinion that the exchanges in which Global IV participated should not have been found by the court to comply with Section 3(a)(10), in whole or in part, for two reasons. First, the Staff contends that because the RPA, in some cases, provides that Global IV's payments to creditors will be made after a court approves the transaction and the company issues shares to Global IV pursuant to the order, the claims that the court authorized to be exchanged were not "bona fide" (rather than "bona fide outstanding") within the meaning of Section 3(a)(10). Second, the Staff contends that the mathematical formula within the court's order that determines the number of shares to be issued, which provides for the issuance of additional shares in the event the issuer's market price declines during the measurement period agreed to in the settlement agreement, creates what amounts to a "privilege" on a security which the Staff analogizes to an option or warrant which somehow means that shares issued under this provision must be registered notwithstanding the court's approval.

Never in the 80-year history of the Section 3(a)(10) exemption has the Commission advanced the interpretations on which the Staff's Section 5 theories rest. For the reasons set forth below, neither theory offered by the Staff provides a basis to retroactively challenge the state courts' approvals of the exchanges in which Global IV participated.

### 3. The Staff's Statutory Interpretation of Section 3(a)(10) Is Not Entitled to Deference

The Staff's novel interpretation of the meaning of Section 3(a)(10) will not be entitled to deference under either the *Chevron*[22] or *Skidmore* standards.[23] First, the Staff's interpretation is not entitled to *Chevron* deference because (i) the meaning of Section 3(a)(10) is clear and unambiguous;[24] (ii) Congress did not delegate rulemaking authority to the Commission for

---

[21] The Staff suggested it may hold the view that the transactions were not fair to the market as a whole. As noted above, in each case the courts concluded that Global IV was the only person issued securities in the exchange and the only party entitled to notice. In addition, Global IV requires as a term of the settlement agreement that the proposed exchange be reviewed by the issuer's board and that the board conclude the transaction is fair and in the best interests of its shareholders before entering into the settlement agreement. Although it is difficult to imagine the criteria a court might apply in assessing whether a proposed bilateral exchange is fair to the market as a whole, as discussed below, such an amorphous and open-ended determination is not contemplated, much less required, by Section 3(a)(10).

[22] *Chevron v. Natural Res. Def. Council*, 467 U.S. 837 (1984).

[23] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

[24] *Chevron*, 467 U.S. at 843 n.9 ("If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.").

Section 3(a)(10),[25] and, even if it had, the Staff's interpretation is not the product of notice-and-comment rulemaking or formal adjudication;[26] and (iii) the Staff's interpretation appears to be a "convenient litigation position" merely developed to bring an enforcement action against Partners LLC and deference, therefore, is "entirely inappropriate."[27] Second, the Staff's interpretation is not entitled to *Skidmore* deference because, as thoroughly described below, it is an unpersuasive *ad hoc* interpretation developed for this case, is in conflict with the Staff's past guidance, and would produce arbitrarily disparate results.[28]

> **4.     The Claims That Are the Subject of the Exchanges in Which Global IV Participated Meet the Statutory Requirement That Claims Be "Bona Fide Outstanding"**

The Staff's contention that Global IV's ownership of the claims is not bona fide is inconsistent with the plain language of the statute, the legislative history, and the Staff's prior interpretations of that provision. In significant respects the Staff's position is at odds with well-settled practice under the exemption, and an enforcement action premised on the Staff's theories threatens to disrupt the use of Section 3(a)(10) exchanges in a wide variety of contexts.

> **a.     The Staff's Interpretation Is Inconsistent With the Statutory Language**

The Staff's position rests on its interpretation of the language in Section 3(a)(10) stating that it covers "bona fide outstanding securities, claims or property interests." Under the Staff's interpretation of that language, "bona fide" modifies "claims" rather than "outstanding" and therefore the availability of the exemption can depend on the Staff's post hoc assessment of the quality of the claim or the quality of the owner's title to that claim. Because the Staff asserts the payment provision in the RPA renders Global IV's interest in the claims not "bona fide," it contends that Global IV's claims are not eligible for a Section 3(a)(10) exchange.

The Supreme Court has repeatedly held that statutory construction must "'start, of course, with the statutory text.'" *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) (quoting *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006)). *See also Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) ("In a statutory construction case, the beginning point must be the language

---

[25] Quite to the contrary, the statute and its legislative history make clear that the court reviewing the exchange, not the Commission, should determine whether the terms and conditions of the exchange are fair.

[26] *United States v. Mead Corp.*, 533 U.S. 218, 226-227 (2001) (holding that "administrative implementation of a particular statutory provision qualifies Chevron deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.")

[27] *Bowen v Georgetown Univ. Hosp.*, 488 US 204, 213 (1988) (holding that "[d]eference to what appears to be nothing more than an agency's convenient litigating position would be entirely inappropriate.").

[28] *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) ("'The weight [accorded to an administrative] judgment in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'") (quoting *Skidmore*, 323 at 134).

of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."). "When the language of a statute is clear and unambiguous and conveys a clear and definite meaning, the statute must be given its plain and ordinary meaning." *Mike Smith Pontiac, GMC, Inc. v. Mercedes-Benz of North America, Inc.*, 32 F.3d 528, 531 (11th Cir. 1994) (quotations and citations omitted). "In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy." *Crandon v. United States*, 494 U.S. 152, 158 (1990). *See also K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.").

When possible, statutory language should be interpreted to further, rather than undermine, the purpose of a statute. *See, e.g., Kasten v. Saint-Gobain Performance Plastics*, 131 S. Ct. 1325, 1333 (2011) (holding that the phrase "filed any complaint" in the anti-retaliation provision of the Fair Labor Standards Act includes oral and written complaints because, *inter alia*, "an interpretation that limited the provision's coverage to written complaints would undermine the Act's basic objectives."); *Ransom v. FIA Card Servs.*, 131 S.Ct. 716, 725 (2011) (holding that the term "applicable" in the means test provision of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 should be interpreted to "best achieve[]" the Act's purpose); *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944), *superseded, in part, by statute on other grounds*, Portal-to-Portal Act, 29 U.S.C. § 254 as recognized by *Kitchen v. WSCO Petroleum Corp.*, 481 F. Supp. 2d 1136, 1152 (D. Org. 2007) (stating that the Fair Labor Standards Act's "remedial and humanitarian . . . purpose" cautions against "narrow, grudging" interpretations of its language). Moreover, it is a "fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used." *Deal v. United States*, 508 U.S. 129, 132 (1993). *See also Johnson v. United States*, 130 S. Ct. 1265, 1270 (2010) ("[u]ltimately, context determines meaning."); *McCarthy*, 500 U.S. at 139 ("[S]tatutory language must always be read in its proper context.").

The plain meaning of Section 3(a)(10) is clear from the statutory language and the context in which it is used. The grammatical structure of the language used in the sentence at issue is that "bona fide outstanding" is a unitary adverbial phrase that modifies the word "claims." As such, the focus in the statute on claims that are "bona fide outstanding" is whether they represent actual claims against the company. Nothing in the language of Section 3(a)(10) suggests the phrase "bona fide outstanding" relates to the quality of the claim or the claimant's title.

Moreover, the language and design of the Securities Act as a whole does not support such a suggestion. In Section 3(a)(9) of the Securities Act, which immediately precedes Section 3(a)(10) and was adopted as part of the same amendment, Congress expressly conditioned the availability of the exemption on the character of the exchanging party's interest. Section 3(a)(9) exempts from the registration requirements of Section 5 "any security exchanged by the issuer with its *existing security holders exclusively* where no commission or other remuneration is paid or given directly or indirectly for soliciting such exchange." 15 U.S.C. §77c(a)(9) (emphasis added). The fact that Congress created no such condition in Section 3(a)(10) indicates that it did not intend for there to be one, and underscores that the phrase "bona fide outstanding" does not

19

limit Section 3(a)(10) exchanges based on the quality of the claim or the claimant's title. *See, e.g., Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) (holding that Congress did not intend Resource Conservation and Recovery Act to create a private right of action to recover cost of removing toxic waste because statute lacks language like that used to create such an action in analogous statute); *Cent. Bank of Denver v. First Interstate Bank*, 511 U.S. 164, 176-77 (1994) (holding that Congress did not intend to impose "aiding and abetting" liability under Section 10(b) of the Exchange Act because it did not use the words "aid" and "abet" in the statutory text as it has in other statutes).

Even if there were any ambiguity about the meaning of the phrase "bona fide outstanding" claims, the legislative history concerning the adoption of Section 3(a)(10) makes abundantly clear that the Staff's interpretation is incorrect. During the Senate debate concerning Section 3(a)(10), Senator Duncan Fletcher, who proposed the amendment that included the language at issue, explained its meaning and purpose, stating that "[b]y the requirement that securities, claims, and property interest must be bona fide outstanding, the new section will provide protection against resort to the exemption for the purpose of evading the registration requirements of the [Securities Act]." 78 CONG. REC. 8185 (1934) (statement of Senator Duncan Fletcher). Thus, the purpose of the "bona fide outstanding" requirement is to ensure that the claims are actually outstanding. Since the Staff does not dispute that the claims Global IV exchanged were actual, non-fraudulent obligations of issuers, their assertion that Global IV's claims were not bona fide is without merit.

The Staff's formal guidance on Section 3(a)(10) has never advanced the interpretation on which the Staff now relies and that guidance conflicts with the position that phrase "bona fide outstanding" relates to the quality of the claim or the claimant's title. In fact, the Staff has acknowledged that the bona fide outstanding requirement of Section 3(a)(10) "generally does not raise interpretive issues." SEC Staff Legal Bulletin No. 3A (June 18, 2008). This requirement does not raise interpretive issues because it does not contemplate retroactive challenges to the quality of title to claims of the kind the Staff now advances.

The incoherence of the Staff's proposed interpretation is evident from the fact that it produces arbitrarily disparate results, foreclosing the exemption under circumstances that do nothing to advance the purposes of the statute. The legislatively created exemption to registration is based on the fact that the procedural and substantive protections of Section 3(a)(10) are a sufficient substitute for registration in protecting investors that obtain securities pursuant to an exchange. As interpreted by the Staff, the issuer in each of the transactions at issue here would be free to issue exempt securities to the original creditors in exchange for their claims, or even to acquirers of or successors to those claims in the absence of the payment provision contained in the RPA. But there is nothing about the fact that the claims have been sold, or that the parties to the RPAs, in some cases, agreed to schedule payments based on the occurrence of certain events, that affects in any way the efficacy of the procedural and substantive protections of Section 3(a)(10) as applied here.

b.   **The Staff's New Focus on the Quality of the Claims Is Inconsistent with Long-Standing Staff Guidance and Would, If Adopted, Substantially Disrupt Settled Expectations Regarding the Use of the Exemption**

The Staff's interpretation that the "bona fide outstanding" claims requirement of Section 3(a)(10) relates to the quality of the claim conflicts with and would disrupt the long-standing practice of using the exemption to resolve disputed claims. Indeed, the Commission has itself employed the exemption to resolve its own litigation under circumstances that would be impermissible under the Staff's current theory. In *SEC v. Blinder Robinson Co.*, the Commission affirmatively sought district court approval of a Section 3(a)(10) exchange to settle an enforcement action. 511 F. Supp. 799, 801 (D. Colo. 1981). The terms of the exchange under the settlement approved by the Commission illustrates the flexibility of this exemption to resolve uncertain and disputed claims. The court was asked to approve the issuance of securities in exchange for releases from investors who *might* have claims against the defendant, notwithstanding that the defendant did not admit the Commission's allegations and the recipient investors had not asserted any claims. *Id.* Indeed, in virtually every class action settlement in which Section 3(a)(10) has ever been utilized the issuer vigorously disputes the claims.

The Staff has also repeatedly given its approval to the use of Section 3(a)(10) exchanges to settle private litigation where claims are in dispute and uncertain. *See, e.g.*, I.I.S. Intelligent Information Systems Ltd., SEC No Action Letter, 2000 SEC No-Act. LEXIS 632 (May 9, 2000) (class action settlement); Windmere Corp., SEC No Action Letter, 1992 SEC No-Act. LEXIS 669 (May 20, 1992) (class action settlement); Carolco Pictures Inc., SEC No Action Letter, 1991 SEC No-Act. LEXIS 89 (Jan. 23, 1991) (litigation settlement); Riverbend International Corp., SEC No Action Letter, 1990 SEC No-Act. LEXIS 631 (Mar. 30, 1990) (litigation settlement).

The Staff's interpretation, disregards that guidance and practice, as it would require a predicate determination on the merits to conclude that claims are eligible for exchange. Perhaps most importantly, allowing the Staff to retroactively challenge before an administrative law judge the findings of the reviewing court and the validity of the exemption years after the fact would interpose massive uncertainty into the process. It would necessarily mean that contested claims cannot be settled utilizing the Section 3(a)(10) exemption.

c.   **The Proposed Enforcement Action is an Impermissible Attempt to Attack a Judicial Determination Made in Each Case that Claims Were Exchangeable**

In all of Global IV's Section 3(a)(10) transactions, a state court acting pursuant to all of the required statutory processes, made a judicial determination that Global IV owned bona fide outstanding claims that were exchangeable for securities from the issuer. Each judge reached his or her decision after considering the parties' motions and substantial accompanying papers (including copies of the RPAs that Staff now relies on to support its contrary view), and the Staff's only published guidance regarding Section 3(a)(10) in SLB 3A.

As is evident from the text of the statute and the related legislative history, Congress specifically empowered courts to supervise Section 3(a)(10) transactions by conducting a

21

fairness hearing and determining whether an exchange meets the requirements of the statute, including the bona fide outstanding claims requirement. The extent of Congress's deference to courts and other authorized government entities to administer this exception is evident from the fact that Congress did not require the parties in a Section 3(a)(10) exchange to obtain Commission approval or even provide notice of the fairness hearing to the Commission. Instead, Congress gave courts and authorized governmental entities plenary authority to approve Section 3(a)(10) exchanges.

A state court is an entirely appropriate body to exercise that jurisdiction. State courts routinely evaluate whether claims are bona fide rather than fraudulent, whether parties have followed procedural rules such as notice and hearing requirements, and whether settlements are fair to the parties involved. Specifically, a state court in California is best suited to determine based on California law whether a creditor's assignment of a claim to Global IV is valid, whether Global IV owns a claim against an issuer that is bona fide outstanding, and whether Global IV has standing to sue an issuer for breach of contract. Federal courts recognize this obvious fact, which is why they must defer to state courts' interpretations of state law when they interpret state law. *See, e.g., Bush v. Palm Beach Cnty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam) ("As a general rule, this Court defers to a state court's interpretation of a state statute."); *United States v. Fernandez-Antonia*, 278 F.3d 150, 162 (2d Cir. 2002) ("It is axiomatic, however, that when interpreting state statutes federal courts defer to state courts' interpretation of their own statutes."). Similarly, in the absence of exceptional circumstances, federal courts defer to state-court factual findings. *See, e.g., Hernandez v. New York*, 500 U.S. 352, 366 (1991) ("[I]n the absence of exceptional circumstances, we would defer to state-court factual findings."); *324 Liquor Corp. v. Duffy*, 479 U.S. 335, 351 (1987); *Cal. Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 111-12 (1980); *Time, Inc. v. Firestone*, 424 U.S. 448, 463 (1976).

The Staff now seeks by an administrative enforcement action to second-guess and effectively overturn the final judgments of the tribunals that Congress selected to administer Section 3(a)(10) exchanges in order to apply its novel and unprecedented statutory construction to historic transactions that have long since been approved and completed. Reopening and relitigating matters that have long been resolved is unwarranted and would create a myriad of problems.[29]

As the Supreme Court has recognized, "[a] fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction . . . cannot be disputed in a subsequent suit between the same parties or their privies . . . .'" *Montana v. United States*, 440 U.S. 147, 153 (1979) (quoting *S. Pac. R. Co. v. United States*, 168 U.S. 1, 48-49 (1897)). These doctrines exist to "preserve the finality of judgments," *Crist v. Bretz*, 437 U.S. 28, 33 (1978),[30] "relieve parties of the cost and vexation of multiple

---

[29] Ex. F, Transcript of Oral Proceedings at 40, 44-47, *Ironridge Global IV, Ltd. v. VelaTel Global Communications Inc.*, No. BC486893 (Sup. Ct. L.A. Cnty. May 21, 2014).

[30] *See also Montana v. United States*, 440 U.S. 147, 153 (1979) ("Application of both doctrines is central to the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdictions.").

lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94 (1980). Whether or not the specific preclusion doctrines technically apply here, the important principles and due regard for finality that underlie these doctrines do apply.

Were the Commission to now insert itself into these historic and long settled exchanges, based on novel and previously unarticulated statutory interpretation, the practical effect would be to overburden and infringe on the authority of the courts, throw into doubt the validity and finality of each of Global IV's numerous Section 3(a)(10) exchanges, create confusion and uncertainty, and disrupt the courts and the markets.

In each exchange, in reliance on validly issued court orders following a process that met the requirements of the statute and the Staff's own guidance, a public company issued freely tradable shares to Global IV, Global IV sold some of those shares in the open market, and unknown third parties bought those shares. An enforcement action premised on the theory that those exchanges were invalid would undermine the legitimacy of the exempt shares issued and sold in the market, and could spur massive litigation regarding the transactions and the sales of shares issued in them, even if it is ultimately determined to be meritless. In addition, an administrative enforcement action would cause confusion among issuers and market participants about the reliability of the Staff's current written guidance regarding Section 3(a)(10) and could have a chilling effect on the use of the Section 3(a)(10) exemption generally.

The Staff's proposed enforcement action is particularly unwarranted since there are other opportunities for the Commission to express its views on these matters. Of course, a responsible way to communicate a novel Staff interpretation would be to issue additional guidance. The Division has updated its guidance from time, most recently in 2008. Even if it were of the view that Global IV's exchanges should be addressed directly, the Staff could have done so in the exchange proceedings. Although it is evident that the Staff has been aware of Global IV's exchanges for more than a year, it has not sought to have the Commission intervene or otherwise formally express its views regarding the proper statutory interpretation of Section 3(a)(10) in any of them. Since Congress empowered courts to supervise Section 3(a)(10) transactions, the proper way for the Staff to advance its statutory theories would have been to intervene in the courts supervising them—before the courts made their rulings, or as soon as the Staff became aware of them when Global IV filed its Schedules 13G. The Commission has the means to do so, and has previously taken steps to express its views in Section 3(a)(10) litigation. *See Merger Mines Corp. v. Grismer*, 137 F.2d 335, 341 (9th Cir. 1943) (SEC filed an amicus brief with the U.S. Court of Appeals for the Ninth Circuit arguing that an exchange transaction did not satisfy the conditions of Section 3(a)(10) because a fairness hearing was not held to consider the exchange). Under California law, any person who has an interest in a matter in litigation may intervene in the action or proceeding. Cal. Code of Civil Procedure § 387(a). California appellate courts have allowed government entities to intervene in court proceedings, *Cnty. of San Bernardino v. Harsh Cal. Corp.*, 52 Cal. 2d 341 (1959),[31] and to bring equitable actions to vacate

---

[31] In *County of San Bernardino v. Harsh California Corp.*, the California Supreme Court held that the United States was entitled to intervene in a state court action brought by a California county to recover unpaid taxes from a property manager. 52 Cal. 2d 341 (Cal. 1959). The federal government sought to intervene because the case hinged upon a federal tax statute. Even though the federal government had no pecuniary interest in the action, the court

judgments, *People v. Ryerson*, 241 Cal. App. 2d 115, 119 (Ct. App. 1966).[32]  Even after a judgment has been rendered, a non-party to a proceeding may bring an equitable action to vacate the judgment on the grounds of extrinsic fraud or mistake if his interests have been adversely affected by the judgment.  *See, e.g., Villarruel v. W. Pioneer Ins. Co.*, 66 Cal. App. 3d 309, 318 (Ct. App. 1977) ("'A stranger may maintain such an action if his interests have been adversely affected by the judgment.'") (quoting *People v. Ryerson*, 241 Cal. App. 2d 115, 119 (Ct. App. 1966)).

Even though the Commission has not formally intervened in any of Global IV's state court exchanges, the Staff's views have been considered and rejected by a court handling one of those exchanges.  In *Ironridge Global IV, Ltd. v. VelaTel Global Communications Inc.*,[33] Global IV sought to enforce the settlement order against VelaTel Global Communications Inc. ("VelaTel"), which had refused to issue shares as it was required to do under the formula.  In an effort to defend its breach of its obligations, VelaTel represented to the court, based on discussions it said it had with the Staff, that "the SEC questions the practice" of taking the assignment of numerous creditors' claims and arranging Section 3(a)(10) exchanges, since "the 1933 Act was intended for an issuer to settle its own debts on a one-off basis with one creditor." (Ex. D, Transcript of Oral Proceedings at 53-55, *Ironridge Global IV, Ltd. v. VelaTel Global Communications Inc.*, No. BC486893 (Sup. Ct. L.A. Cnty. Mar. 26, 2014).)  Further, VelaTel informed the court that the Staff suggested that that it could avoid its obligation under the court approved settlement agreement to issue unrestricted shares to Global IV by simply concluding that Global IV was an affiliate, and issuing it restricted shares.  *Id.*  In response to questioning from the court, VelaTel's counsel acknowledged that the Staff would not make the affiliate determination itself but repeated that the Staff had raised the issue for the company's consideration, which caused the court to ask if VelaTel took "that as a hint that [it] ought to do so?" *Id.*

Following multiple written submissions and hearings the court ordered VelaTel to comply with the terms of its settlement agreement and to issue free trading shares to Global IV pursuant to the agreement that had been approved by the court.  (Ex. F, Transcript of Oral Proceedings at 50, *Ironridge Global IV, Ltd. v. VelaTel Global Communications Inc.*, No. BC486893 (Sup. Ct. L.A. Cnty. May 21, 2014).)  During the final hearing, the court specifically stated on the record, "The more I heard about this, the more I am persuaded that [Global IV] is correct in this." *Id.* at 36.  In addition, the court stated, "I am now strongly inclined towards the conclusion that [Global IV's] interpretation of this stuff, as to both delay days and what the terms of this, is correct." *Id.* at 38.  Finally, the court ruled: "The court is persuaded that [Global IV's] computation of delay days is, in fact, correct.  Court is further persuaded that VelaTel's issuance

---

held that "the interest of the United States in sustaining its fiscal policy by securing an adjudication of the validity and correct interpretation of its statute is fully sufficient to support its intervention." *Id.* at 345.

[32] In *People v. Ryerson*, a California appeals court held that the California Public Utilities Commission, on behalf of the people of California, could bring an action to vacate the judgment in a case even though it was not a party to the case. 241 Cal. App. 2d 115, 119 (Ct. App. 1966). The court held that the parties had perpetrated an extrinsic fraud by colluding to obtain a judgment that adversely affected the interests of the people of California because it undermined the "integrity of the order of the Public Utilities Commission." *Id.* at 120.

[33] No. BC486893 (Sup. Ct. L.A. Cnty.).

of restricted as opposed to unrestricted shares is in breach of the terms of the stipulated settlement. [Global IV's] motion for enforcement of the settlement agreement is granted." *Id.* at 50.

> ### d.   Even Under the Staff's Incorrect Statutory Interpretation, Global IV's Claims Are Bona Fide

Assuming for the sake of argument that the statute permitted claimants to be precluded from engaging in exchanges based on the circumstances of their interest in a claim, there is nothing about Global IV's interest that renders its claims not "bona fide."

> #### (i)   To Be Not Bona Fide A Claim Would Have to be Fraudulent, and There Is Nothing Fraudulent in Global IV's Ownership of the Claims

The phrase "bona fide" is not defined in the securities laws. "Unless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning." *BP Am. Prod. Co*, 549 U. S. at 91 (citing *Perrin* v. *United States*, 444 U.S. 37, 42 (1979)).[34] Following that direction, federal courts in different contexts have defined the phrase "bona fide" based on its ordinary meaning,[35] which is "[i]n or with good faith; honestly, openly, and sincerely; without deceit or fraud." Black's Law Dictionary (8th ed. 2004); *see also* Webster's 3rd New International Dictionary (3d. ed. 1993) (defining "bona fide" as "made in good faith without fraud or deceit"). Accordingly, Global IV's claims are bona fide so long as they are obtained in good faith and without fraud.

The common law definition of fraud is a "misrepresentation made for the purpose of inducing reliance upon the false statement . . . ." *Chiarella* v. *United States*, 445 U.S. 222, 227-28 (1980).[36] Under California law, fraud has a similar definition.[37] There is nothing fraudulent

---

[34] *See, e.g., Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013) ("As in any statutory construction case, '[w]e start, of course, with the statutory text,' and proceed from the understanding that '[u]nless otherwise defined, statutory terms are generally interpreted in accordance with their ordinary meaning.'") (quoting *BP Am. Prod. Co.*, 549 U. S. at 91); *Moskal v. United States*, 498 U.S. 103, 108 (1990) (internal quotation marks and citation omitted).

[35] *See, e.g., Robertson v. Mobil Oil Corp.*, 778 F.2d 1005, 1008 (3rd Cir. 1985) ("The common legal definition of bona fide, consistent with the non-legal definition, is '[i]n or with good faith; honestly, openly, and sincerely . . . Real, actual, genuine, and not feigned.'") (quoting Black's Law Dictionary (5th ed. 1979) and citing *E.E.O.C. v. Westinghouse Electric Corp.*, 725 F.2d 211, 225 (3d Cir. 1983)); *Fabian v. Home Loan Center*, 2014 WL 1648289, *4 (N.D. W.Va. 2014) (finding that "[t]he common legal definition of "bona fide" consistent with the lay definition, is "'[m]ade in good faith; . . . sincere, genuine.'") (quoting *Black's Law Dictionary* (8th ed. 2004)).

[36] In addition, "one who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. And the duty to disclose arises when one party has information 'that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them.'" *Chiarella v. United States*, 445 U.S. 222, 227-28 (1980) (quoting Restatement (Second) of Torts § 551 (2) (a) (1976)).

[37] Section 1572 of the California Civil Code states:

in Global IV's acquisition of the claims that it purchases from creditors, the circumstances of its ownership of those claims, or the manner in which those facts were presented to the courts that approved the exchanges. Global IV bought claims from creditors following arm's length negotiations with them that were pursued in good faith and were honest, open, and sincere. The creditors were ordinary trade providers, including Fortune 500 companies, AmLaw 100 law firms, and PCAOB approved accounting firms with whom Global IV had no prior dealings or relationships. The negotiated terms agreed between the parties are set forth clearly and unambiguously in the RPAs. In particular the payment terms, to which the Staff points for its view that the claims are somehow not bona fide, are typically subject to negotiation, and the timing of the payment obligation as agreed to by the parties is transparent in the document.[38]  In those cases where full payment is not made immediately upon execution of the RPA, the legal obligation to pay arises at that point, and the contract provides for full payment at a defined future point, or for a series of payments to be made on a defined schedule. That document also unambiguously recites the parties' agreement that title to the receivable is to transfer immediately on execution of the RPA.[39]  All of the terms described above are transparently described in the papers presented to the court that conducts the fairness hearing.  In every Section 3(a)(10) transaction that Global IV has completed, it has fulfilled its contractual obligations and fully paid the creditors from whom it bought claims. (Kirkland Tr. at 148, 163, 179.)  Moreover, in every single case the creditors have, in fact, been paid in full. Thus, there is no sense in which Global IV's claims are not "bona fide."

> (ii)  **As a Matter of Law, the Payment Provision Does Not Affect Global IV's Rights as an Owner of the Claims**

Under California law, which expressly governs the RPAs,[40] a contract is freely assignable unless the contract expressly states otherwise or the contract calls for some personal quality of the promisor, such as a unique artistic skill. *See, e.g.*, 1 Witkin, Summary of Cal. Law, Contracts, § 712 (10th ed. 2005). In addition, the California law specifically permits the

---

Actual fraud, within the meaning of this Chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract:

> 1. The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
> 2. The positive assertion, in a manner not warranted by the information of the person making it, of that which is not true, though he believes it to be true;
> 3. The suppression of that which is true, by one having knowledge or belief of the fact;
> 4. A promise made without any intention of performing it; or,
> 5. Any other act fitted to deceive.

[38] As described above, Global IV agrees in some RPAs to pay the creditor on or around the time the RPA is signed.

[39] The exact language of the typical RPAs is: "Purchaser hereby purchases from Creditor, and Creditor hereby sells, transfers, conveys and assigns to Purchaser, for the consideration set forth herein, all right, title and interest of Creditor in and to the receivable of Creditor against Company described herein (all such right, title and interest of Creditor, the "Receivable"). Creditor hereby sells, transfers and assigns the Receivable to Purchaser."

[40] The standard RPA contains a choice of law provision that states that the RPA is governed by the law of the state of California. *See e.g.*, Ex. A, Receivable Purchase Agreement with HerbalScience Singapore Pte Ltd. at IGP-001-00000003. However, the basic contract law discussed herein is substantially the same in most jurisdictions.

assignment of a claim or cause of action.[41]  Cal. Civil Code § 954 ("A thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner."). *See also* Cal. Civil Code § 1427 ("An obligation is a legal duty, by which a person is bound to do or not to do a certain thing.")  An assignment is effective if it "include[s] manifestation to another person by the owner of his intention to transfer [a] right, without further action to such other person or to a third person." *California Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*, 138 Cal. Rptr. 3d 24, 28 (Ct. App. Feb. 6, 2012). *See also Amalgamated Transit Union v. Superior Court*, 209 P.3d 937, 943 (Cal. 2009) ("It is sufficient if the assignor has, in some fashion, manifested an intention to make a present transfer of his rights to the assignee."). Unlike a contract, an assignment does not have to "be supported by any consideration." *Amalgamated Transit Union v. Superior Court*, 209 P.3d 937, 943 (Cal. 2009). *See also Nat'l R. Co. v Metro. T. Co.*, 17 Cal. 2d 827, 831-33 (Cal. 1941).  The California Supreme Court has long held that "[a]n unqualified assignment of a contract or chose in action [i.e., claim] . . . vests in the assignee the assigned contract or chose and all rights and remedies incidental thereto." *Nat'l R. Co. v Metro. T. Co.*, 17 Cal. 2d 827, 831-33 (Cal. 1941). *See also Johnson v. Co. of Fresno*, 4 Cal. Rptr 3d 475, 482 (Ct. App. Sept. 3, 2003) ("An assignment carries with it all the rights of the assignor.").  One right that vests in the assignee is legal title to the contract or claim. California law is clear that a "[c]omplete assignment passes legal title to the assignee who is the real party in interest and may sue in his or her real name." *Fink v. Shemtov*, 148 Cal. Rptr 570, 578 (Ct. App. Sept. 28, 2012). *See also Cal. Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*, 138 Cal. Rptr. 3d 24, 28 (Ct. App. Feb. 6, 2012).

In the exchange transactions in which Global IV participated, the language of the RPA unequivocally manifests the creditor's intention to transfer its claim to Global IV.  As a result, the RPA is an assignment of the creditor's claim that provides Global IV with title to the claim and full legal authority to sue for breach of contract.[42]  Accordingly, as a matter of law, the RPA conveyed to Global IV legal rights sufficient for it to participate in a Section 3(a)(10) exchange of those claims.  Thus, even if the term "bona fide" spoke to the quality of a claimant's title, which it does not, Global IV's claims would be bona fide.

> 5.  **The Formula Contained Within the Court Order Is Not a Separate Security**

---

[41] Under California law, a cause of action is called a "thing in action." *Amalgamated Transit Union v. Superior Court*, 209 P.3d 937, 942 (Cal. 2009). *See* Cal. Civil Code § 953 ("A thing in action is a right to recover money or other personal property by a judicial proceeding.").

