UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 17-62255-CIV-COOKE/GOODMAN

SECURITIES AND EXCHANGE
COMMISSION,

    Plaintiff,

vs.

IBRAHIM ALMAGARBY, *et al.*,

    Defendants.

_____/

**ORDER ON MOTIONS FOR SUMMARY JUDGEMENT**

    The United States Securities and Exchange Commission (the "SEC") sued Ibrahim Almagarby and Microcap Equity Group, LLC ("MEG") (collectively, the "Defendants") for violating Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act") by allegedly acting as "dealers" without registering with the SEC. The SEC has also asserted a claim against Mr. Almagarby for control person liability under Section 20 of the Exchange Act based on MEG's alleged violation of Section 15(a). The SEC now moves for summary judgment against Defendants on both counts brought by the SEC in its Complaint and Defendants' First, Second, Fourth, Fifth and Eighth Affirmative Defenses. The Defendants also seek summary judgment, asserting that Defendants are "traders" who are excluded from the definition of "dealer" by Section 3(a)(5)(B) of the Exchange Act and therefore not required to register with the SEC. For the reasons stated below, the SEC's motion for summary judgment, ECF No. 73, is **GRANTED**. Defendants' cross-motion for summary judgment, ECF No. 74, is **DENIED**.

### I.    BACKGROUND

    Mr. Almagarby formed MEG, a Florida limited liability company, in January 2013. Plt.'s Statement of Material Facts ("PSMF") ¶1. From January 2013 through July 2016 (hereinafter, "the relevant period"), Almagarby was the sole owner, officer, employee, and controlling person of MEG. *Id.* at ¶2. Mr. Almagarby was a 29-year-old college student at Palm

1

Beach State College during the relevant period. Defs.' Statement of Material Facts ("DSMF") ¶¶1-2. Mr. Almagarby operated MEG out of his home. PSMF ¶4. During the relevant period, Mr. Almagarby had no employment outside of MEG and his sole means of support was his profits from MEG's securities transactions. PSMF ¶¶4, 30.

MEG was a commercial enterprise carried on for profit or gain, and its business model was predicated on obtaining shares from the microcap companies (hereinafter, "Issuers") at a discount and selling the shares in the market at a profit. PSMF ¶¶5, 23. MEG obtained shares by purchasing "aged debt"[1] from the Issuers' debtholders and entering into certain agreements granting MEG the right to convert the debt into common stock of the Issuers at a significant discount—most often 50 percent—to then-prevailing market prices. PSMF ¶¶6, 24. MEG specifically purchased aged debt, which allowed MEG to obtain shares that upon conversion of the debt were unrestricted—such shares were exempt from the registration requirements of the Securities Act under SEC Rule 144 when sold into the market. PSMF ¶¶7-8. MEG simultaneously obtained convertible debentures or convertible notes ("convertible debentures") from the Issuers whose debt MEG had agreed to purchase, which gave MEG the right to convert the convertible debentures, or any portion of them, into discounted shares of the Issuer. PSMF ¶12. Almagarby, on behalf of MEG, subsequently converted the convertible debentures into shares of the Issuers. PSMF ¶13.

Defendants did not have any employees, nor did they advertise or otherwise hold themselves out publicly to buy or sell securities. DSMF ¶29. However, MEG entered into written contracts and informal arrangements with a number of persons who acted as "finders" by identifying, contacting, and referring Issuers with aged debt and were willing to assign some portion of their debt to MEG through the issuance of discounted shares to MEG. PSMF ¶31; DSMF ¶19. Finders were compensated based on a percentage of the amount MEG paid for the aged debt it acquired as a result of the referral; compensation was typically in the form of advancements. PSMF ¶¶32, 37. During the relevant period, MEG paid the most total compensation to a finder named Anthony Fusco of Bridgewater Capital LLC ("Fusco"). PSMF ¶33. Fusco was "a large part of the business." PSMF ¶36. Fusco engaged sub-contractors who would contact Issuers with debt on their balance sheet in an effort to find referrals for MEG. PSMF ¶35. Each of Fusco's sub-contractors typically called between 40 and

---

[1] "Aged debt," was debt that was either six months or one year old, depending on the particular exemption sought from the registration provisions of the Securities Act of 1933. DSMF ¶7.

60 companies per day in attempting to find referrals for MEG. PSMF ¶35. Once Fusco, and others like him, referred an Issuer to MEG, Almagarby contacted the Issuers and negotiated the terms of a convertible debenture, including the interest rate of the debt, and the discount at which MEG would be entitled to convert the debt into shares of the Issuer. PSMF ¶40.