[42] *See, e.g., Nat'l R. Co. v Metro. T. Co.*, 17 Cal. 2d 827, 831-33 (1941); *Harrison v. Adams*, 20 Cal. 2d 646, 650 (1942); *Cal. Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*, 138 Cal. Rptr. 3d 24, 28 (Ct. App. Feb. 6, 2012); *Johnson v. Co. of Fresno*, 4 Cal. Rptr 3d 475, 482 (Ct. App. Sept. 3, 2003). *See also Sprint Commc'ns Co., L.P. v. APCC Serv. Inc.*, 554 U.S. 269, 275 (2008).  Even if the RPA had only assigned the creditor's claim to Global IV for the purposes of collection, Global IV would still have legal title to the claim and authority to sue.  Under California law, an assignment of a claim for collection "vests legal title in the assignee which is sufficient to enable him to maintain an action in his own name . . . ." *Cal. Ins. Guarantee Assn. v. Workers' Comp. Appeals Bd.*, 138 Cal. Rptr. 3d 24, 28 (Ct. App. Feb. 6, 2012) ("An assignment for collection vests legal title in the assignee which is sufficient to enable him to maintain an action in his own name . . . ." ) (quoting *Harrison v. Adams*, 20 Cal. 2d 646, 650 (1942)).  The U.S. Supreme Court has similarly held that "[a]ssignees of a claim, including assignees for collection, have long been permitted to bring suit." *Sprint Commc'ns Co., L.P. v. APCC Services Inc.*, 554 U.S. 269, 275 (2008).

The Staff's second Section 5 argument is that additional shares issued pursuant to the mathematical formula contained within the settlement agreement that is incorporated by reference into each court's order are inexplicably not covered by the Section 3(a)(10) exemption and, accordingly, must be registered. The Staff's rationale is that the shares issued pursuant to that provision are analogous to shares issued upon the exercise of an option or a warrant because the provision provides Global IV with the privilege to receive additional issuances of stock after the company's initial issuance of stock. The Staff observes that its Division of Corporation Finance has expressed the position that "when options, warrants, or other convertible securities are issued in [a] Section 3(a)(10) transaction, Section 3(a)(10) does not exempt the later exercise or conversion."[43] The Staff's claim that the formula that determines the number of shares of common stock to be issued under the order creates a separate security is without merit and its reliance on the language in SLB 3A regarding options and warrants is misplaced.[44]

### a.    The Issuance of Additional Shares, If Any, Occurs Pursuant to the Terms of the Order

As discussed above, Global IV's standard settlement agreement provides that shares will be issued to Global IV in an amount that represents a discount to the market price of the company's stock when the transaction closes. This agreement is attached to and incorporated by reference into the court's order. The agreement contains a mathematical formula that provides for additional shares to be issued should the market price decline during a defined measurement period after the court's order. The purpose of the price protection provision is to protect Global IV from a significant decline in the price of the company's stock should one occur after the court approves the transaction.

The full terms and conditions of the price protection mechanism are contained in the settlement agreement, including the formula used to calculate how many shares will be owed. This formula is the key operative provision of the court's order and indeed has been the subject of extensive colloquy with the court at the fairness hearing. Before the fairness hearing, declarations that discuss the formula and the mechanics of its implementation are submitted to the court on behalf of Global IV and separately on behalf of the issuer.[45] At the fairness hearing itself, the court is briefed on the price protection mechanism to the court. In each Section 3(a)(10) exchange in which Global IV has participated, the court has approved a settlement agreement containing the mathematical formula for determining the number of shares to be issued that was fully negotiated and well understood by the parties and the approving court.

---

[43] SEC Staff Legal Bulletin No. 3A (June 18, 2008). We note that this interpretation is entitled to no deference and is contrary to the statute's plain meaning.

[44] The company is required to issue additional shares only when Global IV notifies the company that it is able to receive them, rather than automatically, to ensure that Global IV complies with the settlement's requirement that it never own more than 9.99% of the company's outstanding shares. However, the total number of shares owed to Global IV is determined under the formula based solely on objective market data, regardless of when—or even if—Global IV ever receives or sells such shares.

[45] *See, e.g.*, Ex. B, Declaration of Brendan T. O'Neil; Ex. C, Declaration of Phillip C. Rundle.

b.        **The Staff's Analogy to an Option or Warrant is Fallacious**

The pricing formulas contained within the courts' orders are not separate securities like an option or a warrant. With an option or a warrant, the holder must make a decision to give up the ongoing protections of the convertible security in order to immediately receive shares of common stock. The new security the investor receives upon making such an election has materially different investment characteristics than the option or warrant that the holder decides to exercise. Accordingly, there is some rationale for extending the protection of registration to that investment decision since the Securities Act seeks to provide investors with information so that they can "make informed investment decisions." *Pinter v. Dahl,* 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities in interstate commerce.").

In Global IV's exchange transactions, by contrast, only one security is present — the company's common stock. The formula is simply the method by which the total number of shares of common stock owed is determined. It is nothing more or less than a contract term specifying the formula that determines how many shares of that one security (i.e., common stock) will be issued. Moreover, Global IV is not required to pay for or give up anything in exchange for any additional shares, and the number of shares to which Global IV is entitled is completely unaffected by when, or whether, it is able to receive the shares. The formula is completely objective, and based solely on market data derived from Bloomberg that is completely beyond Global IV's control.

The Staff has cited two cases in support its novel theory that the court order's pricing formula is somehow a separate security. *Securities and Exchange Commission v. Banc de Binary Ltd.*[46] and *Caiola v. Citibank, N.A., New York.*[47] Neither case is on point and, accordingly, they do not support the Staff's position.

*Banc de Binary Ltd.* and *Caiola* do not involve the issuance of additional shares of the same stock pursuant to a contract formula. Rather, both cases concern a wholly different issue: whether a cash-settled option that cannot be exercised to obtain the referenced security is within the definition of a security such that an investor in such an instrument is entitled to the protection of the securities laws. Both courts concluded that such options are securities, although for different reasons.[48] In both cases the controversy concerned the purchase of the options themselves, and the protection of the investors in making that initial investment decision.

---

[46] 964 F. Supp. 2d 1229 (D. Nev. 2013).

[47] 295 F.3d 312 (2d Cir. 2002).

[48] *Caiola* concluded that a cash-settled option is in substance an option and that an option is a security. 295 F.3d at 325. *Banc de Binary Ltd.* concluded that the cash settlement feature precluded a finding that the instrument was an option. 964 F. Supp. 2d at 1236. However, the court held that a cash-settled option was a security since it conveyed "privileges . . . based on the value [of securities]' because [it gave] the purchaser a contractual right to the payment of money based upon the value of securities." *Id.* at 1237.

Neither of the cash-settled options at issue in the cases cited by the Staff bear any resemblance to the pricing formulas approved by the courts here. Both involved distinct contracts, and each required an investment decision for an investor to participate. By contrast, the shares issued under the price protection provision are the same security that is the subject of the exchange, and are issued pursuant to a term of a contract without any further investment decision. Indeed, the formula defines the number of shares of common stock to which Global IV is entitled, and thus *all* of the shares of common stock issued pursuant to the courts' orders are issued pursuant to the formula.

### c.   The Purposes of the Securities Act Provide No Rationale for Treating the Orders' Pricing Formula As a Separate Security

The statutory objectives behind the registration requirements of requiring information necessary to make informed investment decisions do not support treating shares issued by operation of a formulaic contractual pricing provision, with no further investment decision or additional consideration, as a separate security. *Pinter*, 486 U.S. at 638. The contract formula does not involve an investment decision that is separate from the one covered by the court's fairness hearing and the Section 3(a)(10) exemption.[49] Global IV made its sole investment decision when it acquired and agreed to settle its claim in exchange for a number of shares of stock determined by an agreed formula. The court's examination and approval of that exchange (including the pricing formula) provided Global IV with the protection that is statutorily equivalent to that afforded by the registration requirements of Section 5. There is no additional investor protection served by requiring the registration of securities issued pursuant to a court approval which is itself the sine qua non of the Section 3(a)(10) exemption. More to the point, since the court's order expressly approves the additional issuance of shares pursuant to the formula, all such shares are exempt under Section 3(a)(10). It is well-settled that "[o]nce the section 3(a)(10) exemption is established, it applies to all securities issued in the exchange transaction, even though the exact number ultimately issued is contingent at the time of the hearing and cannot be ascertained until some later date." Bruce Alan Mann, *The Section 3(a)(10) Exemption: Recent Interpretations*, 22 UCLA L. Rev. 1247, 1251 (1975) (citing Tool Research and Engineering Corp, SEC No Action Letter, 1974 SEC No-Act. LEXIS 1390 (Nov. 14, 1973)).

### d.   The Staff's Position Contradicts Long-Standing Interpretive Guidance

The Staff's claim that some shares issued under a pricing formula are a separate security from other shares issued under the same formula is not only irrational but inconsistent with its long-standing approval of the use of formulas that operate like the provision in the courts' orders here. Section 3(a)(10) exchange transactions, particularly in corporate acquisitions and litigation settlements, routinely use formulas to calculate the amount of shares that will be issued in the

---

[49] The provision is based on a formula that operates automatically once the settlement agreement is approved by a court. The only reason issuance is not completely automatic is so that Global IV can stage the receipt of the shares and avoid violating the agreement's requirement that it never own more than 9.99% of the company's outstanding shares. However, the pricing formula itself is completely automatic, and the number of shares to which Global IV is entitled is determined automatically based upon public market data.

exchange.  For decades, the Staff has repeatedly issued no-action letters for Section 3(a)(10)
transactions that involve such provisions.  *See, e.g.*, Microsoft Corp., SEC No Action Letter,
1994 SEC No-Act. LEXIS 426 (Apr. 8, 1994); Riverbend Int'l Corp., SEC No Action Letter,
1990 SEC No-Act. Lexis 631 (Mar. 30, 1990); Gen. Pub. Utils. Corp., SEC No Action Letter,
1983 SEC No-Act. LEXIS 2640 (June 29, 1983); Tool Research and Eng. Corp, SEC No Action
Letter, 1974 SEC No-Act. LEXIS 1390 (Nov. 14, 1973).  Indeed, this mechanism is commonly
used even in registered transactions where the number of shares to be issued is unknown at the
time the registration statement becomes effective, but is described with reference to a formula.
For example, such formulas were used in connection with the registration of the AT&T Inc.
securities to be issued in the merger with DIRECTV, the Priceline Group, Inc. securities issued
in the merger with Kayak Software Corporation, and the Zoetis Inc. securities issued in the
exchange offer conducted by Pfizer, Inc.[50]  Like the pricing formula that protects Global IV,
these formulas use the issuer's share price during a determined measurement period.  As a result,
it is common in these transactions for the number of shares ultimately issued to change from the
time an estimate is given at the fairness hearing until the transaction is finally completed.  The
well-settled practice of the Division and market practice has been to treat these fixed formula
provisions as an element of an exchange rather than as a separate security.  Adopting the Staff's
position that shares issued under such a formula require registration would effectively cripple the
utility of Section 3(a)(10) exchanges to facilitate, among other things, business combinations and
litigation settlements.

### 6.     The Green Innovations Exchange

In July 2013, Global IV completed a Section 3(a)(10) exchange with Green Innovations
Ltd. ("Green Innovations").  In this transaction, Global IV agreed to settle approximately $2.6
million of claims against Green Innovations in exchange for shares of the company's common
stock.  Global IV had acquired these claims by purchasing the company's accounts receivable
which arose from the purchase of inventory from several of the company's independent product
suppliers in China.

The Staff has indicated that it believes this transaction differs from the other exchanges in
that it perceives it to have been in substance a capital raising transaction that is not eligible for
the Section 3(a)(10) exemption.  We believe that view arises from a misunderstanding of the
facts as well as the law.  Accordingly, we have addressed in more detail the particular facts of
that transaction.  In discussions with the Staff in advance of this submission, we were informed
that it is relying in part on testimony given by Bruce Harmon, the former Chief Financial Officer
of Green Innovations for its understanding of the facts.  We were afforded an opportunity to
review the transcript of his testimony and have incorporated that information in the discussion
below.

### a.     Facts

The record reflects that early in Green Innovations' discussions with Global IV, the
company indicated it had approximately $500,000 in outstanding trade debt.  Green Innovations

---

[50] DIRECTV, Proxy Statement (Schedule 14A) (Aug. 20, 2014); Zoetis Inc., Prospectus (Form 424B4) (Feb. 4,
2013); Kayak Software Corp., Current Report (Form 8-K) (Nov. 8, 2012).

later disclosed that it had over $1 million in outstanding claims, and ultimately expressed interest
in completing an exchange for $10 million including "future" invoices.[51]  (Harmon Tr. at 19; Ex.
78; Kreger Tr. at 144:22-145:4.)

Based on its investment analysis of the company, Global IV determined that it would be
willing to purchase up to $2.5 million in bona fide outstanding claims, subject to confirmatory
due diligence.  We are informed that in the course of its due diligence on Green Innovations'
claims, a Global IV representative spoke directly with the creditors themselves and learned the
following facts: Green Innovations was then presently indebted for much more than $2.5 million
in currently outstanding claims.  Green Innovations had agreed to order and pay for millions in
merchandise, with specific agreed amounts to be specified in subsequent purchase orders.  In
reliance on these promises, the creditors had ordered raw materials, began production of some
finished goods, and completed production of some finished goods, some of which were still in
the factory, some at the docks waiting to be shipped, some on ships on the water, and some
received by Green Innovations.[52]

While Green Innovations had paid for some of the goods it had received, it had failed to
pay in full for much of the product it already had, and had not paid what it owed for the goods in
transit or waiting at the dock, let alone for the goods in process or to be produced.  Due to Green
Innovation's payment defaults, the creditors were ceasing production and placing the company
on credit hold, refusing to make or ship any further product until they were paid in full for
everything.  From the creditor's perspective, Green Innovations was both in breach of the
parties' agreements and liable to the creditors for payment in full.  When confronted with these
facts, company management acknowledged that was, in fact, the case.  (Kirkland Tr. at 198-199,
213:10-214:22; Harmon Tr. at 32.)

Although Global IV verified that Green Innovations' suppliers had approximately $4
million in contractual claims against Green Innovations, it was able to negotiate agreements by
which it would purchase $2.5 million of the currently outstanding claims.  (Kreger Tr. at 155:1-
14.)  The creditors agreed to accept this amount, which was substantially less than what they
were then owed, and to release the credit hold and ship product pursuant to newly issued
invoices after payment was received.  (Kirkland Tr. at 198-199, 213:10-214:22.)

The new invoices were issued on July 16, 2013 for the additional inventory that it was
willing to ship upon payment.  (Kirkland Tr. at 206:1-14.)  On July 19, 2013, Global IV executed
a separate receivable purchase agreement with each of the suppliers to purchase their claims.

---

[51] In Global IV's experience, it is not uncommon for companies to underplay the amount owed on claims so as not
to scare off a potential investor, and then gradually reveal the full extent of their debts over the course of discussions
and negotiations.

[52] Kirkland Tr. at 198-199, 213:10-214:22.  Mr. Harmon testified about Green Innovations' obligations to its
suppliers for inventory that it had received and inventory that had been shipped to it and was in transit.  He was not
asked, and accordingly gave no testimony, regarding obligations to the company's suppliers arising from
commitments to make future purchases.  Global IV learned about those obligations in the course of its pre-
transaction due diligence with Green Innovations' suppliers.

Global IV thereafter filed a court action, and the parties sought court approval of a Section 3(a)(10) exchange. Consistent with the process described above, the parties made a detailed fact presentation to the court regarding a proposed settlement of the action, which we are informed included showing the court both the RPAs and copies of all of the invoices, pointing out the recent dates of some of the invoices, and explaining at length the circumstances that gave rise to the claims, the invoices, and the RPAs. In their application, the parties pointed out that the statute provides for the issuance of free trading stock, "<u>in exchange for one or more bona fide outstanding</u> securities, <u>claims</u> or <u>property interests</u>, or partly in such exchange and partly for cash."

On July 25, 2013, after the presentation by counsel, review of the applicable documentation including the invoices, and conducting a fairness hearing, the court ruled that Global IV had bona fide outstanding claims, including the claims based on the July 16, 2013 invoices, and approved the exchange of the claims for Green Innovations stock pursuant to Section 3(a)(10). On July 27 and August 2, 2013, Global IV made payments to Green Innovations' suppliers totaling over $1 million. Two suppliers were paid in full and the remaining supplier received the first of four monthly payments pursuant to the schedule agreed to by the parties. Global IV did not sell any shares of Green Innovations' stock until August 12, 2013. The remaining supplier was paid in full on the agreed schedule. Global IV's payments to suppliers exceeded at all times through the date of this submission the amount it received in sales proceeds.

### b.    The Claims Against Green Innovations Were Eligible for Exchange

The Staff contends that this transaction failed to comply with Section 3(a)(10) because the result of the transaction was that Green Innovations acquired additional inventory. The Staff has also asserted that, absent this transaction and Global IV's willingness to purchase Green Innovations' obligations, its suppliers were unwilling to ship any additional goods given the company's failure to pay for what it had already received. The Staff believes that those facts make the transaction analogous to a capital raising transaction and that it is therefore not eligible for the Section 3(a)(10) exemption.

The Staff cites no authority for the position that an exchange that results in acquisition of inventory and the solution to a liquidity issue is somehow thereby ineligible for a Section 3(a)(10) exemption. There is no support for that position in the statute, and it is directly contrary to Section 3(a)(10)'s unambiguous language and stated purpose.

The only proper inquiry is whether the "securities, claims *or* property interests" that are to be exchanged are "bona fine outstanding" (i.e., actual as opposed to fictitious or fraudulent) at the time of court approval and whether the procedural and substantive protections of Section 3(a)(10) were applied. Although Green Innovations may well have been able to pursue the same objectives through a capital raising transaction, it did not. Green Innovations could have filed a registration statement and raised money to pay its creditors instead of relying on exemption from registration, but that is true of every Section 3(a)(10) exchange and every exempt transaction in general. But companies are not required to register if they meet the requirements of an exemption. That is the very purpose of exemptions. No capital was raised for Green Innovations

33

in the exchange.  Instead, claims against it were exchanged through a properly structured, legally compliant Section 3(a)(10) exchange.

### (i) The Court Determined that There Were Bona Fide Outstanding Claims Against Green Innovations

As set forth above, in the course of its due diligence, Global IV learned from Green Innovations' creditor there were claims against Green Innovations for amounts substantially in excess of the invoiced amounts based on future purchase commitments Green Innovations had already made.  Consistent with that understanding, the invoices issued shortly before the exchange simply shifted them from claims based on a general purchase commitment to claims based on a specific order and invoice.  Doing so benefited Green Innovation because it was able to order and receive inventory against its purchase commitment that it otherwise was unable to receive because of its failure to pay its already past due obligations.  Although the record of the Staff's investigation is at best unclear with respect to the preexisting claims described by the creditors for the reasons discussed above, a dispute in the claim amount does not foreclose a conclusion that the claim is bona fide outstanding and eligible to be exchanged.

### (ii) Even if the Claims Had Arisen for the First Time with the Issuance of the Invoices, the Court Determined They Were Eligible to Be Exchanged

Section 3(a)(10) does not require that claims be aged or past due, nor does prohibit relying on the exemption to facilitate a solution to pressing corporate liquidity concerns.  Under Section 3(a)(10), a claim can be exchanged for securities so long as the claim came into is existence and is bona fide outstanding prior to the fairness hearing.  It is for the reviewing court to determine the bona fides of the claim based on the evidence, facts and circumstances.  As such, even if one assumed (contrary to the facts) that there was no claim before suppliers accepted the purchase orders and invoiced Green Innovation on July 16, 2013, that claim could properly be exchanged under Section 3(a)(10) on July 25, 2013.

The Staff's supposition that Section 3(a)(10) is not available because the transaction made it possible for Green Innovations to acquire new inventory is also plainly wrong, since it is flatly contradicted by the clear language of the statute.  Section 3(a)(10) *expressly authorizes* the issuance of securities in exchange for "property interests," such as inventory.  It would have been entirely permissible for Global IV to have purchased inventory rather than claims from Green Innovations' suppliers, and then exchanged that inventory for shares of the company's common stock.

### (iii) Providing Direct Financing for the Purchase of Additional Inventory in Addition to Exchanging Claims Would Have Been Permissible Under Section 3(a)(10)

Even if one were to assume a counter-factual world in which Global IV provided cash to finance Green Innovations' purchase of additional inventory in addition to exchanging the portion of claims the Staff acknowledges were previously invoiced and past due, and received shares of the company's common stock in return, all those shares would be eligible for the

exemption.  Section 3(a)(10) explicitly states the exemption is available for "any security which is issued in exchange for one or more bona fide outstanding securities, claims or property interests, *or partly in such exchange and partly for cash*, . . . ."[53]

In SLB 3A, the Staff has stated that its view is "that Section 3(a)(10) exempts transactions that are predominantly exchanges and that the 'partly for cash' language is intended merely to permit flexibility in structuring those exchanges." [54]  However, that position has no support in the legislative record and it is contrary to Congress's unambiguously expressed intent. *See City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868 (2013).

Had the structuring of the Green Innovations exchange utilized cash in part, it would have been consistent with the legislative grant of flexibility acknowledged by SLB 3A.  To the extent SLB 3A is read to prohibit the use of cash, it is contradicted by the express language of Section 3(a)(10) and the legislative history indicating that Congress wanted the exemption to be available for struggling companies.  As one commentator has noted, "The statute expressly provides that the securities may be issued partly in exchange for an existing interest and partly for cash, thus clearly implying that the [Section 3(a)(10) exemption] is available for distributions at least 'partly' for the purpose of raising capital."  Barbara Ash, *Reorganizations and Other Exchanges Under Section 3(a)(10) of the Securities Act of 1933*, 75 Nw. U. L. Rev. 1, 11-12 (1980).

Given the unambiguous language of the statute and the legislative history, we believe the correct interpretation is that Section 3(a)(10) permits capital raising so long as securities, claims, or property interests are also exchanged and that if the U.S. Court of Appeals for the District of Columbia Circuit is ultimately presented with this question it will so hold.

> **7.  An Enforcement Action Based on the Staff's Novel Interpretation of Section 3(a)(10) Would Violate Due Process and Disrupt Settled Market Practice Based on Existing Guidance**

It is well-settled that due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972).  An enforcement action based on the Staff's novel interpretation of Section 3(a)(10) would contravene that principle of "fair notice."  *See Alaska Prof'l Hunters Ass'n* v. *FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) ("[t]hose regulated by an administrative agency are entitled to 'know the rules by which the game will be played'") (quoting Holmes, *Holdsworth's English Law*, 25 Law Quarterly Rev. 414 (1909)); *Upton* v. *SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (sanctions may not be imposed pursuant to a "substantial change in [an] enforcement policy that was not reasonably communicated to the public").

The circumstances of this case are replete with evidence that no one, much less Global IV or Partners LLC, could have predicted the Staff's novel interpretation of Section 3(a)(10) from the statute or any preexisting guidance.  Global IV entered into Section 3(a)(10) exchanges with

---

[53] 15 U.S.C. § 77c(a)(10) (emphasis added).

[54] SEC Staff Legal Bulletin No. 3A (June 18, 2008).

scores of issuers, each of whom was advised by counsel. The transactions were approved by multiple state court judges, each of whom was briefed on the proposed transaction by counsel and provided the language of Section 3(a)(10) as well as SLB 3A providing the Staff's guidance on it. None of them identified the interpretation the Staff has now proposed as an impediment to these exchanges. Nor did counsel for the issuers or counsel for Global IV, each of whom issued a formal opinion letter, or counsel for the transfer agents, counsel for the receiving brokers, or counsel for the clearing brokers, all of whom concluded that the shares were validly issued and complied with the Section 3(a)(10) exemption following the fairness hearing and the judicial approval of the exchange.

Moreover, we have not located a single secondary authority, such as a law review article or legal treatise, that discusses any of the theories advanced by the Staff, nor has the Staff identified any. The fact that none of the learned, experienced lawyers and judges involved in these exchanges, nor the securities law scholars who have studied Section 3(a)(10), have perceived the issues the Staff now insists exist here is, at a minimum, proof that a person of ordinary intelligence could not have known that these exchanges were in any way improper.

The mere initiation of an enforcement action would disrupt settled market practice. We have made the point throughout this memorandum that that the Staff's proposed litigation theory is inconsistent with established law and would disrupt settled market practices developed in reliance on existing Staff guidance, including with respect to the use of formulas to determine the quantity of shares to be issued in exchanges, and the use of exchanges to resolve uncertain or disputed claims. Even assuming there is some basis for rethinking those well settled positions, an ad hoc reversal through a litigation position taken in an enforcement action is an unnecessarily disruptive and chaotic way to do so. Moreover, it is simply unfair to proceed in that fashion here, where the record establishes a thoughtful and deliberate effort to comply with all the statutory requirements, informed by the Staff's guidance.

**B.      Broker-Dealer Registration**

       **1.      Partners LLC Is Not A Broker-Dealer Within the Meaning of the Securities Laws**

The Staff could not prevail on any assertion that Partners LLC violated Section 15(a)(1) of the Exchange Act by operating as an unregistered broker-dealer. Section 15(a)(1) of the Exchange Act requires any broker or dealer who uses the mails or any means or instrumentality of interstate commerce to induce or effect any transactions in securities to register with the Commission. 15 U.S.C. § 78o(a)(1). Under Section 3(a)(4) of the Exchange Act, a "dealer" for purposes of the securities laws is defined as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5). Whether a person is operating as a broker-dealer is a question of fact and depends on the particular facts and circumstances of each case.

In no-action letters, the Division of Trading and Markets Staff has identified a series of factors the presence of one or more of which might indicate that a person is operating as an unlicensed broker-dealer. However, there is no bright-line test and all of the facts and

circumstances of a particular case must be considered to make a determination.  The relevant factors identified by the Staff include whether a person:[55]

- advertises or otherwise holds itself out as willing to buy or sell securities from its own account on a continuous basis;

- purchases or sells securities as principal from or to customers;

- carries a dealer inventory in securities;

- quotes a market in securities;

- provides investment advice;

- extends or arranges for the extension of credit in connection with securities transactions;

- runs a book of repurchase and reverse repurchase agreements;

- uses an interdealer broker for securities transactions;

- lends securities to customers;

- issues or originates securities;

- guarantees contract performance or indemnifies the parties for any loss or liability from the failure of the transaction to be successfully consummated; and

- participates in a selling group or acts as an underwriter.

In this matter, the Staff points to a single one of those twelve factors:  purportedly acting as an underwriter, by selling a portion of exempt common stock obtained through Section 3(a)(10) exchanges in open market transactions.  As we understand it, the Staff concedes that none of the other eleven broker-dealer factors applies here.  But, as discussed above, Partners LLC does not engage in anything that could be characterized as "underwriting" activities. Partners LLC has never bought or sold a single share of a security in a single public company. Partners LLC does not even have a brokerage account.  It is Global IV, a separate company, that conducts the Section 3(a)(10) exchanges and subsequently sells the stock.  The Staff alleges no conceivable basis on which it could "pierce the corporate veil" and hold Partners LLC responsible for the activity of Global IV.[56]  And as discussed below, the activities of Global IV also could not be considered broker-dealer activity within the securities laws.

---

[55] *See, e.g.,* Davenport Mgmt., Inc., SEC No Action Letter, 1993 SEC No-Act LEXIS 624 (Apr. 13, 1993); C&W Portfolio Mgmt., Inc., SEC No Action Letter, 1989 SEC No-Act LEXIS 1286 (July 20, 1989); Fairfield Trading Corp., SEC No-Action Letter, 1988 SEC No-Act LEXIS 62 (Jan. 10, 1988); Louis Dreyfus Corp., SEC No Action Letter, 1987 SEC No-Act LEXIS 2302 (July 23, 1987); United Sav. Assoc. of Texas, SEC No Action Letter (Apr. 2, 1987); Nat'l Council of Savings Institutions, 1986 SEC No-Act LEXIS 2609 (July 27, 1986); Burton Sec., SEC No Action Letter, 1977 SEC No-Act LEXIS 2871 (Dec. 5, 1977).

[56] As noted above, there is no basis to disregard Partners LLC and Global IV's distinct corporate forms.

2.   **Global IV Is Not a Broker-Dealer Within the Meaning of the Securities Laws**

Even if the Staff had provided a Wells notice to Global IV the Staff would not succeed in an argument that Global IV is required to register as a broker-dealer under Section 15(a).

Global IV sells stock only through its brokerage accounts at registered broker-dealers, the same as any retail investor might sell stock in the open market. Global IV does not solicit or arrange orders, nor does it have any regular customers who purchase shares from it. Neither Partners LLC nor even Global IV engage in the actual selling of Global IV's shares. Rather Global IV's registered investment adviser gives general instructions to licensed broker-dealers to sell free trading shares held in Global IV's brokerage accounts.[57] These sell orders are executed through standard open-market transactions.[58]

3.   **Global IV Is Not An Underwriter**

Under both the Exchange Act[59] and the Securities Act,[60] an "underwriter" is defined as "any person who has purchased from an issuer with a view to, or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking." A "distribution" is "an offering of securities, whether or not subject to registration under the Securities Act, that is distinguished from ordinary trading transactions by the magnitude of the offering and the presence of special selling efforts and selling methods."[61] The Commission has stated that "[a] 'distribution' must have two elements: 'magnitude' and 'special selling efforts and selling methods.'"[62] The "[f]actors relevant to the magnitude element are: the number of shares to be registered for sale by the issuer, and the percentage of the outstanding shares, public float, and trading volume that those shares represent."[63] With regard to the second element, the Commission has "indicated that providing greater than normal sales compensation arrangements pertaining to the distribution of a security, delivering a sales

---

[57] Purchasing or selling securities from or to registered brokers-dealers, rather than trading with customers, is a factor indicating that an entity is a trader and not a dealer under the securities laws. Steven Lofchie, *Lofchie's Guide to Broker-Dealer Regulation* 37-38 (2005).

[58] The record is clear that Partners LLC plays no role at all in the stock sale transactions of Global IV.

[59] The Exchange Act, 15 U.S.C. § 78c(a)(20), adopts the definition of an "underwriter" contained in Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(20).

[60] 15 U.S.C. § 77b(a)(11).

[61] 17 C.F.R. § 242.100.

[62] Review of Anti-manipulation Regulation of Securities Offerings; Securities Exchange Act Release No. 33924, 1994 SEC LEXIS 1302 (Apr. 26, 1994) (internal quotation marks and citation omitted).

[63] Review of Anti-manipulation Regulation of Securities Offerings; Securities Exchange Act Release No. 33924, 1994 SEC LEXIS 1302 (Apr. 26, 1994) (internal quotation marks and citation omitted).

document, such as a prospectus or market letters, and conducting road shows are generally indicative of 'special selling efforts and selling methods.'"[64]

Because Global IV's shares are exempt they are freely tradable, it is entitled to, and does, sell its shares — as would any other investment fund. Its sales do not constitute a distribution, however, because Global IV does not engage in "special selling efforts and selling methods."

When Global IV sells the shares it acquires through Section 3(a)(10) exchanges it does not (i) offer special compensation arrangements to brokers for selling the shares, (ii) create or deliver sales documents to potential buyers, (iii) conduct road shows to pitch the shares to potential investors, or (iv) engage in any promotional activities for the sale of its shares.[65] Rather, Global IV's sales are made in ordinary open market transactions that are executed by registered broker-dealers. There is simply nothing "special" about the selling efforts and methods that Global IV uses. Therefore, Global IV's sales activities do not constitute a distribution.