Upon receipt of a conversion notice, the Issuers would arrange for their transfer agents to deposit the requested shares into one of MEG's brokerage accounts. PSMF ¶14. MEG had no fewer than six brokerage accounts in its own name, into which it received deposits of shares from the Issuers that had executed convertible debentures to MEG. PSMF ¶17. Following the deposit of the shares into MEG's brokerage accounts, MEG brokers sold the shares into the market pursuant to Almagarby's instructions. PSMF ¶15.

Defendants typically sold the shares they acquired very quickly. PSMF ¶45. Almagarby converted most of the convertible debentures that MEG received during the relevant period into shares within ten trading days of receiving the convertible debenture from the Issuer. PSMF ¶44. Further, MEG, more often than not, sold all the shares in a given deposit within 7 to 14 days from receipt. PSMF ¶45. Almagarby did not conduct research on the companies whose shares he acquired because his stated goal was to "turn [his] money around as fast as possible." PSMF ¶43.

During the relevant period, Defendants engaged in at least 57 purchases of aged debt from the debtholders of at least 38 different Issuers. PSMF ¶11. MEG received deposits of shares into its brokerage accounts on no fewer than 167 occasions as a result of issuing conversion or reset notices. PSMF ¶¶19, 45. MEG completed no fewer than 962 sales of shares. PSMF ¶21. MEG received approximately 8.5 billion shares, and the total number of shares MEG sold during this period exceeded 7.6 billion. PSMF ¶20. MEG purchased no less than approximately $1,115,000 of outstanding debt from the Issuers and obtained more than $2.8 million in proceeds from selling shares obtained pursuant to the convertible debentures and related documents. PSMF ¶22. MEG used the proceeds from the sales of the shares to fund additional purchases of aged debt. PSMF ¶28.

## II.   LEGAL STANDARD

Summary judgment "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) (quoting Fed. R. Civ. P. 56(c)) (internal quotations omitted); *Damon v. Fleming Supermarkets of Florida, Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). Thus, the entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id*.

Rule 56 "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted).

"A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon*, 196 F.3d at 1358. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)). When deciding whether summary judgment is appropriate, "the evidence, and all inferences drawn from the facts, must be viewed in the light most favorable to the non-moving party." *Bush v. Houston County Commission*, 414 F. App'x 264, 266 (11th Cir. 2011).

### III.   DISCUSSION

#### A. Statute of Limitations

On November 17, 2017, the SEC initiated this action against defendants alleging that Defendants engaged in transactions in violation of Section 15(a)(1) of the Exchange Act between January 2013 and July 2016. Defendants assert that the SEC's claims for disgorgement

4

are barred by the applicable statute of limitations because the SEC failed to commence this action within five years from the date when the claim "first accrued." Invoking the five-year statute of limitations in Section 2462, Defendants argue that violations of the sort at issue here first accrue when it comes into existence or "when the plaintiff has a complete and present cause of action." Citing *Gabelli v. SEC*, 568 U.S. 442, 454 (2013). In Defendants view, the claims first accrued in January 2013, when Defendants first began the business. The SEC contends that the statute of limitations does not bar the SEC's disgorgement claim because a claim is timely if "any act that is part of the claim occurred within the statute of limitations." Citing *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002). The SEC further contends that the aged debt transactions were an ongoing series of violations and that the Court is required to evaluate the cumulative effect of the transactions. As such, the fact that the conduct at issue began more than five years before the complaint was filed does not preclude the SEC from seeking disgorgement.

The SEC relies on *Birkelbach v. SEC*, 751 F.3d 472 (D.C. Cir. 2014). There, the president of a brokerage firm challenged the SEC's finding that he had failed to properly supervise a registered representative who had churned a customer's account. On appeal, Birkelbach claimed that the statute of limitations barred the disciplinary proceeding, arguing "the failure to supervise [the registered representative] was a single indivisible act which accrued on the day of the first failure to supervise and the fact that it continued thereafter is irrelevant for purposes of the statute of limitations." *Id.* at 479. In rejecting that defense, the court opined, "any violative conduct that falls within the statute of limitations is independently sanctionable, regardless of whether there was additional violative conduct which occurred before that time." *Id.* at 479. *See also, United States v. Spectrum Brands, Inc.,* 924 F.3d 337, 352 (7th Cir. 2019) ("it is clear that the nature of [defendant's] wrongdoing cannot logically be confined to one point in time but must be seen as a continuing wrong.")