Because Global IV's activities do not satisfy the required "special selling efforts" element of the Commission's two-part test for distribution, we need not address whether Global IV's activities satisfy the "magnitude" element of that test as that, standing alone, does not establish the existence of a distribution. However, we do wish to comment on the Staff's assertions that the Global IV traded shares in significant volume following Section 3(a)(10) exchanges. First, in many of the exchanges, Global IV's sales are not a significant part of the market. The occasional transactions in which there are a large volume of sales can be explained by the circumstances of these investments:

- Because the securities are exempt under Section 3(a)(10), Global IV is free to sell shares in volume where the circumstances of the investment warrant.

- Global IV never owns more than 9.99% of the outstanding shares in any of its portfolio companies — an amount that generally is insufficient to meet the "magnitude" test.

- The volume and timing of Global IV's sales is partly a function of the amount of shares Global IV acquires and the nature of the companies with whom it conducts exchanges. In its Section 3(a)(10) exchanges, Global IV typically acquires shares in small companies with low market capitalizations, volatile stock prices, and limited liquidity. Given the number of shares that Global IV acquires and the limited liquidity for those securities, there is nothing unusual about the fact that when Global IV sells shares, it may sell a relatively large percentage of the volume in those companies (although, as discussed above, it attempts to represent a minority of the trading volume in any given period of time).

---

[64] Review of Anti-manipulation Regulation of Securities Offerings; Securities Exchange Act Release No. 33924, 1994 SEC LEXIS 1302 (Apr. 26, 1994) (internal quotation marks and citation omitted).

[65] Nor is there any external publicity regarding the issuer beyond that required by the securities laws. As mentioned above, Global IV files a Schedule 13G disclosing the exchange, and encourages each issuer to comply with the federal securities laws by disclosing to investors any information about the transactions that the issuer deems material. (Kirkland Tr. at 127-128; Coulston Tr. at 84; O'Neil Tr. at 118.)

- In addition, when Global IV sells it may seek to maximize Global IV's profits or minimize its losses by taking advantage of the stock's price and market conditions at a particular time, which may on occasion result in a large volume of sales over a short period. Similarly, given the characteristics of the securities Global IV acquires, any rational investor would attempt to mitigate the risk of its exposure to the securities of any particular company. With that said, the nature of the securities and of Global IV's investment strategy requires it to hold a substantial portion of the securities over the long term. It often holds the bulk of its position for months or years, and continues to own shares in every company with which it has completed a Section 3(a)(10) exchange.

- The functioning of the price protection provisions that are agreed to by the issuer and Global IV, and approved by the court as part of the Section 3(a)(10) exchange, may also result in an incentive to sell in sufficient volume to attempt to recover Global IV's investment. If sales under such circumstances amounted to a distribution, any market participant who acquires a large amount of shares in a company and then sells a large volume of shares at any time after acquiring them would be considered a broker-dealer. This type of trading and investing activity is commonplace among market participants of all kinds, which the Commission and the Division of Trading and Markets have long recognized are not and should not be required to register as broker-dealers.

### 4.   Even If Global IV Were Deemed An Underwriter, Under the Commission's Acqua Wellington No-Action Letter, That Fact Alone Would Not Require Registration As A Broker-Dealer

Even if the Staff were to conclude that Global IV is engaged in underwriting, that fact would not by itself be sufficient to require Global IV to register as a broker-dealer. In a no action letter to Acqua Wellington, the Staff agreed that an investment fund company could engage in underwriting without being required to register as a broker-dealer. Acqua Wellington North American Equities Fund, Ltd., SEC No Action Letter, 2001 WL 1230266 (Oct. 11, 2001). The facts of Acqua Wellington actually present a far stronger case for "dealer" activity than those in Global IV's situation. Acqua Wellington, like Global IV, is an offshore investment fund (in its case, incorporated in the Bahamas). Acqua Wellington engages in equity line-of-credit transactions with issuers: it commits to buy purchase a specified dollar amount of equity securities directly from the public company issuer of those securities. The number of shares Acqua Wellington receives is determined by a mathematical formula; as is true for Global IV, if the per-share price of the securities drops, then Acqua Wellington receives a right to an increased number of shares. Acqua Wellington then sells the shares it received from these transactions through unaffiliated broker-dealers into the U.S. securities markets.

Acqua Wellington buys its shares directly from issuers, unlike Global IV, which purchases claims from third-party creditors and then exchanges those claims for shares in the issuer. Unlike Global IV (which in its Section 3(a)(10) exchanges simply reduces an issuer's already outstanding debt), Acqua Wellington provides cash financing directly to the issuers in return for stock sold to it by those issuers. As a result, Acqua Wellington conceded that it met the statutory definition of an "underwriter" and that it met the single "underwriter" prong in the multi-factor test applied by the Staff for "dealer" status. However, Acqua Wellington, like Global IV here, did not meet any of the other prongs of "dealer" status under the securities laws.

40

Acqua Wellington argued, and the Division of Market Regulation Staff agreed, that without
more, Acqua Wellington's activities were insufficient to meet the definition of "dealer" in the
Exchange Act and did not trigger registration under Section 15(a).

The facts of the Acqua Wellington letter present a much stronger case for underwriter
status than do the facts concerning Global IV.  Since Acqua Wellington bought securities
directly from issuers and then resold those securities into the marketplace, while Global IV does
not.  For all of the other prongs of the test that the Staff has applied for determining "dealer"
status, Acqua Wellington and Global IV are indistinguishable — neither entity triggers any of
the other prongs.  And Global IV, unlike Acqua Wellington, has an impartial, duly confirmed
state court judge adjudicate the fairness of its exchanges with issuers before it engages in any
selling at all.  No rational trier of fact could conclude that Global IV is required to register as a
dealer when Acqua Wellington was not.  The Acqua Wellington no-action letter is fatal to the
Staff's dealer registration theory here.

### 5.      The Purposes of Broker-Dealer Registration Argue Against Alleging
that Partners LLC or Global IV Are Broker-Dealers Within the
Meaning of the Securities Laws

The Commission cannot allege that Partners LLC is a broker-dealer and should not allege
that Global IV is a broker-dealer for securities law purposes because to do so would introduce
substantial uncertainty for the activities of thousands of other similar firms.  As we believe the
Commission's Division of Investment Management can readily confirm, the structure used by
Partners LLC and its affiliates is extremely widespread in the investment management industry.
Although the Staff seemed unfamiliar with the structure here, the majority of large and medium-
sized U.S. managers of hedge funds, private equity funds, and venture capital funds establish off-
shore funds like Global IV.[66]  Many managers of U.S. registered mutual funds also establish off-
shore funds (through hub-and-spoke or master-feeder structures).  In both cases, they do so for
entirely legitimate reasons of tax efficiency and liability limitation.  The only thing that is
unusual about Global IV is that to date, Global IV has not offered or accepted investments by
any third parties; it is wholly owned by Partners LLC.  The lack of any outside investors should,
if anything, decrease the Commission's concern about the Global IV structure.

Moreover, the activities of Parters LLC and Global IV are indistinguishable from the
activities of hundreds of other investment managers.[67]  Many hedge funds, and virtually all
private equity funds, purchase or otherwise obtain securities directly from issuers.  So, too, do

---

[66] There are a variety of reasons why managers set up off-shore funds.  For example, if the fund decides to accept
investments from foreign investors, the foreign investors do not thereby become subject to U.S. taxation.  In
addition, an off-shore fund can accept investments from certain U.S. entities without triggering unrelated business
income tax (UBIT) issues for those entities.  The Staff has not and cannot allege that there is any improper tax
avoidance purpose or effect of Global IV's structure.

[67] As discussed above, the "activities" of Partners LLC in a Section 3(a)(10) transaction consist entirely of passively
owning its interest in Global IV, which both engages in the Section 3(a)(10) exchange with the issuer, and then sells
some of the shares it receives in that exchange.  In our view there is not even a colorable basis to argue that Partners
LLC, as opposed to Global IV, acts as a dealer.  Partners LLC does not even have brokerage accounts and has never
bought or sold a single share in any public company.

many registered investment companies (especially closed-end funds and unit investment trusts). Sales of securities directly to investment funds is a critical form of capital-formation for issuers in the modern U.S. capital markets. In particular, many private equity funds purchase substantially larger ownership positions in issuers than the less than 9.99% stakes that Global IV purchases. And in all of these cases, investment managers purchase these securities with the intention that they will resell those securities into the public markets for a profit. Many hedge funds do so in very short periods of time (often much shorter than Global IV), and many private equity funds will begin to sell their positions shortly after acquisition, like Global IV, although they maintain parts of their positions for an extended period of time.

In all of these situations, both private funds and registered funds have relied on the Commission's long-standing guidance discussed above to conclude that they need not register as a broker-dealer because these funds buy and sell the securities of public companies only for their own account and do not hold themselves out as brokers or dealers. For nearly a decade and a half, those funds have relied on the well-known Acqua Wellington letter (which itself simply recognized securities law concepts widely applied before that time), and have understood that even if they purchase securities directly from an issuer and theoretically could be considered an underwriter for Securities Act purposes, this activity, without any further indicia of dealer activity, does not trigger a requirement to register as a broker-dealer under Section 15(a) of the Exchange Act.[68]

If the Commission were to allege here that Global IV was required to register as a dealer, the results would have negative ramifications far beyond Partners LLC and Global IV, and well beyond the relatively narrow confines of the Section 3(a)(10) exemption. Such an allegation would create uncertainty about the need for broker-dealer registration for hundreds if not thousands of funds (both registered and private) that purchase securities from issuers and later sell them into the markets. The Commission would throw into confusion well-settled law on which all of those entities have long relied. And the result of that confusion likely would be that many of these entities would fold or hesitate before engaging in future transactions with issuers – thereby potentially depriving those issuers (and the U.S. economy as a whole) of a badly-needed source of capital formation.

In this case, the Section 15(a) allegation is a classic "tag-along" charge. The Section 15(a) allegation (made in the Wells request to an entity against which it could not possibly apply) would provide the Commission with absolutely no relief which it could not obtain based on the Section 5 charge which is the core, such as it is, of the Staff's tenuous theory. But the Section 15(a) allegation would create mischief far beyond the confines of this case. The Section 5 allegation only calls into question Section 3(a)(10) exchanges, a relatively less common (if important) type of transaction for public companies. But a Section 15(a) charge would undercut years of heretofore settled law, and would call into question scores of transaction types far beyond 3(a)(10) exchanges. The result would have a negative effect on capital formation well beyond the specific circumstances of this case. The Commission should not disrupt the settled expectations of a large portion of the U.S. investment management industry by bringing a totally

---

[68] This is in contrast to Global IV, which as discussed above engages in exchange transactions with issuers, not purchases from issuers, and which therefore should not trigger underwriter status.

unnecessary Section 15(a) charge. Such a charge would be a particularly unfortunate decision because, for the reasons discussed above, a Section 15(a) allegation against Partners LLC would be contrary to precedent and would not succeed on the merits in any event.

### 6. Global IV Is Exempt from Registration Because It Is a Foreign Broker-Dealer

Even if selling the securities acquired in a Section 3(a)(10) transaction constituted broker-dealer activity, Global IV would qualify as a foreign broker-dealer exempt from registration. Rule 15a-6(b)(3) of the Exchange Act defines a foreign broker-dealer as:

[A]ny non-U.S. resident person (including any U.S. person engaged in business as a broker or dealer entirely outside the United States, except as otherwise permitted by this rule) that is not an office or branch of, or a natural person associated with, a registered broker or dealer, whose securities activities, if conducted in the United States, would be described by the definition of 'broker' or 'dealer' in sections 3(a)(4) or 3(a)(5) of the [Exchange] Act. 17 C.F.R. § 240.15a-6.

Under Rule 15a-6, a foreign broker or dealer is conditionally exempt from the registration requirements of Section 15 if its activity is limited to certain specified activities involving U.S. investors. *Id.* These activities include, among other things, when the foreign broker-dealer:

- "Effects transactions in securities with or for persons that have not been solicited by the foreign broker or dealer," *Id.* or

- "Effects transactions in securities with or for, or induces or attempts to induce the purchase or sale of any security by: (i) A registered broker or dealer, whether the registered broker or dealer is acting as principal for its own account or as agent for others . . . ." *Id.*

Although either one would be sufficient, Global IV's selling activities meet the requirements of both exemptions. Because Global IV is organized as a British Virgin Islands business company and is based in the BVI, it is a non-U.S. resident. Global IV engages in its trading business entirely outside the United States, except for activities that are permitted without registration by Rule 15a-6. All of Global IV's sales in the United States are unsolicited sales of securities it owns, which are conducted directly with U.S. broker-dealers, not with any U.S. end-investors — and thus are specifically exempt under Rule 15a-6. (Global IV also conducts a minority of its sales to foreign broker-dealers, another activity that could not trigger U.S. broker-dealer status.) And, Global IV is not an office or branch of a registered broker or dealer. The sales made by Global IV in the U.S. fall with the exemption to registration provided by Rule 15a-6 because Global IV makes these sales by effecting transactions with registered broker-dealers. Rule 15a-6 permits a foreign dealer to effect unsolicited transactions directly with U.S. investors — Global IV does not do even this much; it only executes transactions in securities it owns itself. Rule 15a-6 does not impose any limits on a foreign broker-dealer's ability to conduct transactions with U.S. registered broker-dealers — which is the only kind of selling Global IV ever does — foreign broker-dealers can and do conduct these transactions without being required themselves to register in the United States.

43

The fact that Global IV's activities do not trigger registration under Section 15(a) is reinforced by *SEC v. Benger*, 934 F. Supp. 2d 1008 (N.D. Ill. 2013). *Benger* held that the presumption against extra-territorial application of the U.S. securities laws applied in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), applies with equal force to broker-dealer registration claims under Section 15(a) of the Exchange Act. The activities of Global IV are exempt from broker-dealer status under the plain language of Rule 15a-6, and in any event are outside of the Commission's jurisdiction as interpreted by the courts.

## V.    CONCLUSION

For the foregoing reasons, Partners LLC did not violate Section 5 of the Securities Act or Section 15(a) of the Exchange Act, and respectfully requests that the Staff not make a charging recommendation. On further thought and full consideration of the foregoing, we are confident that that the Staff will come to realize on its own that is the only appropriate thing to do in this case is not to bring an enforcement action.

Respectfully submitted,

_____

Erich T. Schwartz
Colleen Mahoney
Daniel J. Sullivan
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC  20005
(202) 371-7000

*Attorneys for Ironridge Global Partners, LLC*

Dated:  September 5, 2014

3024184.5

# EXHIBIT C

UNITED STATES OF AMERICA
BEFORE
THE SECURITIES AND EXCHANGE COMMISSION

----------------------------------------------------------------------x
                                                    :
IN THE MATTER OF                                    :        File No. A-3545
IRONRIDGE GLOBAL PARTNERS, LLC                      :
                                                    :
----------------------------------------------------------------------x


### SUPPLEMENTAL WELLS SUBMISSION ON BEHALF OF
### IRONRIDGE GLOBAL PARTNERS, LLC

Erich T. Schwartz
Colleen Mahoney
Daniel J. Sullivan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC  20005
(202) 371-7000

*Attorneys for Ironridge Global Partners, LLC*

Dated:  February 23, 2015

Ironridge Global Partners, LLC requests confidential treatment of this submission for all purposes pursuant to 17 C.F.R. § 200.83 and requests that this submission not be disclosed pursuant to any request under the Freedom of Information Act.

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT .................................................................................1

II.     ARGUMENT.........................................................................................................2

     A.     There Is No Basis for a Claim that Partners LLC is Liable as a Controlling Person for Violations of Section 15(a).................................................................2

         1.     There is No Primary Violation of the Exchange Act Since Global IV is Not Required to Register as a Dealer....................................3

             a.     Global IV Is Not a Dealer Within the Meaning of the Securities Laws. ...............................................................3

             b.     Global IV Engaged In None of the Activity Identified in the Commission and Staff's Longstanding Guidance as Indicative of an Obligation to Register as a Dealer. .......................4

             c.     The Cases Cited by the Atlanta Staff Do Not Support a Finding That Global IV Is Required to Register Under Section 15(a). .........................................................................5

             d.     The Staff's Acqua Wellington No-Action Position Is Fatal to the Proposed Case, and the Atlanta Staff's Attempt to Distinguish Acqua Wellington Is Not Persuasive..........................10

             e.     Even if Global IV Were a Dealer, It Would Qualify As A Foreign Broker-Dealer Exempt from Registration .......................17

         2.     Partners LLC Did Not Control Global IV Within the Meaning of Section 20(a). ...............................................................................18

         3.     There Is No Suggestion of Culpable Participation or Bad Faith by Partners LLC Regarding Global IV's Conclusion That It Was Not Required to Register. ........................................................................21

     B.     Bringing an Enforcement Action That Relies on an Interpretation of the Registration Requirements That Contradicts Longstanding Prior Guidance Would Violate Due Process ........................................................................25

III.     CONCLUSION...................................................................................................27

## I.     PRELIMINARY STATEMENT

In July 2014, the Staff of the Division of Enforcement in the Atlanta Regional Office (the "Atlanta Staff") of the U.S. Securities and Exchange Commission (the "Commission") notified Ironridge Partners, LLC ("Partners LLC") that it had made a preliminary determination to recommend that the Commission institute an administrative enforcement action against Partners LLC alleging violations of Section 5 of the Securities Act of 1933 ("Securities Act") and Section 15(a) of the Securities Exchange Act of 1934 ("the Exchange Act"). These alleged violations stem from the activities of Ironridge Global IV, Ltd. ("Global IV"), a separate legal entity located in the British Virgin Islands. Global IV – not Partners LLC – acquired bona fide outstanding claims against publicly traded companies, engaged in judicially-approved exchanges of the claims for shares of common stock from the companies, and, subsequently, sold some of the shares in open market transactions executed by registered broker-dealers interacting with a separate registered investment adviser.

On behalf of Partners LLC, we responded to the Atlanta Staff with a comprehensive Wells submission that thoroughly refuted the merits of both its Section 5 and Section 15(a) allegations on the law and the facts. In addition, we noted that a fatal defect of the Atlanta Staff's proposed recommendation was that Partners LLC was not a party to any of the exchanges at issue, never engaged in a Section 3(a)(10) exchange, never received or sold any shares of common stock, and does not even have a brokerage account. Rather, all of the Section 3(a)(10) exchanges and stock sales were conducted by Global IV. As a federal court has already recognized, Partners LLC and Global IV are separate legal entities and allegations as to one do not confer jurisdiction on the other.[1] We noted, therefore, that Partners LLC is not a proper subject of any enforcement recommendation.

On January 5, 2015, the Atlanta Staff notified Partners LLC that it had amended its preliminary determination to assert a claim under Section 20(a) of the Exchange Act that Partners LLC is responsible as a control person for a violation of Section 15(a) by Global IV.[2] Later, on January 6, 2015 the Atlanta Staff notified Global IV – for the first time – that it had made a preliminary determination to recommend that the Commission institute an administrative enforcement action against it for alleged violations of Section 5 and Section 15(a) based on the same conduct that the Atlanta Staff had originally attributed to Partners LLC. These recent attempts by the Atlanta Staff to remedy the fatal defects of its initial Wells notice miss the mark.

The Atlanta Staff's new Section 20(a) proposed recommendation against Partners LLC is even more deeply flawed than its original Section 5 and Section 15(a) proposal. Under the Atlanta Staff's new proposal, it must establish not only that Global IV violated Section 15(a) by not registering as a dealer but also that Partners LLC is secondarily liable under Section 20(a) by showing it controlled Global IV and acted culpably in bad faith. For the reasons set forth in our original submission and developed further below, the Atlanta Staff cannot meet this higher

---

[1] *NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*, No. 14CV3945, 2014 WL 2619588, at *4-5 (S.D.N.Y. June 11, 2014).

[2] The Atlanta Staff has informed us that it does not contend Partners LLC is responsible as a control person for violations of Section 5.

standard because there is neither a primary violation nor secondary liability in this matter. Global IV was not required to register under Section 15(a) because under longstanding interpretative guidance, Global IV is an investor, not a dealer. Moreover, even if Global IV's activity amounted to acting as a dealer within the meaning of the Exchange Act, it would be exempt from registration as a foreign-broker dealer. Finally, it is clear on the investigative record that each other element of Atlanta Staff's secondary liability claim is fatally deficient: Partners LLC did not control Global IV; had no involvement in its assessment of whether it needed to register; and was not a culpable participant and did not act in bad faith in connection with that assessment.

## II.   ARGUMENT

### A.   There Is No Basis for a Claim that Partners LLC is Liable as a Controlling Person for Violations of Section 15(a).

Section 20(a) of the Exchange Act provides that:

Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable (including to the Commission in any action brought under paragraph (1) or (3) of section 78u(d) of this title), unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

To proceed with a claim that Partners LLC is liable as a control person of Global IV, the Commission must be convinced of the following:

(1) that Global IV committed a primary violation of the Exchange Act, *See Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014);

(2) that Partners LLC had control over Global IV in committing the primary violation, *See id.*; and

(3) that Partners LLC possessed the requisite state of mind, either as a culpable participant in the violation or by acting in bad faith. *See id*; *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 25, 43-44 (D.D.C. 2007) (citing cases that apply "good faith" analysis rather than "culpable participation" element). Two circuits articulate the state of mind required to impose control person liability as an element of the claim, requiring proof of "culpable participation." *See, e.g., Carpenters*, 750 F.3d at 236; *SEC v. J.W. Barclay & Co.*, 442 F.3d 834, 841 (3d Cir. 2006); *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996). Others address the state of mind requirement under the statutory provision foreclosing liability where the defendant "acted in

2

good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).  *See, e.g., Paracor Fin., Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1161 (9th Cir. 1996); *Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 881 (7th Cir. 1992).

Because none of the required elements of a Section 20(a) claim are present here, there is no basis to recommend an enforcement action against Partners LLC.

      1.      **There is No Primary Violation of the Exchange Act Since Global IV is Not Required to Register as a Dealer.**

           a.      **Global IV Is Not a Dealer Within the Meaning of the Securities Laws.**

As we explained in our original submission, the Atlanta Staff could not prevail on any assertion that Global IV violated Section 15(a)(1) of the Exchange Act by operating as an unregistered dealer.  Section 15(a)(1) of the Exchange Act requires any broker or dealer who uses the mails or any means or instrumentality of interstate commerce to induce or effect any transactions in securities to register with the Commission. 15 U.S.C. § 78o(a)(1).  A "dealer" for purposes of the securities laws is defined as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A).

However, not every entity that purchases and sells securities is required to register as a dealer.  The Exchange Act specifically provides that a dealer "does not include a person that buys or sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." 15 U.S.C. § 78c(a)(5)(B).  Consistent with this statutory language, the Commission and the Commission Staff (the "Staff") have issued substantial guidance articulating the circumstances under which a person's business activity purchasing and selling securities requires registration.  The thrust of that guidance is to recognize that investment vehicles of many descriptions, such as mutual funds, hedge funds, venture capital funds, and private equity funds – all of which may purchase securities, even purchase securities directly from an issuer, and sell those securities as a regular part of their business – are not dealers and are not required to register.  *See, e.g.*, Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, Exchange Act Release No. 46745 (Oct. 30, 2002), 67 Fed. Reg. 67,496, 67,499 (Nov. 5, 2002) (proposed rule) [hereinafter "Proposed Dealer Exemption Rule"] ("[A] person that is buying securities for its own account may still not be a 'dealer' because it is not 'engaged in the business' of buying and selling securities for its own account as part of a regular business.  This exclusion is often referred to as the dealer/trader distinction.  A 'trader' does not have to register as a broker-dealer.").[3]

---

[3] *See also* Nat'l Council of Sav. Insts., SEC No-Action Letter, 1986 WL 67129, at *2 (July 27, 1986) ("[T]he staff has consistently taken the position that a person who buys and sells securities for his own account in the capacity of a 'trader' is generally not considered to be 'engaged in the business' of buying and selling securities and consequently, is not deemed to be a 'dealer' under the Act."); Burton Sec., SEC No-Action Letter, 1977 WL 10680, at *1 (Dec. 5, 1977) (A "person who buys and sells securities for his own account in the capacity of a 'trader' or

b.    **Global IV Engaged In None of the Activity Identified in the Commission and Staff's Longstanding Guidance as Indicative of an Obligation to Register as a Dealer.**

To assist market participants in understanding how to distinguish between a dealer and an investor for purposes of the securities laws, the Commission and the Staff have identified and repeatedly articulated a well-established list of factors that may indicate a person is a dealer, rather than an investor. The Staff has identified these factors both in no-action letters[4] and in its "Guide to Broker-Dealer Registration," which is prominently displayed on the Commission's public website.[5] This analytical approach is also summarized by the Commission in rulemaking releases.[6]

---

individual investor is generally not considered to be 'engaged in the business' of buying and selling securities and consequently, would not be deemed a 'dealer' under the [Exchange] Act.").

[4] *See, e.g.*, Davenport Mgmt., Inc., SEC No-Action Letter, 1993 WL 120436 (Apr. 13, 1993); C & W Portfolio Mgmt., Inc., SEC No-Action Letter, 1989 WL 258821 (July 20, 1989); Fairfield Trading Corp., SEC No-Action Letter, 1988 WL 233618 (Jan. 10, 1988); Louis Dreyfus Corp., SEC No-Action Letter, 1987 WL 108160 (July 23, 1987); United Sav. Assoc. of Tex., SEC No-Action Letter, 1987 WL 107923 (Apr. 2, 1987); Nat'l Council of Sav. Insts., SEC No-Action Letter, 1986 WL 67129 (July 27, 1986); Burton Sec., SEC No-Action Letter, 1977 WL 10680 (Dec. 5, 1977).

[5] Div. of Trading & Markets. U.S. Sec. & Exch. Comm'n, *Guide to Broker-Dealer Registration* (April 2008), http://www.sec.gov/divisions/marketreg/bdguide.htm (identifying the following factors as indicia of dealer activity: (1) holding oneself out as being willing to buy and sell a particular security on a continuous basis, (2) running a matched book of repurchase agreements, (3) advertising or otherwise letting others know that one is in the business of buying and selling securities, (4) advertising publicly that one is making a market in securities, (5) doing business with the public (either retail or institutional), (6) making a market in, or quoting prices for both purchases and sales of, one or more securities, (7) participating in a selling group or otherwise underwriting securities, (8) providing services to investors, such as handling money and securities, extending credit, or giving investment advice, (9) writing derivatives contracts that are securities).

[6] For example, in a recent notice of proposed rulemaking the Commission stated:

> As developed over the years, the dealer/trader distinction recognizes that dealers normally have a regular clientele, hold themselves out as buying or selling securities at a regular place of business, have a regular turnover of business (or participate in the distribution of new issues), and generally transact a substantial portion of their business with investors (or, in the case of dealers who are market makers, principally trade with other professionals). In contrast, traders have a less regular volume, do not handle others' money or securities, do not make a market, and do not furnish dealer-type services such as rendering investment advice, extending or arranging for credit, or lending securities.

> A person generally may satisfy the definition, and therefore, be acting as a dealer in the securities markets by conducting various activities: (1) Underwriting; (2) acting as a market maker or specialist on an organized exchange or trading system; (3) acting as a de facto market maker whereby market professionals or the public look to the firm for liquidity; or (4) buying and selling directly to securities customers together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in connection with transactions in securities, and carrying a securities account.

Proposed Dealer Exemption Rule, 67 Fed, Reg, at 67,499 (footnotes omitted). In 2010 and 2012, the Commission reiterated the importance these factors when it stated that it "would consider the same factors that are relevant to determining whether a person is a 'dealer' under the Exchange Act as also generally relevant to the analysis of whether a person is a security-based swap dealer." Further Definition of "Swap Dealer," "Security-Based Swap

In addition, the Commission and that Staff have repeatedly emphasized that "the totality of [market participant's] securities activities" must be evaluated "to determine if those activities may constitute engaging in dealer activities." Proposed Dealer Exemption Rule, 67 Fed. Reg. at 67,499 ("A person must evaluate the totality of its securities activities to determine if those activities may constitute engaging in dealer activities."). *See also* Nat'l Council of Sav. Inst., SEC No-Action Letter, 1986 WL 67129, at *2 (July 27, 1986) (stating that whether a person is a dealer "depends substantially upon the facts of a given situation"); Burton Sec., SEC No-Action Letter, 1977 WL 10680, at *1 (Dec. 5, 1977) (same). In other words, there is no bright-line test of dealer status and all of the facts and circumstances of a particular case must be considered to make a determination. Consistent with the Commission and the Staff's longstanding guidance, the federal courts have recognized that "an array of factors determine the presence of [broker-dealer] activity." *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1339, 1341 n.54 (M.D. Fla. 2011) ("In the absence of a statutory definition of either 'effecting securities transactions' or 'engaged in the business,' certain factors determine whether a person qualifies as a broker."). *See also SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003) (listing factors); *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984) (same).

Applying that longstanding guidance to the facts here, it is plain that Global IV is an investor for purposes of the securities laws, not a dealer. Global IV has never held itself out as a dealer and did not engage in any of the activities that the Commission and Staff have identified as indicia of dealer activity. Specifically, Global IV does not (i) advertise or otherwise hold itself out as willing to buy or sell securities from its own account on a continuous basis; (ii) purchase or sell securities as principal from or to customers; (iii) carry a dealer inventory in securities; (iv) quote a market in securities; (v) provide investment advice; (vi) extend or arrange for the extension of credit in connection with securities transactions; (vii) run a book of repurchase and reverse repurchase agreements; (viii) use an interdealer broker for securities transactions; (ix) lend securities to customers; (x) issue or originate securities; (xi) guarantee contract performance or indemnify the parties for any loss or liability from the failure of the transaction to be successfully consummated; or (xii) participate in a selling group or acts as an underwriter. Accordingly, an assessment of the totality of Global IV's securities activities in its Section 3(a)(10) exchanges compels the conclusion that it is not required to register under Section 15(a).

c.   **The Cases Cited by the Atlanta Staff Do Not Support a Finding That Global IV Is Required to Register Under Section 15(a).**

The Atlanta Staff has indicated that in considering this recommendation, it is relying on several cases that contain language making a general observation that the definitions of a broker and a dealer under the Exchange Act both "'connote a certain regularity of participation in securities transactions at key points in the chain of distribution.'" *SEC. v. Offill*, No. 3:07-CV-1643-D, 2012 WL 246061, at *7 (N.D. Tex. Jan. 26, 2012) (citation omitted); *see also Martino*,

---

Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant," Exchange Act Release No. 63452 (Dec. 7, 2010), 75 Fed. Reg. 80,174, 80,177 (Dec. 21, 2010) (proposed rule); Further Definition of "Swap Dealer," "Security-Based Swap Dealer," "Major Swap Participant," "Major Security-Based Swap Participant" and "Eligible Contract Participant," Exchange Act Release No. 66868 (Apr. 27, 2012), 77 Fed. Reg. 30,596, 30,607-608 (May 23, 2012) (final rule).