The continuing violation doctrine is aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time. Here, at least some the violative conduct occurred within the limitations period. And a decision as to whether Defendants acted as dealers will require an evaluation of the totality of Defendants' conduct. Because some of that conduct occurred within the limitations period, the statute of limitations does not bar the SEC's disgorgement claim. *United States v. Spectrum*

*Brands, Inc.*, 924 F.3d 337, 350 (7th Cir. 2019) ("where the violation at issue can be characterized as a continuing wrong, the limitations period begins to run *not* when an action on the violation could first be brought, but when the course of illegal conduct is complete."); *Taylor v. Meirick*, 712 F.2d 1112, 1118 (7th Cir. 1983) ("the statute of limitations does not begin to run on a continuing wrong till the wrong is over and done with").

Defendants reliance on the Supreme Court's decision in *Gabelli* is inapposite because that case evaluated the application of the discovery rule to the statute of limitations of Section 2462, which is not at issue here. There, the Supreme Court held that the federal government could not claim the benefit of the discovery rule because the Supreme Court found no "textual, historical, or equitable reasons to graft a discovery rule onto the statute of limitations of §2462." The SEC in this case is not arguing that the statute of limitations should be extended until it had reason to know of Defendants' failure to comply with Section 15(b). Instead, the SEC is arguing that Defendants' failure to comply with Section 15(b) with respect to the aged transactions was a continuing violation. *Gabelli* sheds no light on whether a Defendants' violation of Section 15(b), amounts to a continuing violation.

In sum, the SEC's complaint is not barred pursuant to the continuing violation doctrine.

### B. Defendants Acted As Unregistered Dealers Not Exempt from the Registration Requirements of the Exchange Act

The complaint charges Defendants with violating Section 15(a) of the Exchange Act by acting as unregistered securities dealers. Defendants contend that they were acting outside the scope of the definition of a "dealer," because their conduct was that of a "trader," which is excluded from the registration requirements of the SEC.

Section 15(a) makes it unlawful for, *inter alia*, for an unregistered dealer to purchase or sell securities. Section 3(a)(5)(A) of the Exchange Act defines dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." Section 3(a)(5)(B) excludes from the definition of dealer any "person that buys and sells securities . . . for such person's own account, either individually or in a fiduciary capacity, but not as part of a regular business." This statutory exception from the definition of dealer is typically referred to as the trader exception. Section 3(a)(5) does not enumerate any specific activities that separate a dealer from a trader; when read together, the two subsections of the statute simply provide that those who buy and sell securities as part of a "regular business" must register with the Commission as securities dealers.

This case turns on whether Defendants engaged in the "business of" buying and selling securities for its own account. The word business is defined as "[a] commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for *livelihood* or *gain*." Black's Law Dictionary 239 (10th ed.2009)

The Eleventh Circuit's decision in *Big Apple* guides this analysis. *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015). There, the Eleventh Circuit upheld a decision granting summary judgment based in part on the definition of dealer under the Exchange Act.2 *Id.* at 809-10. Affirming the district court's finding that the entities were dealers, the appellate court wrote "the centerpiece to [the definition of dealer] is the word 'business,'" and found that where a company's business model is based entirely on the purchase and sale of securities, that fact constitutes conclusive proof that the company is a dealer:

> While evidence of merely some profits from buying and selling securities may alone be inconclusive proof, the defendants' entire business model was predicated on the purchase and sale of securities. [The defendants] depended on acquiring client stock to support operations and earn a profit… As further evidence of their dealer status, [the defendants] purchased [an issuer's] stocks at deep discounts pursuant to its contractual agreement with [the issuer] and then sold those stocks for profit.

*Id.*

It is undisputed that Defendants purchased securities from Issuers at deep discounts and sold them back on the market for profit. By Defendants' own admissions, MEG's entire business model was predicated on the quick sale of shares and Defendant Almagarby's stated goal was to "turn [his] money around as fast as possible." PSMF ¶43. Further, the sheer volume of the number of deals and the large sums of profit Defendants generated—no fewer than 962 sales of shares and more than $2.8 million in proceeds—gives credence to the proposition that Defendants were engaged in the "business" of buying and selling securities. *SEC v. Ridenour*, 913 F.2d 515, 517 (8th Cir. 1990), (defendant "was a dealer because his 'high level of activity . . . made him more than an active investor'.") Defendants even went so far as employing and paying "finders" who were in the business of soliciting referral companies for Defendants' pecuniary benefit. Taken together, it is indisputable that Defendants were "in the business of. . .buying [and] selling securities. . . ." and, therefore, they do not meet the § 4(1) exemption to the registration requirement. *SEC v. Offill*, Case No. 3:07-CV-1643-D, 2012 WL