255 F. Supp. 2d at 283; *Hansen*, 1984 WL 2413, at *10; *Mass. Fin. Serv., Inc. v. Sec. Investor Prot. Corp.*, 411 F. Supp. 411, 415 (D. Mass. 1976), *aff'd*, 545 F.2d 754 (1st Cir. 1976). This entirely unobjectionable, yet hardly elaborative statement, supplies no basis to disregard the longstanding, carefully considered guidance published by the Commission and Staff to guide the determination of who must register as a dealer. None of the cases hold that any regularity of participation in the chain of distribution mandates registration as a dealer. Quite the contrary, the court in *Massachusetts Financial Services* immediately elaborated on this general observation by further explaining that "[n]either definition [i.e., broker or dealer] is all-encompassing. Each excludes, either explicitly or by implication, a variety of functions." 411 F. Supp. at 415. Indeed, the cases cited by the Atlanta Staff generally go on to endorse the rigorous factual analysis set forth in the Commission and Staff's guidance on how to determine in a particular case whether registration is required. *See Martino*, 255 F. Supp. 2d at 283-84; *Hansen*, 1984 WL 2413, at *10-11; *see also Kramer*, 778 F. Supp. 2d at 1339 (noting that "the broker analysis under Section 15(a) (as developed in *Hansen*, *Martino*, and other cases) permits examination of a wide array of factors").

Nor do the cases cited by the Atlanta Staff stand as authority for the proposition that, on the facts present here, Global IV is a dealer required to register. *Hansen*, *Martino*, and *Massachusetts Financial Services* are distinguishable because they do not address at all whether a party was a dealer under the Exchange Act. In *Martino* and *Hansen*, the issue presented was whether the defendant in each case was acting as a broker, a role that Global IV did not have and which the Atlanta Staff has not even asserted it had. *Martino*, 255 F. Supp. 2d at 284; *Hansen*, 1984 WL 2413 at *11. Because "broker" is a separate, defined term under the Exchange Act, and requires a separate analysis, these cases are not instructive as to whether Global IV's activities make it a "dealer." *Massachusetts Financial Services* is similarly uninstructive because the issue presented there was "whether the plaintiff [who was a registered broker-dealer] 'qualified' for 'membership' in the [Securities Investor Protection Corporation ("S.I.P.C.")] and [was] thereby required to contribute to the S.I.P.C. reserve fund." 411 F. Supp. at 414. The case contains no analysis of whether the plaintiff was required to register as a dealer because it was already registered.

The Atlanta Staff only cites two cases in which the issue presented was whether a defendant was a dealer, *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357, 361-62 (1968), a half-century old case, and *Offill*, 2012 WL 246061, at *8-9, an unpublished district court decision. Both cases are distinguishable because they present dramatically different facts. Moreover, neither case appears to take account of the Commission and Staff's interpretive guidance and, therefore, are strikingly unpersuasive as to whether the Commission should authorize an enforcement action in light of that guidance.

*Eastside Church*, a 1968 decision, concerned a group of churches that had been cheated by a faithless agent who obtained from the churches certain "bearer bonds" that the churches had been persuaded to issue to finance church construction. 391 F.2d at 360. The agent had delivered the "bearer bonds" to the defendant, National Plan, but failed to remit any of the proceeds to the churches. *Id.* The churches sought to avoid the obligation to repay the bonds on the ground that National Plan should have been registered as a broker-dealer. In accepting that argument, the court cited National Plan's president's testimony that:

> [T]he principal business of National was to 'put on bond issues to build churches.' He stated that National went to churches where they had been requested to put on bond programs, assisted the church in doing all of the legal work concerning the bond program, took care of necessary printing, handled all of the paper work in connection with the bond issue, acted as fiscal agent and trustee of the property, and directed the bond sales program. He testified that the sales were made throughout the country.

391 F.2d at 361.

This case is not relevant to whether Global IV is a dealer under the securities laws because it does not contain any substantial analysis of the dealer question and it pre-dates by several decades the Commission and Staff's current guidance on dealer registration. Moreover, unlike Global IV, many of the factors that are part of that guidance appear to apply to National Plan. In particular, National Plan was (1) acting as an underwriter (as the defendant engaged in special selling efforts to distribute bonds to the public to raise capital for churches), (2) advertising that it was in the business of buying and selling church bonds, and (3) providing services to churches such as handling money and bonds. *Id.* Given the "totality of [National Plan's] securities activities" it is understandable that the court would determine that "those activities . . . constitute[d] engaging in dealer activities." Proposed Dealer Exemption Rule, 67 Fed. Reg. at 67,499. As explained above, the totality of Global IV's securities activities manifestly do not lead to the same conclusion.

In *Offill*, an unpublished decision from a Texas district court, the single defendant whose status was at issue assisted companies in going public, received shares as compensation for his services, purchased millions of newly issued shares from the companies, and regularly sold the shares he acquired in the market without registration or exemption. 2012 WL 246061, at *1, *3, *8-9. Certain co-defendants conducted a promotional "media awareness" campaign for the companies. *Id.* As further context to that decision, in related criminal cases two of the co-defendants were convicted of criminal securities fraud. *United States v. Offill*, No. 1:09-cr-134 (E.D. Va. Apr. 23, 2010), *aff'd*, 666 F.3d 168 (4th Cir. 2011); *United States v. Stocker*, No. 1:09-cr-118 (E.D. Va. Sept. 5, 2013).

These defendants are nothing remotely like Global IV. As explained in detail in our original submission, Global IV purchases outstanding trade payables owed by companies that are already publicly traded, exchanges those claims for shares of common stock through judicially-approved Section 3(a)(10) exchanges, and then holds some shares and sells others over an extended period of time in open market transactions through registered broker-dealers without any directed selling efforts. There is no suggestion that the market for any of those securities was influenced by any promotional activity, false statements, or other manipulative conduct. To the contrary, unlike *Eastside Church* and *Offill*, the exchanges at issue here were accomplished under judicial supervision and the courts who approved them expressly found that all of the terms and conditions of the exchanges were fair.

Neither the *Eastside Church* or *Offill* decisions reflect any analysis of the factors that the Commission and Staff have embraced for making the fact-specific determination of whether registration as a dealer is required. Accordingly, they provide no persuasive authority as to the

application of those factors to Global IV. Given the attention that the Commission and the Staff have focused on how registration status determinations should be made, it is incongruous to cite these analytically opaque decisions as authority for the proposition that an enforcement action should be authorized based on an analysis as simplistic as that advanced by the Atlanta Staff here. Such an effort has been soundly rejected. *Kramer*, 778 F. Supp. 2d at 1341 n.54 (rejecting and criticizing the Commission's argument that a person's status as a broker can be determined based on a single-factor, whether he received "transaction-based compensation," rather than "an array of factors").

The Atlanta Staff's reliance on *Eastside Church* and *Offill* for the simplistic notion that simply receiving and thereafter selling securities is sufficient to make a person a dealer cannot be squared with the Commission and Staff's extensive guidance, which requires facts not present here, such as contemporaneous and continuous buying and selling, to establish that a market participant is a dealer. For example, as Robert L.D. Colby, former Deputy Director of the Commission's Division of Trading and Markets and current Chief Counsel of the Financial Industry Regulatory Authority, Inc. ("FINRA"), has written in a treatise on the subject, the Staff has consistently "taken the position that a dealer must buy and sell, or be willing to buy and sell, *contemporaneously*" or on a continuous basis, which Global IV clearly does not do. Broker-Dealer Regulation § 2:3.1[B] (Clifford E. Kirsch ed., 2d ed. 2011 & Supp. 2014) (emphasis added) (citing Nat'l Council of Sav. Insts., SEC No-Action Letter, 1986 WL 67129 at *2 (July 27, 1986)) (stating that a trader or investor, unlike a dealer, "does not hold himself out as being willing to buy and sell securities for his own account on a *continuous basis*") (emphasis added). *See also* Proposed Dealer Exemption Rule, 67 Fed. Reg. at 67,499 (stating that "acting as a de facto market maker whereby market professionals or the public look to the firm for liquidity" is a factor that is indicative of dealer activity).

The Staff has identified contemporaneous and continuous buying and selling as a relevant factor in order to "distinguish dealers from investors who buy and sell a security for investment purposes, but sometimes hold the position for only a short amount of time." Broker-Dealer Regulation § 2:3.1[B] (Clifford E. Kirsch ed., 2d ed. 2011 & Supp. 2014). Examples of such investors include hedge funds (including high frequency traders), private equity funds, and venture capital funds, which the Staff has long-recognized are not required to register as dealers. *See id* at § 2:3.2[B]. ("The trader exception to the definition of dealer is often claimed by private equity funds, venture capital funds and hedge funds.") (citing Div. of Mkt. Regulation, U.S. Sec. & Exch. Comm'n, *Testimony of Richard R. Lindsey, Director, Before the House Committee on Banking and Financial Services, Concerning Hedge Fund Activities in the U.S. Financial Markets* (Oct. 1,1998) [hereinafter "Testimony on Hedge Fund Activities"], available at www.sec.gov/news/testimony/ testarchive/1998/tsty1498.htm). Like those investors, Global IV's securities activities do not make it a dealer since it does not hold itself out as being willing to buy and sell securities contemporaneously or on a continuous basis.

In addition, the Commission and the Staff have consistently taken the position that a dealer buys and sells securities *directly* from or to public investors or customers, which, again, Global IV does not do in its Section 3(a)(10) exchanges. *See* Proposed Dealer Exemption Rule, 67 Fed. Reg. at 67,499 (stating that dealer activities include "buying and selling *directly* to securities customers together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in

8

connection with transactions in securities, and carrying a securities account") (emphasis added); Div. of Trading & Markets, U.S. Sec. & Exch. Comm'n, *Guide to Broker-Dealer Registration* (Apr. 2008), http://www.sec.gov/divisions/marketreg/bdguide.htm (stating that "do[ing] business with the public (either retail or institutional)" is a factor indicative of dealer activity); Testimony on Hedge Fund Activities, at n.2 ("[A] dealer buys and sells securities as part of a regular business, *deals directly with public investors*, engages in market intermediary activities, and may provide other services to investors.") (emphasis added).

Global IV never deals directly with public investors. In its Section 3(a)(10) exchanges, Global IV does not directly buy shares of stock from anyone. Rather, it acquires bona fide outstanding claims against issuers, (John C. Kirkland Tr. (Dec. 10, 2013) at 49:18-51:11), and then *exchanges* those claims for shares of stock from the issuer through a court-approved settlement (Kirkland Tr. at 51:11-52:22, 107:21-108:21; Brendan O'Neil Tr. (Mar. 12, 2014) at 82:1-82:17). Likewise, Global IV does not directly sell any shares of stock to anyone. When Global IV does sell shares it does so through open market transactions executed solely through registered broker-dealers that act as an intermediary between Global IV and the unknown open market participants who purchase shares. (O'Neil Tr. at 32:1-33:2, 33:24-34:24, 37:1-37:12, 40:2-22, 42:7-15.) Accordingly, Global IV's transactions in securities is not the buying and selling activity that the Commission and Staff's guidance considers dealer activity.

Commission Chair Mary Jo White in a recent speech confirmed the well-established nature of the Commission and Staff's guidance distinguishing dealers from investors whose buying and selling activities are analogous to Global IV's activities. Mary Jo White, Chair, U.S. Sec. & Exch. Comm'n, Remarks at Sandler O'Neill & Partners, L.P. Global Exch. and Brokerage Conference, *Enhancing Our Equity Structure* (June 5, 2014) [hereinafter "Remarks by Chair White"], http://www.sec.gov/News/Speech/Detail/Speech/1370542004312#. VNfgUdJOWK8. Her speech discussed high frequency traders, who transact continuously and hold positions in securities for much shorter periods of time than Global IV. *Id*; *see* Concept Release on Equity Market Structure, Exchange Act Release No. 61358 (Jan. 14, 2010), 75 Fed. Reg. 3,594, 3,606 (Jan. 21, 2010) (proposed rule) (describing high-frequency traders as "professional traders acting in a proprietary capacity that engage in strategies that generate a large number of trades on a daily basis" who, among other things, often have "very short time-frames for establishing and liquidating positions"). Apparently recognizing that the existing regulatory framework and interpretive guidance will not support an assertion that such market participants must register, Chair White stated that she has asked the Staff to prepare a recommendation for the Commission as to whether it should issue a "rule to clarify the status of unregistered active proprietary traders to subject them to [the Commission's] rules as dealers." Remarks by Chair White. This statement suggests that, even with respect to high frequency traders, which arguably currently exhibit indicia of dealer status (e.g., frequently buying and selling on both sides of public markets), the Commission should proceed by engaging in rulemaking or, at a minimum, issuing further guidance rather than bringing enforcement proceedings. That posture reinforces the view here that it would be singularly unwarranted to proceed against Partners LLC via enforcement proceedings where Global IV's activities have none of the indicia of traditional dealer status.

**d.   The Staff's Acqua Wellington No-Action Position Is Fatal to the Proposed Case, and the Atlanta Staff's Attempt to Distinguish Acqua Wellington Is Not Persuasive.**

Notwithstanding the extensive guidance emphasizing the criticality of factors absent here, the Atlanta Staff has only identified one of twelve factors – purportedly acting as an underwriter – that it believes applies to Global IV.[7]  Our original submission thoroughly explained why Global IV does not engage in anything that could be characterized as "underwriting" activities in respect of the issuers.  Not only is there no agency relationship between Global IV and the issuers, but Global IV is an adverse litigation party obtaining shares in exchange for claims against the issuers, and sometimes must actively enforce the terms of the court order by additional heavily-contested litigation against the issuers.  Nor is Global IV's investment activity analogous to the activity of underwriters.  We will not repeat all of those arguments here.

Even if Global IV was somehow deemed an underwriter – a single one of the twelve factors identified in the Staff guidance – that fact would not by itself be sufficient to require Global IV to register as a dealer.  The Commission and Staff have repeatedly emphasized that it is "the totality of [market participant's] securities activities" that must be evaluated "to determine if those activities may constitute engaging in dealer activities."  Proposed Dealer Exemption Rule, 67 Fed. Reg. at 67,499 ("A person must evaluate the totality of its securities activities to determine if those activities may constitute engaging in dealer activities.").  *See also* Nat'l Council of Sav. Inst., SEC No-Action Letter, 1986 WL 67129, at *2 (July 27, 1986) (stating that whether a person is a dealer "depends substantially upon the facts of a given situation"); Burton Sec., SEC No-Action Letter, 1977 WL 10680, at *1 (Dec. 5, 1977) (same).  When viewed in their totality, Global IV's securities activities do not resemble the activities of a dealer under the securities laws.

The Atlanta Staff's effort to reduce the determination of Global IV's dealer status to a single factor not only ignores the evidence that, in the whole, Global IV's activities are overwhelmingly those of an investor, but also disregards the Commission and Staff's longstanding guidance.  When the Commission recently made a similar effort in district court litigation to reduce the multi-factor test concerning broker status to single-factor its argument was resoundingly criticized and rejected by the court.  *Kramer*, 778 F. Supp. 2d at 1341 n.54.  The court expressly stated that "the Commission's proposed single-factor 'transaction-based compensation' test for broker activity (i.e., a person 'engaged in the business of effecting transactions in securities for the accounts of others') [was] an inaccurate statement of the law."  *Id.*  Moreover, the court reiterated that – like dealer status in this matter – "an array of factors determine the presence of broker activity.  In the absence of a statutory definition enunciating otherwise, the test for broker activity must remain cogent, multi-faceted, and controlled by the Exchange Act."  *Id.*

---

[7] *See, e.g.*, Davenport Mgmt., Inc., SEC No-Action Letter, 1993 WL 120436 (Apr. 13, 1993); C & W Portfolio Mgmt., Inc., SEC No-Action Letter, 1989 WL 258821 (July 20, 1989); Fairfield Trading Corp., SEC No-Action Letter, 1988 WL 233618 (Jan. 10, 1988); Louis Dreyfus Corp., SEC No-Action Letter, 1987 WL 108160 (July 23, 1987); United Sav. Assoc. of Tex., SEC No-Action Letter, 1987 WL 107923 (Apr. 2, 1987); Nat'l Council of Sav. Insts., SEC No-Action Letter, 1986 WL 67129 (July 27, 1986); Burton Sec., SEC No-Action Letter, 1977 WL 10680 (Dec. 5, 1977).

Further, the Atlanta Staff's Section 15(a) theory disregards the Staff's no-action letter to Acqua Wellington, an offshore investment fund that raised capital for small publicly traded companies by purchasing shares of their common stock through equity lines of credit. Acqua Wellington North Am. Equities Fund, Ltd., SEC No-Action Letter, 2001 WL 1230266 (Oct. 11, 2001) [hereinafter "Acqua Wellington"]. There, the Staff properly adhered to the Commission's guidance that the totality of a person's securities activities must be considered in determining whether it is a dealer. Although Acqua Wellington, unlike Global IV here, expressly acknowledged that it was "an underwriter, thus meeting one factor in the list of twelve," it argued that "this factor must be considered in conjunction with the fact that no other factor applies to [Acqua Wellington]." *Id.*, 2001 WL 1230266, at *5. Based on the totality of Acqua Wellington's securities activities, the Staff determined that even though Acqua Wellington was an underwriter, that fact was not sufficient by itself to require Acqua Wellington to register as a dealer. *Id.*, 2001 WL 1230266, at *1.

Acqua Wellington's no-action request expressly asserted that its "underwriter status, standing alone, [did] not create a sufficient basis to require [it] to register as a dealer" because it "satisfie[d] only one of the twelve [dealer] factors" and "other non-dealers are regularly considered underwriters." Acqua Wellington, 2001 WL 1230266, at *5. Both of these arguments apply with equal force to Global IV. The Staff's no-action position in response to Acqua Wellington's request is hardly surprising since it is based on the longstanding guidance that the totality of a person's securities activities must be considered and the well-recognized securities law principle that "[t]he term underwriter is defined not with reference to the particular person's general business but on the basis of his or her relationship to the particular offering." Louis Loss, Joel Seligman, & Troy Paredes, Securities Regulation 1330 (5th ed. 2014). As a result, an underwriter may include broker-dealers and non-broker-dealers, such as individual investors, hedge funds, and private equity funds. *Id.* ("No distinction is made between professional investment bankers and amateurs."); David A. Lipton, Broker Dealer Registration § 3:2 (2014) ("The definition of underwriter is functional, rather than being derived from business titles. As a consequence, . . . . individuals who do not even bear the title of broker or dealer might be considered underwriters if they do satisfy an element of the function definition."). In other words, a person's status as an underwriter does not mean that he is a broker-dealer. Louis Loss, Joel Seligman, & Troy Paredes, Securities Regulation 1330 (5th ed. 2014). ("Any person who performs one of the specified functions in relation to the offering is a statutory underwriter even though he or she is not a broker or dealer.").[8]

Acqua Wellington's no-action request was also grounded on the fact that its activities have "more in common with an institutional or private investor purchasing stock in a private placement than with the types of underwriters that commonly are viewed as dealers." Acqua Wellington, 2001 WL 1230266, at *5. So to do Global IV's activities. Like Acqua Wellington, Global IV "faces risk more akin to an investor than an underwriter that is also a dealer" because (i) it does not control how much stock it will ultimately receive in a Section 3(a)(10) exchange, (ii) it does not control when it will receive the stock, and, perhaps most importantly, (iii) it

---

[8] *See also In re Laser Arms Corp. Sec. Litig.*, 794 F. Supp. 475, 484 (S.D.N.Y. 1989), *aff'd*, 969 F.2d 15 (2d Cir. 1992) (quoting Louis Loss, The Fundamentals of Securities Regulation 277-78 (1983)); *Nelson v. Quimby Island Reclamation Dist. Facilities Corp.*, 491 F. Supp. 1364, 1371 (N.D. Cal. 1980) (quoting Louis Loss, Securities Regulation 547 (2d ed. 1961)).

receives no assurance that there will be an active trading market in the stock at the time Global IV receives the stock or at the time Global IV determines to sell the stock. *Id.* For these reasons, even if Global IV could be deemed an underwriter, that sole factor does not change Global IV's status from an investor to a dealer.

It is evident from the record that Global IV bears greater market risk and is therefore even less analogous to a traditional dealer acting as an underwriter than Acqua Wellington. In an equity line of credit there is a delay, often two weeks, between when an issuer initiates a draw down on an equity line and when an underwriter, such as Acqua Wellington, pays the issuer. Acqua Wellington, 2001 WL 1230266, at *3 n.5. ("A draw down consists of a notice from the company to the investor that it intends to sell a specified dollar amount of common stock to the investor, followed by a pricing period, and culminating in the settlement, at which the investor pays the dollar amount of securities purchased."); Amy Trombly, *Equity Lines Under the Federal Securities Laws*, Insights: The Corporate & Sec. Law Advisor, May 2001, at 2 ("[M]any equity lines are structured so that it takes approximately two weeks from the time the company initiates a drawdown until that drawdown closes and the company receives the proceeds."). During this period, Acqua Wellington could reduce or eliminate its investment risk – much like a traditional underwriter – by selling the shares of stock that it acquires from the issuer into the market *before* it is required to pay the issuer. Acqua Wellington, 2001 WL 1230266, at *6 ("Acqua is entitled to treat the draw-down notice as the transfer of ownership of the common stock and, therefore, Acqua may dispose of the common stock at its discretion once the notice has been given."); Luisa Kroll, *Toxic Stocks*, Forbes (Mar. 4, 2002), http://www.forbes.com/forbes/2002/0304/040a.html (stating that equity line investors, such as Acqua Wellington "can turn a quick profit by selling the stock immediately, before taking possession of the new shares"). Indeed, in its no-action request Acqua Wellington expressly provided that it was free to short sell the issuers shares upon notice of a drawdown, with the proceeds of the short sale available to pay the issuer. Acqua Wellington, 2001 WL 1230266, at *6 ("Acqua . . . agrees not to engage in short selling the company's stock during the term of the equity line agreement, *except pursuant to a draw-down notice for which Acqua has yet to take possession of the shares.*") (emphasis added).

In contrast to Acqua Wellington, and like an investor, Global IV has an out of pocket cash investment – for which it is at market risk – before it engages in any market transactions. Global IV generally makes all or part of the payment to an issuer's creditors on court approval of the settlement and exchange with the issuer, and even in transactions where part of the payment is deferred, it is contractually obligated to pay the full amount. (Kirkland Tr. at 52:23-53:14, 63:7-16.) Global IV *does not engage in any hedging activities* to mitigate that risk. In particular, and in stark contrast to Acqua Wellington, Global IV is under court order not to short. Global IV's settlement agreement expressly prohibits it from short selling the stock of an issuer in a Section 3(a)(10) transaction. (O'Neil Tr. at 43:18-20, 124:13-20.) Rather, Global IV bears the full market risk of its investment, generally for a period of weeks, as it assesses the secondary market and formulates an approach to exiting its investment that will not disrupt the market, which approach may take months or years to execute. (O'Neil Tr. at 89:17-22; Richard Kreger Tr. (Apr. 3, 2014) at 174:19-175:10.) As a result, it has substantial capital outlays from the

commencement of a transaction, and its capital remains at risk for a period of months or years.[9] Not surprisingly given the risks it takes, there are transactions in which it does not successfully recover its capital investment. (Kirkland Tr. at 76:16-19, 248:8-12.) In addition, Global IV does not use the proceeds from the sales of an issuer's stock to pay that issuer's creditors. (Kirkland Tr. at 53:12-14, 127:4-16; O'Neil Tr. 126:21-127:3; Kreger Tr. at 148:17-18.)

The Acqua Wellington guidance disposes of the assertion that Global IV should be registered as a dealer. At a minimum, it stands for the proposition that a market participant that has none of the well-recognized characteristics of a dealer except for a role as an underwriter in the new issuance of securities, and that bears market risk with respect to the securities it purchases and sells, is on the investor side of the dealer/investor distinction and is not required to register. In Acqua Wellington's case that was the Staff's conclusion notwithstanding that it is an acknowledged underwriter distributing newly offered shares in a capital raising transaction by an issuer. Even those features are missing in Global IV's case, as the shares it receives and sells are issued pursuant to judicially-approved exchanges liquidating outstanding claims and are not capital raising transactions.

In an effort to avoid the Acqua Wellington guidance, the Atlanta Staff has scoured the no-action letter and identified what it asserts are distinguishing facts concerning the manner in which Acqua Wellington and Global IV transact their business. But these are mere distinctions without a difference and do not support a different result. First, they do not implicate the features of the required multi-factor factual analysis used to determine dealer status. Second, in many instances the asserted differences do not exist, and in any event are immaterial. They do not implicate any investor protection concerns that should bear on registration determinations. We address each of the asserted differences in turn.

(i)  **Identification of Potential Transactions**

The Atlanta Staff asserts that Global IV identifies issuers that may be suitable for exchanges (i) by attending conferences where it meets issuers and (ii) by using finders who introduce issuers to Global IV and often receive a finder's fee from Global IV, where Acqua Wellington asserted that it did not directly solicit companies to enter into equity lines of credit, though it did have unaffiliated broker-dealers solicit companies, and it did not pay finder's fees. If it was contacted directly by a company about an equity line of credit Acqua Wellington would ask the company to use an unaffiliated broker-dealer as its placement agent.

There is no material difference. First, Acqua Wellington never stated in its no-action request that it would not attend conferences where it could meet issuers. Given the importance of conferences to small publicly traded companies seeking investors and investors that make direct equity investments in such companies, it seems quite likely that Acqua Wellington did attend conferences where it could meet issuers. Second, Aqua Wellington did use finders, albeit registered broker-dealers. The record here is that in many instances Global IV was introduced to

---

[9] (See e.g., SEC Exhibit 36, at VELA - Aggregated Cash Flow, SEC Exhibit 37, at GNIN - Cash Flow, SEC Exhibit 38, at RFMK - Aggregated Cash Flow, SEC Exhibit 39, at AXLX - Aggregated Cash Flow, SEC Exhibit 40, at CERP - Aggregated Cash Flow, SEC Exhibit 41, at ECDC - Aggregated Cash Flow; Kirkland Tr. at 127:13-16.)

issuers by unaffiliated registered broker-dealers. (Kirkland Tr. at 65:1-2, 281:1-3; O'Neil Tr. at 56:21-57:1, 59:3-11; Kreger Tr. at 73:2-11, 114:1-9.) That in some instances issuers may have contacted Global IV in other ways has no bearing on the factual analysis required to determine whether a market participant is a dealer. Unlike Acqua Wellington, Global IV was not engaging with the issuer as a named underwriter on the registration statement in a registered offering, and as such the details of its interaction with the issuer are less analogous to those of a dealer underwriter. Third, the regulatory objective in requiring a licensed broker, instead of a finder, as an intermediary between an issuer and an investor is to protect the investor. *See, e.g.*, Cal. Corp. Code § 25501.5 (providing remedies to an investor who transacts in securities with a broker-dealer without a required license to rescind the transaction or to seek damages). Since Global IV is an investor, and in the Section 3(a)(10) transactions is an adverse party in litigation with the issuer (and not the issuer's agent), there is no conceptual rationale for requiring Global IV to utilize a broker and subjecting it to an enforcement action for the exchanges in which it did not. Fourth, Global IV's interaction with issuers does not implicate any investor protection concerns identified by the Atlanta Staff, which are focused on Global IV's activities in selling the shares it obtains through the court-approved exchanges in the secondary market. Since utilizing an unaffiliated broker-dealer between itself and issuers in the transactions where it does not already do so would not affect any investor protection concern, it cannot stand as a distinguishing factor from Acqua Wellington.

### (ii)    Commissions Paid to Selling Broker-Dealers

In the body of its no-action request letter, Acqua Wellington observed that it would be responsible for paying commissions or markdowns to the selling broker-dealer, which it believed would not be underwriter compensation. It did not include that as a condition that it would commit to observing as part of its request, and the Staff did not require that it do so. That the Atlanta Staff has focused on this feature as a point of distinction is emblematic of the lengths to which it has gone to find some basis to distinguish Acqua Wellington.

As a matter of fact, this point does not distinguish Acqua Wellington from Global IV. Global IV deposits the shares received in a court approved Section 3(a)10 exchange in accounts at registered broker dealers and sells them in open market transactions. These broker dealers charge Global IV sales commissions (typically expressed as percentage of dollar sale value), deposit fees (typically expressed as percentage of dollar deposit value), stamp tax fees, Depository Trust Company ("DTC") fees, non-DTC fees, transfer agent fees, rush fees, and securities processing fees. All of these fees are paid by Global IV and not the issuer. None of these fees are charged to the issuer in a pass through or any other manner.

The Atlanta Staff observed that in a few term sheets associated with a small number of the settlements with issuers, there is reference a small per share adjustment, such as one cent, that was sometimes referred to as relating to transaction costs. No such language appears in the final settlement agreements or court orders for Global IV's Section 3(a)(10) exchanges. To the extent that a small per share charge was included in an exchange, it was the product of arms-length price negotiations with issuers as part of the overall settlement, which in every case was subject to review and approval by a court. It does not correlate to brokerage commissions incurred in subsequent sales of those shares, much less amount to a pass through of such

commissions to the issuers.  It is in no way analogous to an underwriter discount.  In any event, this element of the exchange formula does not implicate any investor protection concern.

### (iii)    Issuer Size

Acqua Wellington did not enter into equity lines of credit with companies that had less than $100 million in market capitalization.  Global IV conducts Section 3(a)(10) exchanges primarily with companies that have less than $100 million in market capitalization.  As a result, the Atlanta Staff assumes that Global IV may represent a larger proportion of secondary trading market volume than Acqua Wellington.

The Atlanta Staff's speculation does not supply a meaningful basis to distinguish Acqua Wellington, and in any event relies on assumptions that appear counterfactual.  First, there is no indication that Acqua Wellington's decision to limit its equity line investments to companies that had $100 million or more in market capitalization was an important factor in the Staff's Section 15(a) analysis.  Nor is there any reason to think that it was, as it is not a factor that the Commission and the Staff have ever identified as indicative of dealer status.  We observe that equity line investors commonly do provide equity lines of credit to smaller capitalization companies without registering as dealers, in reliance on Acqua Wellington.[10]  Second, without a proportionate commitment to limit the size of its transactions – which Acqua Wellington did not offer and the Staff did not seek – a market capitalization condition has no direct impact on the proportion of secondary market activity.  Acqua Wellington's no-action request conspicuously did not place a limit on the amount of shares it could own or the pace at which it could liquidate its investment, and on the contrary specified that it could begin short selling even before receiving any shares.  In stark contrast, Global IV's settlement agreements limit its share ownership to no more than 9.99% of an issuer's outstanding shares at any one time, and the record is that in exiting its investment consciously sought to represent a minority of the secondary market and minimize impact on the market price.  (Kirkland Tr. at 58:16-20; Keith Coulston Tr. (Mar. 12, 2014) at 25:25-26:8; O'Neil Tr. at 89:9-90:2.)

The Atlanta Staff's focus on the size of the companies in which Global IV invests reveals a regrettable and unfair bias against smaller companies and investors in those companies.  There is nothing about the Section 3(a)(10) exemption that limits its availability only to large issuers.

---

[10] *See, e.g.*, Andalay Solar, Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (Dec. 11, 2014); Nutranomics Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (Mar. 6, 2014) (stating that Nutranomics Inc. entered into equity line of credit with Southridge Partners II LP); Writ Media Group, Registration Statement Under the Securities Act of 1933 (Form S-3) (Oct. 31, 2013) (stating that Writ Media Group entered into equity line of credit with Dutchess Opportunity Fund II); Genufood Energy Enzymes, Registration Statement Under the Securities Act of 1933 (Form S-3) (July 26, 2013) (stating that Genufood Energy Enzymes entered into equity line of credit with Kodiak Capital Group LLC); Green Automotive Co., Registration Statement Under the Securities Act of 1933 (Form S-3) (July 10, 2013) (stating that Green Automotive Co. entered into equity line of credit with Kodiak Capital Group LLC); SMTP Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (June 20, 2013) (stating that SMTP Inc. entered into equity line of credit with Dutchess Opportunity Fund II); Advaxis Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (Nov. 14, 2012) (stating that Advaxis Inc. entered into equity line of credit with Hanover Holdings LLC); East Coast Diversified Corp., Registration Statement Under the Securities Act of 1933 (Form S-3) (Aug. 22, 2011) (stating that East Coast Diversified Corp. entered into equity line of credit with Southridge Partners II LP).