246061 at *8-9 (N.D. Tex. Jan. 26, 2012) (granting summary judgment on a Section 15(a) claim for failure to register and holding that the defendant "bought and sold securities as part of his regular business, making him a dealer under 15 U.S.C. § 78c(a)(5)")

Defendants cite various factors and activities identified in previous SEC releases or SEC staff no-action letters as "[e]vidence of those activities are required for the SEC to prove that Defendants were engaged in the business of buying and selling as part of a regular business, and the absence of any such evidence warrants finding summary judgment in favor of Defendants." The Court disagrees. The factors listed are merely examples of activity or actions that might render one a dealer. There is nothing in any of the cited releases or no-action letters that implies that the listed factors are an exclusive or exhaustive checklist that creates a burden of proof for the SEC. Moreover, SEC no-action letters are not binding pieces of legislation, rather they are "informal advice given by members of the Commission's staff" that "state with respect to a specific proposed transaction that the staff will not recommend to the Commission that it take enforcement action if the transaction is consummated exactly as it has been described." Request for Comments on Whether Staff Interpretative and No-Action Letters Should Be Made Available to the Public, SEC Rel. Nos. 229 & 253, 1968 WL 86742 at *1 (Sept. 20, 1968). They are "not rulings of the Commission or its staff on questions of law or fact and are not dispositive of the legal issues raised as to the applicability of the federal securities laws to a given transaction." Monthly Publication of a List of Significant Letters Issued by the Division of Corporation Finance, SEC Rel. No. 430, 1976 WL 160377 at *1 (Mar. 17, 1976).

### C. Almagarby Is Liable For MEG's Violation As A Control Person

The SEC has asserted a claim against Mr. Almagarby for control person liability under Section 20 of the Exchange Act based on MEG's alleged violation of Section 15(a).

Under Section 20(a) of the Exchange Act, a controlling person is liable jointly and severally with and to the same extent as the controlled person for the controlled person's acts, unless the controlling person can establish the affirmative defense of good faith and non-inducement. *Laperrier v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir. 2008). "Control" means the "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405. Section 20(a) violations require a primary violation and that the party "had the power to control the general affairs of the entity primarily

8

liable at the time the entity violated the securities laws…[and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in primary liability. *Brown v. Enstar Group, Inc.*, 84 F.3d 393, 397 (11th Cir. 1996).

MEG directly violated Section 15(a)(1) by its conduct, and Almagarby had the power to control the general affairs of MEG at the time it committed its violations and, further, he possessed the power to directly or indirectly control or influence MEG's specific policies which resulted in its primary liability. Control person liability for Almagarby is therefore warranted as a matter of law.

### D. Injunctive Relief Is Warranted

The SEC has requested that this Court enter a permanent injunction, enjoining Defendants and their purported "agents, servants, employees, attorneys, and all persons in active concert or participation with [them]. . . from acting as an unregistered dealer in violation of Exchange Act Section 15(a)(1)." Defendants have asserted as affirmative defenses that an injunction and a penny stock bar would be inappropriate. Specifically, Defendants argue that no injunction can be awarded because Defendants have voluntarily ceased the conduct at issue, and thus there is no risk of future misconduct.

Courts have routinely rejected Defendants' argument. *See, e.g.,* S*EC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982) ("this circuit has stated that assertions on the part of the defendant that he would cease his wrongful conduct are by no means dispositive."). *See also SEC v. Ginsburg*, 362 F3d 1292, 1305 (11th Cir. 2004); *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1101 (2d Cir. 1972) ("cessation of illegal activities in contemplation of an SEC suit does not preclude the issuance of an injunction enjoining violations"). This is because, absent an injunction, there is little to stop Defendants from resuming their unlawful activity.

## IV.   CONCLUSION

For the foregoing reasons, it is **ORDERED and ADJUDGED** that the SEC's motion for summary judgment, ECF No. 73, is **GRANTED**. Defendants' cross-motion for summary judgment, ECF No. 74, is **DENIED**.

**DONE and ORDERED** in chambers at Miami, Florida, this 17th day of August 2020.

_____
MARCIA G. COOKE
United States District Judge

Copies furnished to:
*Patrick M. Hunt, U.S. Magistrate Judge*
*Counsel of record*