Congress easily could have imposed such a limitation, but it did not. Global IV has every right to invest in such small public companies and those companies have every right to benefit from such investment. It is inconsistent with the Commission's mission to "maintain fair, orderly, and efficient markets, and facilitate capital formation" for the Atlanta Staff to try to limit the benefits of our financial markets to only large companies. U.S. Sec. & Exch. Comm'n, *The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation*, http://www.sec.gov/about/whatwedo.shtml#.VOspb9JOXws (last visited Feb. 18, 2015) ("The mission of the U.S. Securities and Exchange Commission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation.").

### (iv)    Notice of Possible Self-Regulatory Organization Filing Obligations

Acqua Wellington notified its selling broker-dealer that it was participating in an equity line of credit and that the selling broker may have a filing obligation under National Association of Securities Dealers ("NASD") Rule 2710 (which is now FINRA Rule 5110) at the time the issuer filed a post-effective amendments to its registration statement with the Commission. This condition is simply not relevant to Global IV since it does not participate in registered public offerings, and therefore no notice obligations on the filing of a post-effective amendment could arise. What is relevant is that Global IV provided its broker-dealers with a copy of the court order approving the Section 3(a)(10) exchange and notified them that the shares were issued and sold in reliance upon the Section 3(a)(10) exemption. (O'Neil Tr. at 84:20-85:19). In addition, Acqua Wellington expressly stated that it had no responsibility for the compliance or non-compliance of its selling broker-dealers with NASD Rule 2710, so its volunteered notice could not have been critical to the Staff's Section 15(a) analysis.

### (v)    Discount to Market Price

Acqua Wellington limited the difference between its purchase price and the stated market price (as determined by an agreed-upon formula) so that it would not exceed the amount of compensation a broker-dealer could receive as an underwriter under NASD Rule 2710. The Atlanta Staff asserts that Global IV does not place a similar limitation on the difference between its purchase price and the stated market price. The Atlanta Staff fails to recognize the crucial differences between an equity line of credit financing, which is an at the market offering of shares for cash, and a Section 3(a)(10) exchange. As the market has determined, equity lines are a much lower risk and as such warrant a lower return. In its exchanges, Global IV is not buying shares directly from issuers and is not providing equity financing. It is exchanging its claims for shares of stock, through a formula that is the product of arm's length bargaining between adverse litigation parties and that is reviewed for fairness and approved by a court. Global IV does not short sell and typically does not sell any of its positions for some period after the exchange. The mechanics of this exchange do not allow for a simple translation to the "purchase price" and "stated market price" conventions used in NASD Rule 2710. In addition, that rule sets the compensation for a person consciously acting as an underwriter, not an investor who bears market risk. As discussed above, Acqua Wellington consciously acted as an underwriter, and was free to hedge its position to eliminate its market risk in advance of receiving its shares.

16

(vi)    **Compliance**

Acqua Wellington hired a compliance officer to monitor its compliance with the restrictions that it placed on its activities. This is not a valid basis for a distinction. Identifying an employee as a compliance officer does not itself achieve compliance and is not required. In addition, Global IV's Section 3(a)(10) exchanges undergo the legal scrutiny of attorneys from both sides of the transaction and, most importantly, an impartial, duly confirmed state court judge who reviews and approves the fairness of its transactions before it engages in any of them. Mandatory judicial review does more to ensure compliance than designating a function for an internal employee. Moreover, the record is replete with evidence of the focus on legal and regulatory compliance in Global IV's exchanges. (Kirkland Tr. at 18:25-21:24, 93:1-18, 259:2-260:2, 272:25-273:6, 286:1-8.) Moreover, apart from its analytical disagreement regarding the registration requirement at issue, there is no suggestion that Global IV fails to comply with any legal requirement. It cannot seriously be contended that, on the record here and in the face of the Staff's guidance, the fact that there was no formal designation of a "compliance" officer rendered Global IV a dealer under the Exchange Act.

The Atlanta Staff's effort to distinguish Acqua Wellington from Global IV is simply unpersuasive. Overwhelmingly, the differences identified by the Atlanta Staff do not address its investor protection concern with Global IV's activities. Since these differences do not relate to Atlanta Staff's concern in this matter, they are not relevant to whether Global IV is a dealer. It is not enough for the Atlanta Staff to point to differences between Global IV and Acqua Wellington and assert that these differences mean that the Acqua Wellington no-action letter is inapplicable to Global IV. For that to hold, the differences between the two cases must be meaningful, which they clearly are not. The Acqua Wellington no-action letter provides a clear, persuasive, and compelling rationale for concluding that Global IV is not a dealer, even if it is deemed to be an underwriter. But Acqua Wellington does not stand alone. It simply expresses securities law principles that were broadly recognized in Commission and Staff guidance before it was issued and have been widely relied upon by investors, such as Global IV, since it was issued.

c.      **Even if Global IV Were a Dealer, It Would Qualify As A Foreign Broker-Dealer Exempt from Registration**

Even if Global IV's activities could constitute dealer activities, Global IV is exempt from registration as a foreign broker-dealer, as our original submission explained. Global IV is a non-U.S. resident because it is organized as a British Virgin Islands business company, has it sole place of business in the British Virgin Islands, and does not have any offices, employees, or bank accounts in the United States. 17 C.F.R. § 240.15a-6(b)(3). In addition, Global IV is not an office or a branch of a registered broker or dealer. *Id.* Further, as explained in our original submission, Global IV's selling of securities it acquires in Section 3(a)(10) exchanges falls within the specified activities involving U.S. investors that are permitted by foreign broker-dealers without registration. *See* 17 C.F.R. § 240.15a-6(a)(1) ("Effects transactions in securities with or for persons that have not been solicited by the foreign broker or dealer."), *and* 17 C.F.R. § 240.15a-6(a)(1) (4) ("Effects transactions in securities with or for, or induces or attempts to induce the purchase or sale of any security by: (i) A registered broker or dealer, whether the registered broker or dealer is acting as principal for its own account or as agent for others."). The Atlanta Staff has raised the question of whether Global IV has a chaperoning broker-dealer

17

in the U.S., which is required under a different part of the exemption, 17 C.F.R. § 240.15a-6(a)(1) (3). This question is not relevant to Global IV since it does not rely upon that exemption. The exemptions it does rely upon do not require a chaperoning relationship.

### 2. Partners LLC Did Not Control Global IV Within the Meaning of Section 20(a).

The Atlanta Staff cannot establish that Partners LLC controlled Global IV, particularly with regard to Global IV's assessment that it was not required to register as a dealer with the Commission. In the Atlanta Staff's view, Partners LLC is a controlling person of Global IV because, it asserts, (1) Partners LLC was the sole-shareholder of Global IV, which the Atlanta Staff claims gives it the ability to exercise power over Global IV; (2) two of Partners LLC's principals are involved in sales of Global IV's shares of stock, pursuant to Global IV's direction, in their roles with a separate registered investment adviser that acts for Global IV; and (3) Partners LLC identifies issuers to engage in Section 3(a)(10) transactions with Global IV. But these circumstances, even assuming they were all accurate (which they are not), would not establish that Partners LLC was a controlling person within the meaning of Section 20(a) for purposes of Global IV's alleged Section 15(a) violation.

In Section 20(a), "Congress did not define the meaning of control. Rather, it left that task to the courts." *Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (citation omitted). The federal courts have not developed a uniform definition of "control" within the meaning of Section 20(a). Overall, the courts have recognized that a "determination as to whether control exists [is] dependent on the particular factual circumstances of each case." *Laperriere v. Vesta Ins. Grp., Inc.*, 526 F.3d 715, 723 (11th Cir. 2008). The Eighth Circuit, however, "has developed what has become the most widely used test for determining whether a defendant is liable as a controlling person." *Brown v. Enstar Grp., Inc.*, 84 F.3d 393, 396 (11th Cir. 1996). *See also* Alan R. Bromberg, Lewis D. Lowenfels, & Michael J. Sullivan, Bromberg & Lowenfels on Securities Fraud § 7:344 (2d rev. ed. 2003 & Supp. 2014) (stating that the Eighth Circuit's two-prong test for control is "the most common definition of control within the context of . . . [Section 20(a)] and the most widely used test"). That test requires a plaintiff to establish that "'the defendant . . . actually participated in (*i.e.*, *exercised* control over) the operations of the corporation in general . . . [and] that the defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated.'" *Brown*, 84 F.3d at 396 (alterations in original) (citation omitted). Thus, to establish that Partners LLC was a controlling person of Global IV, the Atlanta Staff would have to satisfy *both* prongs of this two-prong test for control, which it cannot do.

There is no evidence in the record that Partners LLC "'actually participated in (*i.e.*, *exercised* control over) the operations of [Global IV] in general.'" *Brown*, 84 F.3d at 396 (citation omitted); *see also Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 85 (1st Cir. 2002) ("To meet the control element, the alleged controlling person must not only have the general power to control the company, but must also actually exercise control over the company."). First, Partners LLC's former position as sole-shareholder of Global IV, standing alone, is not sufficient to establish control. A defendant's status as a controlling shareholder "indicates some potential ability to control," however, "[i]n the absence of some indicia of the *exercise* of control over the entity primarily liable, . . . that status alone is not enough" to prove control under Section 20(a).

18

*Id.* (emphasis in original) (holding that defendants' status as controlling shareholders with the power to elect two-thirds of corporation's directors did not establish that defendants exercised control over the corporation). "Although controlling shareholders own the majority of the shares in a company, they, like any other shareholders, should have the ability to be passive, leaving the management to the directors and officers." *Id.*[11]   There is no evidence in the record that Partners LLC utilized its shareholder rights to actually exercise power over Global IV's operations. (Kirkland Tr. at 122:14-123:5; Kreger Tr. at 54:1-15; Coulston Tr. at 46:1-6; O'Neil Tr. at 26:6-11, 29:1-14, 37:1-12, 40:2-22, 42:7-22, 46:22-47:3, 65:18-66:14, 75:20-24, 79:17-21, 87:13-20, 93:11-94:13.)

Second, the involvement of two of Partners LLC's principals acting on behalf of an investment adviser for Global IV is not tantamount to Partners LLC exercising control over Global IV's operations. These principals acted as investment advisers for Global IV in their role as principals of registered investment adviser, a separate legal entity, engaged by Global IV, not in their role as principals of Partners LLC. (O'Neil (Mar. 12, 2014) Tr. at 35:14-21, 36:3-8, 36:20-25.) Global IV has an investment advisory agreement with that investment adviser, pursuant to which it works for Global IV, not the other way around. (O'Neil Tr. at 34:11-24; SEC Exhibit 66, Investment Management Agreement (SEC-IGP-E-0000068 to SEC-IGP-E-0000073).) The investment adviser's role is to sell Global IV's shares in accordance with general selling instructions provided by Global IV. (O'Neil Tr. at 33:24-34:24, 37:1-37:12, 40:2-22, 42:7-15, 87:13-20.) In doing so, the investment adviser is acting at the direction of Global IV, not exercising control over Global IV's operations on behalf of Partners LLC. *See Lustgraaf,* 619 F.3d at 878 (holding that "the mere fact that . . . two entities shared the same office space" and had "some crossover in agents and representatives" is not a sufficient allegation of control under Section 20(a)). Moreover, as a matter of law, the investment adviser is a fiduciary to its client, Global IV. *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 201 (1963) (stating that an investment adviser has a fiduciary relationship to his clients). As a fiduciary, the investment adviser has a duty to act in the best interests of Global IV. *Id.* at 191 (explaining that investment adviser has a fiduciary duty to protect its client's interests). *See also* U.S. Sec. & Exch. Comm'n, *Information for Newly-Registered Investment Advisers,* available at http://www.sec.gov/divisions/investment/ advoverview.htm (last visited Feb. 21, 2015) (stating

---

[11] Global IV's formation documents "leav[e] the management" of the company to its directors and officers. The documents state: "The business and affairs of the Company shall be managed by, or under the direction or supervision of, the directors of the Company. The directors of the Company have all the powers necessary for managing, and for directing and supervising, the business and affairs of the Company." (SEC Exhibit 58, Memorandum of Association and Articles of Association of Ironridge Global IV, Ltd. (SEC-IGP-E-0000030 to SEC-IGP-E-0000054, at -046).) In addition, the documents state:

[I]t shall be the responsibility of the Chairman of the Board to preside at meeting of directors and Shareholders, the president to manage the day to day affairs of the Company, the vice-presidents to act in order of seniority in the absence of the president but otherwise to perform such duties as may be delegated to them by the president, the secretaries to maintain the register of members, minute books and records (other than financial records) of the Company and to ensure compliance with all procedural requirements imposed on the Company by applicable law, and the treasurer to be responsible for the financial affairs of the Company.

(SEC Exhibit 58, Memorandum of Association and Articles of Association of Ironridge Global IV, Ltd. (SEC-IGP-E-0000030 to SEC-IGP-E-0000054, at -048).)

Case 0:17-cv-62255-MGC   Document 92-4   Entered on FLSD Docket 12/20/2019   Page 112 of 151

that as a fiduciary an investment adviser has "a fundamental obligation to act in the best interests of [its] clients and to provide investment advice in [its] clients' best interests"). The investment adviser's role as a fiduciary that is acting in the bests interests of its client is fundamentally inconsistent with the assertion that Partners LLC controlled Global IV's operations through the investment adviser.

Third, to the extent Partners LLC assisted Global IV in identifying potential investment opportunities, that circumstance would not mean that Partners LLC was exercising control over Global IV's operations. "'Unless there are facts that indicate that [a] controlling shareholder[] [was] actively participating in the decisionmaking process of the [primary violator], no controlling liability can be imposed.'" *Lustgraaf*, 619 F.3d at 878 (fourth alteration in original) (quoting *Aldridge*, 284 F.3d at 85). As the record evidence in this matter reflects, Global IV – not Partners LLC – is the entity that decides whether to engage in Section 3(a)(10) transactions and, ultimately, does engage in such transactions. (Kirkland Tr. at 122:14-123:5; Kreger Tr. at 54:1-15; Coulston Tr. at 46:1-6; O'Neil Tr. at 26:6-11, 29:1-14, 37:1-12, 40:2-22, 42:7-22, 46:22-47:3, 65:18-66:14, 75:20-24, 79:17-21, 87:13-20, 93:11-94:13.) Global IV purchases receivables from creditors, brings lawsuits against issuers, enters settlement agreements with issuers, receives shares of stock through Section 3(a)(10) exchanges, and provides its registered investment adviser with authorization to have registered broker-dealers sell its shares. These activities constitute Global IV's operations and decisions as they relate to Section 3(a)(10) transactions. There is no evidence that Partners LLC exercises control over these operations and decisions. *See Swack v. Credit Suisse First Boston*, 383 F. Supp. 2d 223, 246 (D. Mass. 2004) (dismissing Section 20(a) claim that research analyst was a controlling person of another analyst, who allegedly issued false and misleading research reports, because he did not actually exercise control over the contents of the analyst's research reports, even though he was "in a managerial position with the power to control" him).

A federal district court has already reached this very conclusion with regard to Global IV. *NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*, No. 14CV3945, 2014 WL 2619588, at *4 (S.D.N.Y. June 11, 2014). In *NewLead Holdings*, the court had to determine whether Global IV was a "mere department" of Partners LLC (i.e., whether Partners LLC controlled Global IV) as part of its analysis of whether it had personal jurisdiction over Global IV. *Id.* Like the Atlanta Staff, the court was well aware that Partners LLC and Global IV had common ownership and that Partners LLC assisted Global IV in identifying potential investment opportunities. *Id.* (noting that "[a]ll of [the issuer's] negotiations with [Global IV] were conducted by [Partners LLC]" and that the issuer had "no interactions" with Global IV). Yet, the court found that these facts were insufficient to establish that Global IV was a mere department of Partners LLC because there was "no evidence as to the remaining factors" that make a subsidiary a mere department of a parent. *Id.* Specifically, the court found that there was no evidence that Partners LLC exercised control over the marketing and operational policies of Global IV, that Partners LLC interfered in the selection and assignment of Global IV's executive personnel and failed to observe corporate formalities, or that Global IV was financially dependent on Partners LLC. *Id.* The court's ruling in *NewLead Holdings* entirely undermines the Atlanta Staff's assertion that the assistance Partners LLC provided Global IV in identifying potential investments means that Partners LLC is exercising control over Global IV's operations.

Since the Atlanta Staff has failed to prove the first prong of the control test it cannot establish that Partners LLC was a controlling person of Global IV for purposes of Global IV's assessment of whether it had to register.  Even if that were not the case, the Atlanta Staff's control theory would still collapse because it has also failed to establish that Partners LLC "possessed the power to control the specific transaction or activity upon which the primary violation is predicated," namely, Global IV's conclusion that it was not required to register as a dealer with the Commission.  *Brown*, 84 F.3d at 396 (quotation marks and citation omitted). Although the Atlanta Staff emphasizes Partner LLC's status as sole-shareholder, it has not offered any evidence that Partners LLC's ownership of Global IV conferred upon it the power to decide whether Global IV would register as a dealer.  A defendant's status as a sole-shareholder does not show that he had the power to control a specific transaction or activity.  *See Aldridge*, 284 F.3d at 85 (holding that defendants' status as controlling shareholders with the power to elect two-thirds of company's directors did not establish that defendants had "direct control over the management and operations of the company").  *See also* Corporate Governance: Law & Practice, Ch. 3, Stockholders' Rights, § 3.02 (Amy L. Goodman and Steven M. Haas, eds., Matthew Bender & Co., 2013) (explaining that "[s]tockholders have the right to elect the directors who serve on the board of directors," but "the business and affairs of a corporation are governed by a board of directors").

### 3. There Is No Suggestion of Culpable Participation or Bad Faith by Partners LLC Regarding Global IV's Conclusion That It Was Not Required to Register.

Whether  the state of mind element for control person liability is described as "culpable participation" or lack of "good faith," as set forth in detail below it is clear that it requires evidence of "conscious misbehavior" or "recklessness."  A fact intensive inquiry by a trier of fact is necessary to conclude that such a state of mind exists.  *See, e.g., CompuDyne Corp. v. Shane*, 453 F. Supp. 2d 807, 829 (S.D.N.Y. 2006) (stating that "[w]hether a person is a 'controlling person' is a fact-intensive inquiry".); *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 208 (S.D.N.Y. 2011) (same) (citation omitted).  *Cf. S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1093 (9th Cir. 2010) (establishing recklessness in the antifraud context includes "'a subjective inquiry' turning on 'the defendant's actual state of mind.'") (citation omitted); *Gebhart v. SEC*, 595 F.3d 1034, 1042 (9th Cir. 2010) (same).  Here, however, the Atlanta Staff has not pointed to any facts suggesting that Partners LLC was a culpable participant in or did not act in "good faith" in connection with Global IV's evident conclusion that it was not required to register as a dealer with the Commission.  Against the background of the pre-existing Commission and Staff guidance supporting the view that registration was not required, and the novelty of the Atlanta Staff's contrary approach, it is impossible to do so.

As described in Section II.A, the defendant's state of mind is an essential element of a Section 20(a) claim.  *See, e.g., Mishkin v. Ageloff*, No. 97 Civ. 2690, 1998 WL 651065, at *23 (S.D.N.Y. Sept. 23, 1998) (finding that "a section 20(a) plaintiff must ultimately establish a defendant's state of mind").  As such, it must be proved that the "'defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'"  *Carpenters*, 750 F.3d at 236 (citation omitted); *see also J.W. Barclay*, 442 F.3d at 841; *First Jersey Secs.*, 101 F.3d at 1472; *In re Fed. Nat'l Mortg. Ass'n Sec.*, 503 F. Supp. at 43.  The Commission, like several circuit and district courts, has also recognized that culpable participation is an element of a

Section 20(a) claim.  Richard F. Kresge, Exchange Act Release No. 55988, 2007 WL 1892137 (June 29, 2007).  In an opinion reviewing disciplinary action taken by NASD against the president of a brokerage firm, the Commission set aside NASD's finding that the defendant was liable under Section 20(a) because there was no evidence of his "participation in the conduct" that gave rise to the primary violations committed by employees of his firm. *Id.*, at *15. *See also* SIG Specialists, Inc., Exchange Act Release No. 51867, 2005 WL 1421103, at *7 (June 17, 2005) (finding in a review of disciplinary action taken by New York Stock Exchange against a specialist firm that if Section 20(a) had applied to the case the defendant would have been liable for its employee's primary violations because the defendant was implicated in his violations).

Requiring proof of "culpable participation" is "consistent with the purpose of the Exchange Act." *In re Fed. Nat'l Mortg. Ass'n Sec.*, 503 F. Supp. 2d at 44.  As the Second Circuit has held "'[t]he intent of Congress in adding [Section 20(a)], . . . was obviously to impose liability only on those directors who fall within its definition of control and who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons.'" *Id.* (quoting *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973)).  In addition, the "culpable participation" element is consistent with Supreme Court precedent. *Id.*  In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), "the Supreme Court explained that 'each of the provisions of the 1934 Act that expressly create a civil liability . . . contains a state-of-mind condition requiring something more than negligence.'  The Supreme Court then explicitly cited Section 20(a) as an example of these 'state-of-mind' provisions." *In re Fed. Nat'l Mortg. Ass'n Sec.*, 503 F. Supp. 2d at 44 (quoting *Ernst*, 425 U.S. at 209 n. 28).  The Supreme Court, therefore, indicated that for a "Section 20(a) claim to succeed, the plaintiff must allege facts not only indicating culpability, but exceeding mere negligence." *Id.* (citing *Ernst*, 425 U.S. at 209, n. 28).

Courts have interpreted "culpable participation" to require a showing of "at least recklessness" in order for a defendant to be liable as a control person. *See, e.g., In re Fed. Nat'l Mortg. Ass'n Sec.*, 503 F. Supp. 2d at 44; *In re Alstom SA Sec. Litig*, 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005) ("[R]ecklessness is the minimum standard of culpability that plaintiffs must plead under Section 20(a)."); *In re Livent, Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 355 (S.D.N.Y. 2001) ("[R]ecklessness is the appropriate minimum standard of culpability that plaintiffs must plead under [Section] 20(a).").  "To qualify as reckless conduct, the [alleged conduct] must have been 'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re Alstom SA*, 406 F. Supp. 2d at 491 (quoting *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000)).

Some courts even "define 'culpable participation' to require plaintiffs to allege a level of intent demonstrating conscious misconduct." *In re Fed. Nat'l Mortg. Ass'n Sec.*, 503 F. Supp. 2d at 44-45 (citing *In re Tyson Foods*, No. 01-425, 2004 WL 1396269, at *13 (D. Del. June 17, 2004) (explaining that "[w]hile deliberate inaction can rise to the level of culpable participation, it does so only if the intent is to further the fraud of another"); *Steed Fin. LDC v. Nomura Sec. Int'l, Inc.*, No. 00 Civ. 8058, 2001 WL 1111508, at *10 (S.D.N.Y. Sept. 20, 2001) (requiring that plaintiffs plead facts establishing either "conscious misbehavior or recklessness"); *Mishkin*, 1998 WL 651065, at *25 (requiring that plaintiffs plead "particularized facts of [the controlling person's] conscious misbehavior as a culpable participant in the fraud")).

Those courts that do not articulate "culpable participation" as an element of a Section 20(a) claim address the state of mind requirement of the offense under the statutory provision foreclosing liability to a defendant that acted in "good faith." *In re Fed. Nat'l Mortgage Ass'n Sec.*, 503 F. Supp. 2d at 43 (citing cases that apply "good faith" analysis rather than "culpable participation" element). A defendant acted in "good faith" if he did not act recklessly with respect to the primary violation of the Exchange Act. *See, e.g., Dellastatious v. Williams*, 242 F.3d 191, 194(4th Cir. 2001) ("Defendants must show that they did not act recklessly. Negligence on the part of defendants is insufficient to establish liability."); *No. 84 Emp.-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) ("'[A] defendant is entitled to a good faith defense if he can show no scienter and an effective lack of participation [in the primary violation].'") (citation omitted); *Donohoe v. Consol. Operating & Prod. Corp.*, 30 F.3d 907, 912 (7th Cir. 1994) ("'The controlling person must also act recklessly; negligence alone is insufficient.'") (citation omitted). Thus, the state of mind requirement for a Section 20(a) claim, whether expressed as "culpable participation" element or a "good faith" defense requires, at a minimum, a showing that the defendant acted recklessly in connection with the primary violation of the Exchange Act.

In this case, the Atlanta Staff cannot point to any conduct by Partners LLC that even approximates recklessness – let alone conscious misbehavior as some courts require – in connection with Global IV's conclusion that it was not required to register as a dealer. There is virtually no evidence in the investigative record of Partners LLC's involvement in the consideration of Global IV's registration status. There is none whatever that Partners LLC was a culpable participant in a wrongful decision not to register. *See, e.g., In re Tyson Foods, Inc.*, 2004 WL 1396269, at *13 (finding that CEO and senior chairman of company were not culpable participants in making allegedly misleading statements because they did "not participate in the drafting and release of the issued statements, did not dictate the specific content of the issued statements and did not review the content of the statements until they were publicly issued").

Given the Commission and the Staff's substantial guidance on dealer registration, Partners LLC could not know, and had no reason to know, that Global IV might be required to register as a dealer with the Commission. As described above in Section II.1.b, none of the factors that the Commission and Staff have identified as indicia of dealer activity are present here. Since none of those factors apply to Global IV, there is simply nothing about Global IV's activities in Section 3(a)(10) exchanges that could lead Partners LLC to know that Global IV might be required to register as a dealer. All of the publicly available interpretative guidance from the Commission and the Staff leads to the conclusion that Global IV was not a dealer within the meaning of the securities laws. Under that longstanding guidance, Global IV's evident conclusion that it is an investor, rather than a dealer, was not "'highly unreasonable,'" which is the standard for recklessness. *In re Alstom SA*, 406 F. Supp. 2d at 491 (quoting *Rothman*, 220 F.3d at 90). To the contrary, close scrutiny of the Commission and Staff's guidance regarding the registration requirements would lead any reasonable person to the opposite conclusion, i.e., that registration is not required. The fact that Global IV reached a conclusion that is entirely reasonable under that guidance, and the only logical result of that guidance, means that there is no basis for the Atlanta Staff to allege that Partners LLC was a culpable participant in a wrongful decision not to register or acted in bad faith. Partners LLC simply had no reason whatsoever to think that Global IV's decision was incorrect.

23

The Atlanta Staff's novel theory that Global IV is acting as an underwriter does not change this fact. As described above, the Commission and Staff's longstanding guidance also includes the admonition that the totality of a market participants securities activities must be considered in determining whether it is a dealer. Even if the Atlanta Staff was correct that Global IV is an underwriter, that would not undermine the reasonableness of Global IV's conclusion that it was not required to register – or Partners LLC's assessment that Global IV's conclusion was reasonable. Global IV's status as an underwriter would amount to only one out of twelve dealer factors. When this factor is considered in light of the totality of Global IV's securities activities in Section 3(a)(10) exchanges, it is evident that the absence of any other indicia of dealer activity outweighs any possible underwriter status.

This conclusion is fully supported by the Staff's no-action position in Acqua Wellington. Through the Acqua Wellington no-action letter, the Staff's guidance – for over a decade – has been that even a market participant who is acting as an underwriter in a registered offering of securities is not required to register as a dealer based on that factor alone. Acqua Wellington, 2001 WL 1230266, at *1. As described in our original submission and in Section II.A.1.d of this submission, the similarities between Acqua Wellington and Global IV's investment activities foreclose the argument that it was foreseeable that Global IV could be required to register as a dealer simply because it resembles an underwriter. Like Acqua Wellington, Global IV receives shares of common stock in publicly traded companies at a discount to the stock's market price based upon an agreed upon mathematical formula, bears market risk with regard to those shares, and subsequently sells some of those shares into the market through registered broker-dealers. As discussed at length above, the specifics facts of Global IV's business make it even more like an investor, bearing market risk, than Acqua Wellington. Under all the circumstances, even in hindsight, Global IV's assessment that its investment activities did not require it to register as a dealer appears entirely reasonable. There is no conceivable rational argument that Partners LLC acted recklessly or in bad faith in accepting this conclusion.

That reasonableness is underscored by the approach taken in the Commission's enforcement actions concerning Section 3(a)(10) exchanges and the Staff's guidance concerning such exchanges. First, although the Commission has sometimes brought enforcement actions regarding Section 3(a)(10) exchanges involving egregious facts, it has never advanced the theory that participants in such exchanges are required to register under Section 15(a). See SEC v. Rocky Mountain Energy Corp., No. H-03-CV-1133 (S.D. Tex filed Apr. 3, 2003) and SEC v. Lefkowitz, No. 8:12-CV-1210T35 (M.D. Fl. filed May 30, 2012). In both cases the defendants – unlike Global IV – engaged in sham or misleading transactions that did not meet the statutory requirements of Section 3(a)(10). The Commission alleged various deficiencies in the Section 3(a)(10) exchanges that are not present here. The cases also featured alleged anti-fraud violations or parallel criminal prosecution. Despite that apparently egregious misconduct and the fact that none of the defendants were registered as broker-dealers, the Commission did not allege any violations of Section 15(a).

Nor does the Staff's extensive guidance concerning Section 3(a)(10) exchanges, which is embodied in Staff Legal Bulletin No. 3A ("SLB 3A"), suggest that participants may be required to register as a broker-dealer upon selling the shares they obtain. Div. of Corp. Fin., U.S. Sec. & Exch. Comm'n, Staff Legal Bulletin No. 3A (June 18, 2008), http://www.sec.gov/interps/legal/

cfslb3a.htm.  SLB 3A's only discussion of underwriting is a comment that the Commission has eliminated "the presumptive underwriter provision in Rule 145(c) except for transactions involving a shell company, other than a business combination related shell company." *Id.*  Since Global IV's Section 3(a)(10) exchanges do not fall under Rule 145(c) this comment is not applicable to its exchanges.  However, this comment does reflect that the Staff considered potential underwriting issues without also identifying any potential Section 15(a) issues.  That too supports the reasonableness of the Partners LLC's conduct, and the absence of any culpable participation or bad faith.

Finally, even if Global IV's activities in Section 3(a)(10) exchanges did constitute dealer activity, its conclusion that it did not have to register was reasonable based on the availability of the exemption from registration that the Commission provides for foreign-broker dealers discussed above.  Moreover, Partners LLC did not act recklessly or in bad faith by accepting this conclusion.

In sum, there is no conduct by Partners LLC that approximates recklessness.  On the contrary, it is abundantly clear from the record that Partners LLC was acutely concerned with making sure that it complied with applicable laws and regulations.  (Kirkland Tr. at 18:25-21:24, 93:1-18, 259:2-260:2, 272:25-273:6, 286:1-8.)  Partners LLC did not – and does not – have a cavalier attitude about legal compliance.  Given the Commission and the Staff's longstanding guidance concerning dealer status, there is simply no legal or factual basis for the Atlanta Staff to claim that Partners LLC's conduct "represent[ed] 'an extreme departure from the standards of ordinary care'" to the extent that Global IV's alleged registration requirement was either known to Partners LLC or so obvious that Partners LLC must have been aware of it.  *In re Alstom SA*, 406 F. Supp. 2d at 491 (quoting *Rothman*, 220 F.3d at 90).

**B.      Bringing an Enforcement Action That Relies on an Interpretation of the Registration Requirements That Contradicts Longstanding Prior Guidance Would Violate Due Process**

It is well-settled that due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned* v. *City of Rockford*, 408 U.S. 104, 108 (1972); Michael S. Piwowar, Comm'r, U.S. Sec. & Exch. Comm'n, Remarks to the Securities Enforcement Forum (Oct. 14, 2014) [hereinafter "Remarks by Comm'r Piwowar"], http://www.sec.gov/News/Speech/Detail/Speech/ 1370543156675#.VOszNNJOXws ("[D]ue process starts with fundamental notions of fairness.  Persons should be on notice as to what acts, or failures to act, constitute violations of the law and our regulations.").  An enforcement action based on the Atlanta Staff's novel interpretation of the dealer registration requirements under Section 15(a), and that contradicts prior guidance, would violate the due process requirement of reasonable notice.  *See Alaska Prof'l Hunters Ass'n* v. *FAA*, 177 F.3d 1030, 1035 (D.C. Cir. 1999) ("Those regulated by an administrative agency are entitled to 'know the rules by which the game will be played.'") (quoting Oliver W. Holmes, *Holdsworth's English Law*, 25 Law Quarterly Rev. 414 (1909)); *Upton* v. *SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (sanctions may not be imposed pursuant to a "substantial change in [an] enforcement policy that was not reasonably communicated to the public").

Neither Partners LLC nor Global IV could have had any notice, let alone reasonable notice, of the Atlanta Staff's novel view that, contrary to the longstanding Commission and Staff guidance, including the Acqua Wellington no-action position, these sales alone required registration as a broker-dealer.  Advancing such an unprecedented position in an enforcement action violates due process, and is exactly the kind of conduct that Commissioner Michael Piwowar strongly criticized in a recent speech about the fundamental importance of due process in enforcement matters.  *See* Remarks by Comm'r Piwowar.  He emphatically stated that enforcement actions that "create new interpretations of the laws or regulations or impose new regulatory requirements" are inconsistent with the requirements of due process.  *Id.*[12]

The aggressive nature of the Atlanta Staff's Section 15(a) theory indicates that it is stretching for whatever means possible to bring an enforcement action against Partners LLC and Global IV.  Evidently it is unhappy with Global IV's lawful use of the Section 3(a)(10) exemption and the fact that Congress Congress specifically authorized courts and other authorized entities, not the Commission, to supervise Section 3(a)(10) exchanges.  As our original submission thoroughly explained, Global IV's Section 3(a)(10) exchanges are legally compliant, judicially-approved, and entirely consistent with the statutory language and longstanding Staff guidance and precedent.  Moreoever, the Atlanta Staff's proposed action would second-guess the final judgment of the state courts that approved these exchanges and would undermine the Congressional decision to specifically empower those courts to supervise such exchanges.  Likewise, Global IV's evident conclusion that it is not required to register as a dealer with the Commission (because it is an investor, not a dealer under the securities law) complies with the Exchange Act and follows well-established Commission and Staff guidance.  Partners LLC's reliance on that guidance was entirely reasonable, not reckless conduct that is evidence of culpable participation or bad faith.  If the Atlanta Staff believes that the current guidance on either Section 3(a)(10) or Section 15(a) should be amended in order to account for Partners LLC and Global IV's activities then the proper course of action is to issue new guidance or promulgate rules through the notice-and-comment rulemaking process.[13]  However, as

---

[12] *See also* Paul S. Atkins, Comm'r, U.S. Sec. & Exch. Comm'n, Remarks to the SEC/NASAA 19(d) Conference (May 8, 2007), http://www.sec.gov/news/speech/2007/spch050807psa-2.htm ("I have always been greatly concerned when it appears that a new standard, interpretation, or policy is being established through enforcement action.  This is particularly disconcerting if the alleged misconduct is part of a generally accepted industry practice.  [A]s a matter of due process, where the appropriateness of certain disclosure or conduct is ambiguous, the better course should be to work cooperatively and issue appropriate guidance to address the situation.").

[13] The Commission appears to have tacitly acknowledged that an enforcement action is not the appropriate mechanism for adopting the novel interpretation of Section 3(a)(10) that the Atlanta Staff has advanced in this matter.  On November 5, 2014, the Commission brought enforcement actions against ten issuers for reporting violations in connection with Section 3(a)(10) transactions, at least one of which was done with Global IV.  Worthington Energy, Inc., Exchange Act Release No. 73526 (Nov. 5, 2014), MineralRite Corp., Exchange Act Release No. 73525 (Nov. 5, 2014), ERF Wireless, Inc., Exchange Act Release No. 73524 (Nov. 5, 2014), CoroWare, Inc., Exchange Act Release No. 73523 (Nov. 5, 2014), APT Motovox Group, Inc., Exchange Act Release No. 73522 (Nov. 5, 2014), Green Auto. Co., Exchange Act Release No. 73521 (Nov. 5, 2014), Seaniemac Int'l, Ltd., Exchange Act Release No. 73520 (Nov. 5, 2014), Monster Arts, Inc., Exchange Act Release No. 73519 (Nov. 5, 2014), Red Giant Entm't, Inc., Exchange Act Release No. 73518 (Nov. 5, 2014), Mondial Ventures, Inc., Exchange Act Release No. 73517 (Nov. 5, 2014).  Since these issuers would be equally liable for any Section 5 violations in those transactions, the fact that there were no such charges against any of them is conspicuous.  It would be inequitable for the Commission to reverse its approach without notice through an enforcement action alleging Section 5 violations against Partners LLC or Global IV in this matter.

Commissioner Piwowar recently explained, an enforcement action is not the proper vehicle for pursuing such policy changes, particularly when market participants have relied in good faith on the current guidance. *See* Remarks by Comm'r Piwowar ("I oppose the use by the Commission of enforcement measures as an alternative to rulemaking under the Administrative Procedure Act.").

In addition to Commissioner Piwowar, Chair White and the Staff also appear to understand that pursuing policy changes through enforcement actions violates due process. As discussed in Section II.A.1.c, Chair White has asked the Staff to prepare a recommendation for the Commission as to whether it should issue a "rule to clarify the status of unregistered active proprietary traders to subject them to [the Commission's] rules as dealers." Remarks by Chair White. Whether such a requirement is sound policy may be debated, but it is a debate that should properly occur in the rulemaking process, not in defense of an enforcement action. Accordingly, and as is appropriate, the Staff, at the direction of Chair White, is considering implementing any policy changes regarding how the Commission defines a dealer through the notice-and-rulemaking process, not enforcement actions. In light of Commissioner Piwowar's recent statements condemning the use of enforcement actions to change policy and Chair White's cautious and transparent approach to potentially changing policy, we strongly urge the Atlanta Staff to reconsider its misguided attempt to alter the current landscape of Section 3(a)(10) and Section 15(a) guidance through an enforcement action.

## III.   CONCLUSION

For the foregoing reasons, the Atlanta Staff should not recommend bringing an enforcement action against Global IV or Partners LLC.

Respectfully submitted,

Erich T. Schwartz
Colleen Mahoney
Daniel J. Sullivan
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC  20005
(202) 371-7000

*Attorneys for Ironridge Global Partners, LLC*

Dated:  February 23, 2015

3024184.5

# EXHIBIT D

UNITED STATES OF AMERICA
BEFORE
THE SECURITIES AND EXCHANGE COMMISSION

-----------------------------------------------------------------------x
                                                    :

IN THE MATTER OF                      :      File No. A-3545
IRONRIDGE GLOBAL PARTNERS, LLC    :
                                                    :

-----------------------------------------------------------------------x

**SECOND SUPPLEMENTAL WELLS SUBMISSION ON BEHALF OF
IRONRIDGE GLOBAL IV, LTD. AND IRONRIDGE GLOBAL PARTNERS, LLC**

James Brigagliano
Michael Hyatte
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

David Katz
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

W. Hardy Callcott
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
(415) 772-1200

Erich T. Schwartz
Colleen P. Mahoney
Daniel J. Sullivan
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7000

Lawrence S. Spiegel
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Ironridge Global IV, Ltd. and
Ironridge Global Partners, LLC*

Dated: April 30, 2015

Ironridge Global IV, Ltd. and Ironridge Global Partners, LLC request confidential treatment of
this submission for all purposes pursuant to 17 C.F.R. § 200.83 and request that this submission
not be disclosed pursuant to any request under the Freedom of Information Act.

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ................................................................1

II.     ARGUMENT....................................................................................3

        A.    *Big Apple* Does Not Support, Let Alone Mandate, That the Definition of
              an Underwriter Under the Securities Act Determines Dealer Registration
              Under the Exchange Act ...................................................................3

        B.    The Staff's Assertion That One's Status As a Statutory Underwriter Under
              the Securities Act Requires Registration as a Dealer Under the Exchange
              Act Is Contrary to the Staff's Longstanding Guidance............................4

              1.    The Staff's Section 15(a) Guidance Conflicts With the Theory
                    That Status as a Statutory Underwriter Is Relevant .....................4

              2.    Where the Staff Directly Addressed Whether Underwriting,
                    Standing Alone, Compelled Registration, It Said It Did Not ...................6

              3.    Acqua Wellington Is Much More Like a Dealer Than Global IV .............7

              4.    The Supposed Additional Factors Identified by the Staff Do Not
                    Make Global IV a Dealer...................................................9

                    a.    The Size of Global IV's Transactions Do Not Make It a
                          Dealer...................................................................9

                    b.    Global IV Holds and Sells Securities Like an Investor Not a
                          Dealer...................................................................9

                    c.    Other Aspects of Global IV's Investment Activities Do Not
                          Make It a Dealer........................................................10

              5.    Global IV, Like Other Market Participants, Has Reasonably Relied
                    on Acqua Wellington .......................................................11

        C.    Importing the Securities Act Definition of Underwriter To Determine
              Dealer Registration Would be a Fundamentally Flawed Policy............................15

              1.    The Statutory Underwriter Concept Served Securities Registration
                    Objectives, and Has Largely Been Abandoned As A Matter of
                    Regulatory Policy..........................................................15

              2.    Resurrecting the Statutory Underwriter Concept To Justify This
                    Stand Alone Dealer Registration Enforcement Action Is Not Sound
                    Policy .....................................................................16

3.     Applying the Statutory Underwriter Concept to the Issue of Dealer
Registration Would Cause Confusion and Regulatory Uncertainty ..........17

4.     The Proposed Interpretation Is Fundamentally Inconsistent With
the Legislative Decision Behind Section 3(a)(10) and the Staff's
Guidance Under That Provision................................................................18

D.     Due Process Forbids Reversing Existing Guidance Through an
Enforcement Action and the Commission Should Not Attempt to Do So ............19

E.     Even If Global IV Is a Dealer Under the Exchange Act, It Qualifies For
the Foreign Broker-Dealer Exemption From Registration ...................................20

1.     If Global IV Were a Dealer, It Would Be a Foreign Dealer,
Because It Is Not a U.S. Resident ...........................................................20

2.     The Issuers in Global IV's Section 3(a)(10) Exchanges Were Not
Solicited ................................................................................................21

3.     All of Global IV's Section 3(a)(10) Exchanges Were Effected
With Registered Broker-Dealers..............................................................22

F.     There Is No Basis for a Claim That Partners LLC Is Liable as a
Controlling Person Under Section 20(b) for Violations of Section 15(a) ..............24

III.     CONCLUSION...................................................................................................27

## I.   PRELIMINARY STATEMENT

This investigation has reached a perplexing juncture. Having failed to find violations of any of the antifraud or securities registration provisions it was charged to investigate, the Staff of the U.S. Securities and Exchange Commission ("Commission") now proposes to recommend an enforcement action based on alleged stand-alone violations of the dealer registration provisions of Section 15(a) of the Securities Exchange Act of 1934, as amended ("Exchange Act"). Such a recommendation would be contrary to existing guidance regarding those registration requirements, is unwise as a matter of policy, and is impermissible as a matter of due process.

The evolution of the Staff's investigation leading to this proposed recommendation is revealing. The investigation was authorized in October 2013, at which time the Staff was directed to determine whether any persons or entities violated the antifraud provisions of the Securities Act of 1933, as amended ("Securities Act"), or Exchange Act, or illegally sold unregistered securities in violation of Section 5 with regard to the securities at issue here. After a full investigation, the Staff issued a Wells notice to Ironridge Global Partners LLC ("Partners LLC"), not based on any theory that there were any violations of the antifraud provisions, but based on a theory that Partners LLC had engaged in transactions that violated the securities registration provisions of Section 5 and failed to register as a dealer in connection with those unlawful transactions.

We made an initial Wells submission that, among other things, explained that the exchanges were not conducted by Partners, LLC but by a different entity, Ironridge Global IV, Ltd. ("Global IV"),[1] and there were no Section 5 violations regardless, because all the securities at issue are specifically *exempted* from the Securities Act by Section 3(a)(10) of that statute. As detailed in that the first submission, the Section 3(a)(10) exemption expresses a legislative determination that a satisfactory process of judicial review and approval of the fairness of the terms and conditions of the exchange of securities for the settlement of claims is an *equal and adequate substitute* to regulation of such issuances by the Commission for achieving the investor protection goals that otherwise fall within the purview of the Commission. Because the legislatively authorized alternative was scrupulously adhered to with regard to all of the securities at issue here, and the exchanges bore the statutorily endorsed judicial imprimatur, there could be no violation of Section 5.

Over time the Staff subsequently issued three additional Wells notices, one to Global IV, and two more to Partners, LLC, the last just two days before our meeting with the Staff on April 15, 2015. Having now acknowledged the applicability of the Section 3(a)(10) exemption to the securities at issue and the consequent absence of any Section 5 claim, the Staff persists in pursuing a different theory: that Global IV's exchanges of these exempt securities require that *it* register as a securities dealer under Section 15(a) of the Exchange Act. In our April 15 meeting, the Staff acknowledged that that proposed claim hangs from the thin assertion that Global IV

---

[1] As we have previously communicated to the Staff, our response on behalf of Global IV is not a concession that the Commission has jurisdiction over Global IV. To the contrary, Global IV expressly rejects that there is any basis for jurisdiction.

acted as an underwriter, a single one of some twelve factors that Staff guidance has stated should be considered in evaluating all the facts and circumstances to determine whether a market participant may need to register as a dealer. In that meeting the Staff asserted that this single factor is sufficient, and that its position is supported by a recent decision by a panel of the Eleventh Circuit in *SEC v. Big Apple Consulting USA, Inc.*[2] The Staff cited that decision for the proposition that market participants that fall within the statutory definition of underwriter under the Securities Act (from which, it bears repeating, the securities at issue here are specifically exempt) must register as securities dealers. As discussed more fully below, that is not the holding of *Big Apple*, as the panel expressly did not decide any dealer registration question. Moreover, that case involved a massive, criminal securities fraud and illegal, unregistered distribution of securities, whereas here there are *no* such underlying violations and the entire process was done under court supervision.

We urge the Staff and the Commission to pause and reflect on how much is risked, and how little stands to be achieved, by authorizing an enforcement action in this case. As the proposed recommendation has shrunk to exclude any substantive violations associated with Global IV's court-approved exchanges, the regulatory policy significance of the remaining dealer registration claim, and the impact of such a claim in upsetting settled market understanding and practices regarding registration, has become more acute. Against that backdrop, the breath-taking scope of the position the Staff is advancing – that statutory underwriter status under the Securities Act requires dealer registration under the Exchange Act – is all the more remarkable. It simply flies in the face of longstanding and contrary guidance issued by the Staff as to who must register as a dealer. As articulated by the Staff, its proposed theory is not subject to any rational limiting principle, and as such would subject many different market participants to claims that registration as a dealer is required. Pronouncing such a position for the first time in an enforcement action based *solely* on dealer registration claims with no other substantive securities law violations, and in which the Staff proposes to seek fines and other sanctions for failing to have predicted this departure from existing guidance, will land like a bombshell. It will upset widespread understandings by many market participants as to what conduct may require registration. Moreover, it is a course that would be fundamentally unfair and inconsistent with the requirements of due process. It cannot succeed. In short, Global IV is not a dealer and until now, there was nothing that told Global IV that it must register as one.

We appreciate the opportunity to make this supplemental Wells submission in order to address these important legal and policy issues. In addition, we are addressing (1) the Staff's concern that Global IV does not qualify for the foreign broker-dealer exemption from dealer registration and (2) an additional proposed claim that the Staff has just identified against Partners LLC under Section 20(b) of the Exchange Act.

The Staff's concern about the applicability of the foreign broker-dealer exemption to Global IV is misplaced. Global IV's Section 3(a)(10) exchanges from beginning to end meet the requirements of the foreign broker-dealer exemption and, therefore, even if Global IV possessed characteristics that made it a dealer it would not be required to register. Similarly, the Staff's

---

[2] No. 13-11976, 2015 WL 1566925 (11th Cir. Apr. 9, 2015) (to be reported in F.3d) [hereinafter *Big Apple*].

2

allegation – which it made for the first time two days before our April 15 meeting – that Partners LLC violated Section 20(b) of the Exchange Act by using Global IV to violate Section 15(a) is unfounded. As we thoroughly explained in our first supplemental submission, it is clear from the investigative record that Partners LLC is not secondarily liable as a control person under Section 20(a) of the Exchange Act for Global IV's alleged violation. For those same reasons, Partners LLC also is not liable under Section 20(b) notwithstanding the Staff's novel and expansive interpretation of Section 20(b) liability. Of course, since as set forth herein, there was no obligation to register as a dealer, Sections 20(a) and 20(b) are irrelevant even if there had been evidence to support such claims.

## II.   ARGUMENT

### A.   *Big Apple* Does Not Support, Let Alone Mandate, That the Definition of an Underwriter Under the Securities Act Determines Dealer Registration Under the Exchange Act

According to the Staff, the "linchpin" of its theory that Global IV is a dealer is that Global IV acts as an underwriter simply because it sells a portion of the exempt shares it obtains through Section 3(a)(10) exchanges in open market transactions. During our April 15, 2015 meeting, the Staff asserted that *Big Apple* supports its position that the expansive definition of a statutory underwriter in the Securities Act should determine whether Global IV is required to register as a dealer. As a matter of law, *Big Apple* does not support that position. Moreover, given the starkly different facts, the Commission should not look to *Big Apple* for guidance as to whether it should authorize the Staff to bring a Section 15(a) charge in this case.

In *Big Apple* the Commission took enforcement action to address a massive, criminal securities fraud involving the manipulation of the securities of CyberKey Solutions, Inc. ("CyberKey").[3] The *Big Apple* defendants were charged with antifraud and Section 5 violations, as well as violations of Section 15(a). *Big Apple*, 2015 WL 1566925, at *5. The defendants provided investor and public relations services for CyberKey by running a "boiler room" operation that promoted the company and its stock to the public and broker-dealers by repeatedly publicizing false information about the company. *Big Apple*, 2015 WL 1566925, at *1-2. These marketing and promotional activities aided and abetted the manipulation of CyberKey stock, and the defendants dumped CyberKey stock into the inflated market. *Id.* at *6-8, *8-12. As such, the defendants' role in the fraud scheme included the kinds of special selling efforts that are typical of traditional underwriter and dealer activity.

Nevertheless, the panel in *Big Apple* expressly did not decide whether the defendants were required to register as dealers under Section 15(a), since it found that issue had been abandoned and was not before it. *Big Apple*, 2015 WL 1566925, at *16. Accordingly it provides no authority for the Staff's assertion that it is appropriate to use the expansive statutory underwriter concept from the Securities Act to determine whether a market participant is a dealer

---

[3] In *United States v. Plant*, 2:07-cr-00375-NS-1 (E.D. Pa. Mar. 23, 2009), the CEO of CyberKey was convicted of securities fraud and other related crimes and sentenced to 97 months of imprisonment.

under Section 15(a). It is striking that the Staff should claim that it does, since the Commission did not argue in either its appellate briefs or its district court briefs in *Big Apple* that the defendants were dealers under the Exchange Act because they were statutory underwriters under the Securities Act.

Likewise, the panel's discussion of whether the defendants were underwriters for purposes of an exemption to Section 5 is not instructive to the dealer registration question. On the contrary, it illustrates the hazards of looking to litigation positions successfully taken in massive fraud cases in making judgments as to the appropriate scope of the Commission's regulatory program. In *Big Apple*, the Commission's litigators succeeded in persuading the panel to accept a two year holding period as a "rule of thumb" to be used in assessing whether the defendants had acquired shares with an intent to distribute, an element of the statutory underwriter definition relevant to the exception at issue in that case. *Big Apple*, 2015 WL 1566925, at *17. If the Staff's suggested application of *Big Apple* to this recommendation were adopted with regard to dealer registration decisions under Section 15(a), it would suggest that investors who buy and sell securities within two years are underwriters and, under the Staff's current theory, must therefore register as dealers. Simply stating that standard illustrates its unworkability as a matter of regulatory policy.

      **B.**      **The Staff's Assertion That One's Status As a Statutory Underwriter Under the Securities Act Requires Registration as a Dealer Under the Exchange Act Is Contrary to the Staff's Longstanding Guidance**

            **1.**      **The Staff's Section 15(a) Guidance Conflicts With the Theory That Status as a Statutory Underwriter Is Relevant**

The Commission does not approach the issue that is now at the heart of the Staff's proposed recommendation with a blank slate. There is extensive published guidance to assist market participants in understanding how to distinguish between a "dealer" and an "investor" (and therefore to make the determination whether or not they are required to register). The Commission and the Staff have identified and repeatedly articulated a well-established list of factors to consider, all of which describe activities that are traditionally carried on by dealers. One of the twelve factors that the Commission and the Staff have identified is acting as an underwriter, which it has done using language that is descriptive of traditional underwriting activities. For instance, the Staff's *Guide to Broker-Dealer Registration* states that a market participant may be a dealer if he "participate[s] in a 'selling group' or otherwise underwrite[s] securities." Div. of Trading & Markets, U.S. Sec. & Exch. Comm'n, *Guide to Broker-Dealer Registration* (Apr. 2008), http://www.sec.gov/ divisions/marketreg/bdguide.htm. A selling group includes "all banks involved in selling or marketing a new issue of stock or bonds." *Selling Group Definition*, NASDAQ, http://www.nasdaq.com/investing/glossary/s/ selling-group (last visited Apr. 27, 2015). The members of a selling group are professional broker-dealers involved in the traditional underwriting process, not investors like Global IV. The Staff's use of the phrase "selling group" indicates that the type of underwriting that may represent dealer activity in the context of Section 15(a) is traditional underwriting.

That guidance directs users to underwriting activity that in no way resembles the transactions at issue here. While the precise activities performed by an underwriter may vary,

4

traditionally underwriting has been characterized by a set of services performed to assist an issuer in raising capital from investors. Underwriters typically work with issuers to understand the nature of the issuer's business, gauge the market for its securities, prepare and deliver various regulatory documents, and market the issuer's securities. Underwriters often commit to purchasing the securities from the issuer, but with the intention of quickly reselling all of them directly to investors. To facilitate these sales, an underwriter engages in special selling efforts and selling methods both before and after securities are issued.[4] In a traditional underwritten offering, an underwriter pre-markets the offering to investors and takes orders in advance of the new issuance of securities. Through these pre-marketing efforts an underwriter can substantially minimize, or even eliminate, its market risk by matching the size of the new issuance to the orders it has received *before* it sells securities. As a result, when the underwriter does sell the securities it does so immediately, if not instantaneously. Underwriters also use various hedging strategies to further minimize their market risk. In addition, underwriters will also generally look to make a market in the securities in the aftermath of the new issuance. Generally, underwriters are compensated through fees and commissions, as well as the revenue generated from the underwriting spread (*i.e.*, the purchase of securities from the issuer at an agreed-upon discount to the price at which the underwriter commits to sell them to investors).[5] Thus, both the activities and the compensation of underwriters are designed to avoid speculating in, and realizing profits from, the appreciation in the value of the issuer's securities. Put differently, the underwriter's goal is to merchandise the securities.

Such activities are plainly more expansive than the statutory underwriter provisions of the Securities Act. Global IV's transactions in no way resemble that underwriting activity. Global IV acquires claims against issuers from third parties and then exchanges those claims for shares of stock from the issuer through a court-approved settlement meeting all the requirements of Section 3(a)(10). After receiving its shares, Global IV does begin selling *some* shares through a registered broker-dealer, but it does not sell all – or anywhere close to all – of its shares immediately as underwriters typically do. To the contrary, Global IV used a registered investment adviser that exercised independent judgment in selling its shares over months and often years based on its observation of the secondary market and ongoing analysis of various factors such as the company's business performance, stock performance, and overall stock market conditions. Thus, unlike an underwriter, Global IV takes on market risk over the long term, rather than making a profit based on merchandising securities over the course of a short period of time. Moreover, Global IV does not use the shares it does hold to make a market in a stock as underwriters typically do. Since Global IV never purchases shares in open market transactions, it is incapable of making a market in an issuer's stock. When Global IV does sell

---

[4] Such special selling efforts enable underwriters to generate and gauge the extent of demand before committing to purchasing any amount of securities. In a traditional underwritten offering, they routinely include pre-marketing the offering to investors via phone call solicitations and deal road shows; having sell-side analysts publish research on the issuer prior to and after the offering; and, in the case of emerging growth companies, allowing sell-side analysts to assist in marketing the offering.

[5] The Commission discussed these practices in its recent release adopting the "Volcker Rule." *See* Prohibitions and Restrictions on Proprietary Trading and Certain Interests in, and Relationships With, Hedge Funds and Private Equity Funds, Release No. BHCA-1 (Dec. 10, 2013), 79 Fed. Reg. 5,536 (Jan. 31, 2014) (final rule).

shares it does not engage in any special selling efforts or special selling methods, but rather it sells its shares in ordinary open market transactions through registered broker-dealers, unlike an underwriter. Also, unlike an underwriter, Global IV does not hedge its positions by, for instance, short-selling an issuer's shares. In fact, it agrees in advance that it will not do so, which agreement is incorporated into the supervising court's settlement order. In all of these respects, Global IV acts as an investor, not an underwriter.

That the Staff's current theory is not predictable from that guidance is also evident from the fact that, when the Staff of the Division of Enforcement has brought enforcement actions against participants in Section 3(a)(10) exchanges who were engaged in fraud, it has never before asserted a violation of Section 15(a). *See SEC v. Rocky Mountain Energy Corp.*, No. H-03-CV-1133 (S.D. Tex. filed Apr. 3, 2003); *SEC v. Lefkowitz*, No. 8:12-CV-1210T35 (M.D. Fl. filed May 30, 2012). In these cases the defendants – unlike Global IV – engaged in sham or misleading transactions that did not meet the statutory requirements of Section 3(a)(10). The Commission alleged various deficiencies in the Section 3(a)(10) exchanges that are not present here. In addition, the cases involved antifraud violations, Section 5 violations, or parallel criminal prosecution. Despite the presence of such egregious misconduct and the fact that none of the defendants were registered as broker-dealers, the Commission never asserted that the exchange and resale of shares required registration as a dealer.

## 2.    Where the Staff Directly Addressed Whether Underwriting, Standing Alone, Compelled Registration, It Said It Did Not

The Staff has spoken directly to whether one's status as an underwriter, standing alone, compels registration as a dealer and concluded it does not. Acqua Wellington North Am. Equities Fund, Ltd., SEC No-Action Letter, 2001 WL 1230266 (Oct. 11, 2001) [hereinafter "Acqua Wellington"]. Not only did Aqua Wellington meet the definition of a statutory underwriter, it also formally appeared as an underwriter on registration statements for equity offerings. If one's status as a statutory underwriter rendered one a dealer then Acqua Wellington would have been required to register. Since the Staff instead granted Acqua Wellington a no-action letter, the underwriting activity that is indicative of dealer activity must be something more than activity that merely meets the technical definition of a statutory underwriter. At a minimum, Acqua Wellington stands for the proposition that a market participant that has none of the well-recognized characteristics of a dealer *except for* a role as a statutory underwriter in the new issuance of securities, and that bears market risk with respect to the securities it purchases and sells, is on the investor side of the dealer/investor distinction and is not required to register. Since the Aqua Wellington no-action letter was released numerous legal commentators have recognized that it stands for this proposition.[6]

---

[6] *See, e.g.*, James R. Tanenbaum & Anna T Pinedo, Exempt and Hybrid Securities Offerings § 4:2.2[A] (2d ed. 2011 & Supp. 2014) (citing Acqua Wellington for proposition that "being classified as a 'statutory underwriter' under the Securities Act would not render an entity a 'dealer' under the Exchange Act"); Broker-Dealer Regulation § 2:3.2[A] (Clifford E. Kirsch ed., 2d ed. 2011 & Supp. 2014) ("While an underwriter would usually be a dealer, in limited circumstances being designated as 'underwriter' under the Securities Act does not necessarily make an entity a dealer under the Exchange Act.") (co-authored by Robert L.D. Colby, former Deputy Director of the Commission's Division of Trading and Markets and current Chief Counsel of the Financial Industry Regulatory Authority, Inc. ("FINRA")); Guy P. Lander, 14B U.S. Sec. Law for Financial Transactions and Capital Mkts. § 13:23 (2014)

6

### 3.      Acqua Wellington Is Much More Like a Dealer Than Global IV

The substantive argument in the Acqua Wellington request letter was that, notwithstanding its acknowledged status as an underwriter, the financial risks it bore more closely resembled investment risks.  Given the resulting no-action position, there is no basis for the Staff to claim that Global IV is a statutory underwriter and, therefore, because Acqua Wellington's activities more closely resemble traditional dealer activity than Global IV.  For example, Acqua Wellington provided cash financing directly to issuers in return for stock sold to it by those issuers through equity line of credit transactions.  Although Acqua Wellington asserted in its no-action request that it took the "risk of ownership from the time of signing the equity line agreement," in reality Acqua Wellington was only required to purchase an issuer's stock if it received a draw down notice.  Acqua Wellington, 2001 WL 1230266, at *3. Moreover, it could hedge its exposure to an issuer's stock by short selling the stock between the notice and the purchase date.  *Id.* at *6 ("Acqua . . . agrees not to engage in short selling the company's stock during the term of the equity line agreement, *except pursuant to a draw-down notice for which Acqua has yet to take possession of the shares.*") (emphasis added).  When the issuer did finally initiate a draw down Acqua Wellington was exposed to limited or virtually no market risk because it received its shares at a discount, it could pre-sell shares before it actually received them, and we understand equity line investors seek to sell their shares within a day or two of receiving notice of a draw down.[7]  *Id.* ("Acqua is entitled to treat the draw-down notice as the transfer of ownership of the common stock and, therefore, Acqua may dispose of the common stock at its discretion once the notice has been given."); Luisa Kroll, *Toxic Stocks*, Forbes (Mar. 4, 2002), http://www.forbes.com/ forbes/2002/0304/040a.html (stating that equity line investors, such as Acqua Wellington "can turn a quick profit by selling the stock immediately, before taking possession of the new shares").  By contrast, the window between a draw down notice and delivery can be two weeks.  Acqua Wellington, 2001 WL 1230266, at *3 n.5. ("A draw down consists of a notice from the company to the investor that it intends to sell a specified dollar amount of common stock to the investor, followed by a pricing period, and culminating in the settlement, at which the investor pays the dollar amount of securities purchased."); Amy Trombly, *Equity Lines Under the Federal Securities Laws*, Insights: The Corporate & Sec. Law Advisor, May 2001, at 2 ("[M]any equity lines are structured so that it takes approximately two weeks from the time the company initiates a drawdown until that drawdown closes and the company receives the proceeds.")

Because Acqua Wellington sold its shares immediately after receiving notice of a draw down – and before receiving them – it made a profit on its investment purely based on the spread between the discounted price it paid for the shares and the market price at which it sold the

---

("Participating in a selling group or otherwise underwriting securities (however, being classified as an 'underwriter' under the Securities Act will not render an entity a 'dealer' under the Exchange Act where that entity is acting solely as an investor.").

[7] Acqua Wellington's no-action request does not discuss the length of time it took to sell its shares.  However, we understand it is widely known in the financial industry that equity line investors typically sell all of their shares immediately upon receiving notice of a draw down and before they ever receive any shares.

shares like a dealer, not an investor. Acqua Wellington simply did not own the shares long enough to be exposed to material market risk. The delay between notice and the payment obligation allowed Acqua Wellington to raise its capital obligations and generate profits by selling shares before it had to pay an issuer.

Global IV takes risk much more investment like than Acqua Wellington. Global IV generally begins making out of pocket cash payments to an issuer's creditors on court approval of the settlement and exchange with the issuer, but sometimes pays creditors, and is at risk of loss, before the exchange. (John C. Kirkland Tr. (Dec. 10, 2013) at 52:23-53:14, 63:7-16.) It takes months or years for Global IV to recoup the capital outlays it has made as part of a Section 3(a)(10) exchange. As the attached exhibit prepared by our clients demonstrates, it takes Global IV, on average, three months to recover approximately 67% of its capital outlays and six months to recover approximately 82% of its capital outlays.[8] (*See* Ex. A, Graph of Ironridge Percent of Investment Recover Overtime.) In contrast, Acqua Wellington, like a traditional underwriter, could – and did – sell all of its shares immediately. In fact, since Acqua Wellington had several weeks to sell shares before it had to pay the issuer it could recover its investment before making any capital outlays to an issuer.

During the months or years it is exposed to an investment, Global IV bears the risk of the stock's price declining, the disappearance of liquidity, and the issuer going bankrupt. Since Global IV invests in small, emerging companies these risks are ever present. In addition to market and credit risks, Global IV bore a variety of operational type risks that arose from the structure of the exchanges, including the risk that the delivery of shares that are fully cleared for trading to Global IV's brokerage accounts would be delayed by the multiple-parties involved in the delivery and clearance process (e.g., legal counsel, transfer agent, the Depository Trust Company ("DTC"), clearing firms, and broker-dealers); the risk that the delivery of shares would be delayed by an issuer physically delivering shares to Global IV due to its inability to electronically deliver shares; and the risk that issuers would refuse to issue shares to Global IV and even re-open litigation (as some issuers did) in an effort to avoid their obligations to Global IV. If Acqua Wellington is on the investor side of the investor/dealer line, Global IV is much farther away from the line.

---

[8] For these reasons, Global IV is also unlike International Capital Group, LLC ("ICG"), which recently settled an enforcement matter for illegally selling unregistered securities in violation of Section 5 and operating as an unregistered broker *and* unregistered dealer in violation of Section 15(a). International Capital Group, LLC, et al., Exchange Act Release No. 74172, 2015 WL 365381 (Jan. 29, 2015). ICG held itself out as a financing and financial services company, not an investor, that provided stock-based loans and other services, such as block purchases of stock. Its business model was to acquire shares as collateral for stock-based loans or block trades and then immediately and illegally sell those shares into the market. On average, ICG began selling shares associated with each loan three days *prior* to loan closing and funding, which allowed ICG to use the proceeds from the sale of the shares to fund the loans, and completed the sale of all remaining collateral within two weeks of receiving the stock from the customer. In addition, ICG displayed two other factors of dealer activity: extending credit to securities customers and making stock-based loans to securities customers.

4.      **The Supposed Additional Factors Identified by the Staff Do Not Make Global IV a Dealer**

Although the Staff has asserted that acting as an underwriter is the "linchpin" of its theory that Global IV is a dealer it has also asserted that other factors when coupled with its underwriting activity make Global IV a dealer.  In particular, the Staff has identified these additional factors as (1) the high volume of Global IV's sales activities, (2) the length of time that Global IV holds share before starting to sell them and its success in making a profit from Section 3(a)(10) exchanges, (3) the incidental investment advice that Global IV allegedly provides to issuers, and (4) the fact that Global IV allegedly holds itself out as a financing company.  The Staff's assertion that these so-called additional factors contribute to Global IV's status as a dealer is misplaced and unfounded.

a.      **The Size of Global IV's Transactions Do Not Make It a Dealer**

The Staff's assertion that Global IV's occasional high volume of sales activities in the secondary market is unfounded and based on a distorted view of the record.  Although the Staff has previously recognized that "[t]he level of a dealer's activity in securities transactions is usually more than that of an active trader. . . .  [a market participant's] regularity and level of participation in buying and selling securities or volume of transactions are often not enough to make a person a 'dealer.'"  Broker-Dealer Regulation § 2:3.2[A] (Clifford E. Kirsch ed., 2d ed. 2011 & Supp. 2014) (citing United Trust Co., SEC No-Action Letter, 1978 WL 13781 (Sept. 6, 1978)).  The Staff is viewing Global IV's secondary trading data in a distorted way.  During our April 15 meeting, the Staff asserted that Global IV represented 90% of the daily trading volume for at least one day for most issuers in its Section 3(a)(10) exchanges and that in fourteen out of thirty-three Section 3(a)(10) exchanges Global IV represented more than 25% of the average daily trading volume over a six-month period.  These data points are not meaningful in a market for thinly-traded stocks where on some days there may be minimal or no volume, and Global IV may be one of only a few market participants – or the only market participant – selling shares that day.  The fact is that on the majority of days when Global IV had positions to sell it represented a much smaller percentage of the trading volume – or none at all.  As the attached exhibit prepared by our clients demonstrates, when Global IV's sales from all of its Section 3(a)(10) exchanges are viewed in their totality it is clear that Global IV typically represents a minority of the secondary trading volume for issuers. (*See* Ex. B, Chart of Percent of Days that Ironridge Sold Percent of Daily Volume Between 0% and 90-100%.)

b.      **Global IV Holds and Sells Securities Like an Investor Not a Dealer**

The Staff's assertions as to the length of time that Global IV holds shares before starting to sell them and its success in making a profit from Section 3(a)(10) exchanges are not facts that are relevant to whether Global IV is a dealer.[9]  The Commission and the Staff have not identified

---

[9] According to the Staff, Global IV typically begins to sell shares from Section 3(a)(10) exchanges within four days of receiving them from issuers and has only lost money on five of its Section 3(a)(10) exchanges.  Although we do not have access to the Staff's calculations, measuring the time to commencement of sales from receipt of shares, as opposed to the approval of exchanges, is misleading, since for the myriad reasons described above there can be

the length of time a market participant holds a security before starting to sell it as an indicia of dealer activity. Instead, as we explained in our first supplemental submission, the Staff has identified contemporaneous and continuous buying and selling (*i.e.*, making a market in a security) – which Global IV does not do – as a relevant factor in order to "distinguish dealers from investors who buy and sell a security for investment purposes, but sometimes hold the position for only a short amount of time." Broker-Dealer Regulation § 2:3.1[B] (Clifford E. Kirsch ed., 2d ed. 2011 & Supp. 2014).

Of course, the Staff's view that Global IV starts selling too quickly to be an investor is entirely inconsistent with its no-action position in Acqua Wellington. Not only did Acqua Wellington make no assurances that it would hold it shares for a specific period of time before beginning to sell them, it expressly stated that it could short-sell an issuer's stock immediately once a draw down was initiated, even though it had not received the shares yet. Acqua Wellington and other equity line investors who are not registered broker-dealers begin to sell shares even before they receive them and sell all of their shares as quickly as possible.

Finally, to the extent the Staff's observation that many of Global IV's transactions have been profitable is intended to imply they are without investment risk, it is wrong. Months or years of exposure to small, illiquid securities is inherently risky. It is far riskier than the positions deemed to be investment positions in Acqua Wellington.

### c.    Other Aspects of Global IV's Investment Activities Do Not Make It a Dealer

The Staff's assertion that Global IV provides incidental investment advice to issuers in Section 3(a)(10) exchange is also irrelevant and inaccurate. Although the Commission and the Staff have identified providing investment advice as a factor that is indicative of dealer activity, it has done so in the context of providing investment advice to retail customers, not issuers of securities. Definition of Terms in and Specific Exemptions for Banks, Savings Associations, and Savings Banks Under Sections 3(a)(4) and 3(a)(5) of the Securities Exchange Act of 1934, Exchange Act Release No. 46745 (Oct. 30, 2002), 67 Fed. Reg. 67,496, 67,499 (Nov. 5, 2002) (proposed rule) (stating that "buying and selling directly to *securities customers* together with conducting any of an assortment of professional market activities such as providing investment advice, extending credit and lending securities in connection with transactions in securities, and carrying a securities account" are activities that are indicative of dealer activity (emphasis added)). Unlike a dealer, Global IV does not have retail customers, let alone any retail customers to whom it provides investment advice.

Global IV clearly does not provide investment advice to the issuers with whom it engages in Section 3(a)(10) exchanges. Global IV is not an adviser to these issuers, but rather an adverse

---

delays in the delivery of shares following the approval of an exchange. As Global IV does not generally expect to sell immediately after an exchange, Global IV may well be able to accommodate such delays in the ordinary course. In any event, the testimonial record is that sales generally commenced weeks after an exchange.

litigation party obtaining shares in exchange for claims against the issuers. In this litigation, Global IV and the issuer are each represented by their own attorneys. The settlement agreement, which is incorporated into the court order approving the Section 3(a)(10) exchange, expressly provides that: "[Global IV] has not and is not acting as a legal, financial, accounting or tax advisor to [the issuer], or agent or fiduciary of [the issuer], or in any similar capacity," and that "any statement made by [Global IV] or any of [Global IV's] representatives, agents or attorneys is not advice or a recommendation to [the issuer]." (*See, e.g.*, Ex. C, Ironridge Global IV, Ltd. v. Velatel Global Communications, Inc., Stipulation for Settlement of Claims ¶ 13.) On multiple occasions, Global IV has had to actively enforce the terms of the court settlement order by additional heavily-contested litigation against the issuers.

Although there is communication about the terms on which Global IV would be willing to enter into an exchange, settlement terms proposed in the context of adversarial negotiations do not constitute advice to the issuers, let alone investment advice. Indeed counterparties, including funds, frequently negotiate the terms of prospective investments – particularly large ones. If the negotiation process constituted the provision of investment advice then virtually all business negotiations in the financial markets would be covered. That they are not is evident from the fact that the Staff's own Division of Investment Management has repeatedly acknowledged that advice to issuers "concerning the structuring of their securities offerings" does not constitute investment advice. *See* Div. of Inv. Mgmt., U.S. Sec. & Exch. Comm'n, *Regulation of Investment Advisers* (Mar. 2013), http://www.sec.gov/about/offices/oia/oia_investman/rplaze-042012.pdf; *see also* Div. of Inv. Mgmt., U.S. Sec. & Exch. Comm'n, Staff Legal Bulletin No. 11, *Applicability of the Advisers Act to Financial Advisors of Municipal Securities Issuers* (Sept. 19, 2000) (stating that investment advice does not include "providing advice as to whether and how a municipality should issue debt securities, including advice with respect to the structuring, timing and terms concerning such issue or issues").[10] In addition, the Staff's assertion that Global IV is providing investment advice to an issuer because an issuer consents to its negotiating a receivable purchase agreement with an issuer's creditors is meritless. Global IV's receivable purchase agreements are the result of arm's length bargaining between it and an issuer's creditors. The fact that Global IV may decide to pursue such negotiations where an issuer is open to separately negotiating an exchange does not transform them into advice to the issuer.

### 5. Global IV, Like Other Market Participants, Has Reasonably Relied on Acqua Wellington

During our April 15 meeting, the Staff contended that its Acqua Wellington no-action letter does not apply to Global IV for two principal reasons. First, the Staff recited the rote

---

[10] The Staff's assertion that Global IV holds itself out as a financing company is also irrelevant and inaccurate. The Commission and the Staff have not identified holding one's self out as a financing company as a factor that is indicative of dealer activity. Rather, the Commission and Staff have identified the following as dealer factors: (1) advertising or otherwise holding one's self out as a dealer, and (2) advertising or otherwise holding one's self out as willing to buy or sell securities from its own account on a continuous basis. Global IV does not do either of these things. In addition, as a factual matter, Global IV does not hold itself out as a financing company. Global IV is an investor that is interested in making direct equity investments in public companies.

11

disclaimer that a no-action letter only applies to the addressee and is limited to the facts presented in the letter. Second, the Staff asserted that Acqua Wellington, unlike Global IV, agreed to limit the difference between its purchase price for shares and the market price as determined by the formula in the equity line agreement to the amount that the National Association of Securities Dealers ("NASD") interpreted as the maximum compensation a broker-dealer could receive under NASD 2710 (which is now Financial Industry Regulatory Authority ("FINRA") Rule 5110). Neither of these reasons provides a compelling basis for the Staff to bring an enforcement action against Global IV that is inconsistent with the core holding of Acqua Wellington, which is directly on point in this case.

Although a no-action letter may not be technically binding on the Staff or the Commission, the Commission's procedural rules expressly provide that any statement by, among others, the chief counsel of a division "can be relied upon as representing the views of that division." 17 C.F.R. § 202.1(d). In addition, as former Commissioner Fleischmann stated the Staff "know[s] that no-action letters are treated, inside and outside the [SEC], as decisional materials evidencing 'staff's views', that the Bar and the public do, and should be able to rely to, rely on these decisional materials, and that the public reliance presumes generalizations from the particular facts and application beyond that particular addresses." Morgan Stanley & Co, Inc., Exchange Act Release No. 28990, 1991 WL 296498 (Mar. 20, 1991). In litigation, the Commission has even argued "that a no-action letter issued to a similarly situated third party evidenced that the defendant had prior notice, for purposes of constitutional due process, of the SEC's interpretation of a particular regulatory provision." Donna M. Nagy, *Judicial Reliance on Regulatory Interpretations in SEC No-Action Letters: Current Problems and a Proposed Framework*, 83 Cornell L. Rev., 921, 951 n.135 (1998) (citing *General Bond & Share Co. v. SEC*, 39 F.3d 1451, 1455 (10th Cir. 1994)). The Commission's "suggestion that publication of an interpretive view in a no-action letter constitutes constitutionally adequate notice to an unrelated third party is diametrically opposed to [the Staff's] contention that an 'addressee-only' limitation applies to no-action letters." *Id.*

In fact, the guidance in Acqua Wellington appears to have been widely relied upon by many market participants who, like Global IV, have not perceived various additional ancillary undertakings by Acqua Wellington, none of which were expressly mandated by the Staff, to be critical to the analysis. Many of these investors do not adhere to the conditions that Acqua Wellington imposed on itself, such as complying with FINRA underwriter compensation rules and only investing in companies with market capitalizations greater than $100 million.[11] Despite

---

[11] *See, e.g.*, Andalay Solar, Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (Dec. 11, 2014); Nutranomics Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (Mar. 6, 2014) (stating that Nutranomics Inc. entered into equity line of credit with Southridge Partners II LP); Writ Media Group, Registration Statement Under the Securities Act of 1933 (Form S-3) (Oct. 31, 2013) (stating that Writ Media Group entered into equity line of credit with Dutchess Opportunity Fund II); Genufood Energy Enzymes, Registration Statement Under the Securities Act of 1933 (Form S-3) (July 26, 2013) (stating that Genufood Energy Enzymes entered into equity line of credit with Kodiak Capital Group LLC); Green Automotive Co., Registration Statement Under the Securities Act of 1933 (Form S-3) (July 10, 2013) (stating that Green Automotive Co. entered into equity line of credit with Kodiak Capital Group LLC); SMTP Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (June 20, 2013) (stating that SMTP Inc. entered into equity line of credit with Dutchess Opportunity

this widespread conduct that the Staff now asserts that it views as indicative of dealer activity, the Staff, to our knowledge, has not brought enforcement actions against these investors for violations of Section 15(a), nor has the Staff rescinded the guidance provided in the Acqua Wellington no-action letter. To bring an enforcement action now against Global IV or Partners LLC based on conduct that is entirely consistent with the Staff's longstanding Acqua Wellington guidance (as well as its more general dealer-trader guidance) would be fundamentally unfair and a violation of due process. Moreover, such an enforcement action would upend the settled expectations of countless investors and unjustifiably transform them into dealers.

The Staff's assertion that the Acqua Wellington guidance is not available to Global IV because it did not follow FINRA Rule 5110(c), which addresses limits on compensation that a broker-dealer can receive when acting as an underwriter in a public offering, is entirely unpersuasive. These compensation rules have no bearing on an investor engaged in Section 3(a)(10) exchanges. Unlike Acqua Wellington, Global IV is not underwriting an "at the market offering" of securities and then selling all of the shares it acquires immediately, as a dealer typically would. As described above, such underwriting activity involves limited or no market risk. FINRA's compensation rules are intended to assure fair and reasonable compensation for broker-dealers who are exposed only to the limited risks of underwriting. In contrast, Global IV is an investor that holds shares for months or years during which time it is subject to market and other risks as described above. Thus, it makes no conceptual sense to limit Global IV's compensation in accordance with a self-regulatory organization's compensation regime for broker-dealers acting as underwriters.

The better analogy is to look at the market rate discounts available to investors in similar transactions. In many secondary offerings and private placements investors purchase shares of stock at a 10% to 40% discount to the market price. To the extent that there are separate underwriters (who avoid exposing themselves to any market risk), the underwriters of such offerings may only receive a customary underwriter's spread of 5% to 8%. The investors who hold the securities and take on market risk analogous to Global IV's risks are compensated for that risk. Even in the underwriting context, FINRA's rules recognize the fundamental principle that market participants who take greater risks are entitled to greater rewards. *See* FINRA Rule 5110(c)(20) ("The maximum amount of compensation (stated as a percentage of the dollar amount of the offering proceeds) that is considered fair and reasonable generally will vary directly with the amount of risk to be assumed by participating members and inversely with the dollar amount of the offering proceeds."). Since Global IV is an investor taking market risk and it should reasonably be compensated, or risk losses, as such.

Indeed, the FINRA underwriting compensation rules place limits on transactions that are "public offerings of securities," a defined term in FINRA's rules. For purposes of FINRA Rule 5110, a "public offering" is expressly defined to be "any primary or secondary offering of securities *made pursuant to a registration statement or offering circular* including exchange

---

Fund II); Advaxis Inc., Registration Statement Under the Securities Act of 1933 (Form S-3) (Nov. 14, 2012) (stating that Advaxis Inc. entered into equity line of credit with Hanover Holdings LLC).

offers, rights offerings, offerings made pursuant to a merger or acquisition and all other securities offerings of any kind whatsoever."[12] FINRA Rule 5121(f)(11) (emphasis added); FINRA Rule 5110(a) (stating that the definitions in FINRA Rule 5121 are incorporated by reference into FINRA Rule 5110). Global IV's Section 3(a)(10) exchanges are not public offerings within the meaning of FINRA Rule 5110(c) because neither Global IV's receipt of shares from issuers nor its sale of shares in open market transactions are made pursuant to a registration statement or an offering circular. As result, even if Global IV were a registered dealer, its compensation in its Section 3(a)(10) exchanges would not be limited by FINRA Rule 5110(c).[13] It is, therefore, completely unreasonable for the Staff to claim that Global IV's failure to adhere to FINRA 5110(c) means that the Acqua Wellington guidance does not apply to Global IV.

Moreover, the Staff's view that an investor that engages in a Section 3(a)(10) exchange must adhere to FINRA underwriting compensation rules for broker-dealers (and, as the Staff suggested, receive FINRA's pre-approval of its exchange formula) is fundamentally inconsistent with the Section 3(a)(10) exemption. Congress enacted Section 3(a)(10) to provide an alternative means for issuers to issue securities in exchange for outstanding securities, claims, or property interests such that issuers and claim holders could readjust their rights in a mutually beneficial manner under the supervision of a court. As part of the Section 3(a)(10) exchange process, Congress entrusted courts and other authorized governmental entities – not the Commission – to administer this exemption by reviewing and ruling upon the fairness of the terms and conditions of an exchange. If Congress did not even entrust the Commission with administering the Section 3(a)(10) exemption, then it certainly did not make use of the Section 3(a)(10) exemption contingent upon the views of a non-governmental, private organization such as FINRA.

In addition, as a practical matter, judicial review and approval of Global IV's Section 3(a)(10) exchanges functionally serves an analogous role to a FINRA review of underwriting compensation. Under FINRA Rule 5110(c)(2)(D), FINRA reviews a broker-dealer's underwriting compensation to determine whether it is fair and reasonable. A court reviewing a Section 3(a)(10) exchange similarly must review and conclude that the terms and conditions of the exchange are fair. Those terms and conditions include the formula by which Global IV receives shares from the issuer in exchange for settling its claims against the issuer. When the court rules that the terms and conditions of the exchanges are fair (as every court in every one of Global IV's exchanges did) that ruling includes a determination that Global IV is receiving – to borrow the language of FINRA Rule 5110(c) – compensation that is fair and reasonable. Thus,

---

[12] FINRA Rule 5121(f)(11) excludes from the definition of public offering any offering made pursuant to "an exemption from registration under Sections 4(1), 4(2), or 4(6) of the Securities Act;" "Securities Act Rule 504, if the securities are 'restricted securities' under Securities Act Rule 144(a)(3), Securities Act Rules 505 or 506;" or "Securities Act Rule 144A or SEC Regulation S." In addition, FINRA Rule 5121(f)(11) also excludes from the definition of public offering "exempted securities as defined in Section 3(a)(12) of the Exchange Act."

[13] Indeed, we are informed that it appears that none of the registered broker-dealers involved in Global IV's Section 3(a)(10) exchanges sought approval from FINRA for the compensation they received in connection with the exchanges. Their actions indicate that they did not think FINRA Rule 5110(c) applied to Global IV's Section 3(a)(10) exchanges.

14

in addition to being inapplicable to Global IV's Section 3(a)(10) exchanges, a FINRA review and approval of the terms and conditions of such exchanges is unnecessary and duplicative.

### C. Importing the Securities Act Definition of Underwriter To Determine Dealer Registration Would be a Fundamentally Flawed Policy

#### 1. The Statutory Underwriter Concept Served Securities Registration Objectives, and Has Largely Been Abandoned As A Matter of Regulatory Policy

The very broad definition of underwriter contained in the Securities Act was intended to advance the objective of expanding the transactions for which securities registration would be required in order "'to protect investors by promoting full disclosure of information thought necessary to [make] informed investment decisions.'" *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) (quoting *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953)); *see also* Collins Securities Corp., Exchange Act Release No. 11766, 1975 WL 160411, at *11 (Oct. 23, 1975) ("The purpose of the Securities Act is to provide adequate disclosure about an issuer through the registration process in situations where registration is necessary and practicable."). To accomplish that purpose, the definition of statutory underwriter and the term distribution within it have been interpreted broadly in order afford investors the benefits of registration in public offerings. *See, e.g.*, Collins Securities Corp., Exchange Act Release No. 11766, 1975 WL 160411, at *11 (Oct. 23, 1975) ("The Securities Act contemplates that registration will be required, absent some special exemption, when securities are publicly offered by or on behalf of an issuer or are purchased from an issuer for public resale, and the term 'distribution' as used in the Act has been interpreted to accomplish that purpose.").

As such, it captures not only dealers engaged in traditional underwriting activity but "individuals who do not even bear the title of broker or dealer." David A. Lipton, Broker Dealer Registration § 3:2 (2014); *see also In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 180 (2d Cir. 2011) (explaining that "'underwriter' was 'defined broadly enough to include not only the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also . . . the person who purchases an issue outright with the idea of then selling that issue to the public'") (quoting H.R. Rep. No. 73–85, at 13 (1933)).

Even in the Section 5 context, however, the statutory underwriter concept has been largely abandoned by the Commission through a series of regulatory decisions that span more than thirty years. This process began with the abandonment of the so-called "presumptive underwriter" analysis by the Division of Corporation Finance. As the director of that division explained in 1986:

> [The presumptive underwriter] doctrine assumed that a purchaser of a relatively large amount of securities covered by a registration statement (at one point 10%) was buying with a view to distribution and, therefore, should be deemed a statutory underwriter. The theory was most subjective, most difficult of explication and presented considerable problems both in compliance, as well as administration. In 1983, in the *American Council of Life Insurance* letter, the presumptive underwriter doctrine was for all intents and purposes abandoned. The letter recognized that institutional investors generally

should not be deemed underwriters simply on the basis of the purchase of a large amount of registered securities. The purchase of large amounts of securities was, after all, the institution's day-to-day business. Nothing in the Securities Act compelled the view that person acquiring a substantial part of an offering should be treated differently from any other investor with a large position in the issuer, unless the purchaser becomes an affiliate as a result of the purchases.[14]

To similar effect, the Staff concluded in a no-action letter to St. Ives Holding Company in 1987 (and has repeatedly re-affirmed in subsequent no-action letters) that unregistered securities issued under Section 3(a)(10) of the Securities Act are not restricted securities within the meaning of Rule 144(a)(3).  St. Ives Holding Co., SEC No-Action Letter, 1987 WL 108169 (July 22, 1987); *see also*, Nabi Biopharmaceuticals, SEC No-Action Letter, 2012 WL 2339264 (June 20, 2012); Aura Systems, Inc., SEC No-Action Letter, 1994 WL 362097 (July 8, 1994).  As a result, resales of securities obtained through Section 3(a)(10) exchanges are not subject to the limitations applicable to restricted securities.  Based on that guidance, market participants have widely understood that that persons to whom shares are issued in a Section 3(a)(10) who are not deemed to be "affiliates" of the issuer may publicly resell such shares without registration in reliance upon Section 4(1) of the Securities Act.  *See, e.g.*, Sprint Corp., SEC No-Action Letter, 2003 WL 22019523 (Aug. 25, 2003) (no-action request stating counsel's understanding that non-affiliates can resell unregistered securities from Section 3(a)(10) exchange based on Section 4(1)); John Hancock Financial Services, Inc., SEC No-Action Letter, 1999 WL 1018123 (Nov. 8, 1999) (same).  The availability of the trading exemption under Section 4(a)(1) for such resales necessarily implies that the seller is not a statutory underwriter.

Most recently in 2007, the Commission amended Rule 145(c) to eliminate the presumptive underwriter status of certain parties to a business combination and their affiliates except where a party to the transaction is a shell issuer.  As to other transactions, the Commission observed, "[t]he presumptive underwriter provision in Rule 145 is no longer necessary in most circumstances."[15]  As a result, persons previously covered by Rule 145(c) may now make immediate sales of securities acquired in a business combination in any amount except where the seller is a controlling person subject to the public information, volume, manner of sale, and notice conditions of Rule 144.

2.    **Resurrecting the Statutory Underwriter Concept To Justify This Stand Alone Dealer Registration Enforcement Action Is Not Sound Policy**

It is not sound as a matter of policy to import that definition, crafted for an entirely different purpose, simply to support an enforcement recommendation here.  Because of the

---

[14] Linda C. Quinn, Div. of Corp. Fin., U.S. Sec. & Exch. Comm'n, Address to Federal Regulation of Securities Committee, *Redefining "Public Offering or Distribution" for Today* (Nov. 22, 1986), *available at* https://www.sec.gov/news/speech/1986/112286quinn.pdf.

[15] Revisions to Rules 144 and 145, Securities Act Release No. 33-8869 (Dec. 6, 2007), 72 Fed. Reg. 71,546 (Dec. 17, 2007) (final rule).

16

breadth of the definition and the absence of any rational limiting principle, the consequence
would be to require a broad swath of market participants who otherwise lack the characteristics
of a dealer to register as dealers. To do so, as the Staff proposes, would be inconsistent with the
Commission's guidance that the term distribution as used in the definition of underwriter "is not
defined either in the Securities Act of 1933 or in the Securities Exchange Act of 1934 and its
meaning and applicability to particular persons in each context should be derived from the
differing purposes for which it is used." *Id.* Unlike the Securities Act, the purpose of the
Exchange Act is to protect investors in "securities trading as contrasted to securities
distribution." *Drake v. Thor Power Tool Co.*, 282 F. Supp. 94, 103 (N.D. Ill. 1967).

      Consistent with that differing statutory objective, even in adopting Regulation M under
the Exchange Act to "preclude manipulative conduct by persons with an interest in the outcome
of an offering," the Commission has employed a narrower definition of offering than would be
attempted in the enforcement action proposed here. Anti-manipulation Rules Concerning
Securities Offerings, Exchange Act Release No. 34-38067 (Dec. 20, 1996), 62 Fed. Reg. 520
(Jan. 3, 1997). Regulation M defines a distribution as "an offering of securities, whether or not
subject to registration under the Securities Act, that is distinguished from ordinary trading
transactions by the magnitude of the offering and the presence of special selling efforts and
selling methods." 17 C.F.R. § 242.100. If the Commission desired to seek registration of parties
engaged in offering activity that presented investor protection risks, a formulation like
Regulation M provides a sensible limiting principle on which to do so. The fact that the
Commission narrowed the concept of Securities Act distributions when adopting rules aimed at
preventing fraud reinforces the appropriateness of narrowing the concept of Securities Act and
distributions when adopting rules simply mandating who must register as a dealer. Under the
circumstances here, where securities were issued through a judicial proceeding and where sales
were made through registered broker-dealers, there is no material enhancement of investor
protection to be gained by applying a definition more expansive than that provided by Regulation
M.

      **3.**     **Applying the Statutory Underwriter Concept to the Issue of Dealer
Registration Would Cause Confusion and Regulatory Uncertainty**

      The Staff's adoption of the statutory underwriter concept into the dealer registration
context would establish a flawed policy that would unjustifiably disrupt settled market
expectations and negatively impact businesses, the economy, and the capital markets. As we
discussed above and in our initial submission, many investors, such as private equity investors,
hedge funds, venture capital funds, and mutual funds, purchase securities directly from issuers
and resell them – often immediately and routinely in less than two years – into the market. In all
of these situations, these investors would qualify as statutory underwriters under the expansive
definition of that term in the Securities Act. However, such investors have typically not
registered as dealers in reliance upon the Staff's guidance that their investment activities, without
any other indicia of dealer activity, do not trigger a requirement to register as dealers. The
Staff's novel theory that statutory underwriters must register as dealers would unjustifiably
disrupt the well-settled expectations of these investors. Since the statutory underwriter concept
is so broad and bereft of any reasonable limiting principle, these investors would be required to
register as dealers even though they do not engage in traditional underwriting activities or any
other dealer activities. The result would be confusion and regulatory uncertainty.

4.      **The Proposed Interpretation Is Fundamentally Inconsistent With the Legislative Decision Behind Section 3(a)(10) and the Staff's Guidance Under That Provision**

As is clear from the extensive legislative history cited in our original Wells submission in this matter, Congress specifically enacted Section 3(a)(10) to promote business development by providing businesses and holders of bona fide outstanding securities, claims, or property interests with a means to re-adjust their rights in a mutually beneficial manner under the supervision of a court, and thereby obtain free-trading securities outside of the securities registration process. The utility of the Section 3(a)(10) exemption depends on the ability of exchanging parties to resell the securities. As we discussed in our initial submission, Section 3(a)(10) exchanges, consistent with the Congressional intent behind the Section 3(a)(10) exemption, are frequently used to settle large class action litigation, restructure businesses, and facilitate business acquisitions. For instance, "Facebook took advantage of Section 3(a)(10) in August 2012 when it obtained a determination from the California Department of Corporations that the terms and conditions of its cash and stock acquisition of Instagram, Inc. were fair to the Instagram shareholders." Charles J. Johnson & Joseph McLaughlin, Corporate Finance and the Securities Laws § 1.05[E] (4th ed. 2006 & Supp. 2013). Like other issuers who use the Section 3(a)(10) exemption, Facebook was able to "avoid[] the time and expense of registering its shares under the 1933 Act and the Instagram shareholders received Facebook shares that were not restricted as they would have been if Facebook had issued its shares in a private placement." *Id.*

However, the Staff's theory that exchange recipients who desire to sell the exchanged securities -- or sell them within the two year holding period advanced by the Staff based on its misreading of the *Big Apple* decision – thereby become statutory underwriters required to register as dealers, would eliminate the utility of the Section 3(a)(10) exemption. The courts will not countenance a regulatory interpretation that renders unviable a legislatively created exception to registration, nor should the Commission. *See Brucker v. Thyssen-Bornemisza Europe N.V.*, 424 F. Supp. 679 (S.D.N.Y. 1976) (rejecting challenge to approval of Section 3(a)(10) settlement on the grounds that settlement violated the Exchange Act's filing requirements for tender offers because those requirements "were not meant to apply to judicially approved settlement agreements, particularly in light of the legislative history"), *aff'd sub nom., Brucker v. Indian Head, Inc.*, 559 F.2d 1202 (2d Cir. 1977). For it is almost certain that shareholders of businesses, such as Instagram, and plaintiffs in class action litigation would not engage in Section 3(a)(10) exchanges if they could not resell their newly acquired securities for two years or more or had to expend considerable time, money, and effort to register as a dealer. As a result, the businesses and claim holders that Congress specifically intended to assist by enacting the Section 3(a)(10) exemption would be deprived of a critical means of re-adjusting their rights in order for their mutual benefit.

Certainly the restrictive regime postulated to support this enforcement recommendation was not anticipated by the Commission Staff in developing its extensive guidance regarding Section 3(a)(10) exchanges. To the contrary, Staff Legal Bulletin No. 8A supports the conclusion that exchange recipients can freely sell their securities, identifying only a narrow limitation on the re-sale of securities involving shell companies:

18

> When a Rule 145(a) transaction is exempt from Securities Act registration under Section 3(a)(10) and any party to that transaction is a shell company, other than a business combination related shell company, then the Rule 145(c) and (d) resale limitations apply to any party to that transaction (other than the issuer of the Section 3(a)(10) securities) and to any person who is an affiliate of such party at the time such transaction is submitted for vote or consent.[16]

In particular, there is *no mention whatever* of the possibility that exchangers who resell will be statutory underwriters and thereby be required to register as securities dealers.

Similarly, as discussed above, the Staff in no-action letters consistently indicated that securities from Section 3(a)(10) exchanges can be freely re-sold after they are issued and that an investor does not have to hold the securities for a specific period of time before reselling them. Until now, the Staff has never suggested that reselling such securities less than two years after acquiring them would make an investor a statutory underwriter and, thus, a dealer. It defies logic for the Staff to claim that an investor who receives Section 3(a)(10) securities does not have to follow the re-sale limitations of Rule 144, but does have to hold such securities for two years or more before reselling them to avoid dealer status. The Staff's claim is so extraordinary, that not once in any of Global IV's Section 3(a)(10) exchanges have any of the attorneys or judges involved in the exchanges raised the possibility that Global IV would be a statutory underwriter, let alone a dealer, by reselling the shares it received.

### D.   Due Process Forbids Reversing Existing Guidance Through an Enforcement Action and the Commission Should Not Attempt to Do So

Under the Commission and Staff's longstanding guidance, Global IV could not have had any notice, let alone reasonable notice, that the Staff would consider its involvement in Section 3(a)(10) exchanges underwriting activity that required registration as a dealer under Section 15(a). As we thoroughly explained in our first supplemental submission, an enforcement action, especially one that only involves a charge of failing to register as a dealer, is not the proper means for the Staff to create new interpretations of the dealer registration requirements under Section 15(a). It is obvious that advancing the Staff's unprecedented position in an enforcement action violates due process. *See, e.g., Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (holding that due process requires that "laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited"); *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (holding that SEC may not sanction a person pursuant to a "substantial change in its enforcement policy that was not reasonably communicated to the public"); Michael S. Piwowar, Comm'r, U.S. Sec. & Exch. Comm'n, Remarks to the Securities Enforcement Forum (Oct. 14, 2014), *available at* http://www.sec.gov/News/Speech/Detail/Speech/ 1370543156675#.VOszNNJOXws (stating that enforcement actions that "create new interpretations of the laws or regulations or impose new regulatory requirements" are inconsistent with the requirements of due process).

---

[16] Div. of Corp. Fin., U.S. Sec. & Exch. Comm'n, Staff Legal Bulletin No. 3A (June 18, 2008), *available at* https://www.sec.gov/interps/legal/cfslb3a.htm.

Even if due process did not forbid the attempt, the Commission could not achieve regulatory clarity through an enforcement action. If the Commission fails in its litigation – which it should for the reasons discussed above – it would need to issue new guidance or follow the rulemaking process to establish the new dealer registration policy that it is trying to create through an enforcement action. Even in the unlikely event that it were to succeed, it is not at all clear that the dealer registration standards that would emerge from contested litigation would match the dealer registration policy that the Staff and the Commission would arrive at following a thoughtful policymaking process. Indeed, even successful litigation might produce registration standards that are entirely unworkable in practice. In such an event, the Staff in the wake of a successful ruling would still need to issue new guidance to clarify the result of the litigation.

Under these circumstances, and in particular because that given this matter involves no underlying substantive violations, the Staff should pursue any desired changes to its dealer registration policy not through an enforcement action against Global IV that violates due process, but through a thoughtful and transparent policymaking process that results in new guidance from the Staff or a rulemaking from the Commission. The Staff is soundly pursuing just such a process to develop a rational registration regime for high frequency traders, a category of market participants that engage in substantial dealer activity under the Staff's existing guidance. If it wants to pronounce new standards for market participants like Global IV it should do the same.

E.   **Even If Global IV Is a Dealer Under the Exchange Act, It Qualifies For the Foreign Broker-Dealer Exemption From Registration**

Even if Global IV's activities did constitute dealer activities – which they do not – Global IV would be exempt from Section 15(a)(1) dealer registration requirements because it would be a foreign broker-dealer under Rule 15a-6. Rule 15a-6 under the Exchange Act provides an exemption from broker-dealer registration "to the extent that" a foreign broker or dealer engages in specified activities which involve U.S. investors. 17 C.F.R. § 240.15a-6(a); U.S. Sec. & Exch. Comm'n, Div. of Trading & Mkts., *Frequently Asked Questions Regarding Rule 15a-6 and Foreign Broker-Dealers* (April 14, 2014) [hereinafter "Rule 15a-6 FAQs"], https://www.sec.gov/divisions/marketreg/faq-15a-6-foreign-bd.htm.

1.   **If Global IV Were a Dealer, It Would Be a Foreign Dealer, Because It Is Not a U.S. Resident**

As an initial matter, if it were a dealer Global IV would fall within Rule 15a-6's definition of a foreign dealer, which includes "any person not resident in the United States" whose activities would otherwise fall within the definition of "dealer" in section 3(a)(5) of the Exchange Act. 17 C.F.R. § 240.15a-6(b)(3). Global IV is a non-U.S. resident because it is a British Virgin Islands business company, has its sole place of business in the British Virgin Islands, and does not have any offices, employees, or bank accounts in the United States.[17] In addition, Global IV is not an office or a branch of a registered broker or dealer. During our April 15 meeting, the Staff erroneously asserted that Global IV is not a foreign broker-dealer because it

---

[17] Global IV was established off-shore primarily to utilize the services of a highly recommended fund administrator and to achieve certain tax benefits. (Kirkland Tr. at 24:23-25:3.)

had three U.S.-based directors for a limited period of time from February 2011 to November 2012. The Staff's assertion is incorrect as a matter of law, because none of these directors was an employee or officer and was not involved in the day-to-day or executive management of Global IV. Merely having a U.S.-based shareholder or non-executive director does not change a foreign company's place of residence. In fact, under U.S. tax law,[18] a "foreign corporation shall not be considered to have an office or other fixed place of business merely because a person controlling that corporation has an office or other fixed place of business from which general supervision and control over the policies of the foreign corporation are exercised." 26 C.F.R. § 1.864-7(c).[19]

## 2.   The Issuers in Global IV's Section 3(a)(10) Exchanges Were Not Solicited

Rule 15a-6(a)(1) provides that a foreign broker-dealer is not required to register with the Commission to the extent it "[e]ffects transactions in securities with or for persons that have not been solicited by the foreign broker or dealer." Notwithstanding comments by the Staff at our April 15 meeting, it appears this exemption would apply here, because Global IV did not solicit the issuers with whom it actually entered into Section 3(a)(10) exchanges. (Kirkland Tr. at 63:23-64:1 ("How does Ironridge find an issuer for 3(a)(10) transactions? A. They call us. . . .".) Indeed, we are informed that it seems that in all of the successfully completed Section 3(a)(10) exchanges, it was a representative of the issuer (e.g., an officer, director, registered broker-dealer, accountant, attorney, or advisor of the issuer) that initiated discussion.[20]

Generic activities by Partners LLC such as attending trade conferences and meeting with issuers do not constitute solicitation of a specific exchange, particularly given that such efforts appear to have been uniformly unsuccessful. "[T]he Commission generally views 'solicitation,' in the context of broker-dealer regulation, as including any affirmative effort by a broker or dealer intended to induce transactional business for the broker-dealer or its affiliates." Registration Requirements for Foreign Broker-Dealers, Exchange Act Release No. 27017 (July 18, 1989), 54 Fed. Reg. 30,013, 30,017. In particular, the Commission has provided the following examples of conduct that it would consider to be solicitation by a foreign broker-dealer:

---

[18] The Staff's own guidance recognizes that U.S. tax law informs whether a foreign broker-dealer satisfies the requirements of Rule 15a-6. *See* Rule 15a-6 FAQs, at n.24 (indicating that under Rule 15a-6(a)(3), a foreign broker-dealer should consider whether its participation in unchaperoned meetings with U.S. institutional investors should be structured in such a way that they do not create a de facto "office" or presence in the U.S. for U.S. tax purposes).

[19] As we explained in our first supplemental submission, although Partners LLC was the sole shareholder of Global IV there is no evidence in the record that Partners LLC utilized its shareholder rights to exercise power over Global IV's daily operations.

[20] Global IV has successfully completed numerous Section 3(a)(10) exchanges during the past four years and our clients have had only two weeks to review the assertions made by the Staff at our April 15 meeting. But to the best of their knowledge, it appears that the issuers in Global IV's successfully completed Section 3(a)(10) exchanges were not solicited.

Conduct deemed to be solicitation includes telephone calls from a broker-dealer to a customer encouraging use of the broker-dealer to effect transactions, as well as advertising one's function as a broker or a market maker in newspapers or periodicals of general circulation in the United States or on any radio or television station whose broadcasting is directed into the United States. Similarly, conducting investment seminars for U.S. investors, whether or not the seminars are hosted by a registered U.S. broker-dealer, would constitute solicitation. A broker-dealer also would solicit customers by, among other things, recommending the purchase or sale of particular securities, with the anticipation that the customer will execute the recommended trade through the broker-dealer.[21]

Neither Global IV nor Partners LLC ever had any direct contact with any U.S. investors, which is the focus of the rule. *See* Rule 15a-6 FAQs (stating that rule applies to "certain specified activities involving U.S. investors"). Moreover, Global IV never had direct contact with any issuers, and did not engage in any activities with U.S. issuers that the Commission has identified as solicitation. While Partners LLC did interact with issuers, its activities also did not constitute solicitation, and cannot be attributed to Global IV in any event. As a federal court has already ruled, Global IV and Partners LLC are separate legal entities and Partners LLC's activities in the United States are not attributable to Global IV. *NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*, No. 14CV3945, 2014 WL 2619588, at *4 (S.D.N.Y. June 11, 2014). With regard to the Section 3(a)(10) exchanges, Global IV is the entity that entered into receivable purchase agreements with creditors, filed lawsuits against issuers, entered into stipulated settlements with issuers, sought court orders approving the exchanges pursuant to Section 3(a)(10), received shares of stock, and sold shares via unaffiliated registered broker-dealers in regular open market transactions. Because the U.S. issuers with whom Section 3(a)(10) exchanges were completed were not solicited, those exchanges are permitted under Rule 15a-6(a)(1).

### 3.    All of Global IV's Section 3(a)(10) Exchanges Were Effected With Registered Broker-Dealers

Rule 15a-6(a)(4)(i) provides that a foreign broker-dealer is not required to register with the Commission to the extent that it, "[e]ffects transactions in securities with . . . [a] registered broker or dealer, whether the registered broker or dealer is acting as principal for its own account or as agent for others." 17 C.F.R. § 240.15a-6(a)(4)(i). The Staff appears to concede – as it must – that Global IV's sales of shares of common stock are exempt under Rule 15a-6(a)(4)(i). However, during our April 15 meeting, the Staff asserted that the court-approved exchanges with issuers could be viewed as separate transactions which fall outside the exemption.[22] The Staff's

---

[21] Registration Requirements for Foreign Broker-Dealers, Exchange Act Release No. 27017 (July 18, 1989), 54 Fed. Reg. 30,013, 30,017.

[22] As an initial matter, it not clear that the filing requirements of the Exchange Act were meant to apply to judicially approved settlement agreements. *See Brucker*, 424 F. Supp. at 691 ("While the settlement agreement does contemplate what might technically be described as a tender offer, we think that these sections were not meant to apply to judicially approved settlement agreements, particularly in light of the legislative history."), *aff'd sub nom.*, *Brucker v. Indian Head, Inc.*, 559 F.2d 1202 (2d Cir. 1977).

assertion conflicts with the essential element of its dealer registration theory – that Global IV's transactions were unitary distributions. When Global IV's Section 3(a)(10) exchanges are viewed in their entirely, it is clear that all of those exchanges were effected with registered broker-dealers and, therefore, fall squarely within the exemption of Rule 15a-6(a)(4)(i).

In Global IV's Section 3(a)(10) exchanges, the receivable purchase agreements that Global IV entered into with creditors of the issuers provided that it would promptly seek court approval, and that payment would be made "following entry and full effectuation of an order approving settlement." (*See, e.g.*, Ex. C (Ironridge Global IV, Ltd. Receivable Purchase Agreement with American Hygiencis Corp. ¶ 3).) The court orders approving the fairness of the terms and conditions provided that the shares of issuers' common stock were to be deposited into Global IV's brokerage accounts, from which they could be resold by Global IV without restriction. (*See, e.g.*, Ex. D, Ironridge Global IV, Ltd. v. Velatel Global Communications, Inc., Stipulation for Settlement of Claims ¶ 10, 13.) In every case, the common shares were deposited into ordinary brokerage accounts with registered broker-dealers from which they were sold. Consistent with the intent of Rule 15a-6(a)(4)(i), the receiving broker-dealers themselves and the clearing firms that the broker-dealers clear through which are also a broker-dealers, performed extensive due diligence before accepting, clearing and, ultimately, selling the shares. Global IV typically provided copies of the court orders approving the exchanges, the stipulations between Global IV and the issuers, and the underlying receivable purchase agreements – as well as legal opinions from the issuers' attorneys and representation letters from the issuers to the broker-dealers – to the broker-dealers' compliance departments and attorneys. Every Section 3(a)(10) exchange was reviewed and approved by at least two registered broker-dealers, and every share of stock received pursuant to a court-approved Section 3(a)(10) exchange that was ever sold for the benefit of Global IV was sold by a registered broker-dealer. Since Global IV effected the transactions with registered broker-dealers, it is exempt under the plain language of Rule 15a-6(a)(4)(i).

There is no valid legal basis to split off pieces of a transaction, and then claim that certain subparts were not effected with a broker-dealer and, therefore, are not exempt. Nowhere does Rule 15a-6 suggest anything of the sort, and we are unaware of any case that has so held. Indeed, such an interpretation would be nonsensical, given that the rule expressly states it applies to conduct engaged in by the foreign broker-dealer, as long as the transaction is effected "with" a registered broker-dealer, acting as either an agent or as a principal for its own account. 17 C.F.R. § 240.15a-6(a)(4)(i). Even worse, the Staff's position is inconsistent with its dealer registration theory, because the Staff's theory that Global IV is a dealer is premised on the assertion that it acquired shares as part of a distribution and as such is an underwriter and therefore a dealer.

The rationale for the Staff's theory that Global IV acquired shares from the exchanges with a view to distribution depends upon a single sweep of activity that begins with discussions with an issuer and ends with registered broker-dealers selling shares into the open market. It cannot be that the court-approved exchanges through which Global IV obtained shares should be treated as part of a distribution that ultimately resulted in the sale of the shares to the public, while at the same time the acquisition of the shares is treated as unrelated to the sale for purposes of determining whether an exemption applies. The Staff cannot have it both ways. If the acquisition and sale are unrelated, then there is no distribution and Global IV is not a dealer. If they are related, then Rule 15a-6(a)(4)(i) applies and Global IV is exempt. Either way, there is

no basis for an enforcement action. In the context of Section 15(a), the Staff calls Global IV a dealer because it engaged in Section 3(a)(10) exchanges to effectuate the sale of unregistered shares to the public. Yet, in the context of Rule 15a-6 the Staff wants to claim that the court approved exchanges and the subsequent resales of the shares which the courts approved can be divided in half. The Staff cannot split the baby. Moreover, the Staff's attempt to do so is yet another troubling sign of its misguided commitment to bringing a case where none exists.

The Staff's divide and conquer premise is false because every one of Global IV's Section 3(a)(10) exchanges was a single, unitary transaction in securities that was effected with a registered broker-dealer who effectuated the receipt of shares from the issuer per the court's order and subsequently sold the shares in open market transactions. Each transaction began with Partners LLC's discussions with the issuer and ended with Global IV's sales of shares through a registered broker-dealer. Pursuant to the court's order, the successful completion of the entire transaction – including the execution of the receivable purchase agreements with the issuer's creditors – required that the issuer deliver to Global IV's designated broker-dealer the initial issuance of shares approved by the court so that Global IV could sell the shares through the broker-dealer. Accordingly, it is clear based on the plain language of Rule 15a-6 that Global IV effects its Section 3(a)(10) exchanges with a registered broker-dealer. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) (an agency's interpretation of its own regulation does not control if it is "'plainly erroneous or inconsistent with the regulation'") (citation omitted).

In addition, we are informed that a majority of the issuers in the Section 3(a)(10) exchanges were represented by investment bankers who were registered broker-dealers. Thus, even if the exchanges were treated as an entirely separate transactions, most of the time they were effected with registered broker-dealers acting as agents for the issuers. Accordingly, even under the Staff's distorted view Rule 15a-6(a)(4)(i) would apply to a majority of Global IV's Section 3(a)(10) exchanges.

### F. There Is No Basis for a Claim That Partners LLC Is Liable as a Controlling Person Under Section 20(b) for Violations of Section 15(a)

Two days before our April 15 meeting, the Staff notified us that it was – yet again – amending its Wells notice to Partners LLC by adding a claim under Section 20(b) that Partners LLC used Global IV to violate Section 15(a). Section 20(b) provides that: "It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this chapter or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b). Like the Staff's claim that Partners LLC is responsible under Section 20(a) as a control person for Global IV's alleged violation of Section 15(a), there is no basis for its theory that Partners LLC violated Section 20(b).

To establish that Partners LLC violated Section 20(b), the Commission would have to prove that that (1) Partners LLC controlled Global IV,[23] (2) that Global IV committed a primary

---

[23] *See SEC v. Coffey*, 493 F.2d 1304, 1318 (6th Cir. 1974) ("Under section 20(b), there must be shown to have been knowing use of a controlled person by a controlling person before a controlling person comes within its ambit."); *SEC v. Savoy Industries, Inc.*, 587 F.2d 1149, 1168-70 (D.C. Cir. 1978) (same); *Espinoza v. Whiting*, No.

violation of the securities laws,[24] and (3) that Partners LLC knowingly used Global IV to commit this violation.[25] These elements are consistent with the elements the Commission would have to prove to show that Partners LLC violated Section 20(a).[26] However, a critical difference between the sections is that Section 20(b), unlike Section 20(a), does not "put[] the burden on the defendant to prove an affirmative defense to avoid liability." *SEC v. Stringer*, No. CIV. 02-1341-ST, 2003 WL 23538011, at *6 (D. Or. Sept. 3, 2003). Instead, the Commission bears the higher burden of proving a defendant's knowledge and participation in a primary violation of the Exchange Act. *Rush v. Oppenheimer & Co.*, 628 F. Supp. 1188, 1196 (S.D.N.Y. 1985) (holding that "[v]icarious liability for criminal acts under § 20(b) . . . requires allegations of knowledge and participation"). As we thoroughly explained in our first supplemental submission, the Staff's Section 20(a) is fatally deficient: Partners LLC did not control Global IV; had no involvement in its assessment of whether it needed to register; and was not a culpable participant and did not act in bad faith in connection with that assessment. For those same reasons, which we need not repeat here, the Staff's new Section 20(b) claim of secondary liability is also fatally deficient.

Like the 20(a) theory addressed in our previous submission, the Section 20(b) theory cannot be sustained here since Global IV was not required to register as a dealer for the reasons stated above. In the absence of a registration obligation and primary violation of Section 15(a) by Global IV, there is no "act or thing which would be unlawful" for Partners LLC to have done that was done through another person. As such, this matter is unlike hypotheticals addressed by Chair White and the Staff in recent speeches in which it has posited the possibility that Section 20(b) could be employed in the absence of any primary violation. Mary Jo White, Chair, U.S. Sec. & Exch. Comm'n, *Three Key Pressure Points in the Current Enforcement Environment* (May 19, 2014) (stating that Section 20(b) "is a form of primary liability, rather than secondary

4:12CV1711 SNLJ, 2014 WL 1057295, at *5 (E.D. Mo. Mar. 18, 2014) (same); *Cohen v. Citibank, N.A.*, 954 F. Supp. 621, 630 (S.D.N.Y. 1996) (same); *Rush v. Oppenheimer & Co.*, 628 F. Supp. 1188, 1196 (S.D.N.Y. 1985) (same); *Moss v. Morgan Stanley*, 553 F. Supp. 1347, 1362 (S.D.N.Y. 1983), *aff'd*, 719 F.2d 5 (2d Cir. 1983) (same).

[24] *See, e.g., Shemian v. Research In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *24 (S.D.N.Y. Mar. 29, 2013) ("In order to establish a prima facie case of liability under Section 20(a) and (b), a plaintiff must show a primary violation of securities law by a controlled person."), *aff'd*, 570 F. App'x 32 (2d Cir. 2014); *Espinoza*, 2014 WL 1057295, at *13 (dismissing Section 20(b) claim for failure to sufficiently plead a primary violation of the Exchange Act); *SEC v. Stringer*, No. CIV. 02-1341-ST, 2003 WL 23538011, at *6 (D. Or. Sept. 3, 2003) ("Both Sections 20(a) and 20(b) create secondary liability."); *Rush*, 628 F. Supp. at 1196 (holding that Section 20(b) imposes "[v]icarious liability" for control persons).

[25] *See Coffey*, 493 F.2d at 1318 ("Under section 20(b), there must be shown to have been knowing use of a controlled person by a controlling person before a controlling person comes within its ambit."); *Savoy Industries*, 587 F.2d at 1168-70 (same); *Espinoza*, 2014 WL 1057295, at *5 (same); *Cohen*, 954 F. Supp. at 630 (same) *Rush*, 628 F. Supp. at 1196 (same); *Moss*, 553 F. Supp. at 1362, *aff'd*, 719 F.2d 5 (2d Cir. 1983) (same).

[26] Section 20(a) and Section 20(b) share similar elements because, as originally enacted, Section 20(b) provided a basis for the Commission to bring enforcement actions based on secondary liability, while 20(a) provided a basis for private litigants to bring suits based on secondary liability. *See Coffey*, 493 F.2d at 1318; *Stringer*, 2003 WL 23538011, at *6 (D. Or. Sept. 3, 2003).

25

liability, which would require proof of a separate violation by someone other than the defendant."), http://www.sec.gov/news/speech/2014-spch051914mjw.html; Aruna Viswanatha, *U.S. SEC enforcement looks to revive use of 1930s law*, Reuters (Feb. 21, 2014), http://www.reuters.com/article/2014/02/21/usa-sec-enforcement-idUSL2N0LQ29B20140221 (reporting similar comments by the Chief Counsel of the Staff's Division of Enforcement). Those hypotheticals assume a complete violation of Rule 10b-5 (a materially false statement made with scienter in connection with the purchase or sale of a security) where for various reasons the "maker" of the statement under recent Supreme Court authority is not liable. That theory cannot be available where, as here, there is no violation or even any "act or thing which would be unlawful."

In any event, the cases decided under Section 20(b) do not support the interpretation that a primary violation is unnecessary. Rather several courts have interpreted Section 20(b), like Section 20(a), as imposing secondary liability on a control person that uses a controlled person to commit a primary violation of the Exchange Act. *See, e.g., Shemian v. Research In Motion Ltd.*, No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *24 (S.D.N.Y. Mar. 29, 2013) ("In order to establish a prima facie case of liability under Section 20(a) and (b), a plaintiff must show a primary violation of securities law by a controlled person."), *aff'd*, 570 F. App'x 32 (2d Cir. 2014); *Espinoza v. Whiting*, No. 4:12CV1711 SNLJ, 2014 WL 1057295, at *13 (E.D. Mo. Mar. 18, 2014) (dismissing Section 20(b) claim for failure to sufficiently plead a primary violation of the Exchange Act); *Stringer*, 2003 WL 23538011, at *6 ("Both Sections 20(a) and 20(b) create secondary liability."); *Rush*, 628 F. Supp. at 1196 (holding that Section 20(b) imposes "[v]icarious liability" for control persons).[27]  In light of that case law, multiple commentators have questioned the Staff's "expansive view of the scope of potential liability" under Section 20(b).[28]  If the Commission were to bring an enforcement action against Partners LLC based on Section 20(b), Partners LLC would vigorously challenge the Staff's erroneous interpretation of the law in any administrative or judicial proceedings.

Not only is the Staff's effort to apply Section 20(b) on these facts inconsistent with settled case law, but bringing an enforcement action in this case would also be inconsistent with and contradict the Commission's enforcement practices and priorities.  Since the Commission restarted charging Section 20(b) violations last year, it has only brought Section 20(b) charges in cases involving serious allegations of fraud. *See* Timothy Edwin Scronce, Exchange Act Release No. 74626 (Apr. 1, 2015); *SEC v. Milrud*, No. 2:15-cv-00237-KM-SCM (D.N.J. filed Jan. 13, 2015); *SEC v. Strebinger, et al.*, No. 1:14-cv-03533-LMM (N.D. Ga. filed Nov. 3, 2014); Houston American Energy Corp., et al., Exchange Act Release No. 72749 (Aug. 4, 2014); *SEC*

---

[27] Notably, the Supreme Court in *Janus Capital Group v. First Derivative Traders*, the case that prompted the Staff to starting bringing Section 20(b) claims again, declined to decide whether Section 20(b) imposes primary or secondary liability.  131 S. Ct. 2296, 2304, n.10 (2011) ("We do not address whether Congress created liability for entities that act through innocent intermediaries in 15 U.S.C.A. § 78t(b).").

[28] *See* Dale E. Barnes, Jr., et al., *SEC Seeks to Deploy Section 20(b) to Skirt Restrictions of Janus* (May 5, 2014), *available at* http://www.morganlewis.com/pubs/sec-seeks-to-deploy-section-20b-to-skirt-restrictions-of-janus; Marc J. Fagel, et al., *Exchange Act Section 20(b): The SEC Enforcement Division Dusts Off an Old Weapon*, Wall Street Lawyer (Sept. 2014), *available at* http://www.gibsondunn.com/publications/Documents/Fagel-Loseman-SEC-Exchange-Act-Section-20(b)-Wall-Street-Lawyer-September-2014.pdf.

*v. Plummer*, No. 1:14-cv-05441-LTS (S.D.N.Y. filed July 18, 2014); Jeffrey C. Kuehr and Michael J. Willoughby, Exchange Act Release No. 72471 (June 25, 2014). For example, one of these cases involves allegations of widespread market manipulation that directly harmed investors and resulted in a parallel criminal proceeding. *SEC v. Milrud*, 2:15-cv-00237-KM-SCM (D.N.J. filed Jan. 13, 2015) (complaint charging defendant with securities fraud for "orchestrating a lucrative market manipulation scheme"); *United States v. Milrud*, No. 2:15-mj-07001-CLW-1 (D.N.J. filed Jan. 12, 2015) (criminal complaint charging defendant with securities and fraud). As we have previously discussed, there is no evidence – let alone allegations – that Partners LLC or Global IV engaged in any fraudulent conduct. Thus, there is no rationale for the Staff to use this case as vehicle to advance its new found interest in Section 20(b) as an enforcement tool.

## III.   CONCLUSION

For the reasons discussed above, because the Staff's proposal conflicts with longstanding guidance, there was nothing to put Global IV or anyone else on notice that registration was required. Therefore, and because it would violate due process the Staff should not recommend bringing an enforcement action against Global IV and certainly not against Partners LLC.

Respectfully submitted,

James Brigagliano
Michael Hyatte
SIDLEY AUSTIN LLP
1501 K Street, NW
Washington, DC 20005
(202) 736-8000

David Katz
SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, NY 10019
(212) 839-5300

W. Hardy Callcott
SIDLEY AUSTIN LLP
555 California Street, Suite 2000
San Francisco, CA 94104
(415) 772-1200

Erich T. Schwartz
Colleen P. Mahoney
Daniel J. Sullivan
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7000

Lawrence S. Spiegel
SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
4 Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Ironridge Global IV, Ltd. and Ironridge Global Partners, LLC*

Dated:  April 30, 2015

27

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2015, I filed an original of the foregoing Notice and three copies of the foregoing Notice and all attachments (including the Report) by Federal Express Overnight Mail with the Office of the Secretary, Securities and Exchange Commission, Attn: Secretary of Commission Brent J. Fields, 100 F Street NE, Mail Stop 1090, Washington, DC 20549, and by facsimile transmission to (202) 772-9324; that Mr. James Burns separately filed the original of his Report with the Commission by Federal Express Overnight Mail delivery to the same address; and that I served a true and correct copy of the foregoing Notice and all attachments upon counsel of record and the hearing officer by electronic mail, as follows:

Mr. Robert Gordon: gordonr@sec.gov
Securities and Exchange Commission

The Honorable James E. Grimes: alj@sec.gov
Administrative Law Judge
William Miller: millerwi@sec.gov

Josh C. Hess

KILPATRICK STOCKTON LLP
1100 Peachtree St., Ste. 2800
Atlanta, GA 30309-4530
(404) 815-6500
Fax: (404) 815-6555
jchess@kilpatricktownsend.com

Counsel for Respondents

US2008 7740197 2